UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                      :

ESPIRITU SANTO HOLDINGS, LP,        :
                                        :

                      Petitioner,    :
                                        :

   -against-                     :    No.
                                        :

L1BERO PARTNERS, LP,           :
                                        :

   and                             :
                                        :

ESPIRITU SANTO TECHNOLOGIES, LLC    :
                                        :

                  Respondents.   :
                                        :
---------------------------------------------------------------x

## EMERGENCY PETITION FOR
## INJUNCTIVE RELIEF IN AID OF ARBITRATION

      Petitioner Espiritu Santo Holdings, LP ("ES Holdings" or "Petitioner"), as and for its Petition for Injunctive Relief in Aid of Arbitration (the "Petition"), pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure (the "FRCP"), Section 7502(c) of the New York Civil Practice Law and Rules (the "CPLR"), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208 (the "Convention")), against respondents L1bero Partners, LP ("L1bero Partners"), and Espiritu Santo Technologies, LLC ("ES Technologies," and, together with L1bero Partners, "Respondents"), alleges, on knowledge as to its own acts and on information and belief as to all other matters, as follows:

## Nature of Proceeding

      1.    This proceeding arises out of an egregious case of corporate fraud and malfeasance: Respondents' attempt to steal a billion-dollar business—its funds, its technology, its intellectual property, its goodwill, and its know-how—from its founders. This Court's

intervention is required to restore the *status quo* and prevent any further irreparable harm by Respondents until their misconduct can be addressed in arbitration.

2.       Petitioner and L1bero Partners are equal investors, with equal control, in ES Technologies; their relationship is defined by a Partners Agreement (the "Partners Agreement" or "Agreement").[1]  This agreement was crafted to allow the partners, through ES Technologies and its subsidiaries, to jointly control Servicios Digitales Lusad, S. de R.L. de C.V., a Mexican company that, with its affiliates (collectively, "Lusad"), operates a valuable concession from the Mexico City government for the replacement, installation, and maintenance of the taximeters in the city's 138,000 taxis.  The physical taximeters are the product of Petitioner's research, investment, and ingenuity; they include a satellite geo-localization system, smart maps, centralized tracking, safety and security features, announcements and publicity capabilities including advertising, as well as the ability for remote taxi hailing, all of which make Mexico City's taxis safer, more efficient, and more profitable.

3.       Respondents, however, are not satisfied with joint control over ES Technologies and Lusad, as provided for in the Partners Agreement.  Instead, Respondents have—in blatant violation of this Partners Agreement—engaged in numerous forms of self-dealing.  When Petitioner called Respondents on this illicit conduct, Respondents took steps to seize sole control of Lusad, and embarked on a program to misappropriate its assets for themselves (including its valuable taximeter technology and associated trade secrets) so that they can obtain new taxi concessions, by means of new entities they control that wrongfully compete with the partnership, in violation of the Partners Agreement.  In doing so, Respondents have committed numerous fraudulent acts, including the filing of false criminal charges with Mexican authorities; they have

---

[1]       A true and correct copy of the Partners Agreement is annexed as Exhibit 1 to the Declaration of Santiago León Aveleyra, dated April 30, 2019 (the "León Decl."), and submitted herewith.

denied Petitioner its contractual right to review the business records of ES Technologies and Lusad; they have abused Lusad by using it to engage in numerous other actions without Petitioner's consent, including the filing of a notice of controversy against Mexico pursuant to the North American Free Trade Agreement ("NAFTA") against Mexico—all of which acts are *ultra vires*.

4.       The Partners Agreement requires disputes thereunder to be resolved by the International Court of Arbitration of the International Chamber of Commerce; accordingly, Petitioner commenced that proceeding (the "ICC Arbitration") on May 1, 2019.  ES Holdings is requesting from the ICC tribunal a declaration that Respondents' illicit seizure of the partnership's business has breached the Partners Agreement by, *inter alia*: misappropriating partnership assets, violating the Partners Agreement's non-competition provisions, prohibiting joint control in the company and its subsidiaries, and usurping corporate opportunities that rightly belong to the partnership.  ES Holdings seeks a permanent prohibition preventing Respondents from taking acts against the interest of the partnership and in contravention of the joint control established by the Partners Agreement.  ES Holdings also seeks money damages for those wrongs to the extent they can be quantified.

5.       To the degree that any of the ICC Arbitration claims are considered to be derivative, Petitioners alternatively have requested that the ICC tribunal consider the claims as derivative on behalf of ES Technologies and its 100%-owned downstream entities against L1bero Partners.  Petitioners make the same request to this Court.  Any demand for ES Technologies to bring claims against L1bero Partners would be futile given the circumstances described herein.

6.     Through this Petition, ES Holdings seeks a temporary restraining order and preliminary injunction restoring and thereafter maintaining the *status quo* and preventing any further irreparable harm by Respondents pending the ICC Arbitration.   More specifically, Petitioner requests an order to preclude further irreparable harm being caused by: (a) Respondents' prohibited competition in violation of the Partners Agreement through the creation of new unaffiliated companies; and (b) Respondents' actions in misappropriating ES Holdings' equal share of the partnership's valuable intellectual property, trademark, and technology in seeking new concessions without ES Holdings' consent or participation.

7.     Petitioner will make the same requests of the ICC tribunal that hears the ICC Arbitration, as soon as it is consummated.  But time is of the essence.  Respondents are, at this very moment, pilfering the partnership's valuable assets for their own benefit, and engaging in prohibited competition with the partnership, causing injury that cannot be fully compensated, and otherwise are causing irreparable harm and threatening further immeasurable injury.   In particular, Respondents are poised to illegitimately bid on—and win—a taxi concession in the Mexican city of Monterrey, using Lusad's technology and other confidential information, via a separate company that Respondents promised would be brought into the partnership (before reneging on that promise).  Bidding on that concession is open now, and closes later this month; Respondents can and should be barred from seizing this opportunity and others in violation of the Partners Agreement.

**The Parties**

8.     ES Holdings is a limited partnership organized under the laws of the province of Alberta, Canada, with its principal place of business in Missouri, Texas.  ES Holdings is represented and managed by Santiago León Aveleyra ("León") and Eduardo Zayas Dueñas ("Zayas") on behalf of a close group of investors.

9.      L1bero Partners is a limited partnership organized under the laws of the province of Alberta, Canada, with its principal place of business in Houston, Texas.  L1bero Partners is indirectly owned and controlled by well-known Mexican businessmen Ricardo Salinas ("Salinas") and Fabio Covarrubias ("Covarrubias").

10.     ES Technologies is a limited liability company organized under the laws of the State of Delaware with its principal office in Miami, Florida.  ES Technologies is owned equally by ES Holdings and L1bero Partners.  ES Technologies' operations are governed by the Partners Agreement entered into between the parties on or about December 6, 2017.  Pursuant to the Partners Agreement, the Chief Executive Officer of ES Technologies is Mr. Covarrubias.

## Jurisdiction and Venue

11.     The Court has jurisdiction to enter the requested relief pursuant to the Convention.  *See* 9 U.S.C. §§ 203, 206.  The Convention states:  "An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding . . . ." *Id.* at § 203.  A request for injunctive relief in aid of an arbitral agreement that would otherwise fall under the Convention is "an action or proceeding falling under the Convention," and this Court thus has subject-matter jurisdiction.  *See Borden, Inc. v. Meiji Milk Prods. Co., Ltd.*, 919 F.2d 822, 826 (2d Cir. 1990) (holding that "entertaining an application for a preliminary injunction in aid of arbitration is consistent with the court's powers pursuant to § 206"); *Venconsul N.V. v. Tim Intern. N.V.*, No. 03CIV.5387, 2003 WL 21804833, at *3 (S.D.N.Y. Aug. 6, 2003) ("*Borden* has been interpreted as recognizing a court's power to entertain requests for provisional remedies in aid of arbitration even where the request for remedies does not accompany a motion to compel arbitration or to confirm an award."); *Rogers, Burgun, Shahine & Deschler, Inc. v. Dongsan Constr. Co.*, 598 F. Supp. 754, 758 (S.D.N.Y.

1984) ("The fact that this dispute is to be arbitrated [in Paris under the rules of the ICC] does not deprive the Court of its authority to provide provisional remedies," such as a preliminary injunction).  The Partners Agreement "falls under the Convention," 9 U.S.C. § 202, because it is an "arbitration agreement . . . arising out of a legal relationship  . . . which is considered as commercial" and not "entirely between citizens of the United States."  *Id.*; Partners Agreement § 12.

12.     The Court has personal jurisdiction over Respondents because they consented to the jurisdiction of this Court "to issue a pre-arbitral injunction, pre-arbitral attachment or other temporary or interim order in aid of arbitration proceedings."  Partners Agreement § 12(c).

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Respondents are subject to the Court's personal jurisdiction, Respondents consented to the jurisdiction of this Court, and the Agreement specifies that the Arbitration will take place in New York City, New York.  *Id.*

### Factual Background

#### A.     The Mexico City Taximeter Concession

14.     There are approximately 138,000 registered taxis in Mexico City that, every day, account for approximately 2.7 million taxi trips.  This fleet is equipped with technologically obsolete equipment that is inefficient for service optimization.  Mexico City's taxi fleet cannot be hailed from smart-phone applications or paid for with credit cards like the applications now commonly used by ridesharing companies such as Uber and Lyft.  Many of the taxis' fare-calculation systems are inaccurate and lack geolocation or safety features.

15.     Understanding these shortcomings, León and Zayas began to develop digital taximeter and hailing technologies specifically for use, at least initially, in Mexico City.  They recruited and built a team that included senior managers formerly from companies like Uber and

Apple.  They created and registered the "L1bre" tradename and associated trademarks for the system.  They also developed the overall technology and related software.  In October 2015, they incorporated an operating company in Mexico that they named Servicios Digitales Lusad, S. de R.L. de C.V., or "Lusad."

16.    León and Zayas, through Lusad, then approached the Mexico City Secretariat of Mobility (*Secretaría de Movilidad*, commonly referred to as "Semovi") in order to explain and promote the benefits of the system they were developing.  Mexico City's representatives explained that the technology was appropriate and necessary, but that Semovi would have to put such a project out for public bid.

17.    Accordingly, in or around May 2016, Semovi published in the *Mexico City Official Gazette* a declaration of need for the replacement, installation, and maintenance of the city's taxi fleet taximeters, to include a satellite geo-localization system, smart maps, centralized tracking, safety and security features, announcements and publicity capabilities, including advertising, as well as the ability for remote taxi hailing.

18.    Eight companies, including Lusad, submitted bid packages.  Lusad was, however, the only bidder that—because of its extensive work in the field and product development— submitted a bid that fully complied with Semovi's bidding specifications and requirements.  Accordingly, on June, 17, 2016, Semovi's adjudication committee granted the concession to Lusad for the substitution, installation, and maintenance of these new taximeters and related application technology.

**B.    León and Zayas Seek Investors**

19.    In developing this winning technology, ES Holdings deployed US $40 million of its own capital, but more was needed.  Rather than continue to fund the enterprise themselves,

and with the concession in hand, León and Zayas sought external capital and financing necessary to finalize the technology, manufacture the taximeters, and further develop the L1bre project. Eventually, they met with Salinas and Covarrubias, who quickly came to understand the value of the technology, concession, as well as the upside potential of this investment.

20.     Salinas and Covarrubias, on the one hand, and ES Holdings on the other, then negotiated the terms of the investment along with the overall structure of how the business would be organized.  In sum, the parties agreed that Salinas and Covarrubias, through their affiliated companies, would acquire 50% of the business in exchange for US $5 million in cash, a US $20 million intercompany loan, and Salinas' commitment to obtain a US $90 million line of credit for working capital from Salinas' bank, Banco Azteca.

21.     To effectuate the agreement, the parties used ES Technologies, which was then 100% owned by ES Holdings, and agreed to transfer 50% of the voting units of ES Technologies to Salinas and Covarrubias to hold through their company, L1bero Partners.  ES Technologies, through two other entities—L1bre Holding and L1bre LLC (each 100% owned by ES Technologies)[2]—was the 100% indirect owner of Lusad and the concession.  After the negotiations were finalized, on November 23, 2017, the parties entered into a Unit Purchase Agreement.

C.     **The Parties Join Forces Through The Unit Purchase Agreement and The Partners Agreement**

22.     In the Unit Purchase Agreement, the parties formally agreed both to the transfer of 50% of ES Technologies to Salinas and Covarrubias' company, L1bero Partners, and that they would enter into a separate Partners Agreement that would, among other provisions, amend the LLC agreement of ES Technologies and further define the parties' rights, duties, and obligations.

---

[2]     L1bre Holding owns 99.9% of Lusad and L1bre LLC owns the remaining 0.01%.

Much of this holding structure was complex, but the parties understood that this was the most beneficial structure for tax and other legitimate business purposes. Accordingly, as a result of the Unit Purchase Agreement, the following ownership and ultimate control structure was created for the L1bre project:



23.     Approximately two weeks after entering into the Unit Purchase Agreement, on December 6, 2017, the parties executed the Partners Agreement. The Partners Agreement provides that its purpose is "to govern the relation between [L1bero Partners and ES Holdings] as partners of [ES Technologies or the "Company"]." Again, ES Technologies was, through L1bre Holding and L1bre LLC, the 100% indirect owner of the concessionaire, Lusad.

24.     The Partners Agreement included the following express terms and provisions:

(i)     Each partner agreed they would be 50/50 owners of the Company and that the partners may not sell or transfer their ownership interests until after a "Lock-Up Period" of three years. *See* Partners Agreement §§ 3.1, 5.4.

(ii)     L1bero Partners will lend the Company US $10,000,000 to pay the purchase price of units as provided in the Unit Purchase Agreement dated October 13, 2017, and another US $10,000,000 for the Company to pay all accounts payable owed to third-party vendors. *Id.* §§ 4.1(a)(i)-(ii).

(iii)    L1bero Partners will use its "best efforts" to cause Banco Azteca to grant a line of credit for working capital purposes for up to US $90,000,000. *Id.* *Id.* §§ 4.1(a)(vi).

(iv)     All partners shall be "jointly responsible" for the day-to-day operations of L1bre and Lusad, and responsible for exploring new business opportunities in which services similar to those contemplated in the concession may be performed. *Id.* § 4.2.

(v)      Each partner shall appoint two directors to the Company.  The Chairman shall be rotated every year.  The board shall have the ultimate power to make decisions for the Company on material matters and each director shall have one vote, with any resolutions having to be approved by a majority of three directors, and "Major Decisions" having to be approved by unanimous consent.  These Major Decisions are described in more detail in Paragraph 25 below. *Id.* §§ 5.1, 5.2

(vi)     At the first board meeting, L1bero Partners is entitled to appoint the first Chief Executive Officer and Chief Financial Officer, with ES Holdings to appoint the Chief Operating Officer and Chief Technology Officer. *Id.* § 5.1(b).

(vii)    *Importantly*, the parties agreed that this composition and structure would be "replicated in the other Company's Affiliates and in any new affiliates or subsidiaries that may be incorporated as part of the Company's expansion of its business operations."  Accordingly, the parties expressly agreed that the concessionaire, Lusad, would always be under the 50/50 joint control of two partners. *Id.* § 5.1(b).

(viii)   If the board is deadlocked on a major decision, the business of the Company and its Affiliates will "stop immediately" and an independent reputable international investment bank will be appointed by the Partners at the cost of the Company to value the Company. *Id.* § 5.3.

(ix)     The Company shall keep full, complete and accurate books of account and records, including financial statements. *Id.* § 8.1

(x)      Each Partner may examine, at any time, during normal business hours, the books of account, records, vouchers, contracts and documents of any kind of the Company, L1bre LLC, and Lusad. *Id.* § 8.3.

(xi)    The Partners and their affiliates shall use Confidential Information only for the purposes specified in the Agreement and shall not disclose to "third Partners (sic)" without prior written consent.  *Id.* § 11(a).

(xii)   The Partners agreed not to compete and not to intervene directly or indirectly in "any activities similar to the ones performed by the Company and the Company's Affiliates."  *Id.* §§ 11(d)-(e).

25.    As stated above, the full board of all four members must approve all Major Decisions, as defined by the Partners Agreement.  These Major Decisions include any decisions regarding:

(e) Pledge, mortgage or otherwise encumber any material assets of the company . . . .

(h) The entry by the Company or by any of the Company's Affiliates into any partnership, joint venture, or other profit sharing arrangement with a third party . . . .

(j) The Company's annual Business Plan and/or Annual Budget . . . .

(n) The granting of powers of attorney by the Company or by any of the Company's Affiliates and the exercise and execution of any acts thereof . . . .

(m) Any transaction or series of transactions . . . which are not provided in the annual Business Plan and/or the Annual Budget . . . .

(p) The amendment to the Lusad Concession by . . . Lusad, or its termination, suspension, assignment, encumbrance, relinquish[ment] or abandonment by any means. . . .

(u) The exercise of any corporate or voting rights issued by the Company's Affiliates and the designation of any proxy or representative authorized to vote and approve any of the acts [described as Major Decisions] by each of the Company's Affiliates.

*See id.* § 5.2.

**D.     The Partnership Proceeds to Spend $100 Million in Further
         Developing the L1bre System**

26.     For about the next year, the partnership appeared to proceed well.  The partners

invested over $100 million developing the software, purchasing the hardware, and gearing up the

installation facilities to install the L1bre system into over 138,000 Mexico City taxis.  The

concession allowed Lusad to install the taximeters in the entire existing Mexico City taxi fleet

and receive trip-based compensation as well as advertising and other revenue streams.

27.     So promising was the concession and its potential future that a major investment

bank conservatively valued the concession, and therefore the business, as being worth over $2.4

billion until 2024 only, without valuing:  the remaining years of the ten-year concession; the fact

that it includes at least one renewal option for an additional ten-years; or the application of the

business model to additional cities around the world.  Indeed, in December 2018, L1bre was

invited to participate in a panel discussion at the United Nations in New York regarding

sustainable development in Latin America.  León attended and spoke on the company's behalf.

28.     Regrettably, however, rather than celebrating the company's success,

Respondents instead conspired first to engage in self-dealing and then to fraudulently seize the

entire business for themselves.

**E.     Reports of Self-Dealing and Defalcation**

29.     León and Zayas had initially appointed Manuel Tabuenca ("Tabuenca"), a former

high-level employee at Uber, as Chief Financial Officer of Lusad, but Salinas and Covarrubias

demoted Tabuenca into a day-to-day operations function and removed his full access to the

company's financial information.  In or around October 2018, Tabuenca informed León and

Zayas that L1bero Partners' representatives were unlawfully siphoning funds from the

company's bank accounts for non-company related expenses.  Tabuenca provided an extensive

list of improper actions occurring at the direction of and for the benefit of Salinas, Covarrubias, and/or their related companies.   Specifically, among other improprieties, León and Zayas discovered the following:

    a. As Chief Executive Officer of Lusad, Covarrubias staffed the company for his own benefit, not for the benefit of the company.  Specifically, of a total of 37 employees, only 14 worked exclusively on Lusad's operation, and the remaining 23 employees were hired by Covarrubias to work for his other businesses, including one named Inversiones COVA, S.A. de C.V. ("Inversiones COVA"), while being paid by Lusad.  Notably, these employees included Covarrubias' son, brother in law, one of his close friends, and the wife of that friend.

    b. The very same day that Lusad received the US $10,000,000 to pay the Intercompany Loans for the operation of the concession, as provided in the Partners Agreement, Lusad (under the direction of Salinas and Covarrubias) defalcated and transferred to Inversiones COVA (Covarrubias' company) amounts totaling almost US $8.7 million.

    c. Salinas and Covarrubias breached the non-compete agreement provided in the Partners Agreement, pursuant to which L1bero Partners cannot intervene or participate directly or indirectly in "any activities similar to the ones performed by the Company and the Company's Affiliates."  Only five months after the Partners Agreement was executed, Salinas and Covarrubias, acting through third parties they controlled, incorporated  a separate company under the name of L1BRE Jalisco, appointing Covarrubias' son (Diego Julio Covarrubias Trascierra) and Covarrubias' lawyer (Francisco José Flores) as representatives of the company.   Covarrubias then approached Jalisco's government, through this separate company, to offer the company's L1bre system for Jalisco's taxi fleet.  Salinas and Covarrubias did the same thing in the Mexican city of Monterrey by offering the L1bre technology to that city for their own benefit and not the company's benefit.  Not only did they not consult with León and Zayas, but they actively concealed their involvement with both of these cities.

    d. Salinas and Covarrubias caused the fraudulent transfer of significant corporate funds to purported vendors of Lusad, which in reality were entities owned and/or controlled by Salinas or Covarrubias, and which had provided no goods or services to Lusad.  Pursuant to Covarrubias' instructions, Lusad paid over US $500,000 to a company named Cubeice Consultores de Negocios, S.C., which is owned through a series of intermediaries by Covarrubias' son.  Similarly, Covarrubias caused Lusad to pay over US $290,000 to a company named MOOK, S.A.P.I de CV, which is also owned by Covarrubias' son.  In addition, Covarrubias instructed Lusad to pay US $34,000 to a Belgian

company named Vistra Corporate Services, which then transferred the funds to Fama Properties Ltd., a company owned and controlled by Covarrubias.

e. Salinas and Covarrubias caused US $2.7 million dollars to be paid to two companies named Kichink Servicios, S.A. de C.V. and N9 Tecnología Mexico, S.A. de C.V.  Kichink and N9 were ostensibly to provide services to Lusad, however, there was no contract and no benefit was provided in exchange for these funds.

f. Salinas and Covarrubias caused Lusad to agree to pay almost US $1 million to a law firm, Villasante y Freyman, as payment for legal fees incurred for thirteen short *amparo* actions—a wildly inflated rate that no legitimate local law firm would have charged (and no company should have willingly paid).

g. Despite the 12-month "grace period" that the Partners Agreement required for repayment of the agreed intercompany loans provided by L1bero Partners, Salinas and Covarrubias caused Lusad to immediately pay back over US $2.2 million dollars to Covarrubias' companies.

h. Even though Lusad was a start-up company, Salinas and Covarrubias charged Lusad over US $200,000 to reimburse themselves for use of their private aircraft, which was neither necessary nor appropriate for the business. Directing and orchestrating the Respondents to conduct and permit these and the other forgoing defalcations was in breach of the Partners Agreement and the Respondents' fiduciary duties to the Petitioner.

i. Salinas and Covarrubias purchased tablets for the concession through Inversiones COVA for US $11,832,000 and subsequently resold the tablets to Lusad at the inflated price of US $12,058,675, causing Lusad to pay an unnecessary and unjustified markup of over US $200,000.

j. After siphoning funds from Lusad's bank accounts and placing the company in financial jeopardy, Salinas offered to provide a loan under abusive terms, including a 67% interest rate and collateral to include all of ES Technologies, L1bre Holding, and L1bre LLC's shares, as well as the concession rights, the IP rights over the technology, and any other asset held by ES Technologies or its 100%-owned downstream entities.

k. Finally, Tabuenca reported to León and Zayas that he had uncovered evidence that Lusad was maintaining two sets of books, one including many of the improper transactions described above, and one making no reference to those transactions.

30.    Upon receiving these reports, León met with Salinas, who feigned ignorance of this fraudulent conduct.  Accordingly, Salinas suggested convening a meeting of the board of

Lusad to hire an independent auditor to review the books and records of the company. León agreed to the suggestion. That board meeting took place on December 14, 2018, and the board agreed to a formal audit of Lusad to be performed by Deloitte, a "big-four" accounting firm. It was also agreed that L1bre Jalisco and L1bre Monterrey—entities wrongfully created by Salinas and Covarrubias to misappropriate ES Technologies' technology, business opportunities, and other assets—would be formally brought back under the control of the L1bre partnership. *See* León Decl., Ex. 3 (Unanimous Resolutions of the Board of Managers of Lusad, dated December 14, 2018).

### F.    Deloitte Begins its Work but Is then Removed and Accused of Theft

31.    Shortly after this board decision, in late December 2018, Deloitte began its work and arrived at Lusad's office to begin the audit. Lusad's employees, managed by Covarrubias, did not provide the company's books and records or cooperate with the audit in any way. Covarrubias' representative and lawyer, Francisco José Flores, then abruptly advised Deloitte that the audit was "no longer a priority." But one Lusad employee did provide Deloitte two Lusad laptop computers requested by Deloitte that contained the company's financial information.

32.    Upon learning that Deloitte had received this information (*i.e.* files that possibly contained the company's second set of books), Lusad, at the instruction of Covarrubias and his counsel, took the extraordinary step of filing a criminal complaint in Mexico City alleging that Deloitte stole the computers in a "robbery."

33.    This, of course, was an utter fabrication, done only to obstruct and prevent the investigation into Salinas and Covarrubias' self-dealing and defalcation. Nevertheless, Deloitte had no choice but to cease work on the audit in light of the baseless criminal action against it.

34.     For his part, Zayas truthfully reported to Mexican authorities that Deloitte had been authorized to review the computers in the context of the audit it was hired to perform by Lusad.  These events, however, became the pretextual basis that Salinas and Covarrubias would use to seize full control of the business.  Salinas and Covarrubias used Zayas' truthful report to the authorities to claim that he was complicit in the "robbery."  Thus, they falsely claimed Zayas was not acting in the company's interests.  Salinas and Covarrubias then undertook to remove both Zayas and León from the board of the company (Lusad) that they had co-founded and created, in violation of the Partners Agreement.

### G.     The Respondents Take Unilateral Control Over All the Downstream Entities

35.     After the Salinas and Covarrubias representatives falsely accused Deloitte and Zayas of theft, Salinas and Covarrubias then caused Lusad to file a civil action in Mexico against León and Zayas.  In that action, they requested that the court declare León and Zayas liable for acting against the interests of the company, and to have León and Zayas barred from taking any action on behalf of the board of Lusad.  *See* León Decl., Ex. 4 (Civil Complaint filed with the Superior Court of Justice of Mexico City, dated February 20, 2019).

36.     Based on the false information provided by Salinas and Covarrubias, on February 21, 2019, a Mexican court issued an *ex parte* temporary injunction, ostensibly to maintain the *status quo*.  Instead of maintaining any *status quo*, however, the injunction barred León and Zayas from making any decisions or otherwise acting on behalf of Lusad pending the trial and final decision, which provided Respondents sole control of the business.  *See* León Decl., Ex. 5 (Order of the Superior Court of Justice of Mexico City, dated February 21, 2019).

37.     On the very next day, Salinas and Covarrubias caused Lusad to call a sham meeting of the shareholders of Lusad, L1bre Holding and L1bre LLC.  Although these

companies were owned 100% by ES Technologies (and therefore the two partners), Covarrubias, as CEO of both L1bre LLC and L1bre Holding, unilaterally appointed all the representatives who would attend the sham shareholders meeting.  *See* León Decl., Ex. 6 (*Carta Poder* – Power to Represent executed by Covarrubias on behalf of L1bre Holding).

38.     At this sham shareholders meeting—and in violation of the Partners Agreement— Covarrubias' hand-picked representatives voted supposedly on behalf of all the shareholders to remove León and Zayas from the board of Lusad.  *See* León Decl., Ex. 7 (Shareholder Meeting Minutes, 22 February 2019).  This, again, contravened the Partners Agreement's requirement that the composition and structure of ES Technologies would be "replicated in the other Company's Affiliates" and that the concessionaire, Lusad, would always be under the 50/50 joint control of two partners.  *See* Partners Agreement §§ 5.1(a)-(b).

### I.     Respondents Have Allowed Salinas and Covarrubias to Seize All Control Including Corporate Funds and Technology, Refuse to Permit an Accounting, and are Attempting to Usurp the Partnership Assets

39.     In sum, Respondents, L1bero Holdings and ES Technologies, acting in concert, have allowed ES Technologies' 100%-owned subsidiaries to be seized by Salinas and Covarrubias, in breach of the Partners Agreement and controlling law.  Salinas and Covarrubias have now taken the partnership assets, including cash and inventory, and converted them to their own use.  They also have directed other companies that they control to compete with the partnership.  And they are continuing to operate the enterprise in a manner that is causing irreparable harm to Petitioner.

**J.     Respondents Are Now Jeopardizing the Concession**

40.     Having seized control of Lusad, Respondents are now attempting to appropriate the concession for their own benefit, leaving ES Holdings' 50% interest in ES Technologies effectively valueless, as the partnership will be unfunded and stripped of its core business opportunity without the concession.

41.     Having improperly seized control of the Lusad operating company, Salinas and Covarrubias are using it as their own personal slush fund, to make improper transfers like paying salaries of employees who work for other companies they control, arranging for and agreeing to insider vendors charging and being paid for work never performed, and they are claiming reimbursement for hours flown in their private jet aircraft.  They have pillaged the partnership's assets and the operating company's good will; they are emptying Lusad's bank accounts.

42.     Incredibly and again in breach of the Partners Agreement, Salinas and Covarrubias are now actively lobbying the Mexico City government to cause the concession to be issued to another company under their sole ownership and control.  Despite Petitioner's repeated request for a copy of ES Technologies' NAFTA notice, Respondents have refused to provide Petitioner a copy of this submission.  Of course, these actions are being taken without Petitioner's consent or agreement in express violation of the Partners Agreement.

43.     Additionally, Petitioner has been informed that Respondents unilaterally approved and allowed ES Technologies and L1bre to bring the NAFTA notice of controversy against Mexico without approval of their 50/50 partner.  Respondents should not have allowed that major decision to have been made without joint approval of the partners.

44.     This is all in addition to Salinas and Covarrubias having set up a competing business, L1bre Jalisco, to compete for the taximeter commission in Jalisco, and another to

compete in Monterrey.  Last month, the state agency responsible for the operation of taxis in Monterrey issued a press release announcing that bidding for that city's taximeter concession opens on May 2, 2019 and closes on May 15, 2019.  *See* León Decl., Ex. 8 (Public Bidding Announcement from the Transportation Agency of the State of Nuevo León, Mexico).  L1bre Monterrey intends to bid on that concession, whose requirements are designed to be met by a company with Lusad's technology and capabilities.  Because L1bre Monterrey is armed with the innovative taximeter technology and know-how that Petitioner created—trade secrets and proprietary information that are the property of the partnership—unless restrained, L1bre Monterrey will win that concession, by means of improper exploitation of intellectual property that belongs to the partnership.  This would constitute a gross violation of the Partners Agreement, stripping the partnership of its valuable rights and expressly depriving Petitioner of its rightful 50% interest in such a concession.

45.     By plundering the operating company, Lusad, and independently seeking the Mexico City concession as well as at least two others, Respondents have repeatedly violated fiduciary duties owed to their partner, and have systematically undermined and  jeopardized the viability of a partnership that was valued at billions of dollars.

46.     Any demand for ES Technologies to bring claims against L1bero Partners would be futile given the circumstances described above.

### Claim for Relief
### (Temporary Restraining Order and Preliminary Injunction in Aid of Arbitration)

47.     ES Holdings repeats and realleges each of the preceding paragraphs of the Petition as if fully set forth herein.

48.     Pursuant to 9 U.S.C. § 206 and Rule 65 of the FRCP, this Court may issue injunctions in aid of arbitration.  CPLR § 7502(c), which the Court may invoke pursuant to Rule

64 of the FRCP, also provides the authority to issue "a preliminary injunction in connection with an arbitrable controversy . . . upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."

49.     An injunction is warranted here, pursuant to 9 U.S.C. § 206, Rules 64 and 65 of the FRCP, and CPLR § 7502(c), in order to restore the *status quo*, prevent further irreparable injury to ES Holdings, and to prevent an award by the ICC tribunal from being rendered ineffectual.

50.     ES Holdings has a strong likelihood of success on the merits of the parties' dispute.  As described above, the Partners Agreement expressly provides that ES Holdings and L1bero Partners would be 50/50 shareholders with joint control of ES Technologies and that such composition and structure would be replicated in the affiliates and subsidiaries.  Further, under the clear terms of the Partners Agreement, all Major Decisions require approval of all four members of the board.  These decisions include such matters as the granting of powers of attorney and any amendment to the Lusad Concession by Lusad.  The Partners Agreement precludes such decisions from being made unilaterally by one partner.  By improperly stripping León and Zayas of their 50% partnership interest and rights in ES Technologies and the affiliated companies, Respondents have repeatedly and systematically violated the Partners Agreement.  In furtherance of this scheme of control, Respondents have engaged in theft of the company's intellectual and financial resources.

51.     In addition, ES Holdings is suffering irreparable harm in the absence of the requested relief, in at least four ways:

>      A.     First, Respondents have misappropriated the trade secrets developed by ES Holdings in violation of the Partners Agreement. León and Zayas

developed revolutionary technology to be installed in Mexico City's 138,000 taxis.  Now that ES Holdings has been illegally stripped of its rightful 50% control of ES Technologies and the affiliated companies, it has lost joint control of the L1bre trademark and intellectual property in the partnership, and the business plans developed to take advantage of these valuable assets.  This misappropriation of trade secrets constitutes irreparable injury.

B.   Second, Respondents have engaged in competitive actions in violation of the Partners Agreement.  Salinas and Covarrubias have created entities that directly complete with the partnership, including L1bre Jalisco.  These actions are in violation of the Partners Agreement and constitute irreparable injury.

52.     The balance of equities tips decidedly in ES Holdings' favor because of the lack of harm to L1bero Partners and ES Technologies if the requested relief is granted.  ES Holdings is only asking the Court to enforce the Partners Agreement and restore and maintain the *status quo* for a brief period of time until the ICC tribunal can rule on the issues presented in this petition.  Thus, an injunction here would do no harm to Respondents, but it would prevent ES Holdings from suffering further irreparable injury.

53.     Finally, injunctive relief here would serve the public interest.  There is a recognized public policy in favor of enforcing contractual arrangements and an even stronger public interest in protecting a person's intellectual property and trade secrets.

54.     Because of these violations, ES Holdings seeks an injunction restoring the *status quo* to that required by the plain terms of the Partners Agreement and preventing any further

breach of the Partners Agreement pending the outcome of the ICC Arbitration between the parties.

55.     No prior proceeding has been filed for the relief requested herein or for like relief.

**WHEREFORE,** ES Holdings respectfully requests that the Court enter an order:

A.     Immediately, temporarily, and preliminarily enjoining L1bero Partners and ES Technologies, their employees, agents, officers, directors, parents, subsidiaries, affiliates or assignees, and anyone acting in concert or cooperation with them or on their behalf, from:

1)   Engaging in any competitive activities in violation of the Partners Agreement, including, but not limited to, any efforts to obtain concessions from Monterrey and Jalisco, or taking any actions to cancel or transfer the existing Mexico City concession to any entity other than an entity jointly controlled by Petitioner;

2)   Using any trade secrets or other intellectual property developed by ES Holdings – specifically, (a) the digital taximeter and hailing and related technologies developed and utilized by Lusad; (b) the L1bre trade name and associated trademarks; and (c) Lusad's business plans and strategies – for any purpose other than to benefit the existing Mexico City concession or any future concession that is held by an entity jointly controlled by Petitioner and Respondents, as provided for in the Partners Agreement; and

3)   Such other, further, or different relief as the Court deems just and proper.

Dated: May 2, 2019
New York, New York

HOGAN LOVELLS US LLP

David Dunn
Benjamin A. Fleming
390 Madison Avenue
New York, New York 10017
Tel. (212) 918-3000
Fax (212) 918-3100
david.dunn@hoganlovells.com
benjamin.fleming@hoganlovells.com

Richard C. Lorenzo (*pro hac vice* pending)
Mark R. Cheskin (*pro hac vice* pending)
600 Brickell Avenue, Suite 2700
Miami, Florida 33131
Tel. (305) 459-6500
Fax (305) 459-6550
richard.lorenzo@hoganlovells.com
mark.cheskin@hoganlovells.com

*Attorneys for Petitioner*
*ESPIRITU SANTO HOLDINGS, LP*