19 CV 03930

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

ESPIRITU SANTO HOLDINGS, LP,

                       Petitioner,

  -against-

L1BERO PARTNERS, LP,

    and

ESPIRITU SANTO TECHNOLOGIES, LLC,

                   Respondents.

-----------------------------------------------------------x

:    No.

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER ES HOLDINGS'
EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND
<u>TEMPORARY RESTRAINING ORDER IN AID OF ARBITRATION</u>**

HOGAN LOVELLS US LLP
390 Madison Avenue
New York, New York 10017

600 Brickell Avenue, Suite 2700
Miami, Florida 33131

*Attorneys for Petitioner
Espiritu Santo Holdings, LP*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

JURISDICTION .........................................................................................................5

FACTUAL BACKGROUND........................................................................................6

    A.    León and Zayas Develop Technology to Improve Mexico City's Taxi Transport...............................................................................................6

    B.    The Partners Agreement between L1bero Partners, ES Holdings, and ES Technologies ............................................................................................7

    C.    The Partnership Invests US $100 Million to Develop the Concession .....10

    D.    Salinas and Covarrubias Engage in Self-Dealing and Other Wrongful Conduct...............................................................................................10

    E.    The Respondents Take Unilateral Control Over All of the Downstream Entities ...............................................................................................12

    F.    The Respondents' Wrongdoing Continues to this Day ...........................13

ARGUMENT.............................................................................................................14

    I.    Applicable Legal Standards...................................................................14

    II.    ES Holdings Is Entitled to a Preliminary Injunction ...........................17

    A.    ES Holdings Has Demonstrated a Strong Likelihood of Success on the Merits Or, at a Minimum, Sufficiently Serious Questions Going to the Merits to Make Them Fair Ground for Litigation...................................17

    B.    ES Holdings Would Suffer Irreparable Harm in the Absence of a Preliminary Injunction..........................................................................19

    C.    The Balance of Hardships Tips Decidedly in Petitioner's Favor.............21

    D.    The Public Interest Would Be Served by the Issuance of an Injunction ...22

    III.    ES Holdings Is Also Entitled to a TRO Pending a Determination of Its Motion for a Preliminary Injunction Pending Arbitration ....................................22

    IV.    The Court Should Dispense with the Security Requirement in FRCP 65(c) ........23

CONCLUSION..........................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*,
    876 F. Supp. 482 (S.D.N.Y. 1994) ...................................................................................... 15

*Am. Express Fin. Advisors, Inc. v. Thorley*,
    147 F.3d 229 (2d Cir. 1998) ............................................................................................... 16

*Andino v. Fischer*,
    555 F. Supp. 2d 418 (S.D.N.Y. 2008) ................................................................................ 16

*Bahrain Telecomms. Co. v. Discoverytel, Inc.*,
    476 F. Supp. 2d 176 (D. Conn. 2007) ................................................................................ 15

*Banus v. Citigroup Glob. Mkts., Inc.*,
    No. 09 Civ. 7128, 2010 WL 1643780 (S.D.N.Y. Apr. 23, 2010) ....................................... 16

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015) ............................................................................................... 15

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    910 F.2d 1049 (2d Cir. 1990) ....................................................................................... 15, 16

*Borden, Inc. v. Meiji Milk Prods. Co., Ltd.*,
    919 F.2d 822 (2d Cir. 1990) ................................................................................................. 5

*Chan v. Chinese-Am. Planning Council Home Attendant Program, Inc.*,
    No. 15 Civ. 9605, 2016 WL 3004516 (S.D.N.Y. Jan. 21, 2016) ....................................... 23

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) ............................................................................................. 4, 19

*Clarkson Co., Ltd. v. Shaheen*,
    544 F.2d 624 (2d Cir. 1976) ............................................................................................... 23

*Control Sys., Inc. v. Realized Sols., Inc.*,
    No. 11 Civ. 1423, 2011 WL 4433750 (D. Conn. Sept. 22, 2011) ...................................... 22

*Credit Suisse Sec. (USA) LLC v. Ebling*,
    No. 06 Civ. 11339, 2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006) ..................................... 21

*D.H. Blair & Co. v. Gottdiener*,
    462 F.3d 95 (2d Cir. 2006) ................................................................................................... 6

*Doctor's Assocs., Inc. v. Distajo*,
    107 F.3d 126 (2d Cir. 1997) ...........................................................................23

*E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*,
    498 A.2d 1108 (Del. 1985) ..............................................................................18

*Flood v. Kuhn*,
    309 F. Supp. 793 (S.D.N.Y. 1970).................................................................16

*Free Country Ltd v. Drennen*,
    235 F. Supp. 3d 559 (S.D.N.Y. 2016) ...........................................................23

*GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*,
    36 A.3d 776 (Del. 2012) ..................................................................................18

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No.*
    *70 of Alameda Cty.*,
    415 U.S. 423 (1974) .........................................................................................23

*JFE Steel Corp. v. ICI Ams., Inc.*,
    797 F. Supp. 2d 452 (D. Del. 2011) ...............................................................18

*Lehman v. Standard Forms, Inc.*,
    C.A. No. 13688, 1995 WL 54443 (Del. Ch. Jan. 12, 1995) ...................................19

*Marsh USA Inc. v. Schuhriemen*,
    183 F. Supp. 3d 529, 536 (S.D.N.Y. 2016) ........................................................21

*Masonic Home of Del., Inc. v. Certain Underwriters at Lloyd's London*,
    No. CV N12C-08-184 RRC, 2013 WL 3006909
    (Del. Super. Ct. May 22, 2013)........................................................................18

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price*,
    C.A. No. 11097, 1989 WL 108412 (Del. Ch. Sept. 13, 1989).............................19

*Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*,
    297 F. Supp. 2d 463 (N.D.N.Y. 2003) (2d Cir. 2005) .......................................20

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004) ........................................................................17

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*,
    754 F. Supp. 2d 616 (S.D.N.Y. 2010) .......................................................16, 22

*Rogers, Burgun, Shahine & Deschler, Inc. v. Dongsan Constr. Co.*,
    598 F. Supp. 754 (S.D.N.Y. 1984).................................................................6

*Salinger v. Colting*,
 607 F.3d 68 (2d Cir. 2010) ........................................................................... 15, 16

*SG Cowen Sec. Corp. v. Messih*,
 224 F.3d 79 (2d Cir. 2000) ........................................................................... 15, 16

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*,
 190 F. Supp. 2d 577 (S.D.N.Y. 2002) .............................................................. 4, 16

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*,
 No. 03 Civ. 4148, 2003 WL 22909149 (S.D.N.Y. Dec. 10, 2003) ......................................15

*Ticor Title Ins. Co. v. Cohen*,
 173 F.3d 63 (2d Cir. 1999) ...............................................................................21

*Venconsul N.V. v. Tim Int'l N.V.*,
 No. 03 Civ. 5387, 2003 WL 21804833 (S.D.N.Y. Aug. 6, 2003) .........................................5

*Vringo, Inc. v. ZTE Corp.*,
 No. 14 Civ. 4988, 2015 WL 3498634 (S.D.N.Y. June 3, 2015) ...........................................4

**Statutes**

9 U.S.C. §§ 201–208 ..........................................................................................1, 5

9 U.S.C. § 202 ......................................................................................................6

9 U.S.C. §§ 203, 206 ..............................................................................................5

**Other Authorities**

C.P.L.R. § 7502(c) ........................................................................................ 1, 15, 22

Fed. R. Civ. P. 65 ......................................................................................... 4, 16, 23

Petitioner Espiritu Santo Holdings, LP ("ES Holdings" or "Petitioner") submits this memorandum in support of its emergency motion, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure ("FRCP"), Section 7502(c) of the New York Civil Practice Law and Rules ("CPLR"), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208, and brought on by Order to Show Cause, for:

A.      A preliminary injunction in aid of arbitration prohibiting respondents L1bero Partners, LP ("L1bero Partners") and Espiritu Santo Technologies, LLC ("ES Technologies" and, together with L1bero Partners, "Respondents"), from (1) improperly competing in violation of the parties' partnership agreement; and (2) misusing any trade secrets or other intellectual property developed by ES Holdings in violation of the partners agreement, until Respondents' misconduct can be addressed in the International Court of Arbitration of the International Chamber of Commerce (the "ICC Arbitration"); and

B.      A temporary restraining order ("TRO") granting the same relief while the Court considers Petitioner's motion for a preliminary injunction in furtherance of the ICC Arbitration.[1]

## PRELIMINARY STATEMENT

This proceeding arises out of an egregious case of corporate fraud and malfeasance: Respondents have concocted and are executing a scheme to steal a billion-dollar business—its funds, its technology, its intellectual property, its goodwill, and its know-how—from its founders. This Court's intervention is required to restore the *status quo* and prevent further irreparable harm to Respondents until the issues between the parties are addressed in arbitration.

---

[1]     Submitted herewith in support of the motion, are: (1) the Declaration of Santiago León Aveleyra, dated April 30, 2019 (the "León Declaration" or the "León Decl.") and the exhibits annexed thereto; (2) the Declaration of David Dunn, dated May 2, 2019 (the "Dunn Declaration" or "Dunn Decl."), which, among other items, attaches as Exhibit 1 the Request for Arbitration that ES Holdings filed in the ICC Arbitration on May 1, 2019, and as Exhibit 2 the Emergency Petition for Injunctive Relief in Aid of Arbitration (the "Petition" or "Pet.") filed in this action.

Petitioner and Respondents are equal investors in ES Technologies; their relationship is defined by a detailed partnership agreement, dated December 6, 2017 (the "Partners Agreement" or "Agreement").[2] This Agreement requires that the partners, through ES Technologies and its 100%-owned downstream entities, jointly control Servicios Digitales Lusad, S. de R.L. de C.V. ("Lusad"), a Mexican company that, with its affiliates and under the "L1bre" trade name, operates a valuable concession in Mexico City to replace and maintain taximeters in the city's 138,000 taxis. Lusad's taximeters are the product of Petitioner's research, investment, and ingenuity; they include a satellite geo-localization system, smart maps, centralized tracking, safety and security features, announcements and publicity capabilities including advertising, as well as the ability for remote taxi hailing, all of which, when implemented, will make Mexico City's taxis safer, more efficient, and more profitable.

Respondents, however, are not satisfied with the shared control over ES Technologies and its 100%-owned downstream entities they agreed to in the Partners Agreement. Instead, in blatant violation of this Agreement, Respondents have taken actions to wrest control of the partnership's valuable intellectual property and competitive rights for themselves alone. When Petitioner called Respondents on this illicit conduct, Respondents seized control of Lusad, and have misappropriated its assets for themselves (including its proprietary taximeter technology and associated trade secrets) in an attempt to obtain and operate new taxi concessions through new entities that wrongfully compete with the partnership in direct violation of the non-compete provisions in the Partners Agreement. Accordingly, ES Holdings commenced the ICC Arbitration on May 1, 2019, and has asked the ICC tribunal for a declaration that Respondents breached the Partners Agreement by, *inter alia*: misappropriating partnership assets including but

---

[2]     A true and correct copy of the Partners Agreement is annexed as Exhibit 1 to the León Declaration, and submitted herewith.

not limited to proprietary, unique, and valuable intellectual property rights, violating the Partners Agreement's non-competition provisions, prohibiting joint control in ES Technologies and its 100%-owned downstream entities, and usurping corporate opportunities of the partnership. ES Holdings seeks a permanent prohibition through the ICC Arbitration preventing Respondents from taking acts against the interest of the partnership and in contravention of the joint control requirements that they expressly agreed to in the Partners Agreement. ES Holdings also seeks money damages to the extent Respondents' wrongs can be quantified.

*This* Petition is necessary to halt the irreparable harm that Respondents have inflicted, and are continuing to inflict, on ES Holdings through actions in wrongful competition with the partnership and through misappropriation of its intellectual property. These wrongs cannot be fully remedied after the fact in the ICC Arbitration; monetary damages will be insufficient to compensate and are difficult (and in some respects impossible) to quantify. ES Holdings thus seeks limited relief in this motion: a temporary restraint restoring the *status quo ante* and preventing any further irreparable harm by Respondents pending the ICC Arbitration. More specifically, Petitioner requests an order temporarily barring Respondents from continuing to engage in the following misconduct: (1) competitive actions in violation of the Partners Agreement through the creation of unaffiliated companies—including those unaffiliated companies' *active bidding* for taximeter concessions in the Mexican city of Monterrey and the state of Nuevo León; (2) misusing ES Holdings' valuable technology and trademark for their own benefit in seeking new concessions without Petitioner's joint control.

It is well-settled that district courts in this Circuit have authority to issue preliminary injunctions and temporary restraints in aid of arbitration, especially where, as here, an award in the arbitration could be rendered ineffectual if such provisional relief is not granted. The legal

standard for such requests is well established. Courts look to: (1) the movant's likelihood of success on the merits or whether there are sufficiently serious questions going to the merits and the balance of hardships tips decidedly in the movant's favor; (2) the likelihood of irreparable harm in the absence of relief; (3) the balancing of hardships between the plaintiff and defendant and (4) whether the public interest would be "disserved" by the issuance of an injunction. *See, e.g.*, *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010); *Vringo, Inc. v. ZTE Corp.*, No. 14 Civ. 4988, 2015 WL 3498634, at *4 (S.D.N.Y. June 3, 2015). The legal standards for granting a TRO are identical. *See Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002) ("The standard[s] for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of [Civil] Procedure are identical."). Here, a TRO is needed to preserve the possibility of full and effective relief later by restoring and maintaining the *status quo* until there is a determination regarding ES Holdings' request for a preliminary injunction.

ES Holdings has demonstrated entitlement to the requested interim relief. ES Holdings has a clear likelihood of success on the merits of its claims; Respondents' actions are a blatant violation of the plain language of the Partners Agreement. At a minimum, there are sufficiently serious questions going to ES Holdings' rights under the Partners Agreement, and, as discussed below, the balance of hardships tips decidedly in ES Holdings' favor. The irreparable-harm prong is amply met because, as described in detail in the accompanying León Declaration, Respondents are actively misappropriating the partnership's trade secrets, intellectual property, and other valuable assets—harms that courts regularly recognize as "irreparable," and that could not be unwound even after a favorable ruling in the ICC Arbitration. Temporary relief also is

needed to protect Petitioner's bargained-for right to have the parties' dispute resolved by arbitration. In contrast, Respondents cannot show any legitimate harm that would ensue if the *status quo* is preserved until the ICC tribunal rules on the Parties' rights under the Partners Agreement. Finally, the public interest would be served by the issuance of injunctive relief, given the longstanding public policy in favor of the enforcement of contractual rights and binding agreements to arbitrate, not to mention the public interest in the protection of trade secrets, and the enforcement of covenants by sophisticated businesses not to compete.

Accordingly, ES Holdings respectfully requests that the Court enter a TRO in the form provided in the accompanying Order to Show Cause and thereafter enter the requested preliminary injunctive relief pending arbitration.

## JURISDICTION

The Court has jurisdiction to enter the requested relief pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-208 (the "Convention"). *See* 9 U.S.C. §§ 203, 206. The Convention states: "An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding . . . ." *Id.* at § 203. A request for injunctive relief in aid of an arbitral agreement that would otherwise fall under the Convention is "an action or proceeding falling under the Convention," and this Court thus has subject-matter jurisdiction. *See Borden, Inc. v. Meiji Milk Prods. Co., Ltd.*, 919 F.2d 822, 826 (2d Cir. 1990) (holding that "entertaining an application for a preliminary injunction in aid of arbitration is consistent with the court's powers pursuant to § 206"); *Venconsul N.V. v. Tim Int'l N.V.*, No. 03 Civ. 5387, 2003 WL 21804833, at *3 (S.D.N.Y. Aug. 6, 2003) ("*Borden* has been interpreted as recognizing a court's power to entertain requests for provisional remedies in aid of arbitration even where the request for

remedies does not accompany a motion to compel arbitration or to confirm an award."); *Rogers, Burgun, Shahine & Deschler, Inc. v. Dongsan Constr. Co.*, 598 F. Supp. 754, 758 (S.D.N.Y. 1984) ("The fact that this dispute is to be arbitrated [in Paris under the rules of the ICC] does not deprive the Court of its authority to provide provisional remedies," such as a preliminary injunction).[3]

The Court has personal jurisdiction over Respondents because they consented to the jurisdiction of this Court "to issue a pre-arbitral injunction, pre-arbitral attachment or other temporary or interim order in aid of arbitration proceedings." León Decl., Ex. 1 (Partners Agreement), at ¶ 12(c); *see D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements.").

**FACTUAL BACKGROUND**

A.      **León and Zayas Develop Technology to Improve Mexico City's Taxi Transport**

Beginning in 2015, Santiago León Aveleyra ("León") and Eduardo Zayas Dueñas ("Zayas") began to develop technology to improve, modernize, and make taxi transport in Mexico City safer, more efficient, and more profitable. León Decl. ¶ 1. Mexico City has approximately 138,000 registered taxis that, every day, account for over 2.7 million taxi trips. *Id.* ¶ 2. This fleet is equipped with technologically obsolete and inefficient equipment. *Id.* Mexico City taxis cannot be hailed from smart-phone applications or paid for with credit cards, as can be done by the applications now commonly used by ridesharing companies such as Uber

---

[3]      The Partners Agreement "falls under the Convention," 9 U.S.C. § 202, because it is an "arbitration agreement . . . arising out of a legal relationship . . . which is considered as commercial" and not "entirely between citizens of the United States." *Id.*; Partners Agreement § 12. Any dispute among the partners relating to the Partners Agreement is to be resolved by binding ICC arbitration. Partners Agreement § 12. The clause, however, provides that the partners do not intend to deprive any New York court of its jurisdiction to issue pre-arbitral injunctions, attachments, or other temporary or interim relief. *Id.* § 12(c).

and Lyft. *Id.* Many of the existing taxis' fare-calculation systems are inaccurate and lack geolocation or safety features. *Id.*

Understanding this, León and Zayas developed digital taximeter and hailing technologies of general applicability, but originally tailored for Mexico City. *Id.* ¶ 3. To do so, they created and registered the "L1bre" tradename and associated trademarks for the system and developed the overall technology and related architecture and software. *Id.* They also established the initial structure for their business: ES Technologies, through subsidiaries, controlled Lusad (and other related entities). *Id.* ¶¶ 3, 9.

León and Zayas approached Mexico City officials with their new taximeter technology and business proposal. *Id.* ¶ 4. In May 2016, Mexico City initiated a public, open bidding process for the replacement, installation, and maintenance of new taximeters for the city's taxis. *Id.* ¶ 5. Eight companies, including Lusad, submitted bid packages, and on June 17, 2016, the Secretary of Mobility of Mexico City granted Lusad the concession for the substitution, installation, and maintenance of new taximeters as well as for the development of a mobile application allowing customers to remotely request a taxi. *Id.* ¶ 6.

## B. The Partners Agreement between L1bero Partners, ES Holdings, and ES Technologies

Petitioner deployed US $40 million of its own capital to develop Lusad's technology, but needed additional capital to implement the Mexico City concession. *Id.* ¶ 7. As a result, León and Zayas met with well-known Mexican businessmen Ricardo Salinas ("Salinas") and Fabio Covarrubias ("Covarrubias") and negotiated the terms of an investment, along with the related agreements to define the organization of the business. *Id.* ¶¶ 7-8.

In essence, Salinas and Covarrubias, through L1bero Partners, agreed to acquire a 50% interest in ES Technologies from ES Holdings. *Id.* ¶ 8. To that end, the parties entered into a

detailed Partners Agreement, governed by Delaware law, "to govern the relation between [L1bero Partners and ES Holdings] as partners of [ES Technologies]." Partners Agreement § 1. The Partners Agreement established that ES Technologies, through two other entities—L1bre Holdings and L1bre (Delaware limited liability companies owned 100% by ES Technologies)— would remain the 100% indirect owner of Lusad and the concession.[4] *Id.* Covarrubias was appointed the Chief Executive Officer of ES Technologies, L1bre Holding, L1bre, and Lusad. León, Zayas, Covarrubias, and a representative of Salinas were also named to the boards of directors of ES Technologies, L1bre Holding, and Lusad. León Decl. ¶ 11.

Crucially, the parties agreed that León and Zayas (through ES Holdings) and Salinas and Covarrubias (through L1bero Partners) would *jointly* control the new partnership's assets— including ES Technologies, Lusad, and the valuable technology and other assets León and Zayas had developed. To that end, the Partners Agreement contains a series of provisions effectuating *joint* control over ES Technologies and its subsidiaries:

(i)      Each partner owns 50% of ES Technologies. Partners Agreement § 3.1.

(ii)     All partners are jointly responsible for the day-to-day operations of L1bre and Lusad, and responsible for exploring new business opportunities in which services similar to those contemplated in the concession may be performed. *Id.* § 4.2.

(iii)    Each partner appoints two directors to ES Technologies. The Chairman is rotated every year. The board has the ultimate power to make decisions for the Company on material matters and each director has one vote, with any resolutions having to be approved by a majority of three directors, and "Major Decisions" having to be approved by unanimous consent. *Id.* §§ 5.1, 5.2

(iv)    At the first board meeting, L1bero Partners was entitled to appoint the first Chief Executive Officer and Chief Financial Officer, with ES Holdings to appoint the Chief Operating Officer and Chief Technology Officer. *Id.* § 5.1(b).

---

[4]     L1bre Holding has a 99.99% interest in Lusad and L1bre holds the remaining 0.01%.

(v)     Importantly, the parties agreed that this composition and structure would be "**replicated in the other Company's Affiliates and in any new affiliates or subsidiaries** that may be incorporated as part of the Company's expansion of its business operations." *Id.* § 5.1(b) (emphasis added). In other words, the parties expressly agreed that the concessionaire, Lusad, would always be under the 50/50 joint control of ES Holdings and L1bero Partners.

(vi)    If the board is deadlocked on a major decision, the business of the Company and its Affiliates will "stop immediately" and an independent reputable international investment bank will be appointed by the Partners at the cost of the Company to value the Company. *Id.* § 5.3.

The Partners Agreement required the partnership to (i) "keep full, complete and accurate books of account, record and information with respect to its business," (ii) maintain the "accounts and records of the Company . . . in accordance with the International Financial Reporting Standards," and (iii) prepare "audited financial statements in accordance with IFRS no later than forty-five (45) days" after the end of each fiscal year. *Id.* §§ 8.1, 8.2. To ensure each partner acts in the best interests of the partnership, the Partners Agreement grants each partner (including ES Holdings) the right to "examine, at any time, during normal business hours, the books of account, records, vouchers, contracts and documents of any kind of both [ES Technologies], L1bre and Lusad for monitoring the financial performance of [these entities] . . . or have them reviewed by persons designated by" ES Holdings or L1bero Partners. *Id.* § 8.3.

Importantly, L1bero Partners and ES Holdings agreed "either directly or indirectly not to compete or to not to intervene . . . in any activities similar to the ones performed by [ES Technologies or its affiliates]" and to "refrain to analyze and/or to enter into any new line of businesses or economic activities or initiatives that could have a synergy with the activities or the line of business performed by [ES Technologies or its affiliates]." *Id.* §§ 11(d)-(e). These provisions bar either L1bero Partners or ES Holdings from attempting to exploit for its own benefit the digital taximeter and mobile application developed by the partnership.

## C. The Partnership Invests US $100 Million to Develop the Concession

After obtaining the concession, the partners invested over US $100 million developing the software, purchasing new digital taximeters, and building installation facilities to install the L1bre system into Mexico City's over 138,000 taxis. León Decl. ¶ 12. The concession was so promising that a major investment bank conservatively valued the concession, and therefore the business, as being worth over $2.4 billion until 2024 only, without considering: the remaining years of the ten-year concession; that it includes at least one renewal option for an additional ten-years; or the application of the business model to additional cities around the world. *Id.* Indeed, in December 2018, L1bre was invited to participate in a panel discussion at the United Nations in New York regarding sustainable development in Latin America, and León attended and spoke on the company's behalf. *Id.* ¶ 13.

## D. Salinas and Covarrubias Engage in Self-Dealing and Other Wrongful Conduct

In or around October 2018, the company's controller first uncovered evidence that L1bero Partners' representatives were using partnership assets for purposes not related to the partnership business and engaging in other actions in violation of their duties and obligations to ES Holdings. *Id.* ¶ 15. For example, the controller discovered that Lusad employees were performing substantial work on unrelated business projects of Salinas and Covarrubias, while being paid by Lusad. *Id.* The controller also discovered that the officers installed by Salinas and Covarrubias were maintaining a second set of books for Lusad and that between January and April 2018, Lusad had transferred almost US $8.7 million dollars to Inversiones Cova, S.A., a company owned by Covarrubias alone. *Id.*; *see also id.* (listing other abuses).

In direct violation of their obligations to ES Holdings, Salinas and Covarrubias have been competing directly against the interests of the partnership. For example, while L1bre is a trade

name for the taximeter technology that has been developed for the Mexico City market, León and Zayas have discovered two other companies, named L1bre Jalisco and L1bre Monterrey, which have been created to market and sell the taximeter technology in other Mexican cities. *Id.* Francisco José Flores ("Flores"), Covarrubias' representative and lawyer, and Covarrubias' son have been appointed representatives of L1bre Jalisco. *Id.* These ventures have been established separate from ES Holdings and in breach of the Partners Agreement's non-competition provisions. *Id.*; *see also* Partners Agreement §§ 11(d)-(e).

Upon receiving these reports, León met with Salinas, who claimed ignorance as to these improprieties. León Decl. ¶ 16. Salinas suggested convening a meeting of the board of Lusad to agree to hire an independent auditor to review the books and records of the company. *Id.* León agreed, and at the ensuing meeting on December 14, 2018, the Lusad board agreed to hire the "big-four" accounting firm Deloitte to conduct a formal accounting. *Id.* & Ex. 3 (December 14, 2018 board resolution). It was also agreed that L1bre Jalisco and L1bre Monterrey—entities created by Salinas and Covarrubias to misappropriate ES Technologies' technology, business opportunities, and other assets—would be brought into the partnership. *Id.* After this board decision, in December 2018, Deloitte arrived at Lusad's offices to conduct the audit. *Id.* ¶ 17.

Almost immediately, Salinas and Covarrubias took actions to obstruct and impede Deloitte's work. For example, one of Lusad's employees gave Deloitte two Lusad laptop computers requested by Deloitte that supposedly contained the company's financial information. *Id.* To prevent the laptops from being reviewed, Flores abruptly advised Deloitte that the audit was "no longer a priority." *Id.* Lusad, at the instruction of Covarrubias and his counsel, then took the extraordinary and outrageous step of filing a criminal complaint in Mexico City, alleging that Deloitte's representative stole the computers in a "robbery." *Id.* ¶ 18. This, of

course, was an utter fabrication, undertaken to impede the investigation into Salinas and Covarrubias' self-dealing and defalcation. *Id.* ¶ 19.  In contrast to this fabrication, Zayas truthfully reported to Mexican authorities that Deloitte was authorized to review the computers as part of the audit it was hired to conduct by Lusad.  *Id.*

Salinas and Covarrubias did not stop there.  In an effort to take sole control of Lusad, Salinas and Covarrubias orchestrated a series of maneuvers, in violation of the Partners Agreement and Mexican law, culminating in the removal of León and Zayas from the board and management of Lusad—including obtaining and utilizing an unauthorized Power of Attorney, in which Covarrubias unilaterally appointed representatives to attended a sham meeting of the shareholders of Lusad, without the knowledge or approval of ES Holdings. *Id.* ¶ 23.  Salinas and Covarrubias used Zayas' truthful report to the authorities about Deloitte's authority as a pretext to claim that Zayas was complicit in Deloitte's supposed "robbery" and that he was not acting in the company's interests, and therefore, should be removed from the board. *Id.* ¶ 20.  Zayas was added to the criminal complaint as a defendant. *Id.*

### E.     The Respondents Take Unilateral Control Over All of the Downstream Entities

On February 20, 2019, Salinas and Covarrubias caused Lusad to file a civil action in Mexico against León and Zayas.  *Id.*, Ex. 4 (Civil Complaint filed with the Superior Court of Justice of Mexico City, dated February 20, 2019).  In that action, they requested that the court declare León and Zayas civilly liable for acting against the interests of the company and to order that León and Zayas be barred from taking any acts on behalf of the board of Lusad. *Id.*

On February 21, 2019, the Mexican court issued an *ex parte* temporary injunction barring León and Zayas from making any decisions or otherwise acting on behalf of Lusad pending the trial and final decision.  León Decl., Ex. 5 (Order of the Superior Court of Justice of Mexico

City, dated February 21, 2019).  This civil proceeding remains pending in the Mexican courts. León Decl. ¶¶ 21-22.

The very next day, on February 22, 2019, Salinas and Covarrubias, purporting to act on behalf of Lusad, orchestrated a sham meeting of the shareholders of Lusad, L1bre Holding, and L1bre LLC.  *Id.* ¶ 23.  Although these companies were owned 100% by ES Technologies (and therefore the two partners ES Holdings and L1bero Partners), Covarrubias, as CEO of both L1bre LLC and L1bre Holding, unilaterally appointed the representatives who attended the shareholders meeting purporting to represent all the shareholders, even though this appointment was made without the knowledge or approval of ES Holdings' representatives on the board of L1bre Holding (*i.e.*, León or Zayas).  *Id.*; *see also id.*, Ex. 6 (Power to Attorney executed by Covarrubias on behalf of L1bre Holding).

At this sham shareholders meeting—in direct violation of the Partners Agreement—the representatives appointed by Covarrubias purportedly voted on behalf of the shareholders of Lusad to remove León and Zayas from the board. León Decl. ¶ 24; *see also id.*, Ex. 7 (Shareholder Meeting Minutes, dated 22 February 2019).  The Partners Agreement expressly requires that the composition and structure of ES Technologies would be "replicated in the other Company's Affiliates" and that that the concessionaire, Lusad, would always be under the 50/50 joint control of the two partners.  Partners Agreement §§ 5.1(a)-(b); León Decl. ¶ 24.

F.     **The Respondents' Wrongdoing Continues to this Day.**

The wrongdoing by Salinas and Covarrubias continues.  L1bre Jalisco and L1bre Monterrey have not been integrated into the partnership, as was agreed at the December 14, 2018, meeting of Lusad's board, and continue to be operated by Salinas and Covarrubias as separate companies, competing with the partnership. *Id.* ¶ 27.  León and Zayas have learned that Salinas and Covarrubias have filed a notice of controversy on behalf of ES Technologies against

Mexico pursuant to NAFTA relating to actions allegedly taken by Mexico to deprive Lusad of its concession. *Id.* ¶ 26. This action was taken without approval of their 50/50 partner, and constitutes yet another example of the breach of the Partners Agreement by Salinas and Covarrubias. *Id.* And, despite Petitioner's repeated request for a copy of ES Technologies' NAFTA notice, Respondents have refused to provide ES Holdings a copy of this submission. *Id.*

Incredibly, Salinas and Covarrubias also are now actively lobbying the Mexico City government to cause the concession to be issued to another company under their sole ownership and control. *Id.* ¶ 25. These actions are, of course, being taken without the consent or agreement of ES Holdings, and violate the Partners Agreement. *Id.*

Most imminently: Respondents, through their controlled entity L1bre Monterrey, are poised to bid on and are likely to win a valuable taxi concession in Monterrey, for which the bidding *is currently open*. *Id.* ¶ 27; *see also id.*, Ex. 8 (Public Bidding Announcement from the Transportation Agency of the State of Nuevo León, Mexico). According to Mr. León, that concession is designed to be met by a company with Lusad's technology and capabilities. León Decl. ¶ 27. By using the partnership's technology and know-how, Respondents are positioned to arrogate this significant opportunity to themselves—a gross violation of the Partners Agreement, one that strips the partnership of a unique and valuable opportunity and ES Holdings of its rightful 50 percent interest in such a concession. *Id.* Bidding closes on the Monterrey concession on May 15, 2019, by which time Respondents—unless stopped—will have successfully implemented their scheme to misappropriate this partnership opportunity for themselves. *Id.*

## **ARGUMENT**

### I.     **Applicable Legal Standards**

Federal courts treat motions for preliminary injunctions in aid of arbitration as

applications under Rule 65 of the Federal Rules of Civil Procedure and, accordingly, evaluate them under the criteria for Rule 65 motions. *See, e.g.*, *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990); *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.,* No. 03 Civ. 4148, 2003 WL 22909149, at *3 (S.D.N.Y. Dec. 10, 2003); *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994). This Court has further authority to issue the requested injunctive relief pursuant to Rule 64 of the Federal Rules, which incorporates state-law provisional remedies, including injunctions in aid of arbitration under C.P.L.R. § 7502(c). *See Alvenus Shipping*, 876 F. Supp. at 487; *see also Bahrain Telecomms. Co. v. Discoverytel, Inc.*, 476 F. Supp. 2d 176, 183 (D. Conn. 2007) (applying Rule 64 and state-law provisional remedy to protect rights of a party in pending arbitration). Section 7502(c) allows a court to enter "a preliminary injunction in connection with an arbitration that is pending or that is to be commenced . . . upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." N.Y. C.P.L.R. 7502(c). In deciding applications under Section 7502(c), the courts apply the test for injunctions under Article 63 of the CPLR (which is discussed below in more detail). *See SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 83–84 (2d Cir. 2000).

In the Second Circuit, requests for preliminary injunctive relief must satisfy a four-pronged inquiry. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). First, the plaintiff must demonstrate "either (a) a likelihood of success on the merits or (b) sufficiently serious questions to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010). Second, the plaintiff must demonstrate that "he is likely to suffer irreparable injury in the absence of an injunction." *Id.* at 79–80. "Third, a court must consider the balance of

hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Id.* at 80. Fourth, "the court must ensure that the public interest would not be disserved" by the issuance of a preliminary injunction. *Id.*[5] "The standard[s] for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of [Civil] Procedure are identical." *Spencer Trask Software & Info. Servs., LLC*, 190 F. Supp. 2d at 580; *see also Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.").[6]

Judges in this District have recognized the important role that injunctions serve in preserving arbitral rights. The Second Circuit explained in *Blumenthal* that "[a]rbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." 910 F.2d at 1053; *see also Am. Express Fin. Advisors, Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998) ("In many instances, it is by freezing the status quo that the meaningfulness of arbitration is best protected."); *Banus v. Citigroup Glob. Mkts., Inc.*, No. 09 Civ. 7128, 2010 WL 1643780, at *8 (S.D.N.Y. Apr. 23, 2010) (noting that "temporary restraining orders and preliminary injunctions may be, and frequently are, granted in aid of arbitration claims where necessary to avoid irreparable injury").

"The status quo has been frequently defined as the last uncontested status which preceded the pending controversy." *Flood v. Kuhn*, 309 F. Supp. 793, 798 (S.D.N.Y. 1970), *aff'd*, 443 F.2d 264 (2d Cir. 1971), *aff'd*, 407 U.S. 258 (1972). "'Status quo' does not mean the situation

---

[5]     Article 63 of the CPLR adopts similar criteria for preliminary injunctive relief: "likelihood of the petitioner's success on the merits, danger of irreparable harm to the petitioner should preliminary relief be denied, and a balancing of the equities that tips in the petitioner's favor." *SG Cowen*, 224 F.3d at 81 (citing New York state law cases). Because the state-law standard is subsumed within the federal standard, we will focus on the latter in this brief.

[6]     Courts in this District apply this standard in cases involving injunctions in aid of arbitration. *See, e.g.*, *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 620 (S.D.N.Y. 2010).

existing at the moment the law suit is filed, but the last peaceable uncontested status existing between the parties before the dispute developed. Thus, courts of equity have long issued preliminary injunctions requiring parties to *restore* the status quo ante." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (McConnell, J., concurring) (internal quote omitted), *aff'd and remanded,* 546 U.S. 418 (2006).

## II.     ES Holdings Is Entitled to a Preliminary Injunction.

### A.     ES Holdings Has Demonstrated a Strong Likelihood of Success on the Merits Or, at a Minimum, Sufficiently Serious Questions Going to the Merits to Make Them Fair Ground for Litigation.

The essence of ES Holdings' claim in the ICC Arbitration is that Respondents are misappropriating ES Technologies' intellectual property and economic resources, and using them to compete improperly for personal gain and in flagrant violation of the Partners Agreement. ES Holdings' claim is strongly supported by the express language of the Partners Agreement, which unequivocally provides that ES Holdings and L1bero Partners are 50/50 partners with joint control of ES Technologies, and that the same balance must be replicated in the affiliates and subsidiaries, including Lusad. Partners Agreement §§ 5.1(a)-(b). Further, under the clear terms of the Partners Agreement, all Major Decisions—which include such matters as the granting of powers of attorney and any alterations to the valuable Lusad Concession—require approval of all *four members* of the board, including León and Zayas. *Supra* at 8. These are not decisions that can be made unilaterally. Yet Respondents have done precisely that and will continue to do so, unless restrained. *Supra* at 10-14.

Under governing Delaware law, the merit of Petitioner's claims for breach of the Partners Agreement is clear. Delaware courts interpret contracts to "give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). "The basic rule of contract construction gives

priority to the intention of the parties." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *Id.* "The Court will interpret clear and unambiguous terms according to their ordinary meaning." *GMG Capital Invs.*, 36 A.3d at 780. "Delaware adheres to the 'objective theory of contracts,' which means that a contract should be interpreted as it 'would be understood by an objective, reasonable third party.'" *JFE Steel Corp. v. ICI Ams., Inc.*, 797 F. Supp. 2d 452, 469 (D. Del. 2011) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)). "[W]hen two sophisticated parties bargain at arm's length and enter into a contract, the presumption is even stronger that the contract's language should guide the Court's interpretation." *Id.*; *see also Masonic Home of Del., Inc. v. Certain Underwriters at Lloyd's London*, No. CV N12C-08-184 RRC, 2013 WL 3006909, at *3 (Del. Super. Ct. May 22, 2013) ("Delaware honors the freedom of contract and enforces the bargains of sophisticated parties."), *aff'd*, 80 A.3d 960 (Del. 2013).

Respondents' blatant disregard of the Partners Agreement's 50/50 joint control provisions, the requirement to permit ES Holdings access to the company's records, its protection of the trade secrets and intellectual property developed by ES Holdings, and the prohibition against one partner competing with the company are each clear violations of the Partners Agreement that, separately and in the aggregate, warrant injunctive relief. *See Lehman v. Standard Forms, Inc.*, C.A. No. 13688, 1995 WL 54443, at *8 (Del. Ch. Jan. 12, 1995) (granting preliminary injunction enforcing non-competition agreement because it "would maintain the status quo as agreed upon by the parties"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price*, C.A. No. 11097, 1989 WL 108412, at *4 (Del. Ch. Sept. 13, 1989) (enforcing non-

competition agreement because "plaintiff threatens to be deprived of that which its contract accords it").

Nor are Respondents' breaches of the Partners Agreement mere technical violations. To the contrary, Respondents have stripped ES Holdings of its 50% control of Lusad, in violation of the Partners Agreement, specifically for the purpose and with the intent to misappropriate the company's assets, and arrogate partnership property and opportunities to themselves. *Supra* at 12-14. Indeed, Respondents' illegitimate side business is *currently bidding* on a concession in Monterrey, an opportunity that patently belongs to the partnership, and requires exploitation of the partnership's intellectual property. *Supra* at 14. This is a manifest, core breach of Respondents' obligations under the Partners Agreement and relevant law—and shows that Petitioner is likely to prevail on their claims.[7]

Under the circumstances, ES Holdings has a strong likelihood of success on the merits or, at a minimum, there are sufficiently serious questions going to the merits that make them a fair ground for resolution in the ICC Arbitration.[8]

**B.    ES Holdings Would Suffer Irreparable Harm in the Absence of a Preliminary Injunction.**

ES Holdings would suffer irreparable harm in numerous ways if Respondents are permitted to continue their improper actions in the period until the ICC tribunal is able address the merits of ES Holdings' claims.

---

[7]       To the extent that any of the ICC Arbitration claims are considered to be derivative, Petitioner alternatively has requested that the ICC tribunal consider the claims as derivative, on behalf of ES Technologies and its 100%-owned downstream entities against L1bero Partners. Petitioner makes this same request to this Court. Any demand for ES Technologies to bring claims against L1bero Partners would be futile given the circumstances described herein.

[8]       "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Markets*, 598 F.3d at 35. In order to satisfy the "sufficiently serious questions" prong, a party must also show that the balance of hardships tips "decidedly" in its favor. *Id.* The balancing of hardships is discussed below in Part II.C.

*First*, Respondents have misappropriated the trade secrets developed by ES Holdings in violation of the Partners Agreement. It is well settled that misappropriation of trade secrets constitutes irreparable injury supporting the issuance of an injunction. *Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 492 (N.D.N.Y. 2003), *aff'd*, 126 F. App'x 507 (2d Cir. 2005). Under Delaware law, a "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique or process, that . . . [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and . . . [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Del. Code Ann. tit. 6, § 2001(4). Misappropriation of such trade secrets includes "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 2001(2)(a). An injunction is an appropriate remedy for "[a]ctual or threatened misappropriation." *Id.* § 2002(a). Here, Respondents' misappropriation of the revolutionary technology developed by ES Holdings alone constitutes irreparable injury.

*Second*, Respondents have engaged in competitive actions in violation of the Partners Agreement—most notably, seeking to obtain concessions from Jalisco and Monterrey using Lusad's technology and the L1bre name that are the property of the partnership. It is well-settled that the violation of an enforceable non-competition agreement constitutes irreparable harm. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."); *see also Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 536 (S.D.N.Y. 2016), *amended*, 2016 WL

2731588 (S.D.N.Y. May 3, 2016). As noted above, bidding on the Monterrey taxi concession is open at this moment; unless restrained, Respondents will misappropriate this valuable opportunity and confiscate it for themselves. These actions are causing, and will continue to cause, irreparable injury.

*Third*, courts have held that the irretrievable loss of arbitral rights, by itself, would result in irreparable harm. For example, in *Credit Suisse Sec. (USA) LLC v. Ebling*, No. 06 Civ. 11339, 2006 WL 3457693, at *3 (S.D.N.Y. Nov. 27, 2006), the court held: "Without a preliminary injunction, the harm that Petitioner seeks to address via arbitration will occur before the arbitrator can render a decision, and Petitioner will lose its right to meaningfully resolve these employment disputes via arbitration. This constitutes irreparable harm." The same is true here. In the absence of injunctive relief, Respondents would be able to circumvent the arbitral process by continuing their appropriation of ES Holdings' trade secrets and engaging in prohibited competition, actions which the ICC tribunal will be unable to unwind, and for which the tribunal will be unable to provide adequate compensation. The ICC tribunal will not even be fully consummated for at least 60 days, and therefore will not be able to rule on these issues before Respondents take irreversible action in violation of the Partners Agreement. *See supra* at 14.

### C. The Balance of Hardships Tips Decidedly in Petitioner's Favor.

A comparison of the relative hardships shows that the potential harm to ES Holdings far outweighs the potential harm to Respondent. ES Holdings faces the very real prospect of being unable to restore its lost intellectual property and trade secrets and unable to receive appropriate or sufficient compensation for its incalculable lost business opportunities due to Respondents' misconduct. In contrast, the requested injunctive relief would require that Respondents comply with the plain and clear obligations of the Partners Agreement, a bargain that they willingly accepted.

**D.     The Public Interest Would Be Served by the Issuance of an Injunction.**

Public policy favors the enforcement of contracts, especially in the context of agreements to arbitrate.  *See, e.g.*, *Rex Med.*, 2010 WL 4977775, at *9.  In *Rex Medical*, the court stated: "All that the Court is being asked to do is to enforce the parties' bargained-for right to arbitrate any disputes that arise under the Partners Agreement.  The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense."  *Id.*   This reasoning applies here; Petitioner's requested TRO and preliminary injunction are intended and needed to protect its right to arbitrate this dispute with Respondents before valuable partnership property is irrevocably stripped away.  And courts generally find that protection of trade secrets serves the public interest.  *See Control Sys., Inc. v. Realized Sols., Inc.*, No. 11 Civ. 1423, 2011 WL 4433750, at *4 (D. Conn. Sept. 22, 2011).

For similar reasons here, a preliminary injunction under CPLR § 7502(c) is also justified. The Article 63 standard for preliminary injunctions has been met and, without injunctive relief, an award by the ICC tribunal in ES Holdings' favor may well be rendered ineffectual because Respondents will, unless restrained, engage in further forbidden competitive conduct and usurp Petitioner's joint control of the intellectual property, trade secrets, and business strategies before the ICC tribunal is even constituted.  These are harms for which money damages will be inadequate and will have significant competitive consequences that will be impossible to unwind.

**III.     ES Holdings Is Also Entitled to a TRO Pending a Determination of Its Motion for a Preliminary Injunction Pending Arbitration.**

Because the standards for a preliminary injunction and TRO are the same, a TRO should be granted to preserve the *status quo* until the Court can rule upon ES Holdings' motion for a preliminary injunction.  Issuing a TRO will preserve the possibility of full and effective relief

later by restoring and maintaining the *status quo* until there is a determination regarding ES Holdings' request for a preliminary injunction. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974) (temporary restraints are appropriate where they preserve the *status quo* and prevent irreparable harm until a hearing can be held); *Chan v. Chinese-Am. Planning Council Home Attendant Program, Inc.*, No. 15 Civ. 9605, 2016 WL 3004516, at *1 (S.D.N.Y. Jan. 21, 2016) ("The function of a temporary restraining order is to maintain the status quo for a short period of time, usually only until a hearing can be held."); *see also Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) (same).

## IV. The Court Should Dispense with the Security Requirement in FRCP 65(c).

Although Federal Rule 65(c) refers to the posting of a bond in connection with an application for injunctive relief, the Court has the discretion to waive this requirement, and should do so here. District courts have "wide discretion . . . even to dispense with the bond requirement 'where there has been no proof of likelihood of harm.'" *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (quoting *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)); *see also Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) ("[B]ecause, under Fed. R. Civ. P. 65, the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond." (citations omitted)).

Here, Respondents would not suffer any damages if the Court were to grant the injunctive relief ES Holdings has requested. As discussed above, the TRO and preliminary injunction would merely preserve the *status quo* until the ICC tribunal can rule on the issues presented here. The fundamental effect of an injunction would be to require Respondents to honor their plain and

clear contractual obligations under the Partners Agreement. Under the circumstances, there is no need for a bond.

<u>**CONCLUSION**</u>

For all these reasons and based on the supporting papers filed in this action, ES Holdings respectfully requests that the Court enter an order:

(a) immediately, temporarily, and preliminarily enjoining L1bero Partners and ES Technologies, their employees, agents, officers, directors, parents, subsidiaries, affiliates or assignees, and anyone acting in concert or cooperation with them or on their behalf, pending a further order from this Court or a ruling from the ICC tribunal regarding ES Holdings' claims, from:

1) Engaging in any competitive activities in violation of the Partners Agreement, including, but not limited to, any efforts to obtain concessions from Monterrey and Jalisco, or taking any actions to cancel or transfer the existing Mexico City concession to any entity other than an entity jointly controlled with Petitioner;

2) Using any trade secrets or other intellectual property developed by ES Holdings – specifically, (a) the digital taximeter and hailing and related technologies developed and utilized by Lusad; (b) the L1bre trade name and associated trademarks; and (c) Lusad's business plans and strategies – for any purpose other than to benefit the existing Mexico City concession or any future concession held by an entity jointly controlled by Petitioner and Respondents, as provided for in the Partners Agreement; and

3) Such other, further, or different relief as the Court deems just and proper.

Dated: May 2, 2019
New York, New York

HOGAN LOVELLS US LLP

David Dunn
Benjamin A. Fleming
390 Madison Avenue
New York, New York 10017
Tel. (212) 918-3000
Fax (212) 918-3100
david.dunn@hoganlovells.com
benjamin.fleming@hoganlovells.com

Richard C. Lorenzo (*pro hac vice* pending)
Mark R. Cheskin (*pro hac vice* pending)
600 Brickell Avenue, Suite 2700
Miami, FL 33131
Tel. (305) 459-6500
Fax (305) 459-6550
richard.lorenzo@hoganlovells.com
mark.cheskin@hoganlovells.com

*Attorneys for Petitioner*
*ESPIRITU SANTO HOLDINGS, LP*

- 25 -