| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | 19 CV 03930 |

```
------------------------------------------------------x
                                                      :
ESPIRITU SANTO HOLDINGS, LP,                          :
                                                      :
                        Petitioner,                   :
                                                      :
        -against-                                     :   No.
                                                      :
L1BERO PARTNERS, LP,                                  :
                                                      :
        and                                           :
                                                      :
ESPIRITU SANTO TECHNOLOGIES, LLC                      :
                                                      :
                        Respondents.                  :
                                                      :
------------------------------------------------------x
```

## DECLARATION OF SANTIAGO LEÓN AVELEYRA

I, Santiago León Aveleyra, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. In 2015, Eduardo Zayas Dueñas and I began to develop technology aimed at making taxi transport within Mexico City safer and more efficient for both taxi drivers and their customers.

2. There are approximately 138,000 registered taxis in Mexico City that, every day, account for over 2.7 million taxi trips in that city. Most of the taxi fleet is equipped with technologically obsolete equipment that is inefficient for service optimization. The Mexico City taxi fleet cannot be hailed from smart-phone applications or paid for with credit cards, as with the applications now commonly used by ridesharing companies such as Uber and Lyft. Many of the taxis' fair-calculation systems are inaccurate and lack geolocation or safety features.

3. Understanding these shortcomings, Mr. Zayas and I began to develop digital taximeter and hailing technologies specifically for use, at least initially, in Mexico City. We recruited and built a team that included senior managers formerly from companies like Uber and Apple. We created and registered the "L1bre" tradename and associated trademarks for the system. We also developed the overall technology and related software. In October 2015, we incorporated an operating company in Mexico that we named Servicios Digitales Lusad, S. de R.L. de C.V., and certain other affiliated companies (collectively, "Lusad").

4. Mr. Zayas and I, through Lusad, then approached the Mexico City Secretariat of Mobility (*Secretaría de Movilidad*, commonly referred to as "Semovi") in order to explain and promote the benefits of the system we were developing. The city's representatives explained that the technology was appropriate and necessary, but that Semovi would have to put such a project out for public bid.

5. As such, in or around May 2016, Semovi published in the *Mexico City Official Gazette* a declaration of need for the replacement, installation, and maintenance of the city's taxi fleet taximeters, to include a satellite geo-localization system, smart maps, centralized tracking, safety and security features, announcements and publicity capabilities, including advertising, as well as the ability for remote taxi hailing.

6. Eight companies, including Lusad, submitted bid packages. Lusad was, however, the only bidder that—because of our extensive work in the field and product development—was able to submit a bid that complied with all the bidding specifications and requirements that Semovi mandated. Accordingly, on June 17, 2016, Semovi's adjudication committee granted Lusad the concession for the substitution, installation, and maintenance of new taximeters and related application technology.

7. In developing this winning technology, Espiritu Santo Holdings, LP ("ES Holdings") deployed US $40 million of its own capital, but more was needed. Rather than continue to solely fund the enterprise, and with the concession in hand, we began to seek the capital and financing necessary to finalize the technology, manufacture the taximeters, and further develop the L1bre project. Eventually, we met with Ricardo Salinas and Fabio Covarrubias, who both quickly came to also understand the value of the concession, as well as the upside potential of this investment.

8. Mr. Zayas and I, on the one hand, and Mr. Salinas and Mr. Covarrubias on the other, then negotiated the terms of the investment along with the overall structure of how the business would be organized. In sum, we agreed that Mr. Salinas and Mr. Covarrubias, through their companies, would acquire 50% of the business in exchange for US $5 million in cash, a US $20 million intercompany loan, and Mr. Salinas gave his commitment to obtain a line of credit for working capital from Mr. Salinas' bank, Banco Azteca, of US $90 million.

9. Before the investment, ES Technologies, LLP ("ES Technologies"), through two other entities—L1bre Holding and L1bre LLC (each 100% owned by ES Technologies)—was the 100% indirect owner of Lusad and the concession, and ES Technologies was 100% owned by ES Holdings. To effectuate the investment, we agreed to transfer 50% of the voting units of ES Technologies to Mr. Salinas and Mr. Covarrubias to hold through their company, L1bero Partners, LP ("L1bero Partners"). After the negotiations were finalized, on November 23, 2017, we entered into a Unit Purchase Agreement.

10. In the Unit Purchase Agreement, we formally agreed both to the transfer of 50% of ES Technologies to L1bero Partners, and to enter into a separate Partners Agreement that would, among other provisions, amend the LLC agreement for ES Technologies and further

3

define the parties' rights, duties, and obligations. Much of this holding structure was complex, but we understood that this was the most beneficial structure for tax and other legitimate business purposes. Accordingly, as a result of the Unit Purchase Agreement, the following ownership and ultimate control structure was created for the L1bre business:



11. Approximately two weeks after entering into the Unit Purchase Agreement, on December 6, 2017, we executed the Partners Agreement. A true and accurate copy of the Partners Agreement is attached as Exhibit 1. The Partners Agreement provides that its purpose is "to govern the relation between [L1bero Partners and ES Holdings] as partners of [ES

Technologies or the "Company"]." Again, ES Technologies was, through L1bre Holding and L1bre LLC, the 100% indirect owner of the concessionaire, Lusad. Mr. Covarrubias was appointed the Chief Executive Officer of ES Technologies, L1bre Holding, L1bre, and Lusad. Mr. Zayas, Mr. Covarrubias, Mr. Salinas' hand-picked representative, and I were also named to the boards of directors of ES Technologies, L1bre Holding, and Lusad.

12. For about the next year, the partnership appeared to proceed well. As partners, we invested over US $100,000,000 developing the software, purchasing the hardware, and gearing up the instillation facilities to install the L1bre system into over 138,000 Mexico City taxis. The concession allowed Lusad to install the taximeters in the entire existing Mexico City taxi fleet and receive trip-based compensation as well as advertising and other revenue streams. After the concession was awarded, a major investment bank conservatively valued the concession, and therefore the business, as being worth over $2.4 billion until 2024 only, without valuing: the remaining years of the ten-year concession; the fact that it includes at least one renewal option for an additional ten-years; or the application of the business model to additional cities around the world.

13. In December 2018, L1bre was invited to participate in a panel discussion at the United Nations in New York regarding sustainable development in Latin America. I attended and spoke on the company's behalf. L1bre issued a press release about my appearance, which described me as the "Chairman of the Board" and "a founder of L1bre," and included a video and photograph of my remarks. A true and accurate copy of that press release is attached as Exhibit 2, and the video can be viewed at https://www.prnewswire.com/news-releases/l1bre--the-guiding-principle-of-its-business-model-is-prioritizing-social-responsibility-300764704.html.

14. Regrettably, however, rather than celebrating the company's success, Mr. Salinas and Mr. Covarrubias instead conspired first in self-dealing and then in fraudulently seizing the entire business for themselves.

15. Mr. Zayas and I had initially appointed Manuel Tabuenca, a former high-level employee at Uber, as Lusad's Chief Financial Officer. Subsequently, Mr. Salinas and Mr. Covarrubias appointed a different Chief Financial Officer, demoted Mr. Tabuenca to a day-to-day operations function, and removed his full access to the company's financial information. In or around October 2018, Mr. Tabuenca informed Mr. Zayas and me that L1bero Partners' representatives were unlawfully siphoning funds from the company's bank accounts for non-company related expenses. Indeed, Mr. Tabuenca provided an extensive list of wrongdoing at the direction of and for the benefit of Mr. Salinas, Mr. Covarrubias, and/or their related companies. Specifically, among other improprieties, we discovered the following:

- As Chief Executive Officer, Mr. Covarrubias staffed the company for his own benefit, not for the benefit of the company. Specifically, of a total of 37 employees, only 14 worked exclusively on Lusad's operation, and the remaining 23 employees were hired by Mr. Covarrubias to work for his other businesses, including one named Inversiones COVA, S.A. de C.V. ("Inversiones COVA"), while being paid by Lusad. Notably, these employees included Mr. Covarrubias' son, brother in law, one of his close friends, and the wife of that friend.

- The very same day that Lusad received the US $10,000,000 to pay the Intercompany Loans for the operation of the concession, as provided in the Partners Agreement, Lusad (under the direction of Mr. Salinas and Mr. Covarrubias) wrongly transferred to Inversiones COVA (Mr. Covarrubias' company) amounts totaling almost $8.7 million.

- Mr. Salinas and Mr. Covarrubias breached the non-compete provision in the Partners Agreement, pursuant to which L1bero Partners cannot intervene or participate directly or indirectly in "any activities similar to the ones performed by the Company and the Company's Affiliates." Only five months after the Partners Agreement was executed, Mr. Salinas and Mr. Covarrubias incorporated, through third parties, a separate company under the name of L1BRE Jalisco, and appointed

Mr. Covarrubias' son (Diego Julio Covarrubias Trascierra) and Mr. Covarrubias' lawyer (Francisco José Flores) as representatives of the company. Mr. Covarrubias then approached Jalisco's government through that separate company to offer the L1bre system for Jalisco's taxi fleet. Mr. Salinas and Mr. Covarrubias did the same in the Mexican city of Monterrey by offering the L1bre technology to that city for their own benefit and not Lusad's benefit. Not only did they not consult with Mr. Zayas or me, but they actively concealed their involvement with both of these cities.

- Mr. Salinas and Mr. Covarrubias caused the improper transfer of significant company funds to purported vendors of Lusad, which in reality were owned or controlled by Mr. Salinas or Mr. Covarrubias and provided no or limited benefit to Lusad. Pursuant to Mr. Covarrubias' instructions, Lusad paid over US $500,000 to a company named Cubeice Consultores de Negocios, S.C., which is owned through a series of intermediaries by Mr. Covarrubias' son. Similarly, Mr. Covarrubias caused Lusad to pay over US $290,000 to a company named MOOK, S.A.P.I. de CV, which is also owned by Mr. Covarrubias' son. In addition, Mr. Covarrubias instructed Lusad to pay US $34,000 to a Belgium company named Vistra Corporate Services, which then transferred the funds to Fama Properties Ltd., a company owned and controlled by Mr. Covarrubias.

- Mr. Salinas and Mr. Covarrubias caused US $2.7 million dollars to be paid to two companies named Kichink Servicios, S.A. de C.V. and N9 Tecnología Mexico, S.A. de C.V. Kichink and N9 were ostensibly to provide services to Lusad; however, there was no contract and no benefit was provided in exchange for these funds.

- Mr. Salinas and Mr. Covarrubias caused Lusad to agree to pay almost US $1 million to a law firm named Villasante y Freyman, as payment for legal fees incurred for thirteen short *amparo* actions that would never cost close to that much by any legitimate local law firm.[1]

- Despite the 12-month "grace period" that the Partners Agreement required for repayment of the intercompany loans provided by L1bero Partners, Mr. Salinas and Mr. Covarrubias caused Lusad to immediately pay over US $2.2 million dollars back to Mr. Covarrubias' companies.

- Despite that Lusad was a start-up company, Mr. Salinas and Mr. Covarrubias charged Lusad over US $200,000 to reimburse themselves for their private aircraft, which was neither necessary for

---

[1] An *amparo* action is a challenge to the validity or constitutionality of an act taken by the government.

7

the business nor appropriate. The fact that they allowed the respondents to permit these and the other improper payments was in my view a breach of the Partners Agreement and their fiduciary duty to ES Holdings.

- Mr. Salinas and Mr. Covarrubias purchased tablets for the concession through Inversiones Cova for US $11,832,000 and subsequently resold the tablets to Lusad at the inflated price of US $12,058,675, causing Lusad to pay an unnecessary and unjustified markup of over US $200,000.

- After siphoning funds from Lusad's bank accounts and placing the company in financial jeopardy, Mr. Salinas offered to provide a loan under abusive terms, including a 67% interest rate and collateral to include all of ES Technologies, L1bre Holding, and L1bre LLC's shares, as well as the concession rights, the IP rights over the technology, and any other asset held by ES Technologies or its 100%-owned downstream entities.

- Finally, Mr. Tabuenca reported to Mr. Zayas and me that he had uncovered evidence that Lusad was maintaining two sets of books, one including many of the improper transactions described above, and one making no reference to those improper transactions.

16. Upon receiving these reports, I met with Mr. Salinas, who claimed ignorance as to these improprieties. Mr. Salinas suggested convening a meeting of the board of Lusad to agree to hire an independent auditor to review the books and records of the company. Trusting Mr. Salinas, I agreed to the suggestion. That board meeting took place on December 14, 2018, and the board agreed to a formal audit of Lusad to be performed by Deloitte, a "big-four" accounting firm. It was also agreed that L1bre Jalisco and L1bre Monterrey, entities secretly and wrongfully formed by Mr. Salinas and Mr. Covarrubias to seek similar concessions in other Mexican cities, would be formally brought into the L1bre partnership, so as to comply with the mandates and non-competition provisions of the Partners Agreement. A true and accurate copy of the December 14, 2018 Unanimous Resolutions of the Board of Managers of Lusad, as well as a translation of the same, is attached as Exhibit 3.

8

17. Shortly after this board decision, in late December 2018, Deloitte began its work. However, Lusad's employees, at the instruction of Mr. Covarrubias, refused to provide the company's books and records or assist with the audit in any way. Instead, Mr. Covarrubias' representative and lawyer, Mr. Flores, abruptly advised Deloitte that the audit was "no longer a priority." Notwithstanding, one Lusad employee provided Deloitte two Lusad laptop computers requested by Deloitte that contained the company's financial information.

18. Upon learning that Deloitte had received the laptop that possibly contained the company's second set of books, Lusad, at the instruction of Mr. Covarrubias and his counsel, took the extraordinary step of filing a criminal complaint in Mexico City alleging that Deloitte stole the computers in a "robbery."

19. This of course was an utter fabrication, done only to obstruct and prevent the investigation into the self-dealing and other improper transactions by Mr. Salinas and Mr. Covarrubias. Deloitte had no choice but to cease work on the audit. For his part, Mr. Zayas truthfully reported to Mexican authorities that Deloitte had been authorized to review the computers in the context of the audit that it was hired to perform by Lusad.

20. These events would become the pretextual basis for Mr. Salinas and Mr. Covarrubias to seize full control of the business. Mr. Salinas and Mr. Covarrubias used Mr. Zayas' truthful report to the authorities to claim that he was complicit in the "robbery." Thus, they falsely claimed Mr. Zayas was not acting in the company's interests. Mr. Salinas and Mr. Covarrubias then undertook to remove both Mr. Zayas and me from the board of the company (Lusad) that we had co-founded and created. Mr. Salinas and Mr. Covarrubias have now also expanded the criminal proceedings to include me.

21. After representatives of Mr. Salinas and Mr. Covarrubias falsely accused Deloitte and Mr. Zayas of theft, Mr. Salinas and Mr. Covarrubias then caused Lusad to file a civil action in Mexico against both Mr. Zayas and me. In that action, Lusad requested that the court declare that we were liable for acting against the interests of the company, and to have us barred from taking any action on behalf of the board of Lusad. A true and accurate copy of the relevant portions of the Civil Complaint filed with the Superior Court of Justice of Mexico City, dated February 20, 2019, as well as a translation of the same, is attached as Exhibit 4.

22. Based on the false information provided by Mr. Salinas and Mr. Covarrubias, on February 21, 2019, a Mexican court issued an *ex parte* temporary injunction, ostensibly to maintain the *status quo*. A true and accurate copy of the Order of the Superior Court of Justice of Mexico City, dated February 21, 2019, as well as a translation of the same, is attached as Exhibit 5. Instead of maintaining the *status quo*, however, the injunction barred Mr. Zayas and me from making any decisions or otherwise acting on behalf of Lusad pending the trial and final decision, which provided Mr. Salinas and Mr. Covarrubias sole control of the business, in violation of the Partners Agreement.

23. On the very next day, February 22, 2019, Mr. Salinas and Mr. Covarrubias, on behalf of Lusad, orchestrated a sham meeting of the shareholders of Lusad, L1bre Holding and L1bre LLC. Although these companies were owned 100% by ES Technologies (and therefore the two partners), Mr. Covarrubias, as CEO of both L1bre LLC and L1bre Holding, unilaterally appointed the representatives who attended the shareholders meeting purporting to represent all the shareholders, even though this appointment was made without the knowledge or approval of the ES Holdings representatives on the board of L1bre Holding (*i.e.*, Mr. Zayas and me). A true

and accurate copy of the *Carta Poder* (Power of Attorney) executed by Mr. Covarrubias on behalf of L1bre Holding, as well as a translation of the same, is attached as Exhibit 6.

24. At the sham shareholders meeting, Mr. Covarrubias' hand-picked representatives voted supposedly on behalf of all the shareholders to remove Mr. Zayas and me from the board of Lusad. A true and accurate copy of the February 22, 2019, Shareholder Meeting Minutes, as well as a translation of the same, is attached as Exhibit 7. This, again, was despite the fact that the Partners Agreement required that the composition and structure of ES Technologies would be "replicated in the other Company's Affiliates" and that the concessionaire, Lusad, would always be under the 50/50 joint control of the two partners.

25. Incredibly and again in breach of the Partners Agreement, I have been informed that representatives of Mr. Salinas and Mr. Covarrubias are now also actively lobbying the Mexico City government to cause the concession to be issued to another company under their sole ownership and control. Of course, these actions are being taken without the consent or agreement of ES Holdings and in violation of the Partners Agreement.

26. Further, Mr. Salinas and Mr. Covarrubias have unilaterally approved and allowed ES Technologies to file a notice of controversy against Mexico pursuant to the North American Free Trade Agreement ("NAFTA") without approval of their 50/50 partner. Despite ES Holdings' repeated request for a copy of this NAFTA notice, L1bero Partners have refused to provide ES Holdings a copy of this submission. Again, Mr. Salinas and Mr. Covarrubias should not have allowed that decision to have been made without the joint approval of the partners.

27. Finally, the decision of Mr. Salinas and Mr. Covarrubias to use separate entities to compete with the partnership is poised to cause ES Holdings further imminent harm. Earlier this month, the state agency responsible for the operation of taxis in the city of Monterrey and

the Mexican State of Nuevo León announced that public bidding for that city and state's taximeter concession would open on May 2, 2019, and close on May 15, 2019. A true and accurate copy of the public bidding announcement from the Transportation Agency of the State of Nuevo León, Mexico, as well as a translation of the same, is attached as Exhibit 8. I have been informed that L1bre Monterrey, an entity that Mr. Salinas and Mr. Covarrubias agreed to bring into the L1bre family of companies (as required by the Partners Agreement) but failed to do, intends to bid on that concession. Indeed, the requirements for the Monterrey concession are designed to be met by a company with Lusad's technology and capabilities. However, because L1bre Monterrey is armed with the innovative taximeter technology and know-how that Mr. Zayas and I created—trade secrets that are the property of the partnership—I fully expect that, unless restrained, L1bre Monterrey (a company formed by Mr. Salinas and Mr. Covarrubias and which they indirectly own) will win that concession. This would amount to a gross violation of the Partners Agreement, stripping the partnership of its intellectual property and valuable rights, and ES Holdings of its rightful 50% interest in such a concession.

28. In summary, Mr. Salinas and Mr. Covarrubias are in open and willful breach of the Partners Agreement, and are ignoring the obligations assumed therein, including the mandate that any and all partnership disputes be resolved in arbitration. Any demand for ES Technologies to bring claims against L1bero Partners would be futile given the circumstances described above. Instead, Mr. Salinas and Mr. Covarrubias have wrongfully acted through contrived Mexican court actions and fraudulent corporate acts to seize absolute control of Lusad, which also has allowed them to steal ES Technologies' most valuable assets. ES Holdings is suffering irreparable harm, and it will continue to suffer irreparable harm, unless the Court acts to protect ES Holdings' interests in ES Technologies and its 100%-owned downstream entities

by granting the preliminary measures sought in this proceeding until such time as the ICC tribunal can act on this dispute. Otherwise, the arbitral proceeding will be for naught and L1bero Partners' scheme to steal a multi-billion dollar enterprise will have succeeded.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 30, 2019.

_____
Santiago León Aveleyra