# EXHIBIT 1

## ESPIRITU SANTO TECHNOLOGIES, LLC
## PARTNERS AGREEMENT

**THIS PARTNERS AGREEMENT** ("PA" or this "Agreement") is entered into this date, December 6, 2017, by and between:

**L1BERO PARTNERS, LP**, a limited partnership incorporated under the laws of the province of Alberta, Canada, with its principal place of business at 5651 Doliver Drive, Houston, Texas, 77056, United States of America ("LP"); LP is hereby represented by its President, Mr. Fabio Massimo Covarrubias Piffer;

**ESPIRITU SANTO HOLDINGS, LP**, a limited partnership incorporated under the laws of the province of Alberta, Canada, with its principal office at 4115 Jetty Terrace Circle, Missouri, Texas ("ESH"); ESH is hereby represented by Mr. Eduardo Zayas Dueñas; and

**ESPIRITU SANTO TECHNOLOGIES, LLC**, a limited liability company incorporated under the laws of the State of Delaware, United States of America, with its principal office at 200 South Bizcayne Boulevard, suite 4100, Miami, Florida, Zip Code 33131 (the "Company"); the Company is hereby represented by Mr. Santiago León Aveleyra.



LP, ESH and the Company may hereinafter be referred to individually as a "Party" or "Partner", or collectively LP and ESH as the "Parties" or "Partners".

The object of this PA is to describe and agree on the terms and conditions which are described in Section One hereto (the "Purpose"). LP and ESH agree that this PA will represent a mutual binding and legally enforceable document among the Parties and the Company.

### 1.    PURPOSE

The purpose of this Agreement is to govern the relation between LP and ESH as partners of the Company.

The Company will cause and take all necessary corporate actions to ensure that its operating agreement reflects and includes the agreements contained in this PA.

### 2.    BUSINESS SCOPE OF THE COMPANY

The Company acts as a pure holding company and is the controlling partner in L1bre Holdings, LLC, a limited liability company incorporated under the laws of the State of Delaware ("L1bre"). L1bre is also the controlling partner among

others in Servicios Digitales Lusad, S. de R.L. de C.V. ("Lusad"), a limited liability company incorporated under the laws of México which is the title holder of a certain concession dated June 17, 2016 issued by the Mobility Directorship of the Government of Mexico City (*Secretaría de Movilidad or "Semovi"*) for the substitution, installation and maintenance of taximeters, with geo-localization, of individual public passenger transport in Mexico City, as well as the development, operation and exploitation of a mobile application for remote hiring of cab trips (the "Lusad Concession").

## 3.    OWNERSHIP INTEREST

3.1    Ownership Interest of Each Party.

Each of the Partners agrees that the percentage of ownership interest it owns in the Company, as of the date of this Agreement (the "Ownership Interest") shall be as follows:

*LP*: 50 units, representing a 50% (fifty percent) of all outstanding, ordinary common voting units issued by the Company under fully diluted basis ("LP Minimum Equity Participation").

*ESH*: 50 units representing the remaining 50% (fifty percent) of all outstanding, ordinary common voting units issued by the Company under fully-diluted basis ("ESH Minimum Equity Participation").

3.2    Right to Maintain Percentage of Ownership Interest.

In the event of any merger, consolidation, division or other reorganizations of the Company, each of the Partners shall have the right to maintain its percentage of Ownership Interest in the Company or any successor of the Company as the percentage it then holds immediately before such merger, consolidation, division or other reorganizations.

3.3    Increase or Decrease in Registered Capital.

Any increase or decrease in the registered capital of the Company shall be approved by the Board of Directors unanimously pursuant to terms hereof. Each Party has the right (but not the obligation) to contribute towards any increase or decrease in the registered capital in proportion to the Ownership Interest owned by such Party in the Company, provided that ESH, as founding partner of the Company, shall not be obliged to make any additional cash contributions to the latter (unless it is expressly consented by ESH granted in writing and/or the Board of Managers of the Company agrees so by means of an unanimous resolution pursuant to the terms of this Agreement); and provided further that any additional capital contribution to be made by LP (either in the form of an equity or capital contribution or through a loan scheme (including among others the Intercompany

2

Loans, as defined hereinafter)) shall not have a dilutive effect in the ESH Minimum Equity Participation in the Company (or in the controlling equity participation of the latter in each of the Company's Subsidiaries as defined hereinafter) as long as ESH, its successors and/or assignors are owners of units in the Company and/or a Party of this Agreement.

3.4     Transfer of Ownership Interest.

After the Lock-Up Period (as defined hereinafter) is elapsed and subject to the provisions of this Article 3, any Party may sell, transfer or otherwise dispose of all of its Ownership Interest in the Company, to any third party which is not a competitor of the other Party (the "Transfer"). The Party who desires to sell, transfer or otherwise dispose of its Ownership Interest in the Company shall bear the cost of any valuation of the Company as a going concern. The Partners shall cause the Company to provide all necessary documentation and other information to the appraiser in connection with such valuation.

(b)     When a Party (the "Transferring Party") intends to Transfer a portion or all of its Ownership Interest in the Company to a third party pursuant to paragraph (a) above, it shall provide written notice (the "Transfer Notice") to the other Party (the "Non-Transferring Party") specifying its intention to make the Transfer, the terms and conditions of the Transfer, and the identity of the proposed transferee. The Transfer Notice shall also include a written copy of any offer submitted to the Transferring Party by the offeror and proposed transferee.

(c)     The Non-Transferring Party shall have a right of first refusal and may itself, or designate another entity affiliated or not to the Non-Transferring Party, to purchase the whole, and not part of, such Ownership Interest to be transferred in the same terms and conditions than those specified in the Transfer Notice.

(d)     If the Non-Transferring Party elects to exercise its respective right of first refusal, it shall notify the Transferring Party in writing (the "Written Acceptance") within ninety (90) days following the receipt of the Transfer Notice by such Non-Transferring Party. Each of the Partners shall cause the Board of Directors appointed by it to approve the Transfer at a duly convened Board meeting pursuant to the terms hereof. The Non-Transferring Party or its appointee shall then, purchase such Ownership Interest in the terms and conditions specified in the Transfer Notice within a term of up to one hundred and twenty (120) days following the delivery of the Written Acceptance.

(e)     If the Non-Transferring Party fails to respond in writing to the Transfer Notice within such ninety (90) days notice period, the Non-Transferring Party shall be deemed to have consented to the Transfer. The Non-Transferring Party who responds to the Transfer Notice by delivering a Written Acceptance shall have the right (directly or through its appointee) to purchase the whole, but not part of the Ownership Interest to be transferred.

(f)    If the Non-Transferring Party consents, or is deemed to have consented to the Transfer, the Transferring Party may Transfer its Ownership Interest to the third party; provided, however, that to the extent permitted by applicable laws, the Non-Transferring party shall have the right (the "Tag-along Right") to sell together with the Transferring Party to the third party in the same terms and conditions set forth in the Transfer Notice as a condition for the Transferring Party to effectively transfer its Ownership Interest. If the Ownership Interest that the Non-Transferring Party and the Transferring Party intend to sell exceeds the amount that the third party intends to purchase, the Ownership Interest that can be Transferred to the third party shall be equally divided between the Non-Transferring Party and the Transferring Party proportionately.

(g)    The Transferring Party and the Non-Transferring Party (if the Non-Transferring Party exercises its Tag-along right) shall complete the Transfer before the earlier of (i) ninety (90) days following the expiration of the ninety (90) day notice period; and (ii) three (3) days after the Company receives necessary government approvals relating to the Transfer (the "Transfer Period"); provided, however, that the Transfer shall not be effective and shall be voidable unless and until a copy of the transfer agreement executed by the transferee has been submitted to the Non-Transferring Party, and, (i) if only a portion of the Ownership Interests of the Transferring Party and the Non-Transferring Party (if applicable) is being transferred, the transferee has agreed therein to assume, jointly and severally with the Transferring Party, the rights and obligations of the Transferring Party and the Non-Transferring Party (if applicable) under this Agreement, or (ii) if all Ownership Interests of the Transferring Party and the Non-Transferring Party (if applicable) in the Company are being transferred, the transferee has agreed therein to assume all of the rights and obligations of the Transferring Party and the Non-Transferring Party (if applicable) under this Agreement. The Transfer shall be in terms and conditions no more favourable to the transferee than those set forth in the original Transfer Notice.

(h)    If the Transfer is not completed within the Transfer Period, the Transferring Party shall not be permitted to Transfer its Ownership Interest to any third party unless it fully complies with the procedures set forth in Articles 3.4(b) and (c).

3.5    Transfer to Affiliates.

Notwithstanding the provisions of Article 3.4, in the event that any Party intends to transfer all or part of its Ownership Interest in the Company to an Affiliate of such Party, such Party may do so upon the other Party's prior written consent, which shall not be unreasonably withheld (the "Permitted Transfer"). The right of first refusal set forth in Article 3.4 shall not apply in such case.

For the purposes hereof, the term "Affiliate" shall mean (i) with respect to any Person (as defined below), any other Person directly or indirectly Controlling or

Controlled by or under direct or indirect common Control (as defined hereinafter) with such specified Person, and (ii) with respect to any Person that is a partnership, the general partners thereof and the record owners of equity securities of such general partners, and "Control" shall mean (i) the ownership of more than 50% of the voting securities, social quotas, shares or rights, in a Person, legal entity or vehicle with or without legal personality, and (ii) the power to exercise or impose a decision, order, instruction or controlling order or influence over the decisions, management or policies of such Person or legal vehicle. Notwithstanding the foregoing, neither the Company nor any Person Controlled by the Company shall be deemed to be an Affiliate of any Shareholder (as defined hereinafter) for the purposes of this Agreement. Furthermore, the term "Person" shall include any individual, company, limited liability company, limited or general partnership, joint venture, association, joint-stock company or trust.

3.6 Effect of Transfer.

The Transfer of a Party's Ownership Interest in the Company shall not release such Party from its liability to pay any amount of money accrued, due and payable to the other Party, or to discharge its obligations owed to the other Party or a third party accrued and unfulfilled prior to the completion of the Transfer, including any liability to the Company or the other Party in respect of any breach of this PA. Any third party acquiring units of the Company shall adhere itself to this Agreement by means of a written agreement as a condition precedent to perfect such acquisition and to be admitted as a partner in the Company.

**4. RESPONSIBILITIES OF THE PARTIES:**

4.1. LP shall be responsible for the following:

(a) The granting by LP or any Affiliate thereof, to the Company, of certain cash contributions in the form of the following Intercompany Loans whereby LP will act as lender and the Company as borrower (jointly, the "<u>Intercompany Loans</u>"), all of which shall be granted by LP under current market conditions as per arm-length basis (as categorized in the Companies Act, 2013):



(i) a loan in a principal aggregate amount of up to USD$10'000,000.00 (Ten million US dollars 00/100) (the "<u>Intercompany Loan 1</u>"), in order for the Company to exercise and pay the purchase price of certain units issued by L1bre as provided in the Unit Purchase Agreement dated October 13, 2017 executed by and between the Company, as purchaser, and Accendo Holdings LLC, as seller (as such agreement is amended on or before this date or on or before the disbursement of the Intercompany Loan 1 by the Company). The Intercompany Loan 1 shall be disbursed by LP to the Company within a maximum term of 5 (five) business days after the same is requested

in writing by the Company to LP and will result payable by the Company within a maximum term of 2 (two) years following the date of its effective disbursement, but in any event not before a 12 (twelve) month period after the date of execution of this Partners Agreement, provided that the Intercompany Loan 1 shall have a grace period in the payment of capital of 12 (twelve) months after its effective disbursement by the Company;

(ii) a loan in principal aggregate amount of up to USD$10'000,000.00 (Ten million US Dollars 00/100) (the "Intercompany Loan 2"), in order for the Company to pay all the accounts payable owed by the Company and/or by its subsidiaries (including L1BRE and Lusad to the third party vendors whose collectibles and amounts owed are listed restrictively in **Annex 1** of this Agreement, provided that LP, or any Affiliate thereof, will be entitled to directly assume or pay such receivables in case it decides to pay them directly to such third parties. The Intercompany Loan 2 shall be disbursed by LP within a maximum term of 5 (five) business days after the same is requested in writing by the Company and will result payable by the Company within a maximum term of 2 (two) years after its effective disbursement, but in any event not before a 12 (twelve) month period after the date of execution of this Partners Agreement, provided that the Intercompany Loan 2 shall have a grace period in the payment of capital of 12 (twelve) months after its effective disbursement by the Company. As of the date of execution of this Agreement, LP, acting through its Affiliate Inversiones Cova, S.A. de C.V., has already advanced as of this date the principal amount of USD$6'348,466.97 (six million three hundred and forty eight thousand four hundred and sixty six 97/100 United States Dollars) directly to L1bre or to Lusad (or indirectly through the payment and assumption of accounts payable or debts incurred by the same) as the case may be; as part of this commitment; the receivables paid with this amount is detailed in **Annex 2** hereto. The execution of this Agreement serves as full acknowledgment by L1bre and/or Lusad of the disbursement of such amount as part of the Intercompany Loan 2 in the amounts referred in said **Annex 2**.

(iii) The Intercompany Loans shall have the financial terms (interest rate and principal amortization schedule) provided in **Annex 3** hereof and the same shall be documented by the Company through the subscription of two or more non-negotiable promissory notes in the form of **Annex 4** up to the total principal outstanding amount of the Intercompany Loans (the "Promissory Notes"), provided that none of the Intercompany Loans shall be capitalized in the Company nor will have a dilutive effect among the Partners in the Company (or of the latter in the Company's Affiliates), unless the unanimous consent of the Partners is granted in writing and through an unanimous approval

of the Board of Directors as provided in Section 5.2 of this Agreement. The Intercompany Loans shall not bear nor will have commissions, fees and/or penalties but will have a senior priority payment by the Company. Therefore, any Distributions (as defined hereinafter) to the Partners shall be subordinated to the preferential payment of the Intercompany Loans and its accessories as the case may be.

(iv) The Intercompany Loan 1 shall be disbursed to the Company by LP on or before December 28, 2017. The Intercompany Loan 2 shall be disbursed to the Company by LP on or before March 31, 2018 (each of such maximum disbursement dates, the "Disbursement Maximum Terms") as instructed solely by ESH and/or by the Members of the Board of Directors appointed by the latter.

(v) None of the Intercompany Loans will be foreclosed by LP in the Company in the event there is a default or breach in its payment terms by the Company without having first the Board of Directors exploring, under *bona-fide* basis, additional sources of financing that are not dilutive to the Partners which shall be analyzed by the Company by calling at least two (2) meetings of the Board within a minimum term of 45 (forty five) days among each of such meetings, in order for the Board to analyze and/or discuss the different options available to the Company to refinance or repay the Intercompany Loans, provided that such best efforts shall be documented in writing by the Company. In the event no financial sources result available to the Company after both meetings are held and/or no additional sources of financing are obtained by the Company in the terms hereof, LP shall be entitled to foreclose the Intercompany Loans as per applicable laws.

(vi) Other Loan Commitments. The Partners agree that LP shall make its best efforts to cause that Banco Azteca, S.A. (the "Prospective Lender"), directly or through any of its affiliated financial entities, grants to the Company and/or to any of the Company's Affiliates (preponderantly to Lusad), a line of credit for working capital purposes for up to USD$90,000,000.00 (Ninety million US dollars 00/100) either directly or through a banking syndicate arranged by the same (the "Working Capital Loan"); provided that the Working Capital Loan will be granted under market conditions and subject to the observance of any credit policies in force by or to the Prospective Lender (including, but not limited to the granting of collaterals or guarantees thereof). As part of the best efforts by LP hereof, LP covenants to grant (or obliges itself before ESH and the Company) to cause that its Principals (as defined hereinafter) as beneficial Controlling persons of LP grant, as the case may be, to the Prospective Lender any personal collaterals or guarantees to be

requested by the latter (if any) necessary to secure and disburse the Working Capital Loan. It is expected that the Working Capital Loan will be disbursed by the Company (or by any of the Company's Affiliates) on or before June 30, 2018.

4.2. Additionally, the Partners, shall be jointly responsible for the following:

(a) Handling the day-to-day operations of L1bre and Lusad and taking all appropriate actions needed in order to perform L1bre's and Lusad's businesses as provided in the Lusad Concession pursuant to the terms hereof; and

(b) Explore new business opportunities for the Company and/or L1bre in any other countries in which services similar to those contemplated by the Lusad Concession may be performed, including the licensing of the application, software and know-how developed by L1bre for remote hiring of cab services and other related services.

4.3. Expenses Not Reimbursable.

Unless expressly provided under this PA, expenses incurred by any Party in fulfilling the aforesaid responsibilities and other financial expenses incurred by the Partners shall be borne by the Company only upon unanimous approval of the Board.

## 5. BOARD OF DIRECTORS

5.1 Composition and Term

(a) The Board of Directors of the Company (the "Board" or the "Board of Directors") shall consist of four (4) Directors. LP shall appoint two (2) Directors and ESH shall appoint two (2) Directors. The Chairman shall be initially appointed by ESH provided that such appointment shall be annually rotated among the Partners (therefore and for clarity purposes, LP shall make such appointment for the social year starting on January 1st to December 31st, 2019 and ESH shall make the Chairman appointment for the social year starting on January 1st to December 31st, 2020 and so on). The term of the Directors shall be indefinite. If a Director position becomes vacant for any reason, the Party who appointed the Director whose position is vacant shall be entitled to appoint a successor in writing. Each Party may, subject to applicable laws, remove any Director appointed by such Party and appoint another individual.

(b) The Board shall convene its first meeting within thirty (30) days after the signing of this Agreement. At the first Board meeting (i) LP shall appoint the Chief Executive Officer (the "CEO"), (ii) LP shall appoint the Chief Financial Officer (the "CFO"), (iii) the Chief Operating Officer (the "COO") and the Chief Technology Officer (the "CTO" and jointly with the CEO, the CFO and the COO,

the "Top Management") shall be appointed by ESH; (iv) LP shall appoint the Comptroller, provided however that once the Intercompany Loan 1 and the Intercompany Loan 2 are paid in full, the Comptroller shall be jointly appointed by the Partners, in the understanding that the Comptroller will be independent to the Partners and to the Company. Likewise, the Partners agree that the CFO shall be appointed by LP during the term and as long as the Intercompany Loans remain outstanding. Once the Intercompany Loans are paid in full by the Company both Partners shall jointly appoint the CFO; (v) the other senior managers of the Company and the Corporate Secretary shall be jointly appointed by the Partners by means of a Board unanimous resolution pursuant to the terms hereof, provided that the Corporate Secretary shall be an independent person to any of the Parties; and (vi) the Partners, through a Board unanimous resolution, shall take all appropriate actions in order to cause the Company: (i) to appoint the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Technology Officer, Comptroller and all other top-management positions of the Company, to the same positions in the Company's Affiliates; (ii) to have L1bre and Lusad grant to the persons appointed to the Top Management the necessary powers-of-attorney that they may need in order to operate the business of L1bre and Lusad, respectively, provided that such powers of attorney shall be exercised jointly by the Partners' representatives or appointees as provided in Section 5.2 hereof; and (iii) the Partners, through a Board of Directors unanimous resolution shall take all appropriate actions in order to cause the Company to have L1bre and Lusad approve the first annual business plan (the "Business Plan") and annual budget (the "Annual Budget") for the period commencing from such date to the end of the next following year.

The Parties hereby agree that the Board composition and structure and the appointment procedure for the Top Management shall be replicated in the other Company's Affiliates and in any new affiliates or subsidiaries that may be incorporated as part of the Company's expansion of its business operations, as provided in this Agreement. In such regard, the Partners agree to adopt and formalize on the date of execution of this Agreement the necessary resolutions to perfect such appointments in each of the Company's Affiliates pursuant to the forms of resolution attached as **Annex 5** herein as the case may be.



(c)     The Board shall convene at least four meetings in each year. The Chairman shall call a special Board meeting if he is requested to do so by at least two Directors in writing, provided that each of the Directors, acting individually, will be entitled to call and summon a Board of Directors meeting. The Company shall not pay any fee, remuneration or subsidy to any Director for attending a Board meeting. The expenses incurred by the Directors shall be for the account of the respective appointing Party.

5.2     Functions and Power of the Board.

The Board of the Company shall have the ultimate power to make decisions for the Company on material matters. Each Director shall have one vote. Adoption of any resolutions at a Board meeting must be approved by a majority of the Directors present at such Board meeting, provided that at least 3 (three) Directors are present in the meeting. The foregoing except for the following matters, which must be approved by the unanimous affirmative written resolution of all the Directors (each, a "Major Decision"):

(a)     Any amendments to certain Unit Purchase Agreement dated as of October 13, 2017, executed by and between the Company, as Purchaser, and Accendo Holdings LLC, as Seller, over certain units representing the capital stock of L1bre Holding and any amendments thereof

(b)     Amendment to the articles of association of the Company or the incorporation documents or bylaws of any of the Company's Affiliates;

(c)     Increase or decrease in the registered capital of the Company and the issuance of any units, social quotas or shares representing such capital either with voting, non-voting or with limited rights; provided that any capital increase shall not have a dilutive effect on the ESH Minimum Equity Participation as provided in Section herein. Any capital decrease shall be done under *pari-passu* basis to keep and maintain the participation percentages among the Partners in the same proportions.

(d)     Termination, liquidation or dissolution of the Company or of any of the Company's Affiliates (including, without limitation, Lusad);

(e)     Pledge, mortgage or otherwise encumber any material assets of the Company or of any of the Company's Affiliates (including, without limitation, Lusad) for financing or for other reasons; and/or the pledge, encumber or transfer by any means, the Units representing the capital stock of the Company or representing the capital stock of any of the Company's Affiliates (or of any rights thereof), except for a Permitted Transfer;

(f)     Merger, consolidation or spin-off with any other entities or reorganization of the Company or of any of the Company's Affiliates (including, without limitation, Lusad), division of the Company, or change of the Company's corporate form or of any of the Company's Affiliates;

(g)     Any adjustment of each Partner's percentage of Ownership Interest in the Company and of the latter in any of the Company's Affiliates;

(h)     The entry by the Company or by any of the Company's Affiliates into any partnership, joint venture or other profit sharing arrangement with a third party; and/or the admittance or acceptance to additional partners in the Company or in the Company's Affiliates, either directly or indirectly;

(i) Borrowing loans or granting of guarantees of any nature to a third party by the Company or by any of the Company's Affiliates except (i) for the Intercompany Loans granted and committed by LP under this Agreement which shall be exercised and disbursed by the Company by the sole instruction and approval of the Directors appointed by ESH, and/or (ii) for any loans and financings approved in the Business Plan and/or the Annual Budget;

(j) The Company's annual Business Plan and/or Annual Budget and any amendments to such annual Business Plan and/or Annual Budget and any amendments and deviations thereof;

(k) Engaging or changing the external auditors for the audit of the Company's financial statements or of any of the Company's Affiliates and the fixation of their compensations and fees;

(l) Dividend distribution plans or plans to make up for losses for each fiscal year different to those approved in the annual Business Plan and/or the Annual Budget or the adoption or amendment to the Company's or the Company's Affiliates' Distributions or dividend policies;

(m) Any transaction or series of transactions, including without limitation, acquisition, disposition, encumber, guarantee and/or sale of material assets and investments of the Company or in any of the Company's Affiliates, which are not provided in the annual Business Plan and/or the Annual Budget for the year in which such transactions take place, or such transactions are different in value or in substance from the transactions provided in the annual Business Plan or Annual Budget, and the aggregate value of each such transaction or series of transactions exceeds an aggregate amount of $150,000.00 (One hundred and fifty thousand USD dollars 00/100) or an equivalent amount in other currencies.

(n) the granting of powers of attorney by the Company or by any of the Company's Affiliates and the exercise and execution of any acts thereof for acts of domain or for the subscription of negotiable instruments or securities of any nature (or to secure or accept them), provided that such powers of attorney shall be exercised by the joint participation of a representative A to be appointed by ESH and by a representative B to be appointed by LP to the extent that such acts have an individual or joint value in a sole act or succession of acts of $25,000.00 (Twenty five thousand USD dollars 00/100) or higher, except for (i) the subscription of negotiable credits under the ordinary course of business of the Company or the Company's Affiliates, and (ii) for the acts approved in the Business Plan or the Annual Budget in which cases such powers of attorney can be individually exercised by a representative A or a representative B, indistinctly.

(o) The amendment of the Intercompany Loans and/or of the Promissory Notes thereunder;

(p)     The amendment to the Lusad Concession by Lusad, or its termination, suspension, assignment, encumbrance, relinquish or abandonment by any means;

(q)     the approval of the CEO, the CFO, the COO and the Comptroller compensation's package, and/or the engagement and/or contracting by the Company or by any of the Company's Affiliates, of any employment, services or similar agreements with Persons with an annual compensation in excess of $250,000.00 (Two hundred and twenty five thousand US dollars 00/100) and the granting of any compensation or benefits thereof except for those acts approved in the annual Business Plan or the Annual Budget; provided that if any of the Partners (or their respective Principals) are retained or engaged by the Company for a Top Management Position (or under any condition) in L1bre Holdings, the Principals of the other Partner shall have the right to receive the same compensation package offered to the other Principal for the Top Management position.

(r)     the execution of any agreement, act or operation by the Company or by the Company's Affiliates with a related party to the Parties, to the Company or to its direct and indirect partners (including the Principals), or to any Director of the latter, all of which shall be engaged under market and arm's length conditions;

(s)     the declaration of bankruptcy, insolvency and reorganization (including a *concurso mercantil*) or any filing and petitions thereof, by the Company or by any of the Company's Affiliates;

(t)     the incorporation by the Company or by any of the Company's Affiliates of any direct or indirect affiliate or investment company or vehicle with legal personality or not, and/or the opening or pursuance by the Company or by any of the Company's Affiliates of a new line of business or investment not provided in the annual Business Plan and/or the Annual Budget.

(u)     The exercise of any corporate or voting rights issued by the Company's Affiliates and the designation of any proxy or representative authorized to vote and approve any of the acts and or matters described in paragraphs (a) to (s) hereof by each of the Company's Affiliates.

5.3     Deadlock.

(a)     The Partners shall co-operate and discuss in good faith to resolve operational disputes which might arise between them. Deadlock refers to the situation where the Directors appointed by each Party are not able to reach unanimous agreement on the matters set forth in Article 5.2 above once and as long as the Lock Up Period has elapsed (the "Deadlock"). The Chairman shall deliver a written notice (the "Deadlock Notice") to inform the shareholders of the occurrence of Deadlock and of the unresolved matters which caused the Deadlock. Each Party shall designate a senior representative within 10 (ten) days after receipt of the Deadlock

Notice by such Party. Such senior representatives from each Party shall use their good faith efforts to conduct friendly consultation to resolve matters set forth in the Deadlock Notice within twenty (20) days after the expiration of the ten-day period set forth in the previous sentence, or within a longer period agreed by all Parties. If the representatives of the Partners cannot successfully resolve such matters during the twenty-day period or a longer period agreed by all Parties, then all the activities of the Company and the Company's Affiliates will stop immediately (except for any of such acts that result necessary to keep and preserve the ordinary course of activities and business of the Company and of the Company's Affiliates) and an independent reputable international investment bank will be appointed by the Partners at the cost of the Company (the "Initial Valuation Firm") to do the fair market valuation of the Company and its potential sale of the Company to a third party independent and/or not related directly or indirectly to the Parties and the Principals. The appointment of the Initial Valuation Firm and the valuation result (the "Initial Valuation") will be binding for the Parties, provided that if any of the Partners is not in agreement with the fair market valuation determined by the Initial Valuation Firm and/or with the Initial Valuation, the Party in disagreement shall have the right to appoint, to the cost of the Company, another independent reputable international investment bank (the "Second Valuation Firm") to do a new valuation within a term of forty five (45) days after the Initial Valuation was notified in writing by the Initial Valuation Firm (the "Second Valuation"). The sale value of the Company will be the average between the Initial Valuation and the Second Valuation (the "Average Value") and the Party that requested the intervention of the Second Valuation Firm (the "Valuation Disagreement Party") shall have a right of first refusal to purchase the Units of the other Party in the Company at the Average Value pursuant to Section 3.4 hereof. In any case, the sale of the Company shall be made by the transfer of the Units representing its capital stock and the Partners shall grant customary representations, warranties and indemnities under current market conditions and under the same conditions, provided that any payment thereof shall be denominated in money exclusively and done by the third party purchasing the Units within a maximum term of thirty (30) days after the Average Value is determined and notified to the Partners and such third party executes with the Partners the sale agreement, without prejudice of the right of first refusal of the Valuation Disagreement Party.

(b)     All Partners shall continue to perform their obligations under this Agreement until the Deadlock is solved pursuant to the above provisions.

5.4 Lock-Up Period.

The Partners agree, for the purposes of this Agreement, that the lock-up period shall mean a mandatory term of thirty six (36) months following the date hereof (the "Lock-Up Period"). Hence and for clarity purposes, none of the Partners will be entitled and shall be restricted to make any transfer, pledge, divestiture or disposal of its Units in the Company, nor will experiment a Change of Control (as defined hereinafter), or trigger,

initiate or exercise a Deadlock, on or before the Lock-Up Period or prior to the date when the Lock-Up Period expires.

## 6. MANAGEMENT

6.1     Responsibilities of the CEO.

The CEO shall report to the Board, and shall be responsible for the day-to-day operations and management of the Company and of the Company's Affiliates (among others, L1bre and Lusad), pursuant to the Board's authorization.

6.2     Management Meetings.

The CEO, CFO and the COO of both L1bre and Lusad shall constitute the executive committee of said companies (the "Executive Committee"). The Executive Committee shall discuss important matters relating to the business operations of both L1bre and Lusad, and if necessary, shall make decisions to adjust the detailed operational plans to implement the Board's resolutions. The Executive Committee may invite other Top Management officials of L1bre and Lusad to any Executive Committee meeting.

## 7. ANNUAL BUSINESS PLAN AND ANNUAL BUDGET

7.1     Preparation of Annual Business Plan and Annual Budget.

The CEO, CFO and COO shall be jointly responsible for the preparation of the annual Business Plan and Annual Budget for each fiscal year of both L1bre and Lusad after the Initial Period, and shall submit the draft annual Business Plan and Annual Budget to the Company's Board for approval before November 1 of each year. The draft annual Business Plan and Annual Budget must be revised pursuant to the Board's comments.

## 8. ACCOUNTING AND AUDIT

8.1     Book and Records.

The Company shall keep full, complete and accurate books of account, record and information with respect to its business operations. The accounts and records of the Company shall be maintained in accordance with the International Financial Reporting Standards ("IFRS") and shall include all necessary information for incorporation into the accounts of the Parties, whether through consolidation, equity accounting or otherwise.

8.2     Financial Statements of the Company.

The Company shall (i) prepare audited financial statements in accordance with IFRS no later than forty-five (45) days after the end of each fiscal year of the Company, and (ii) prepare unaudited financial statements in accordance with IFRS no later than fifteen (15) days after the end of each fiscal quarter (other than the final quarter of the fiscal year). The Company shall also provide on a timely basis all statements necessary for each Party to prepare its tax returns as they relate to such Party's interest in the Company.

The Company shall also cause its subsidiaries, L1bre and Lusad, to prepare the same information, within the same time frames.

8.3     Audit.

Each of the Partners may examine, at any time, during normal business hours, the books of account, records, vouchers, contracts and documents of any kind of both the Company, L1bre and Lusad for monitoring the financial performance of the Company, L1bre and Lusad, as the case may be, or have them reviewed by persons designated by such Party. Such examination shall be conducted in a manner to avoid, whenever possible, adversely affecting the normal operations of the Company and/or L1bre and/or Lusad. Expenses relating to such examination shall be borne by the Party who initiates such examination. The Partners agree that the books and records as well as the information obtained therefrom are confidential and are subject to Section 11 hereto.

## 9.  PROFIT DISTRIBUTION

9.1     After payment of taxes in accordance with applicable laws and regulations and after ensuring that the Company has sufficient funds to meet its capital needs for future business operations, the Partners agree that the Company may declare a dividend or capital reduction in cash and/or in kind (the "Distributions").

Any of the Distributions shall be distributed to each Party in accordance to their respective Ownership Interests under *pari-passu* basis, except for any preferential repayment in favour of LP under the Intercompany Loans.

## 10. EARLY TERMINATION

10.1    Triggering Events.

Once the Lock-Up Period is expired, this Agreement may be terminated prior to the expiry of the term of the Company if any of the following events occur:

(a) The Partner who made its contribution to the Company pursuant to this Agreement may terminate this Agreement if the other Partner (i) fails to make its contributions to the Company pursuant to this PA and such failure continues for a period of more than ninety (90) days; and (ii) the obligation of

such Partner to make contributions to the Company is not waived by the other Partner who already made its contribution; provided that this Agreement shall be terminated prior to the Lock-Up Period, in the event LP breaches its obligation to disburse the Intercompany Loans in the Disbursement Maximum Term. In such a case, LP will cease to be a Party to this Agreement and a Partner in the Company and its Units shall be cancelled and extinguished without the Company's and/or ESH liability, and without any payment and/or corporate action thereof by the Company.

(b) If Mr. Fabio Covarrubias Piffer, Mr. Ricardo Benjamin Salinas Pliego, or Mr. Santiago León Aveleyra and Mr. Eduardo Zayas Dueñas (each of them, the "Principals"), cease to have a direct or indirect Control in LP or ESH, respectively, and/or if a change in the ultimate Controlling position of the Partners occurs for any reason (any of such events, a "Change of Control"), the other Partner may terminate this Agreement without any liability and/or the Company's liability, in which case provisions of paragraph (a) above shall result applicable; provided that any transfer of a Controlling interest in the Partners due to the death of any of the Principals shall not be considered as a Change of Control for purposes hereof. In the event a Change of Control takes place after the Lock-Up Period, the Partner that does not suffers a Change of Control shall have the right to initiate a Deadlock procedure pursuant to clause 5.3 of this Agreement.

(c) Once the Lock-Up Period is expired, any Party may terminate this Agreement if the Company sustains serious losses for two (2) consecutive years or the Company is unable to achieve its business goals and, after consultation, the Partners are unable to agree on a business plan to improve the economic situation of the Company.

(d) Once the Lock-Up Period is expired, any Party may terminate this Agreement if Deadlock occurs and the same is not resolved pursuant to Section 5.3 hereto, provided that in such event the provisions of Section 5.3 shall result applicable.

(e) Once the Lock-Up Period is expired, any Party may terminate this Agreement if performance of the whole or part of this Agreement is prevented by an Event of Force Majeure (Acts of God, acts of any government entity, changes in law, riots, wars, embargoes, strikes, lockouts, accidents in transportation, port congestion or other causes beyond its control) lasting for more than ninety (90) consecutive days and, after consultation, the Partners are unable to agree on a method to perform this Agreement provided, however, that in the case of partial performance being prevented, such partial performance is material to the Company. In such a case provisions under Section 5.3 will apply; and

(f) The Partners agree in writing to terminate this Agreement and agree on the terms for the dissolution of the Company. In this case, the Company and its assets shall be liquidated and distributed in accordance with applicable laws and the Partners Agreement.

10.2 Consequences of Termination.

(a) The Partners shall terminate this Agreement by a written document (the "Termination Agreement") executed by the duly authorized representative of each of the Partners.

(b) The termination of this Agreement shall not release a Partner from its liability to pay any sums of money accrued, due and payable to the other Partner or to discharge its then-accrued and unfulfilled obligations including any liability to the Company or the other Partner in respect of any breach of this Agreement.

## 11. CONFIDENTIALITY. NON COMPETE.

(a) The Partners and their affiliates shall use the Confidential Information only for the purposes specified in this PA, and shall not disclose any Confidential Information to third Partners without the prior written consent of the Party providing such Confidential Information; provided, however, that (i) a Party may be permitted to disclose Confidential Information received by it to its Affiliate(s) when such disclosure is necessary for such Party to carry out its obligations under this PA, the Articles of Association or the other Transaction Agreements; provided that such Affiliate(s) shall execute a confidentiality agreement with the Party providing the Confidential Information, and (ii) any Party may disclose certain Confidential Information if required by the regulatory authorities under applicable laws and regulations. The Party who discloses Confidential Information to the regulatory authorities shall timely provide a written notice to the other Partners in such event setting forth the scope of the Confidential Information disclosed. Each Party shall cause its Affiliates to strictly perform these confidentiality obligations.

(b) The Company, the Partners and their respective Affiliates that receive Confidential Information shall make such Confidential Information available only to their respective directors, managers and personnel (the "Representatives") whose duties necessitate awareness of such Confidential Information and shall cause such Representatives to also comply with the confidentiality obligations set forth herein.

(c) The confidentiality obligations set forth in this Section shall remain effective with respect to the Partners and their respective Affiliates during the term of the Company and for an additional period of five (5) years after the termination of this Agreement.

(d) The Partners agree, either directly or indirectly not to compete or to not to intervene (and to cause that none of the Principals compete or intervene directly or indirectly) in any activities similar to the ones performed by the Company and the Company's Affiliates, and/or to directly or indirectly invest or participate in the capital stock and/or as creditor or lender, in or in favour of third parties that is a competitor of the Company in such countries and jurisdictions where the Company and the Company's Affiliates perform their current and/or future activities. The provision herein will be in force during the term of this Agreement and for a term of 24 (twenty four) months after the same is terminated for any reason.

(e) The Partners hereby agree that they will refrain to analyse and/or to enter into any new line of businesses or economic activities or initiatives that could have a synergy with the activities or the line of business performed by the Company or by the Company's Affiliates, without submitting such new venture or new line of business to the prior analysis of the Board of Directors of the Company, provided that if the Board elects to reject or denies to participate in such initiative in writing, the Partners shall be free to pursue the submitted venture independently to the extent the Members of the Board of Directors appointed by the Partner not submitting the initiative rejected the proposal. The approvals of new ventures hereof shall be considered a Major Decision.

## 12. APPLICABLE LAW. ARBITRATION.

This Agreement and all actions contemplated herein shall be governed by and construed in accordance with the laws of the State of Delaware. Any dispute, claim or controversy resulting from, relating to or arising out of this Agreement, including the breach, termination, enforcement, interpretation, or validity thereof, shall be submitted to final and binding arbitration administered by the International Court of Arbitration of the International Chamber of Commerce ("ICC") in accordance with its Rules of Arbitration then in effect (the "Rules"), except as modified herein:

(a) There shall be three (3) arbitrators, of whom the claimant, or claimants jointly, shall nominate one, and the respondent, or respondents jointly, shall nominate another, in each case within twenty (20) days of the date of delivery of the request for arbitration. The two party-nominated arbitrators shall appoint the third arbitrator, who shall be the president of the tribunal, within thirty (30) days of the date of confirmation of the appointment of the second arbitrator. If, for any reason, any arbitrator is not timely nominated as provided herein, then such arbitrator, or the tribunal if required under the Rules, shall be appointed by the ICC upon the written request of any Party.

(b) The seat of arbitration shall be New York City, New York. The language of the arbitration proceedings, and of the award, shall be the English language.

(c)     By agreeing to arbitration, the Partners do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other temporary or interim order in aid of arbitration proceedings. In any such action, each of the Partners hereto irrevocably and unconditionally (i) submit to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York located in New York County, New York, or, if such court does not have jurisdiction, the Supreme Court of the State of New York or any court of competent civil jurisdiction sitting in New York County, New York (the "<u>New York Courts</u>"); (ii) waives, and agrees not to assert, by motion or otherwise, that it is not subject to the jurisdiction and venue of such courts, that its property is exempt or immune from attachment or execution in the New York Courts, that such action is brought in an inconvenient forum, that the action should be transferred or removed to any court other than one of the New York Courts, that such action should be stayed by reason of the pendency of some other proceeding in any other court other than one of the New York Courts, or that this Agreement or the subject matter hereof may not be enforced in or by the New York Courts; and (iii) Waives any right to trial by jury. Without prejudice to such provisional remedies as may be available under the jurisdiction of a court, the arbitral tribunal, or the emergency arbitrator to the extent and as provided in the Rules, shall have full authority to grant provisional remedies and to direct the Partners to request that any court modify or vacate any temporary or preliminary relief issued by such court, and to award damages for the failure of any party to respect the arbitral tribunal's orders to that effect.

(d)     An award of the tribunal shall be final and binding on the Partners thereto, and judgment thereon may be entered or enforced in any court of competent jurisdiction, or any court where a Party or its assets is located (to whose jurisdiction the Partners consent for the purposes of entering or enforcing an award).

## 13. NOTICES.

All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via e-mail to the Partners at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)     if to LP, to:          L1bero Partners, Lp
                                5651 Doliver Drive
                                Houston, Texas
                                77056

19

with a copy (which shall not constitute notice) to:

> Mr. Francisco J. Flores Montes Urales 455 7th floor Lomas de Chapultepec Mexico City, Mexico 11000 Email Address: francisco.flores@romericainvestments.com

(b)   if to the ESH, to:   Espiritu Santo Holdings, LP
50 Cape Florida Drive
Key Bizcayne, Florida
33149
At'n: Mr. Santiago León Aveleyra

with a copy (which shall not constitute notice) to:

> Núñez Sarrapy Abogados Prado Sur 274, 2nd floor Lomas de Chapultepec Mexico City, Mexico 11000 Attention: Mr. Rodrigo Núñez Sarrapy Email Address: rnunez@nsa.com.mx

(c)   if to the Company to:   Espiritu Santo Technologies, LLC
200 South Bizcayne Blvd, Suite 4100
Miami, Florida
33131
At'n: Mr. Santiago León Aveleyra

With a copy (which shall not constitute notice) to the Seller and the Purchaser.

*[Remainder of Page Intentionally Left Blank Signature Page follows]*

**IN WITNESS WHEREOF**, the Partners hereto have caused this Agreement to be executed as of the date first above written by their duly authorized representatives.

**LP**
**L1BERO PARTNERS, LP**

BY: _____
NAME: Fabio Massimo Covarrubias Piffer
TITLE: Representative

**ESH**
**ESPIRITU SANTO HOLDINGS LP**

BY: _____
NAME: Eduardo Zayas Dueñas
TITLE: Representative

**THE COMPANY**
**ESPIRITU SANTO TECHNOLOGIES, LLC**

BY: _____
NAME: Santiago Leon Aveleyra
TITLE: Representative

**Annex 1**

*Accounts payable owed by the Company and/or by its subsidiaries*

[TO BE COMPLETED BY THE PARTIES WITHIN A MAXIMUM TERM OF 10 BUSINEES DAYS AFTER THE DATE OF EXECUTION OF THE PARTNERS AGREEMENT]



[*It is expected by the Parties that this Annex 1 will include any expenses effectively incurred and authorized by LIBRE Holdings, LLC and/or its Affiliates before Doporto & Asociados, S.C., which in its case shall be approved by the Board of Directors of the Company as a Major Decision by means of a unanimous written resolution pursuant to Section 5.2 of the abovementioned Partners Agreement.*]

ANNEX 2

## RELACIÓN DE PAGOS EFECTUADOS POR CUENTA DE SERVICIOS DIGITALES LUSAD.

Cifras al 06/12/2017.

| FECHA | IMPORTE, US | IMPORTE, MN | CONCEPTO: |
|---|---|---|---|
| 30/10/2017 | $ 125,000.00 | | PRIMER PAGO A HERE.COM |
| 01/11/2017 | | $ 375,890.00 | NÓMINA 2A. QUINCENA OCTUBRE 2017 |
| 10/11/2017 | $ 300,000.00 | | PRIMER PAGO A KICHINK |
| 10/11/2017 | | $ 98,000.00 | PAGO A/C A GRUPO AD XITLE |
| 14/11/2017 | $ 70,000.00 | | 100% MANUFACTURA "BOARD", PARA TABLETAS |
| 14/11/2017 | $ 1,386,100.00 | | 25% ANTICIPO A INGRAM, 10,000 KITS |
| 14/11/2017 | $ 3,558,300.00 | | 75% L/C A INGRAM, 10,000 KITS |
| 15/11/2017 | | $ 375,890.00 | NÓMINA 1A. QUINCENA NOVIEMBRE 2017 |
| 21/11/2017 | $ 346,492.00 | | PRIMER PAGO A DELL |
| 23/11/2017 | $ 332,500.00 | | PROGRAMA DE PAGOS A KICHINK, 2° PAGO |
| 24/11/2017 | | $ 793,660.00 | PAGO A CUENTA, ADEUDOS CON RADIOMÓVIL DIPSA |
| 23/11/2017 | $ 19,826.00 | | NÓMINAS Y PRIMA VAC. PENDIENTES A MITCH GRIMES |
| 29/11/2017 | | $ 240,000.00 | PROGRAMA DE PAGOS A CLAUDIO DEL CONDE, 1° |
| 15/11/2017 | | $ 375,890.00 | NÓMINA 1A. QUINCENA NOVIEMBRE 2017 |
| 01/12/2017 | $ 125,000.00 | | SEGUNDO PAGO A HERE.COM |
| 01/12/2017 | | $ 400,000.00 | PRIMER PAGO A ORACLE AMERICA |
| 01/12/2017 | $ 17,552.00 | | PAGO A EDUARDO SAVAS, A/C GASTOS "AMAZON" |
| 01/12/2017 | | $ 301,600.00 | PAGO A VA MÓVIL, A/C DE ADEUDOS |
| 01/12/2017 | | $ 300,000.00 | PAGO A BAKER TILLY MÉXICO |
| 01/12/2017 | | $ 185,600.00 | PAGO A COYOTE MEDIA HOUSE |
| 01/12/2017 | | $ 183,575.00 | PAGO A GRUPO AD XITLE |
| 01/12/2017 | | $ 149,973.00 | PAGO A POINT TECHNOLOGIES |
| 01/12/2017 | | $ 110,664.00 | PAGO A GONZÁLEZ, CORTINA,GLENDER, A/C ADEUDOS |
| 01/12/2017 | | $ 85,840.00 | PAGO A SATÉLITAL TERRESTRE Y ASISTENCIA |
| 01/12/2017 | | $ 73,382.00 | PAGO A RAR GLOBAL SOLUTION, (OUTSOURCING) |
| 01/12/2017 | | $ 8,699.00 | PAGO A INGRAM X ENVÍO DE TABLETAS |
| 01/12/2017 | | $ 995.00 | PAGO A BICENTEL. |
| 04/12/2017 | $ 48,256.00 | | PAGO A INGRAM, 100%, 8,000 "CRADLES" |

| | EN, US | EN, MN |
|---|---|---|
| TOTAL PAGADO: | $ 6,129,026.00 | $ 4,059,658.00 |
| | | US |
| DOLARIZADO: | $ 6,348,466.97 | |

Intercompany Loan 1 Conditions

- Amount: USD$10'000,000.00
- Term: Up to 3 years, with a grace period during the first 12 months
- Interest rate: 6.25% per annum
- Payment of captal and interests: at maturity
- Purpose: payment of Units isued by L1bre Holding LLC as per Unit Purchase Agreement dated October 13, 2017.

Intercompany Loan 2 Conditions
- Amount: up to USD$10'000,000.00
- Term: Up to 3 years, with a grace period during the first 12 months
- Interest rate: 6.25% per annum
- Payment of captal and interests: at maturity
- Purpose: payment of certain accounts receivable by L1bre Holding, LLC and Servicios Administrativos Lusad, S. De R.L. de C.V.

## [FORM OF PROMISSORY NOTE]

### NON-NEGOTIABLE

[●], [●] 201[●]

US$[●]

For value received, ESPIRITU SANTO TECHNOLOGIES, LLC, a limited liability partnership duly incorporated in accordance with the laws of Delaware, United Sates of America (the "Debtor"), unconditionally promises to pay to the order of L1BERO PARTNERS, LP (the "Creditor"), the amount of US$[●] ([●] dollars), in legal currency of the United States of America ("Dollars"), as follows:

1. Principal Payment: The Debtor agrees to pay to the Creditor each principal amount set forth below on the applicable payment date set forth opposite each such amount (each payment date, a "Maturity Date") provided that in any case the principal of this Promissory Note nor any outstanding amount under it shall become payable before [●] (the "Grace Period"):

| Principal Amount | Payment Date |
|---|---|
|  |  |
|  |  |



2. Default Interest: Once the Grace Period is elapsed, if any payment under the Promissory Note is overdue, all amounts owed hereunder, including (a) the outstanding principal amount of the Promissory Note, (b) to the extent permitted by applicable law, any interest payments thereon not paid when due, (c) fees and (d) any other amounts then due and payable, shall become immediately due and payable upon demand by the Creditor, and interest shall accrue on the unpaid principal amount at the Prime Rate *times* 2 (two) (the "Default Interest") starting the date when this Promissory Note becomes delinquent and ending on the effective payment date. The Default Interest on the unpaid principal amount hereof shall be computed on the basis of a 360 (three hundred sixty)-day year, divided by the actual number of days elapsed in the period during which it accrues. This Promissory Note shall not bear ordinary interests, commissions or fees.

3. Expenses: The Debtor agrees to reimburse upon written demand, in the same manner and amounts, all losses, costs and reasonable expenses of the holder hereof, if any, incurred in connection with the enforcement of this Promissory Note (including without limitation, all reasonable legal costs and expenses).

4. Acceleration: Once the Grace Period is elapsed and upon failure to pay any amount owed hereunder on the relevant payment date, or upon the bankruptcy or insolvency of the Debtor, unpaid balance of the principal amount of this Promissory Note, together with all accrued and unpaid interest thereon and all other obligations will automatically become due and payable.

5. <u>Payment</u>: The Debtor hereby expressly extends the period of presentment of this Promissory Note until the last Maturity Date; provided, however, that such extension does not imply that the holder of this Promissory Note cannot present the same for payment at an earlier date in accordance with <u>Section 1</u>.

With respect to payments made hereunder, the Debtor expressly waives diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, notice of non-payment, dishonor or default with respect hereto or any notice of any kind.

No failure on the part of the Creditor to exercise any of its rights hereunder in any particular instance shall operate as a waiver thereof in that or any subsequent instance.

All payments of principal and interest and all other amounts payable under this Promissory Note shall be made by the Creditor free and clear of, and without deduction for, any and all present or future taxes, duties, levies, penalties or similar imposts, charges, assessments, fees or withholdings, and all payment obligations with respect thereto imposed or assessed by any governmental authority (such taxes, "<u>Taxes</u>"), except as provided herein. If the Debtor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder, the sum payable by the Debtor shall be increased to the extent necessary to ensure that, after making the required deductions, the holder receives on an after-tax basis on the due date a sum equal to the sum it would have received had no such deduction been required or made.

All payments by the Debtor of principal, interest, fees and other obligations hereunder shall be made in Dollars, in same day available funds, without defense, set-off or counterclaim, free of any restriction or condition, and deposited into the Creditor's account number [●] in the place of business of the Creditor, or in any other place or account notified in writing by the Creditor, not later than 12:00 P.M. (New York City time) on the date due; funds received by the Creditor after that time on such due date shall be deemed to have been paid by the Debtor on the next succeeding Business Day (as defined herein).

All payments hereunder shall be applied to the payment of the Default Interest (if applicable pursuant to this <u>Section 2</u>) before application to principal.

6. <u>Prepayments</u>: The Debtor has the right at any time and from time to time to prepay all or part of any amount due hereunder without any interest, commission or penalty. Prepayments shall be applied in the following order: (a) moratorium interest if any, (b) interest, and (iii) outstanding principal.

7. <u>Non-Negotiable</u>: The Creditor may not assign or transfer this Promissory Note to any Person. This Promissory Note is issued and delivered to the Creditor by the Debtor in accordance and pursuant to the terms agreed in certain Partners Agreement executed on December 6, 2017 by and between the Creditor and Espiritu Santo Holdings, LP as partners of the Debtor and therefore is subject to the terms and conditions thereof.

8. <u>Governing Law</u>: **THIS PROMISSORY NOTE AND THE RIGHTS AND OBLIGATIONS OF THE DEBTOR AND THE CREDITOR HEREUNDER SHALL BE**

**GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR THIS PURPOSE, SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

9. Jurisdiction: For everything related to the interpretation of, compliance with, or judicial request for payment of the obligations herein undertaken, the Debtor hereby irrevocably and expressly submits to the jurisdiction of the courts of the State of New York or of the United States for the Southern District of New York, United States of America, and any appellate court from any thereof, waiving any other jurisdiction to which it may be entitled to by reason of its present or future domicile; and any right that [he/she] may have to trial by jury.

For purposes of this Promissory Note, the following terms shall have the following meanings:



"*Person*" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, governmental authority or other entity.

"*Prime Rate*" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. (or if not available, the British Bankers' Association interbank offered rates for deposits in Dollars which appears on the relevant page of the Reuters Service) as its prime rate in effect at its principal office in New York City, New York; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

This Promissory Note consists of 3 (three) pages.

THE DEBTOR

ESPIRITU SANTO TECHNOLOGIES, LLC

_____

By: [●]
Its: Representative
Domicile [●]

## UNANIMOUS WRITTEN CONSENT OF ALL OF THE SHAREHOLDERS OF ESPIRITU SANTO TECHNOLOGIES, LLC

The undersigned, being the sole member (the "Member") of ESPIRITU SANTO TECHNOLOGIES, LLC, a limited liability company organized under the laws of Delaware (the "Company"), does hereby consent to the adoption and approval of the following resolutions:

### Partners Agreement

**WHEREAS**, the Member believe it is in the best interest of the Company to approve and consent the content of a certain partners agreement, entered into by and among L1bero Partners LP ("L1bero"), the Member and the Company, to describe and agree on the terms and conditions to govern the relation between L1bero and the Member as partners of the Company, under the terms of the document attached to this resolutions as Exhibit "A" (the "Partners Agreement").

### Board of Directors

**NOW, THEREFORE, BE IT RESOLVED**, that is hereby approved and consented that in execution of the abovementioned Partners Agreement by the Member and the Company with L1bero, from this date, the Board of Directors of the Company will be as follows:

| MEMBER | POSITION |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

**FURTHER RESOLVED**, in execution of what has been agreed by L1bero, the Member and the Company, under the terms of clause 5 of the Partners Agreement, it is hereby approved to expressly instruct L1BRE HOLDING, LLC ("L1bre Holding"), to adopt the corresponding resolutions to appoint Mr. Fabio Covarrubias Piffer, Santiago León Aveleyra and Eduardo Zayas Dueñas as new members of the Board of Directors of L1bre Holding and to revoke all previous members.

**FURTHER RESOLVED**, that to vote the membership of the Company in L1bre Holding in order to adopt the abovementioned resolutions and to execute all of the documents related to such resolutions on behalf of the Company is carried out by Santiago Leon Aveleyra or Eduardo Zayas Dueñas indistinctly (the "Authorized Signatories"), all of which is ratified, confirmed and approved hereof.

**FURTHER RESOLVED**, that the Authorized Representatives of the Company shall cause a copy of each resolution so certified, identified by his signature on the face thereof, to be inserted in the minute book of the Company.

### Further Action

**RESOLVED**, that the Authorized Signatories of the Company be, and he hereby are, authorized and directed in the name of and on behalf of the Company, or otherwise, to take such additional actions as he deems necessary or appropriate to carry out the intent and accomplish the purposes of the foregoing resolutions.

Effective Date: December [*] 2017

**MEMBER:**

**ESPÍRITU SANTO HOLDINGS, LP**

_____ _____

By: Eduardo Zayas Dueñas
Legal representative

## UNANIMOUS WRITTEN CONSENT OF ALL OF THE SHAREHOLDERS OF L1BRE HOLDING, LLC

The undersigned, being the only members (the "Members") of L1BRE HOLDING, LLC, a limited liability company organized under the laws of Delaware (the "Company"), we hereby consent to the adoption and approval of the following resolutions:

### Board of Directors

**WHEREAS**, the Members believe it would be in the best interest of the Company to appoint Mr. Fabio Covarrubias Piffer, Santiago León Aveleyra and Eduardo Zayas Dueñas as new members of the Board of Directors of the Company, given the instruction received by the Company from Espiritu Santo Technologies, LLC, under the terms of the Section 6.2 of the Company's Operating Agreement.



**NOW, THEREFORE, BE IT RESOLVED**, that is hereby approved to appoint Mr. Fabio Covarrubias Piffer, Santiago León Aveleyra and Eduardo Zayas Dueñas as new members of the Board of Directors of the Company and to revoke all previous members.



**FURTHER RESOLVED**, that given the above, it is hereby approved to expressly instruct L1BRE, LLC ("L1bre"), L1BRE TECHNOLOGIES, LLC ("L1bre Technologies") and Servicios Digitales Lusad, S. de R.L. de C.V., to adopt the corresponding resolutions to appoint Mr. Fabio Covarrubias Piffer, Santiago León Aveleyra and Eduardo Zayas Dueñas as new members of the Board of Directors of L1bre and L1bre Technologies, respectively, and to revoke all previous members.

**FURTHER RESOLVED**, that to vote the membership of the Company in L1bre and L1bre Technologies in order to adopt the abovementioned resolutions and to execute all of the documents related to such resolutions on behalf of the Company is carried out by Santiago Leon Aveleyra or Eduardo Zayas Dueñas indistinctly (the "Authorized Signatories"), all of which is ratified, confirmed and approved hereof.

**FURTHER RESOLVED**, that the Authorized Representatives of the Company shall cause a copy of each resolution so certified, identified by his signature on the face thereof, to be inserted in the minute book of the Company.

### Further Action

**RESOLVED**, that the Authorized Signatories of the Company be, and he hereby are, authorized and directed in the name of and on behalf of the Company, or otherwise, to take such additional actions as he deems necessary or appropriate to carry out the intent and accomplish the purposes of the foregoing resolutions.

Effective Date: December [*] 2017

**MEMBER:**

**ESPÍRITU SANTO TECHNOLOGIES, LLC**

_____

By: Santiago Leon Aveleyra
Legal representative



**MEMBER:**

**ACCENDO HOLDINGS, LLC**

_____

By: [*]
Legal representative

## UNANIMOUS WRITTEN CONSENT OF ALL OF THE SHAREHOLDERS OF
## L1BRE TECHNOLOGIES, LLC

The undersigned, being the only member (the "Member") of L1BRE TECHNOLOGIES, LLC, a limited liability company organized under the laws of Delaware (the "Company"), we hereby consent to the adoption and approval of the following resolutions:

### Board of Directors

**WHEREAS**, the Members believe it would be in the best interest of the Company to appoint Mr. Fabio Covarrubias Piffer, Santiago León Aveleyra and Eduardo Zayas Dueñas as new members of the Board of Directors of the Company, given the instruction received by the Company from L1BRE HOLDING, LLC as the sole member of the Company.

**NOW, THEREFORE, BE IT RESOLVED**, that is hereby approved to appoint Mr. Fabio Covarrubias Piffer, Santiago León Aveleyra and Eduardo Zayas Dueñas as new members of the Board of Directors of the Company and to revoke all previous members.

**FURTHER RESOLVED**, that in order to execute all of the documents that may be related to the previous resolution on behalf of the Company is carried out by Santiago Leon Aveleyra or Eduardo Zayas Dueñas indistinctly (the "Authorized Signatories"), all of which is ratified, confirmed and approved hereof.

**FURTHER RESOLVED**, that the Authorized Representatives of the Company shall cause a copy of each resolution so certified, identified by his signature on the face thereof, to be inserted in the minute book of the Company.

### Further Action

**RESOLVED**, that the Authorized Signatories of the Company be, and he hereby are, authorized and directed in the name of and on behalf of the Company, or otherwise, to take such additional actions as he deems necessary or appropriate to carry out the intent and accomplish the purposes of the foregoing resolutions.

Effective Date: December [*] 2017

**MEMBER:**

**L1BRE HOLDING, LLC**

_____

By: Santiago Leon Aveleyra
Legal representative

## UNANIMOUS WRITTEN CONSENT OF ALL OF THE SHAREHOLDERS OF L1BRE, LLC

The undersigned, being the only member (the "Member") of L1BRE, LLC, a limited liability company organized under the laws of Delaware (the "Company"), we hereby consent to the adoption and approval of the following resolutions:

### Board of Directors

**WHEREAS**, the Member believe it would be in the best interest of the Company to appoint Mr. Fabio Covarrubias Piffer, Santiago León Aveleyra and Eduardo Zayas Dueñas as new members of the Board of Directors of the Company, given the instruction received by the Company from L1BRE HOLDING, LLC as the sole member of the Company.

**NOW, THEREFORE, BE IT RESOLVED**, that is hereby approved to appoint Mr. Fabio Covarrubias Piffer, Santiago León Aveleyra and Eduardo Zayas Dueñas as new members of the Board of Directors of the Company and to revoke all previous members.

**FURTHER RESOLVED**, that given the above, it is hereby approved to expressly instruct Servicios Digitales Lusad, S. de R.L. de C.V. ("Lusad"), to adopt the corresponding resolutions to appoint Mr. Fabio Covarrubias Piffer, Santiago León Aveleyra and Eduardo Zayas Dueñas as new members of the Board of Directors of Lusad, and to revoke all previous members.

**FURTHER RESOLVED**, that to vote the membership of the Company in Lusad in order to adopt the abovementioned resolutions and to execute all of the documents related to such resolutions on behalf of the Company is carried out by Santiago Leon Aveleyra or Eduardo Zayas Dueñas indistinctly (the "Authorized Signatories"), all of which is ratified, confirmed and approved hereof.

**FURTHER RESOLVED**, that the Authorized Representatives of the Company shall cause a copy of each resolution so certified, identified by his signature on the face thereof, to be inserted in the minute book of the Company.

### Further Action

**RESOLVED**, that the Authorized Signatories of the Company be, and he hereby are, authorized and directed in the name of and on behalf of the Company, or otherwise, to take such additional actions as he deems necessary or appropriate to carry out the intent and accomplish the purposes of the foregoing resolutions.

Effective Date: December [*] 2017

**MEMBER:**

**L1BRE HOLDING, LLC**

_____

By: Santiago Leon Aveleyra
Legal representative