## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**ESPIRITU SANTO HOLDINGS, LP,**

                Petitioner,

  -against-

**L1BERO PARTNERS, LP,**

    and

**ESPIRITU SANTO TECHNOLOGIES, LLC**

                Respondents.

**Civil Action No. 19-cv-03930**

## RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND <u>TEMPORARY RESTRAINING ORDER IN AID OF ARBITRATION</u>

**REED SMITH LLP**

599 Lexington Avenue
New York, New York 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450

*Attorneys for Respondents*
*L1bero Partners, LP and Espiritu Santo*
*Technologies, LLC*

Dated: May 13, 2019

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.   The Parties ............................................................................................................ 3

    B.   León and Zayas Approach Covarrubias to Invest in the Business ...................... 4

    C.   L1bero Partners Supports Lusad's Development of the Technology.................... 5

    D.   Zayas Violates the Partners Agreement by Signing Documents that Altered the MC Concession Without Unanimous Affirmative Written Resolution ............... 5

    E.   The December 2018 Meeting of the Board of Managers of Lusad and the Formation of Nuevo León .................................................................................... 6

    F.   León and Zayas Continue to Violate the Partners Agreement and Take Actions Detrimental to Lusad............................................................................... 7

    G.   Criminal and Civil Actions in Mexico Against León and Zayas.......................... 8

    H.   ES Holdings Violates the Mexican Court Order by Filing Arbitration and Ambushes Respondents with the Petition .................................................... 9

ARGUMENT ......................................................................................................................... 9

I.     Applicable Legal Standards ............................................................................................... 9

II.    ES Holdings Is Not Entitled to a Preliminary Injunction ............................................. 10

    A.   ES Holdings Has Failed to Show Irreparable Harm................................................. 10

    B.   ES Holdings Has Failed to Show a Likelihood of Success on the Merits................. 14

         1.     ES Holdings Lacks Standing to Sue ........................................................ 14

         2.     ES Holdings Relies on False and Unsubstantiated Facts.......................... 17

    C.   The Balance of Equities Is Strongly Against ES Holdings ...................................... 18

    D.   The Public Interest Would Not Be Served By the Issuance of an Injunction .......... 21

III.   ES Holdings Is Not Entitled to the Continuation of the TRO Pending a Determination of Its Motion for a Preliminary Injunction................................................. 22

IV.     In the Alternative, the Court Should Substantially Increase the Amount of the Bond Pursuant to FRCP 65(c) .......................................................................................... 23

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
    566 F. Supp. 2d 305 (S.D.N.Y. 2008)........................................................16

*Allen v. Wright*,
    468 U.S. 737 (1984)........................................................14

*Andino v. Fischer*,
    555 F.Supp.2d 418 (S.D.N.Y. 2008)........................................................23

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,
    792 F.Supp. 969 (S.D.N.Y. 1992)........................................................19

*Bank of Am. Corp. v. Lemgruber*,
    385 F. Supp. 2d 200 (S.D.N.Y. 2005)........................................................15

*Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*,
    909 F.Supp. 896 (S.D.N.Y. 1995)........................................................13

*Bein v. Heath*,
    47 U.S. 228 (1848)........................................................20

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015)........................................................9

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith*,
    910 F.2d 1049 (2d Cir. 1990)........................................................24

*Cacchillo v. Insmed, Inc.*,
    638 F.3d 401 (2d Cir. 2011)........................................................14

*Cartier v. Symbolix, Inc.*,
    386 F.Supp.2d 354 (S.D.N.Y. 2005)........................................................19

*Century Time Ltd. v. Interchron Ltd.*,
    729 F.Supp. 366 (S.D.N.Y. 1990)........................................................13

*Chan v. Chinese-American Planning Council Home Attendant Program, Inc.*,
    No. 15-CV-9605, 2016 WL 3004516 (S.D.N.Y. Jan. 21, 2016)........................................................23

*Citibank, N.A. v. Citytrust and Citytrust Bancorp, Inc.*,
    756 F.2d 273 (2d. Cir. 1985)........................................................12

*CollaGenex Pharm., Inc. v. IVAX Corp.*,
375 F.Supp.2d 120 (E.D.N.Y. 2005) ...........................................................22

*Comic Strip, Inc. v. Fox Television Stations, Inc.*,
710 F.Supp. 976 (S.D.N.Y. 1989) ...............................................................13

*Control Sys., Inc. v. Realized Sols., Inc.*,
No. 3:11CV1423 PCD, 2011 WL 4433750 (D. Conn. Sept. 22, 2011 ...................22

*Dixon v. Love*,
431 U.S. 105 (1977) ....................................................................................22

*EMI Entm't World, Inc. v. Karen Records, Inc.*,
No. 05 CIV. 390 LAP, 2013 WL 2480212 (S.D.N.Y. June 10, 2013) ...................16

*Exelis, Inc. v. SRC, Inc.*,
5:12-CV-0858(GTS/TWD), 2012 WL 12874469 (N.D.N.Y. Nov. 7, 2012) ...........11

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) .............................................................2, 10, 11

*Feinberg v. Katz*,
No. 99 CIV. 45 (CSH), 2002 WL 1751135 (S.D.N.Y. July 26, 2002) ...................16

*Gaia Technologies Inc. v. Recycled Prods. Corp.*,
175 F.3d 365 (5th Cir. 1999) .......................................................................15

*Gidatex, S.R.L. v. Campaniello Imports, LTD*,
13 F. Supp. 2d 417 (S.D.N.Y. 1998) ............................................................13

*Goldstein v. Delgratia Min. Co.*,
176 F.R.D. 454 (S.D.N.Y. 1997) .............................................................19, 20

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007) ..........................................................................10

*Iavarone v. Raymond Keys Assoc*s.,
733 F.Supp. 727 (S.D.N.Y. 1990) ...........................................................18, 19

*Iron Mt. Info. Mgmt. v. Taddeo*,
455 F.Supp.2d 124 (E.D.N.Y. 2006) .............................................................12

*Litwin v. OceanFreight, Inc.*,
865 F.Supp.2d 385 (S.D.N.Y. 2011) .......................................................18, 19

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................................................................................14

*Marisa Christina, Inc. v. Freis*,
    646 F.Supp. 252 (S.D.N.Y. 1986) ....................................................................................12

*Moore v. Consol. Edison Co. of N.Y.*,
    409 F.3d 506 (2d Cir. 2005) ..........................................................................................10

*New Look Party Ltd. v. Louise Paris Ltd.*,
    No. 11 CIV. 6433 NRB, 2012 WL 251976 (S.D.N.Y. Jan. 11, 2012) ....................11

*Nikkal Indus., Ltd. v. Salton, Inc.*,
    735 F.Supp. 1227 (S.D.N.Y. 1990) ..............................................................................21

*Nokia Corp. v. InterDigital, Inc.*,
    645 F.3d 553 (2d Cir. 2011) ..........................................................................................24

*In re Oppenheimer Funds Fees Litig.*,
    419 F.Supp.2d 593 (S.D.N.Y. 2006) ............................................................................16

*Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*,
    881 F.Supp.2d 470 (S.D.N.Y. 2012) ............................................................................22

*Passlogix, Inc. v. 2FA Tech., LLC*,
    No. 08 Civ. 10986(PKL), 2010 WL 2505628 (S.D.N.Y. June 21, 2010) ................12

*Philip Morris, Inc. v. Star Tobacco Corp.*,
    879 F.Supp. 379 (S.D.N.Y. 1995) ................................................................................24

*Precision Instrument Mfg. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945) ......................................................................................................19

*Procter & Gamble Co. v. Ultreo, Inc.*,
    574 F. Supp. 2d 339 (S.D.N.Y. 2008) ..........................................................................13

*Pullman Group, LLC v. Prudential Ins. Co.*,
    288 A.D. 2d 2 (1st Dep't 2001) ....................................................................................15

*Reynolds v. Giuliani*,
    506 F.3d 183 (2d Cir. 2007) ..........................................................................................10

*Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999) ..........................................................................................10

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ........................................................................................9, 11

*Sanofi-Synthelabo v. Apotex, Inc.*,
    488 F.Supp.2d 317 (S.D.N.Y. 2006) ............................................................................24

*Smith v. Stevens*,
    957 F.Supp.2d 466 (S.D.N.Y. 2013)........................................................................16

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
    646 F. Supp. 2d 510 (S.D.N.Y. 2009)....................................................................21

*Synergy Advanced Pharm., Inc. v. CapeBio, LLC*,
    No. 10 Civ. 1736(SAS), 2010 WL 2194809 (S.D.N.Y. June 1, 2010)................12

*Tecnimed SRL v. Kidz–Med, Inc.*,
    763 F.Supp.2d 395 (S.D.N.Y.2011)........................................................................11

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ......................................................................................14

*Tough Traveler, LTD v. Outbound Prods.*,
    60 F.3d 964 (2d. Cir. 1995).....................................................................................12

*Tula Business, Inc. v. Med. Indus. of Am., Inc.*,
    No. 97 Civ. 0847 (DAB), 1997 WL 68565 (S.D.N.Y. Feb. 18, 1997)................17

*Valley Community Preservation Com'n v. Mineta*,
    373 F.3d 1078 (10th Cir. 2004) ..............................................................................22

*Von Grabe v. Ziff Davis Pub. Co.*,
    No. 91 Civ. 6275 (DLC), 1994 WL 719697 (S.D.N.Y. Dec. 29, 1994)................24

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................................................14

*Watson v. H.J. Heinz Co.*,
    101 F. App'x. 823 (Fed. Cir. June 8, 2004) ...........................................................15

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)................................................................................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...........................................................................................10, 21

*Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC*
    80 F. Supp. 2d 25 (N.D.N.Y. 1999)........................................................................13

## Rules

Fed. R. Civ. P. 65(c) ...............................................................................................23

## Other Authorities

1-2 Milgrim on Trade Secrets § 2.02 (2008) ................................................................15

Respondents L1bero Partners, LP ("L1bero Partners") and Espiritu Santo Technologies, LLC ("ES Technologies") (collectively, "Respondents"), by and through their counsel, Reed Smith LLP, respectfully submit this Memorandum of Law, together with the Declarations of Fabio Massimo Covarrubias ("Covarrubias"), Rodrigo Núñez-Sarrapy ("Núñez"), Horacio Alamilla Medina ("Alamilla"), Laura Ayala Contreras ("Ayala"), and Eduardo Amerena Minvielle ("Amerena"), and all exhibits annexed thereto, in opposition to Petitioner Espiritu Santo Holdings, LP's ("Petitioner" or "ES Holdings") Emergency Petition for Injunctive Relief in Aid of Arbitration (the "Petition").

## PRELIMINARY STATEMENT

Having failed to provide Respondents with reasonable notice and an opportunity to appear in opposition to their emergency application, ES Holdings has misrepresented both the facts and law for the sole purpose of obtaining unwarranted injunctive relief. The Court should deny the Petition, as ES Holdings has not and cannot meet the stringent factors that it must establish to obtain preliminary injunctive relief. Among many flaws in ES Holdings' application is the failure to demonstrate the fundamental requirement of irreparable harm in the absence of the relief. ES Holdings has not met and cannot meet this burden here, because under the actual facts, as opposed to the unsupported and incorrect beliefs recited by ES Holdings, there is no possibility of *any* harm, let alone irreparable harm, from the conduct it seeks to enjoin. And even under ES Holdings' false characterizations, injunctive relief is unwarranted under controlling Second Circuit law that was ignored by ES Holdings.

Tellingly, the Petition's factual allegations rely heavily on unsworn hearsay statements from a disgruntled employee, Manuel Tabuenca, who claims knowledge of a colorful series of fabricated misdeeds, totally unsupported by corroborating evidence. There is no sworn testimony from Tabuenca himself. Respondents have countered these unsupported accusations

with the sworn testimony of competent witnesses and confirmatory documents. When the Petition's unsupported claims are tested, the tale of Respondents' misdeeds falls apart:

- ES Holdings deliberately timed the service of its application on Respondents in the afternoon of a national holiday in Mexico, Labor Day, when ES Holdings knew that corporate personnel would be away and unable to respond to the TRO. The record further shows that ES Holdings had been working on this application for weeks.

- ES Holdings claims that "L1bre Monterrey," an entity established by Respondents to compete against the parties' joint operations, is at the heart of a scheme to pillage partnership assets and misappropriate trade secrets. However, L1bre Monterrey does not even exist. Rather, the entity that intends to bid on the Monterrey concession, an entity named "L1bre Nuevo León ('Nuevo León')," is an entity fully within the parties' agreed-upon joint business structure and complies with the Partners Agreement.

- Even if there were misappropriation of trade secrets (which is denied), ES Holdings relies on outdated and inaccurate law for the principle that misappropriation of trade secrets constitutes irreparable injury supporting an injunction. In *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009), the Second Circuit specifically considered and rejected this principle, holding that merely using trade secrets without publicly disclosing them does not give rise to irreparable injury in the context of a preliminary injunction.

- ES Holdings lacks standing to bring this action. ES Holdings seeks to enjoin conduct not of ES Technologies, the entity in which ES Holdings owns a 50% direct interest and that is subject to the Partnership Agreement, but rather of other subsidiaries that are governed by other laws and agreements and that are not parties to the Partners Agreement. ES Holdings' claims are fatally flawed because it does not own the technology or intellectual property that the application is based on.

- ES Holdings' principals *approved the very transactions they now seek to enjoin*. On December 14, 2018, the Board of Managers of Lusad (which included León and Zayas) duly passed a unanimous resolution authorizing the formation of a company to participate in the bidding process for a concession to install digital taximeters in Monterrey, Mexico. That company is Nuevo León, and ES Holdings also stands to benefit through its 50% indirect ownership stake if Nuevo León prevails in bidding for the Monterrey concession.

- The relief ES Holdings seeks is wholly inappropriate in light of the equities and public policy. Respondents and their principals have invested more than *$30 million* into the parties' operating company, Lusad, and facilitated another *$18 million* in loans; Petitioner and its principals have not put in any money whatsoever. Preventing Respondents from bidding for the Monterrey concession threatens the continued existence of the business enterprise, and needlessly potentially deprives that community of a valuable service.

Accordingly, ES Holdings cannot meet its heavy burden for injunctive relief. If the Court disagrees, at a minimum, Respondents should be permitted to register Nuevo León to bid for the Monterrey concession by the May 15, 2019 deadline; alternatively, ES Holdings should post a bond that appropriately reflects the $48 million invested by Covarrubias and L1bero Partners and the $50 million of annual EBITDA that the Monterrey concession is projected to generate, in order to secure the losses that Respondents will incur if the requested injunction is imposed.

## FACTUAL BACKGROUND

### A.    The Parties

ES Holdings is a limited partnership organized under the laws of Alberta, Canada, with its principal place of business in Missouri, Texas. (Petition ¶ 8.) ES Holdings is represented and managed by Santiago León Aveleyra ("León"), who has a background in politics and lobbying, and Eduardo Zayas Dueñas ("Zayas"), who has a background in the financial sector where he claims to have worked as a trader/account manager. (*Id*; Covarrubias Decl. ¶ 14.)

L1bero Partners is a limited partnership organized under the laws of Alberta, Canada, with its principal place of business in Houston, Texas. (Petition ¶ 9.) L1bero Partners is indirectly owned by Covarrubias,[1] a well-known entrepreneur and investor who has brought to fruition a number of business ventures in Mexico, the United States, and other countries. (*See id*; *see also* Covarrubias Decl. ¶ 2.) Over the years, the companies in which Covarrubias and his team have been involved have created thousands of jobs, revitalized industries, and created considerable wealth for investors, host countries, and the individuals within them. (*Id.*)

ES Technologies is a limited liability company organized under the laws of Delaware with its principal office in Miami, Florida. (Petition ¶ 10.) ES Holdings and L1bero Partners

---

[1] Despite ES Holdings' assertion, L1bero Partners is not indirectly owned or controlled by Ricardo Salinas. (*Compare* Petition ¶ 9 *with* Covarrubias Decl. ¶ 6.)

each own 50% of ES Technologies which, in turn, through two other entities—L1bre Holding LLC and L1bre LLC—is the 100% indirect owner of Servicios Digitales Lusad, S. de R.L. de C.V. ("Lusad"). (*See id.* ¶¶ 10, 21; *see also* Covarrubias Decl. ¶ 6.)

**B.    León and Zayas Approach Covarrubias to Invest in the Business**

In or around September 2017, León and Zayas approached Covarrubias about a potential investment in Mexico. (Covarrubias Decl. ¶ 3.) León and Zayas told Covarrubias that they had, with the help of others, been working to develop technology for a concession from the Mexico City Ministry of Mobility (*Secretaria de Movilidad*) to install taximeters in Mexico City's taxi fleet and to develop and operate a mobile application to order taxis remotely (the "MC Concession"). (*Id.*) The business itself was under serious financial distress. (*Id.* ¶ 4.) León and Zayas had burned through nearly $30 million invested by a company called Accendo Holdings, LLC ("Accendo"), but had been unable to develop working technology and management of the business was in disarray. (*Id.*) Accendo wanted to exit, and León and Zayas were shopping for a new investor, with promises of operational control. (*Id.* ¶ 4.) Covarrubias agreed to invest money and assemble a team with the experience to manage the business. (*Id.* ¶¶ 5 & 7-9.)

On or around November 23, 2017, L1bero Partners and ES Holdings entered into a Unit Purchase Agreement pursuant to which L1bero Partners agreed to purchase 50% of the membership units in ES Technologies. (*Id.* ¶ 5.) As set forth above, ES Technologies through two other entities is the 100% indirect owner of Lusad, which owns the MC Concession and the relevant trademarks and technology. (*See* Covarrubias Decl. ¶¶ 6 & 15; Alamilla Decl. ¶ 9; Núñez Decl. ¶ 2.)

On or around December 6, 2017, L1bero Partners, ES Holdings, and ES Technologies executed a Partners Agreement. (Covarrubias Decl. ¶ 5.) In recognition of the value of the

MC Concession, the parties agreed that unanimous affirmative written resolution of the full board of four directors would be required for any "amendment to the [MC] Concession." (León Decl. Ex. 1 at § 5.2(p).)

### C.    L1bero Partners Supports Lusad's Development of the Technology

At the same time the Partners Agreement was executed, the Board of Managers of Lusad (which included both León and Zayas) passed a Unanimous Resolution appointing Covarrubias as CEO of Lusad.  (Covarrubias Decl. ¶ 7 & Ex. 1.)  L1bero Partners and Covarrubias also made investments and assembled a team to try to bring Lusad back from the brink of failure.  (*See id.* ¶¶ 7-9 & 17.)  To date, L1bero Partners and Covarrubias have contributed more than $30 million and facilitated an additional $18 million in loans.  (*Id.* ¶ 8.)  The loans were obtained using Covarrubias's real estate as collateral.  (*Id.*)  These considerable investments injected much-needed capital to pay vendors and to continue Lusad's development of the digital taximeter technology and mobile application, and the installation processes for the 138,000 taxis in Mexico City.  (*Id.* ¶ 9.)

Despite ES Holdings' unsupported allegations that León and Zayas developed the technology and registered the "L1bre" tradename and associated trademarks, the relevant technology was actually developed by Lusad after L1bero Partners' investment, via contracts with Kichink Servicios, S.A. de C.V. ("Kichink"), and the trademarks are registered to Lusad. (*Compare* León Decl. ¶¶ 3 & 12 *with* Covarrubias Decl. ¶ 15; Alamilla Decl. ¶¶ 8-9.)

### D.    Zayas Violates the Partners Agreement by Signing Documents that Altered the MC Concession Without Unanimous Affirmative Written Resolution

In or around July 2018, Mexico City held general elections and, in the weeks that followed, newly-elected representatives expressed their intention to cancel existing plans to install digital taximeters in Mexico City and the mobile application.    In or around

November 2018, less than a month before Mexico City's new administration took office, authorities from the Mexico City Ministry of Mobility (*Secretaria de Movilidad*) summoned Zayas to their offices. (*See* Covarrubias Decl. ¶ 16.) During that meeting, Zayas signed documents that purported to alter the MC Concession (the "Altered MC Concession"). (*Id.*) The purported alteration was unlawful, and Zayas did this without any authorization, in violation of the Partners Agreement, which expressly requires unanimous affirmative written resolution for any "amendment to the [MC] Concession." (León Decl. Ex. 1 at § 5.2(p).) Under the Altered MC Concession, Lusad was no longer entitled to receive certain fees, which drastically reduced the value of the MC Concession. (Covarrubias Decl. ¶ 16.)

### E. The December 2018 Meeting of the Board of Managers of Lusad and the Formation of Nuevo León

On December 14, 2018, the Board of Managers of Lusad, which included León and Zayas, met and adopted several resolutions. (*See* Covarrubias Decl. Ex. 2.) Among other things, the Board unanimously adopted a resolution "to constitute a Mexican subsidiary of the affiliate L1bre Holding LLC, so that said new company can participate in the bidding process for a concession to install and operate digital taximeters in the taxis holding concessions to operate in the city of Monterrey, Nuevo León and its surrounding municipalities." (*See id.*, Resolution 7.1; *see also id.* ¶ 12.)

On January 31, 2019, pursuant to the resolution passed by Lusad's Board of Managers, L1bre Nuevo León, S. de R.L. de C.V. ("Nuevo León") was incorporated under the laws of Mexico for the purpose of bidding for the concession in Monterrey, Nuevo León and its surrounding municipalities. (*See id.* ¶ 12 & Ex. 3; Núñez Decl. ¶ 5 & Ex. 5.) ES Technologies is the 100% owner of L1bre Holding LLC which, in turn, through

two other entities—Lusad and Servicios Administrativos Lusad, S. de R.L. de C.V. ("SAL")—is the 100% indirect owner of Nuevo León.  (*See id.* at ¶¶ 2-3 & 5; Covarrubias Decl. ¶ 6.)

Given that the Altered MC Concession greatly damaged the value of the MC Concession, the opportunity for Nuevo León to register to bid on the concession in Monterrey by the deadline of May 15, 2019 is critical to the survival of the business.  (Covarrubias Decl. ¶¶ 10 & 16.) The Monterrey concession could generate an annual EBITDA of nearly $50 million. (*Id.* ¶ 10). The loss of that opportunity would jeopardize Lusad's ability to continue as a going concern, and would also result in the wholesale devaluation of existing inventory, including, in particular, tablet kits that were purchased for installation in the taxis and are depreciating by the day.  (*Id.*).

### F.   León and Zayas Continue to Violate the Partners Agreement and Take Actions Detrimental to Lusad

On December 14, 2018, the Board of Managers of Lusad also unanimously adopted a resolution "to hire a special independent auditor to review several of the Company's asset and liability entries at the consolidated level . . ." (Covarrubias Decl. Ex. 2, Resolution 1.1.) The Board authorized Covarrubias, as the CEO of Lusad, "to negotiate and implement the actions" in the various resolutions, including the hiring of auditors.  (*See id.*, Resolution 9.1.)

On December 18, 2018, just four days later and before Covarrubias had an opportunity to implement the resolution by hiring an auditor, a former employee and close business associate of Zayas named Eduardo Herrera stole two company-owned laptops containing back-up financial materials and confidential working papers from Lusad's office.  (Ayala Decl. ¶¶ 2-7; Covarrubias Decl. ¶ 18.)  The theft was witnessed by an employee of Lusad, and also captured on video by security cameras.  (Ayala Decl. ¶¶ 2-7; Amerena Decl. ¶ 3 & Ex. 1.) After a criminal complaint was filed with Mexican authorities against Herrera—not Deloitte

(*see* Petition ¶32)—Zayas appeared before the Mexican authorities and attempted to use an invalid power of attorney to pardon Herrera on behalf of Lusad (Covarrubias Decl. ¶ 18).

### G.     Criminal and Civil Actions in Mexico Against León and Zayas

As a result of their misconduct, León and Zayas are currently the subject of numerous criminal and civil actions in Mexican courts that were commenced between December 2018 and February 2019. (*See* Amerena Decl. ¶¶ 3-6; *see also* Covarrubias Decl. ¶¶ 19-21.)

The criminal proceedings include: (1) an investigation of Zayas and others for conspiring to steal, and for stealing, the laptop computers owned by SAL, which contained confidential and proprietary information belonging to Lusad; (2) an investigation of Zayas for allegedly producing forged documents as part of the previously mentioned criminal investigation; (3) an ongoing investigation regarding a death threat delivered to Covarrubias (i.e., a funeral wreath with his name) days after Lusad filed a civil lawsuit against León and Zayas; and (4) an investigation of Zayas for allegedly forging Lusad board meeting minutes and submitting them in connection with an administrative procedure and a civil proceeding initiated by Lusad. (Amerena Decl. ¶¶ 3-6.)

The civil actions include: (1) a proceeding brought by Lusad which resulted in a Mexican court issuing an order dated February 21, 2019 barring León and Zayas from remaining part of the Lusad Board of Managers in light of their responsibility for the Altered MC Concession and directing or consenting to the theft of the laptop computers; and (2) a proceeding brought by L1bre Holding LLC which resulted in a Mexican court issuing an injunction dated April 24, 2019 barring ES Holdings and Respondents from commencing arbitration under the Partners Agreement pending final adjudication of whether certain provisions of that agreement violate L1bre Holding LLC's ability to exercise its corporate rights in Lusad under Mexican law. (Covarrubias Decl. ¶¶ 19-21.)

**H. ES Holdings Violates the Mexican Court Order by Filing Arbitration and Ambushes Respondents with the Petition**

On May 1, 2019, ES Holdings filed a Request for Arbitration in violation of the Mexican court's injunction dated April 24, 2019. (Covarrubias Decl. ¶ 20.) Later that day, counsel for ES Holdings emailed respondents to notify them that they intended to file the Petition the following morning. (*Id.* ¶¶ 11 & 20.) Significantly, it appears that ES Holdings intentionally timed their "notification" of the emergency hearing to coincide with the May 1, 2019 public holiday in Mexico (Labor Day), and also with the registration period to bid for the Monterrey concession from May 2 to 15, 2019. (*Id.*) They did so notwithstanding the fact that the evidence exhibited to the León Declaration shows that ES Holdings had obtained certified translations of certain documents weeks earlier. (*See* León Decl. Exs. 4 & 6.) As a result of ES Holdings' "ambush" tactic, Respondents were unable to retain U.S. lawyers in time to attend the temporary restraining order hearing (*see* Covarrubias Decl. ¶¶ 11 & 20), and ES Holdings succeeded in their objective of obtaining a temporary restraining order based on a highly misleading, or outright false, account of events (*see id.* ¶¶ 11-18; Alamilla Decl. ¶¶ 4-16).

## ARGUMENT

**I. Applicable Legal Standards**

"A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)).

Further, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (observing that "the preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies'") (citation omitted). Rather, this remedy "is to be used sparingly and cautiously." *Reynolds v. Giuliani*, 506 F.3d 183, 198 (2d Cir. 2007). Indeed, a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. For the reasons below, ES Holdings' petition for a preliminary injunction should be denied.

## II.      ES Holdings Is Not Entitled to a Preliminary Injunction

### A.      ES Holdings Has Failed to Show Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley*, 559 F.3d at 118 (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "To satisfy the irreparable harm requirement, [movants] must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley*, 559 F.3d at 118 (quoting *Grand River*, 481 F.3d at 66). Moreover, "[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005).

The sole alleged harm involves the purported misappropriation of trade secrets related to the upcoming bidding on a concession in Monterrey. (*See* Petition at ¶¶ 29(c) & 51.) Yet, the use of alleged trade secrets in pursuit of profit does *not* constitute irreparable harm as a matter of law. In *Faiveley*, a recent case not cited by ES Holdings, the Second Circuit explained that:

We have previously observed that "the loss of trade secrets cannot be measured in money damages" where that secret, once lost, is "lost forever." Some courts in this Circuit have read this passing observation to mean that a presumption of irreparable harm *automatically* arises upon the determination that a trade secret has been misappropriated. That reading is *not correct*. A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets *to a wider audience or otherwise irreparably impair the value of those secrets.* ***Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury***. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge. As Judge Conner has observed, where there is no danger that a misappropriator will disseminate proprietary information, "the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product ... [which] should be fully compensable by money damages."

*Faiveley*, 559 F.3d at 118-119 (emphasis in bold added) (internal citations omitted). Moreover, courts in this Circuit have recognized that there is no longer any presumption of irreparable harm in intellectual property cases. *See, e.g., New Look Party Ltd. v. Louise Paris Ltd.*, No. 11 CIV. 6433 NRB, 2012 WL 251976, at *10 (S.D.N.Y. Jan. 11, 2012) ("Because we can no longer 'adopt a categorical or general rule or presume that the plaintiff will suffer irreparable harm' in copyright and trademark cases, plaintiff must make an independent showing of such harm.") (quoting *Salinger*, 607 F.3d at 80); *Tecnimed SRL v. Kidz–Med, Inc.*, 763 F.Supp.2d 395, 402 (S.D.N.Y.2011) (applying *Salinger* to a trademark claim).

Here, as in *Faiveley*, the parties' jointly-owned enterprise has developed its technology in order to "gain a competitive advantage in bidding for [concessions] like the [Monterrey taxi concession]" and "[d]isclosure of [the] trade secrets . . . would only undermine the competitive advantage" they confer. *Faiveley*, 559 F.3d at 119. In registering to bid or even bidding for the Monterrey concession, Respondents would not disseminate the trade secrets or otherwise impair their value. *See id; see also Exelis, Inc. v. SRC, Inc.*, 5:12-CV-0858(GTS/TWD), 2012 WL

12874469, at *9-10 (N.D.N.Y. Nov. 7, 2012) ("It is difficult to imagine how Defendant SRC's submission of a bid to [a federal research lab] that uses Plaintiff's trade secrets . . . can be characterized as a 'dissemination [of those trade secrets] to a wider audience' under *Faiveley*, given the lack of any evidence (or even argument) that the trade secrets contained in the bid will at some point be made public."). Thus, ES Holdings has not shown—and cannot show—that it would suffer irreparable harm absent a preliminary injunction. *See, e.g., Passlogix, Inc. v. 2FA Tech., LLC*, No. 08 Civ. 10986(PKL), 2010 WL 2505628, at *9 (S.D.N.Y. June 21, 2010); *Synergy Advanced Pharm., Inc. v. CapeBio, LLC*, No. 10 Civ. 1736(SAS), 2010 WL 2194809, at *5 (S.D.N.Y. June 1, 2010).

Moreover, the loss of the value associated with the Monterrey concession would clearly be monetary in nature and, thus, compensable in money damages. As this is the only (purported) loss that the requested injunctive relief aims to avoid, ES Holdings has not shown the irreparable injury necessary to support that relief.[2] *See, e.g., Iron Mt. Info. Mgmt. v. Taddeo*, 455 F.Supp.2d 124, 132 (E.D.N.Y. 2006) ("A preliminary injunction is not appropriate where monetary damages will serve as adequate compensation."); *Marisa Christina, Inc. v. Freis*, 646 F.Supp. 252, 254 (S.D.N.Y. 1986) (denying preliminary injunction where the injuries from termination of license agreement "could be readily quantified in terms of money damages")

Finally, a movant's delay in seeking a preliminary injunction "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust and Citytrust Bancorp, Inc.*, 756 F.2d 273, 277 (2d. Cir. 1985) (internal quotation marks and citation omitted); *accord Tough Traveler,*

---

[2] The other improprieties alleged in the Petition involve purported siphoning of funds and/or fraudulent transfers that have been expressly quantified, *see* Petition at ¶ 29(a)-(b), (d)-(j), and, thus, are clearly compensable by money damages.

*LTD v. Outbound Prods.*, 60 F.3d 964, 968 (2d. Cir. 1995). Accordingly, "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.R.L. v. Campaniello Imports, LTD*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998); *see also Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.,* 909 F.Supp. 896, 910 (S.D.N.Y. 1995) (three months)*; Century Time Ltd. v. Interchron Ltd.,* 729 F.Supp. 366, 368 (S.D.N.Y. 1990) (over two months)*; Comic Strip, Inc. v. Fox Television Stations, Inc.,* 710 F.Supp. 976, 981 (S.D.N.Y. 1989) (three months)*.*

In determining whether ES Holdings delayed in seeking injunctive relief, the court should decide if ES Holdings delayed in taking action after it became sufficiently "suspicious" that Respondents were threatening to misappropriate alleged trade secrets or otherwise breach the Partners Agreement. *See Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC*, 80 F. Supp. 2d 25, at 34-35 (N.D.N.Y. 1999). ES Holdings unjustifiably delayed at least four months. ES Holdings alleges that it learned of improprieties "[i]n or around October 2018" (Petition ¶ 29); the criminal complaint relating to the theft of laptop computers was filed in late December 2018 (*id.* at ¶¶ 31-34); and the civil action that resulted in an order barring León and Zayas from acting on behalf of Lusad was filed in February 2019 (*id.* at ¶¶ 35-36). ES Holdings also obtained certified translations of at least some of the exhibited documents in anticipation of filing this lawsuit no later than April 18, 2019. (León Decl. Exs. 4 & 6.) Nonetheless, ES Holdings did not file its Request for Arbitration until May 1, 2019, and did not notify Respondents that it intended to file its Petition until late afternoon on May 1, 2019, which is a national holiday in Mexico. (Covarrubias Decl. ¶¶ 11 & 20.)

Given this timeline, ES Holdings unreasonably delayed its filing, which strongly weighs against a finding of irreparable harm. *Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d

339, 354 (S.D.N.Y. 2008) (finding no irreparable harm where, as here, plaintiff "failed adequately to explain the reason for the delay" and there was "some evidence to suggest that [plaintiff] timed [its] public disclosure of this litigation to coincide with the American Dental Association's annual meetings, held in September 2007").

For all of the foregoing reasons, ES Holdings has failed to show any actual or imminent injury and its request for a preliminary injunction should be denied.

**B.    ES Holdings Has Failed to Show a Likelihood of Success on the Merits**

**1.    ES Holdings Lacks Standing to Sue**

"[T]o establish standing for a preliminary injunction, a plaintiff cannot 'rest on such mere allegations [as would be appropriate at the pleading stage] but must set forth by affidavit or other evidence specific facts.'" *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "[T]he standing inquiry requires careful judicial examination . . . to ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984) (emphasis added). Thus, a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Here, ES Holdings lacks standing because it has no direct claims or injury, and it has neither properly pled—nor can it properly plead —a derivative claim on behalf of Lusad. In determining whether a claim is direct or derivative, courts consider "the nature of the wrong and to whom the relief should go." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004). A direct claim requires a "direct injury [that] must be independent of any alleged injury to the [underlying] corporation." *Id.*

ES Holdings alleges that it will suffer injuries absent injunctive relief due to the purported misappropriation of trade secrets and loss of business opportunities. (Petition ¶ 51.) However, ES Holdings has failed to present any proof to show that it is the owner of the alleged trade secrets, and the documentary evidence shows that the trade secrets and business opportunities at issue, in fact, belong to Lusad. (*See* Covarrubias Decl. ¶¶ 6 & 15; Alamilla Decl. ¶ 9.) Accordingly, ES Holdings lacks standing to assert a direct claim for misappropriation of trade secrets. *Pullman Group, LLC v. Prudential Ins. Co.*, 288 A.D. 2d 2, 3 (1st Dep't 2001) (noting that a plaintiff in a trade secret misappropriation case cannot establish standing unless he can establish that he owned the trade secret); *see also* 1-2 Milgrim on Trade Secrets § 2.02 (2008) ("[o]wnership is a common law standing [requirement] for a trade secret plaintiff"); *Watson v. H.J. Heinz Co.*, 101 F. App'x. 823, 824 (Fed. Cir. June 8, 2004) (per curiam) (affirming dismissal of trade secret misappropriation claims "because [plaintiff] was no longer the owner of any intellectual property, [and thus] lacked standing to bring the suit"); *Gaia Technologies Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 376 (5th Cir. 1999) (summary judgment for defendant where plaintiff "failed to prove that it owned any of the trade secrets underlying its misappropriation claim").

Indeed, the claims asserted by ES Holdings would need to be brought derivatively on behalf of Lusad, because the alleged injuries would be suffered directly by Lusad and derivatively by ES Holdings through its 50% indirect ownership interest in Lusad. *See Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 223 (S.D.N.Y. 2005) (holding that "the fact that Plaintiffs had equity interests in and/or were corporate affiliates of the BL Banks at the time of the alleged conversion does not give them ownership rights in the BL Bank funds or otherwise confer them standing to sue Defendants for conversion") (internal citations omitted);

*Feinberg v. Katz*, No. 99 CIV. 45 (CSH), 2002 WL 1751135, at *7 (S.D.N.Y. July 26, 2002)

(holding that parent lacked standing to assert direct claims where, as here, "[t]he loss . . . was

suffered directly by . . . the Mexican Subsidiary" and, thus, "any loss [the parent] suffered was

through its ownership interest in the Mexican Subsidiary"); *see also EMI Entm't World, Inc. v.*

*Karen Records, Inc.*, No. 05 CIV. 390 LAP, 2013 WL 2480212, at *3 (S.D.N.Y. June 10, 2013);

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 314 (S.D.N.Y. 2008).

Perhaps recognizing this glaring deficiency, ES Holdings includes a footnote suggesting

that its lack of standing should be addressed by treating its claims as derivative on behalf of

ES Technologies and its 100%-owned downstream entities.   (*See* MOL at 19 n. 7.)

This proposed solution is defective for numerous reasons:

- *First*, the claims cannot be brought derivatively on behalf of ES Technologies because its alleged injuries would likewise only be suffered derivatively through its 100% indirect ownership of Lusad.

- *Second*, pursuant to the terms of the governing documents for Lusad, any claims brought derivatively on behalf of Lusad would have to be brought in Mexican courts pursuant to Mexican law.  (Núñez Decl. Ex. 2 at Article 42.)

- *Third*, the proper defendant in such an action would not be L1bero Partners, but rather the entity or entities that are allegedly misappropriating trade secrets and usurping corporate opportunities—*i.e.*, the dormant L1bre Jalisco and/or the non-existent L1bre Monterrey (*see* Petition ¶ 44).[3]

- *Fourth*, even assuming that ES Holdings could paper over its lack of standing by asking the Court to treat its pleadings as an entirely different type of claim, the request would be unavailing, because ES Holdings has not properly pled demand futility under FRCP 23.1. *See, e.g.*, *Smith v. Stevens*, 957 F.Supp.2d 466, 472 n.5 (S.D.N.Y. 2013) ("[T]he amended complaint allege[s], in the most cursory fashion, an assortment of reasons that the entire board should be deemed []interested.  These paragraphs do not meet the particularity requirements of Rule 23.1."); *In re Oppenheimer Funds Fees Litig.*, 419 F.Supp.2d 593, 596 (S.D.N.Y. 2006) ("Although [plaintiffs] allege in conclusory fashion that such a

---

[3] Significantly, L1bre Jalisco and Nuevo León are also organized under Mexican law (*see* Núñez Decl. ¶ 5 & Ex. 5), and neither of these entities is a party to the Partners Agreement.

demand would have been futile . . . they have failed . . . to come forth with the requisite particularized allegations.").

- *Finally*, to the extent that ES Holdings seeks to assert a multi-level derivative claim on behalf of Lusad or any of its subsidiaries, it has offered no proof that Mexican law even recognizes such a claim on behalf of a Mexican corporation, nor what the elements of such a claim would be.

For all of the foregoing reasons, ES Holdings' request for an injunction should be denied.

## 2. ES Holdings Relies on False and Unsubstantiated Facts

This Court has described the factual showing required to demonstrate likelihood of success on the merits as "substantial." *Tula Business, Inc. v. Med. Indus. of Am., Inc.*, No. 97 Civ. 0847 (DAB), 1997 WL 68565, at *2 (S.D.N.Y. Feb. 18, 1997). ES Holdings therefore bears a heightened burden to show that it can prevail on the merits on its claims against Respondents for misappropriation of trade secrets and competition in breach of the governing Partners Agreement. (*See* Petition at ¶ 51.) ES Holdings also cannot show a likelihood of success because the actions it seeks to enjoin were authorized under applicable agreements.

Primarily, the evidence provided by Respondents' witnesses Covarrubias and Núñez conclusively demonstrates that (1) the Lusad Board of Managers (including León and Zayas) authorized the formation of an entity to bid for the Monterrey concession; and (2) the entity that was formed for that purpose, Nuevo León, is fully within the corporate structure because it is owned 99.99% by Lusad, and .01% by SAL and, thus, is a wholly-owned indirect subsidiary of L1bre Holding LLC and ES Technologies. (*See* Covarrubias Decl. ¶ 6 & Ex. 2, Resolution 7.1; Núñez Decl. ¶ 5 & Ex. 5.). With respect to Jalisco, the evidence conclusively establishes that: (1) there is no bidding process underway at this time for any concession in the state of Jalisco; and (2) pursuant to the unanimous resolution of the Lusad Board of Managers (including León

and Zayas), L1bre Jalisco is in the process of being incorporated as a wholly-owned subsidiary of Lusad even though it will not be operating in the foreseeable future. (Covarrubias Decl. ¶ 17.)[4]

## C. The Balance of Equities Is Strongly Against ES Holdings

In general, "[a] preliminary injunction may not issue unless the movant clearly shows that the balance of equities favors the movant." *Litwin v. OceanFreight, Inc.*, 865 F.Supp.2d 385, 401 (S.D.N.Y. 2011). The inquiry depends upon the circumstances of each case, and the Court should refuse relief where it "may do more harm by enjoining [the challenged conduct] than good." *Iavarone v. Raymond Keys Assocs.*, 733 F.Supp. 727, 732 (S.D.N.Y. 1990).

Here, ES Holdings is seeking a preliminary injunction that would prevent Respondents and their "subsidiaries" and "affiliates," which includes Nuevo León, from engaging in "any efforts to obtain taximeter concessions from Monterrey," (MOL at 24), which would include registering to bid for the concession by the deadline of May 15, 2019 (León Decl. Ex. 8). If this Court chooses to issue a preliminary injunction that prevents Nuevo León from registering to bid, this Court would eliminate any chance for Nuevo León to obtain this valuable concession (*see* Covarrubias Decl. ¶ 10), despite the fact that the Lusad board unanimously approved the creation of Nuevo León for precisely this purpose (*see id.* ¶ 12). The loss of this critical business

---

[4] Given ES Holdings' reliance on unsupported hearsay statements attributed to Manuel Tabuenca, alleging that Covarrubias and Salinas committed an array of fabricated misdeeds, (*se* Petition ¶ 29), this Court should be advised that the various transfers which Petitioner suggests were fraudulent were in fact entirely proper. For instance, ES Holdings alleges that Covarrubias and Salinas caused Lusad to improperly transfer $8.7 million to a company controlled by Covarrubias. (*See id.* at ¶ 29(b).) In fact, this transfer was a repayment of an advance that was made by a company controlled by Covarrubias to purchase tablets for Lusad because Lusad was not in a position to fund the purchase itself. (Alamilla Decl. ¶ 6.) Similarly, the Petition claims that Covarrubias and Salinas caused Lusad to pay excessive legal fees of nearly $1 million to a local law firm. (*See* Petition. at ¶29(f).) However, the records show that the true amount was far smaller, approximately $156,000, a legitimate fee for services performed. (Alamilla Decl. ¶ 10.) These examples are chosen for illustrative purposes only: for the avoidance of doubt, documentary shows that each and every supposedly fraudulent transfer alleged in the Petition was done in good faith and for a legitimate business purpose.

opportunity will jeopardize Lusad's ability to continue as a going concern. (*id.* ¶ 10.) This is a quintessential irreparable harm to Respondents that should be taken into account in determining whether to issue the preliminary injunction.

This Court has historically been reluctant to enjoin good faith, profitable business transactions, and that policy ought to govern here. *See Litwin*, 865 F.Supp.2d at 401 (denying *de minimis* shareholder's request to enjoin $239 million transaction which promised to double shareholder value); *Iavarone*, 733 F.Supp. at 732 (denying equitable relief postponing meeting of defendant company's board of directors to discuss transaction because the Court "[did] not see the wisdom of . . . potentially derailing a carefully planned reorganization, merely for the benefit of one shareholder who can be fully compensated through post-transaction litigation").

This clear and imminent irreparable harm that the preliminary injunction would cause to Respondents outweighs any potential harm to ES Holdings should the relief be denied. Indeed, ES Holdings can only ***benefit*** if Nuevo León succeeds in securing the Monterrey concession.

Finally, ES Holdings has unclean hands. It is a bedrock principle that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). "A court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith" related to the matter at issue. *Cartier v. Symbolix, Inc.*, 386 F.Supp.2d 354, 362 (S.D.N.Y. 2005) (internal quotation marks omitted). Examples of such conduct include, *inter alia*, perjury and fraud on the court. *See Goldstein v. Delgratia Min. Co.*, 176 F.R.D. 454, 458 (S.D.N.Y. 1997); *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F.Supp. 969, 970 (S.D.N.Y. 1992).

Here, the Petition is riddled with falsehoods, from its fundamental arguments—for instance, that the nonexistent company L1bre Monterrey intends to exploit intellectual property belonging to Petitioner (*see* Petition ¶ 44)—to peripheral claims, such as the assertion that Salinas and Covarrubias caused Lusad to pay excessive fees to the law firm Villasante y Freyman (*see id.* ¶ 29(f)). In addition, ES Holdings alleges that Respondents have lodged criminal accusations of theft against Deloitte (*see id.* ¶ 32), supposedly upon learning that a Lusad employee had given Deloitte two laptops belonging to Lusad containing Lusad's financial records (*see id.* ¶¶ 31-32). This is a complete fabrication: Respondents have made no such accusations against Deloitte, as ES Holdings' principals know full well, because they are currently under criminal investigation for the same alleged theft. (*See* Amerena Decl. ¶ 3.) Similarly, ES Holdings claims that an insider at Lusad reported to León and Zayas that Lusad maintained two sets of financial records, one recording a variety of improper transactions and one "clean" version omitting them. (*See* Petition at ¶ 29(k).) This, again, is entirely invented; Lusad maintains a single set of financials, which were audited by qualified and experienced personnel at Grant Thornton LLP. (Alamilla Decl. ¶ 16.) Such deceit is a classic basis for a finding of unclean hands, and Petitioner's deceitful conduct should not be tolerated by this Court. *See Bein v. Heath*, 47 U.S. 228, 247 (1848) ("The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage."); *see also Goldstein*, 176 F.R.D. at 457-58.

In addition, the gravamen of ES Holdings' allegations is that Respondents have violated provisions of the Partners Agreement governing control of ES Technologies and its subsidiaries, including Lusad, (*see* Petition ¶¶ 2, 24-25, 38, 50), and are "[j]eopardizing the [c]oncession," (*see id.* ¶¶ 40-46). These allegations are incredible given that it was ES Holdings' principal

Zayas who violated the Partners Agreement by signing a document purporting to amend the MC Concession without unanimous affirmative written resolution of the full board of four directors and, thereby, significantly impaired its value. (*See* Covarrubias Decl. ¶ 16; *see also* León Decl. Ex. A at § 5.2(p).) Zayas also conspired with Herrera to steal laptops and then seeking to use an invalid power of attorney to pardon him on behalf of Lusad. (*See* Covarrubias Decl. ¶ 18.) By contrast, the actions taken by Respondents, such as the filing of the NAFTA notice and the filing of criminal and civil actions in Mexico were an attempt to undo the harm caused by León and Zayas and restore the value of the MC Concession. (*See id.* ¶¶ 16 & 19-21.) Significantly, a Mexican court has found, albeit on an interim basis, that León and Zayas acted in a manner detrimental to the interests of Lusad and, consequently, barred them from taking or purporting to take any further action on behalf or in the name of Lusad. (*See id.* ¶ 21.) In these circumstances, ES Holdings' request for an injunction should be denied. *See, e.g., Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 534 (S.D.N.Y. 2009) (holding that plaintiff's "unclean hands also preclude the equitable relief of a preliminary injunction"); *Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F.Supp. 1227, 1238 (S.D.N.Y. 1990) (holding that equitable relief would be inappropriate where, as here plaintiff "appears to have engaged in the very same conduct it has challenged").

### D. The Public Interest Would Not Be Served By the Issuance of an Injunction

The Supreme Court has instructed that "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *accord Winter*, 555 U.S. at 24.

Here, the public interest would not be served by granting the preliminary injunction because it would prevent Respondents and their "subsidiaries" and "affiliates" including

Nuevo León—which ES Holdings admits is most qualified for the Monterrey concession (*see* Petition at ¶ 44)—from registering to participate in a competitive bidding process announced by the State of Nuevo León Transportation Agency for a concession to install and operate digital taximeters in Monterrey. *See Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, 881 F.Supp.2d 470, 480-81 (S.D.N.Y. 2012) (denying preliminary injunction based in part on considerations of public interest because "while patent holders and their licensees are entitled to the protection of their economic rights, there is a countervailing interest in open competition"); *CollaGenex Pharm., Inc. v. IVAX Corp.*, 375 F.Supp.2d 120, 141 (E.D.N.Y. 2005) (denying preliminary injunction based in part on the "strong public interest" in promoting competition that would lower drug prices).

In addition, the public interest would not be served because the preliminary injunction would also deprive the people of Monterrey of innovative technology that would make taxis safer and more secure. *See, e.g., Dixon v. Love*, 431 U.S. 105, 114 (1977) (recognizing "the important public interest in safety on roads and highways"); *Valley Community Preservation Com'n v. Mineta*, 373 F.3d 1078, 1087 (10th Cir. 2004) (affirming denial of preliminary injunction because the public interest "served by safer highways and increased economic development" predominated over strict compliance with environmental laws).[5]

## III.    ES Holdings Is Not Entitled to the Continuation of the TRO Pending a Determination of Its Motion for a Preliminary Injunction

ES Holdings is not entitled to a temporary restraining order or a preliminary injunction, and therefore the temporary restraining order should be lifted.

---

[5] Significantly, ES Holdings has misrepresented the holding of the sole case they cite for the proposition that protection of trade secrets serves the public interest. (*See* MOL at 22.) In *Control Sys., Inc. v. Realized Sols., Inc.*, the Court stated that "although CSI has raised serious merits questions and protecting copyrights and trade secrets generally serves the public interests, this Court concludes that CSI has not clearly carried its burden of persuasion." No. 3:11CV1423 PCD, 2011 WL 4433750, at *4 (D. Conn. Sept. 22, 2011) (denying motion for a TRO).

It is well-established that the standard for imposition of a temporary restraining order is the same as that for granting a preliminary injunction. *Andino v. Fischer*, 555 F.Supp.2d 418, 419 (S.D.N.Y. 2008). Consequently, the temporary restraining order should be lifted for all of the same reasons discussed above that the request for a preliminary injunction should be denied. Further, "[t]he function of a temporary restraining order is to maintain the status quo for a short period of time, usually only until a hearing can be held." *Chan v. Chinese-American Planning Council Home Attendant Program, Inc.*, No. 15-CV-9605, 2016 WL 3004516, at *1 (S.D.N.Y. Jan. 21, 2016). Thus, at the time of the hearing on the preliminary injunction, the purpose of the temporary restraining order is vitiated, and it should be lifted.

In the alternative, if the Court is not inclined to lift the temporary restraining order currently in place, Respondents respectfully request that the Court clarify or amend the scope, so that Respondents' downstream "affiliate" or "subsidiary" Nuevo León will not be barred from registering to bid on the Monterrey concession. The deadline for interested parties to register to bid on that concession expires on **Wednesday, May 15, 2019**. If Respondents and their "affiliates" and "subsidiaries" are barred from registering, the opportunity for Nuevo León to participate in the bidding process for the Monterrey concession will be lost. Conversely, permitting Nuevo León to take the preliminary step of registering will not entail the submission of a proposal, but will merely keep the door open, preserving an extremely valuable interest without harming ES Holdings in any way. On this basis, Respondents submit that a clarification or modification of the temporary restraining order is appropriate.

## IV. In the Alternative, the Court Should Substantially Increase the Amount of the Bond Pursuant to FRCP 65(c)

Should the Court decide to grant the Petition and issue a preliminary injunction, ES Holdings must post a bond in an amount determined by the Court. Fed. R. Civ. P. 65(c).

As the Second Circuit has explained, the bond is "designed to cover any damages that might result if it were later determined that the applicant was not entitled to an injunction." *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith*, 910 F.2d 1049, 1055 (2d Cir. 1990) (internal quotation marks and citation omitted); *see also Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011) (explaining that the bond "assures the enjoined party that it may readily collect damages from funds posted in the event that it was wrongfully enjoined").

Although district courts in this Circuit have wide discretion to set the amount of the bond, courts have generally set substantial bonds where, as here, the evidence establishes that the enjoined party will sustain substantial damages if an injunction is issued.   *See, e.g., Sanofi-Synthelabo v. Apotex, Inc.*, 488 F.Supp.2d 317, 349 (S.D.N.Y. 2006) (setting a $400 million bond based on estimates of the enjoined party's "potential lost profits, lost market share and associated costs"); *Philip Morris, Inc. v. Star Tobacco Corp.*, 879 F.Supp. 379, 389 (S.D.N.Y. 1995) (setting a $5 million bond where it was clear that the issuance of a preliminary injunction would "bring[] to a halt the present forms and expressions of [the enjoined party's] efforts to mark the allegedly-infringing product); *see also Von Grabe v. Ziff Davis Pub. Co.*, No. 91 Civ. 6275 (DLC), 1994 WL 719697, at *4 (S.D.N.Y. Dec. 29, 1994) (denying preliminary injunction in part because it was doubtful that "plaintiff would be able to post the necessary security, which would likely be in the millions of dollars").

Respondents will suffer substantial damages if the injunction is issued.   To date, L1bero Partners has invested more than $30 million and has facilitated an additional $18 million in loans to the business.  (Covarrubias Decl. ¶ 8.)  If the injunction is issued, L1bero Partners' 50% owned indirect subsidiary Nuevo León will lose the opportunity to register for the Monterrey concession, which ES Holdings concedes that it is ideally placed to win,

*see* Petition at ¶ 44 ("[U]nless restrained, L1bre Monterrey [SIC] ***will win*** that concession . . .") (emphasis added), and which, after a full year of operation, is expected to generate an estimated annual EBITDA of nearly $50 million  (Covarrubias Decl. ¶ 10).  The loss of that opportunity would jeopardize Lusad's ability to continue as a going concern, and would also result in the wholesale devaluation of existing inventory, including, in particular, tablet kits that have been purchased for installation in the taxis and are depreciating by the day.  (*Id.*).

In light of the foregoing, Respondents respectfully request that, at a minimum, the Court should increase the bond from the current amount of $50,000 to the amount of $48 million.

## CONCLUSION

For the forgoing reasons, Respondents respectfully request that the Court enter an order lifting the temporary restraining order and denying the request for a preliminary injunction or, in the alternative, clarifying or modifying the scope of the injunction and increasing the amount of the bond to $48 million.

Dated: May 13, 2019  
      New York, New York

**REED SMITH LLP**

By:   /s/ Steven Cooper              
      Steven Cooper  
      SCooper@reedsmith.com  
      John B. Webb  
      JWebb@reedsmith.com  
      Colin A. Underwood  
      CUnderwood@reedsmith.com  
      Jonathan P. Gordon  
      Jonathan.Gordon@reedsmith.com  
      John P. Kennedy  
      JKennedy@reedsmith.com  

      599 Lexington Avenue  
      New York, New York 10022  
      Telephone:  (212) 521-5400  
      Facsimile: (212) 521-5450  

      *Attorneys for Respondents L1bero Partners, LP and Espiritu Santo Technologies, LLC*