**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ESPIRITU SANTO HOLDINGS, LP,

                             Petitioner,

  -against-

LIBERO PARTNERS, LP,

   and

ESPIRITU SANTO TECHNOLOGIES, LLC

                    Respondents.

Civil Action No. 19-cv-03930

---

## DECLARATION OF FABIO MASSIMO COVARRUBIAS

I, Fabio Massimo Covarrubias, hereby declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.　　I am the General Partner of Respondent L1bero Partners, LP ("**L1bero Partners**"), the Chief Executive Officer of Respondent Espiritu Santo Technologies, LLC ("**ES Technologies**"), the Chief Executive Officer of L1bre Holding LLC ("**L1bre Holding LLC**"), and the Chief Executive Officer (*Director General*) of Servicios Digitales Lusad S. de R.L. de C.V. ("**Lusad**").  I have personal knowledge of the facts and circumstances set forth in this Declaration, and as to those statements for which I do not have personal knowledge, I make my declaration on information and belief after a good faith investigation.  I submit this declaration in further support of Respondents' opposition to ES Holdings' Emergency Motion for Preliminary Injunction and Temporary Restraining Order In Aid of Arbitration.

2.　　I am an entrepreneur and investor who has brought a number of business ventures in Mexico, the United States, and other countries around the world to fruition through hard work

and perseverance. Over the years, the companies in which my team and I have been involved have created thousands of jobs, revitalized industries and have created considerable wealth for investors, host countries, and the individuals within them. I am proud of what my team and I have built over time and I am disheartened that we now find ourselves in a dispute orchestrated by two dishonest individuals who—despite not investing a cent out of their own pockets—now seek millions more and threaten to destroy an entire business in the process. Their false and unfounded allegations here are an act of desperation in the face of civil and criminal actions that are pending against them in Mexico in which they are being called to task.

3.      Mr. Santiago León Aveleyra and his associate Mr. Eduardo Zayas Dueñas approached me around September 2017 about a potential investment in Mexico. I was told by these gentlemen that—although they did not personally possess the technical expertise or experience (being neither software developers nor experienced business managers)—they had, with the help of their staff, been working on developing technology for a concession for the installation of new taximeters in Mexico City that they had previously obtained from the Transportation Secretariat (*Secretaría de Movilidad*) in Mexico City.

4.      Although the idea seemed intriguing, the business itself was under serious financial distress. At the time of my arrival, Messrs. León and Zayas admitted they had burned through nearly US $30,000,000 that they said had been invested in the business by a company called Accendo Holdings, LLC ("**Accendo**"). To my knowledge, Mr. León and Zayas had not contributed a single dollar of capital themselves. Despite Accendo's investment, Messrs. León and Zayas had been unable to develop working technology and the management of the company was in a state of disarray. Accendo wanted to exit, and Messrs. León and Zayas were shopping for a new investor to take Accendo's place with promises that the new investor would have operational

control of the business because Mr. León and Mr. Zayas did not have the experience, know-how, or the resources to develop working technology, manage the company, and implement the installation of taximeters in over 138,000 taxis in Mexico City.

5.      Based on Mr. León's and Mr. Zayas' representations, including those regarding the Mexico City taximeter concession and the associated technology, in late 2017, L1bero Partners entered into a Unit Purchase Agreement with Mr. León's and Mr. Zayas' company, Espiritu Santo Holdings LP ("**ES Holdings**").   Pursuant to the Unit Purchase Agreement, L1bero Partners purchased 50% of the membership units in ES Technologies.  L1bero Partners and ES Holdings subsequently executed a Partners Agreement.  From the time of this transaction to the present ES Holdings has not contributed a single dollar to the business.

6.      I have reviewed a graphic of the various entities involved in the business and their relationships that Mr. León included in his declaration.   The graphic below supplements and corrects Mr. León's graphic.  Specifically, Mr. León incorrectly states that Mr. Ricardo Salinas Pliego is a representative of L1bero Partners and omits that L1bre Nuevo León, S. de R.L. de C.V. ("**L1bre Nuevo León**")—incorrectly referred to as "L1bre Monterrey" in Petitioner's pleadings— is part of the corporate structure underneath Servicios Digitales Lusad, S. de R.L. de C.V.  As detailed below, in January 2019, L1bre Nuevo León was formed pursuant to a unanimous board resolution in order to bid for a taximeter concession in the city of Monterrey, Nuevo Leon, which is one of the most important metropolitan areas in Mexico.  Mr. León's sworn statements about "L1bre Monterrey" having been formed to compete with Lusad are simply incorrect:  I have never heard of or been involved with an entity named "L1bre Monterrey," and L1bre Nuevo León is the L1bre entity that will bid on the Monterrey concession.



7.      In December 2017, I was appointed Chief Executive Officer of the operating entity (Lusad) by a Unanimous Written Resolution adopted by the full Board of Managers of Lusad – which included Mr. León and Mr. Zayas. *See* **Exhibit 1** (true and correct copy of December 6, 2017 Unanimous Written Resolution).  When I came into Lusad it was in the red financially and hemorrhaging money.  Given these challenges, I quickly assembled a team with which I could work to try to bring Lusad back from the brink of failure.

8.      In addition to supporting Lusad as Chief Executive Officer, I also provided tens of millions of dollars of my own money in the form of both cash and loans (which have not been repaid) to try to get the company off the ground.  To date, L1bero Partners has contributed more than USD $30,000,000 dollars and has facilitated an additional USD $18,000,000 in loans to the business. Given that the business was not considered credit-worthy since it does not have any revenues, these loans were obtained by using my own personal real estate as collateral. By contrast, Mr. León and Mr. Zayas (and their entities) did not and have not put up a single dollar of cash or

collateral.  Rather than contribute, they have cost the company millions of dollars and have now resorted to misleading this Court to attempt to destroy the company.

9.      The considerable financial investments I made and facilitated, injected much-needed funds to pay vendors and continue Lusad's operations, which consisted of developing the taximeter technology and a hailing app that were the object of the concession, as well as developing the installation processes and protocols for more than 138,000 taxis in Mexico City. As part of the support offered by my team, we developed marketing and created programs to incentivize the adoption of Lusad's eventual technology by taxis in Mexico City.

10.     Lusad currently has the opportunity to bid on a major taxi concession in Monterrey, Nuevo León.  It is not overstating to say that the Monterrey concession represents a live-or-die opportunity for the company.  If obtained, after a full year of operation it could generate an estimated EBITDA of nearly US $50 million. Without bidding on and winning in this concession, Lusad will miss out on millions of dollars not only in lost potential revenue but in the wholesale devaluation of existing tablet kits that have been purchased and are depreciating by the day.  We estimate that without putting these tablets to use in the immediate term, we may see a total of devaluation of roughly 75%.  More than just Lusad's profitability is at stake with the Monterrey concession.  Lusad's very existence as an operating entity is on the line.

11.     Despite the importance of the Monterrey concession, Mr. León and Mr. Zayas have actively worked to derail the bid first through unlawful actions in Mexico and now through the improper use of the court system in the United States.  Mr. León and Mr. Zayas' bad faith is seen in the fact that they specifically timed their "notification" of an emergency hearing to coincide with a public holiday in Mexico (Labor Day, May 1) when they knew offices were closed and key individuals were unavailable. Given the public holiday, we were unable to hire and instruct a U.S.

lawyer in time to attend the temporary restraining order hearing.  By telling their one-sided story, filled with misinformation, distortions, and outright lies, Petitioner misled the Court into issuing an injunction that is improper, unjustified, and that violates Mexican law.

12.     As a central argument for an emergency injunction, Petitioners falsely represented to the Court, without evidence, that L1bero Partners has tried to compete against the company's interests specifically by bidding on a concession in Monterrey purportedly through a separate company. This allegation is demonstrably untrue.  Mr. León and Mr. Zayas were aware of and *expressly approved* moving forward with the Monterrey concession via the resolution adopted by Lusad's Board of Managers on December 14, 2018.  *See* **Exhibit 2**.  Pursuant to this resolution, on January 31, 2019, L1bre Nuevo León, S. de R.L. de C.V. was formed.  *See* **Exhibit 3** (articles of incorporation of L1bre Nuevo León).  As can be seen from L1bre Nuevo Leon's articles of incorporation, the owners of this company are Lusad and Servicios Administrativos Lusad, S. de R.L. de C.V.  *See id.* at p. 12. It is clear, given their misstatements, that Petitioner's interest here is not to prevent wrongful competition, as they claim, but rather to hold the company hostage as leverage while they face civil and criminal liability in Mexico.

13.     I have read Mr. León's declaration in this proceeding and can attest that many of the statements included in Mr. León's declaration are false or misleading or both.  Many of the facts that have been misstated or omitted by Mr. León's were either within Mr. León's knowledge or could have been determined with minimal investigation.

14.     In ¶ 12 of his declaration, Mr. León claims that "as partners, we invested over US $100,000,000 developing the software, purchasing the hardware, and gearing up the installation facilities to install the L1bre system into over 138,000 Mexico City Taxis."  This statement is false. Mr. León and Mr. Zayas (and their companies) did not invest a single dollar.  They also did not

develop any software, purchase hardware, or gear up installation facilities. Mr. León and Mr. Zayas do not possess the expertise or experience to do what they claim. Mr. León's professional background is more closely aligned to politics and lobbying rather than in technology and business management. Similarly, Mr. Zayas' background is not in technology but rather in the financial sector where he claims to have worked as trader/account manager. Lusad's present technology was developed by Kichink Servicios, S.A. de C.V. ("**Kichink**") *after* L1bre Partners' investment in late 2017.  *See* **Exhibit 4** (true and correct copy of agreement with Kichink).

15.     None of the intellectual property at issue in this matter is owned by ES Holdings, Mr. León, or Mr. Zayas.  Rather, the "L1bre" trademark is registered to Lusad, and the relevant taximeter technology which was developed by Lusad via the contract with Kichink, and the associated intellectual property and software, is likewise owned by Lusad.  *See* **Exhibit 4** (Kichink contract), **Exhibit 5** (trademark registration), and **Exhibit 9** (taximeter approval).

16.     Mr. León also asserts in the same paragraph that "for about the next year [from December 2017 to December 2018], the partnership appeared to proceed well."  This is also untrue because it ignores a critical event that gave rise to many of the current disputes involving Mr. León and Mr. Zayas.  Specifically, in November 2018, Lusad's Mexico City concession was unlawfully "altered" at a meeting with government officials that Mr. Zayas attended.  This "alteration" caused the Mexico City concession to lose most or all of its value and has resulted in multiple criminal and civil actions against Mr. León and Mr. Zayas that were initiated between December 2018 and March 2019.  After harming the company (perhaps fatally), Mr. León and Mr. Zayas embarked on a scorched earth campaign consisting of false accusations, theft, and intentional violation of court orders as an ill-conceived "defense" in the face of their misconduct.

17.     In ¶15 of his declaration, Mr. León repeats, without any substantiation, a series of false and defamatory allegations of which he evidently does not have personal knowledge and instead tries to attribute to an ex-employee by the name of Manuel Tabuenca who, it should be noted, did not present a sworn declaration in this proceeding. Mr. Tabuenca was a former Lusad employee who had been brought into the business by Mr. León and Mr. Zayas and was supposed to be functioning as a controller.  When my team and I arrived, we found that the company's financial records were non-existent or in disarray and Mr. Tabuenca was moved to another role. Mr. Leon's/Mr. Tabuenca's allegations, as discussed below, are false:

- It is untrue that Lusad paid employees that were working for other businesses. When I joined Lusad, I found it in a state of such disarray that I was forced to bring in employees who I knew and trusted and with whom I had successfully collaborated in other projects. These employees worked exclusively for Lusad and were paid by Lusad. What is most startling about Mr. León's unsubstantiated accusations in this Court, is that both he and Mr. Zayas were asked and consented to the hiring of this team—without whom the company would not have been able to move forward and keep operating.

- Lusad did not "wrongfully transfer" US $8.7 million to Inversiones Cova.  As Mr. León is aware, but for some reason chose not to disclose in his declaration, Inversiones Cova purchased 25,000 tablet kits because Lusad did not have the funds to do so.  The US $8.7 million to which Mr. León alludes actually corresponds to three transactions relating to the purchase of 10,000, 7,500, and 7,500 of the tablet kits respectively.  There is nothing improper about these transactions. If Mr. León had bothered to investigate before making his reckless accusations and had any interest in the truth, he would have found out that the alleged "wrongful transfer" was a reimbursement for the purchase of tablet kits that now belong to

Lusad.  Inversiones Cova did not make a profit on these purchases. Neither Mr. Leon nor Mr. Zayas (nor their companies) offered to advance the funds for the purchase of these tablet kits.

- L1bero Partners did not breach any non-compete provisions in the Partners Agreement.  As explained above, L1bre Nuevo León (not "L1bre Monterrey" as Petitioners incorrectly state) was created *after* the Board of Managers of Lusad (including both Mr. León and Mr. Zayas) unanimously approved the creation of an entity to participate in the bidding of the Monterrey concession.  *See* **Exhibit 2**.  L1bre Nuevo León is owned by Lusad and a Lusad subsidiary.  *See* **Exhibit 3** at p. 12. Regarding the state of Jalisco, there is no concession bidding process of which we are aware in that state. As was specifically disclosed and approved by the Lusad Board of Managers in December 2018, L1bre Jalisco is in the process of being incorporated as a wholly-owned subsidiary of Lusad even though it will not be operating in the foreseeable future.  *See* **Exhibit 2**.

- There was no "improper transfer" of company funds to Cubeice Consultores de Negocios, S.C. ("**Cubeice**"), MOOK, S.A.P.I. de C.V. ("**MOOK**"), or Vistra Corporate Services ("**Vistra**"). Cubeice developed all of the implementation processes and procedures for the company's installation centers. This was a considerable task given that there are over 138,000 taxis in Mexico City that would have to be processed.  See **Exhibit 6** (Cubeice contract). Despite Mr. León's misstatements, Cubeice is not owned by my son.  Cubeice is a well-regarded company made up of former McKinsey & Co. consultants and personnel.  MOOK was retained to create Lusad's webpage [www.l1bre.com] to help audit technology being developed by Kichink, and to help create a platform for taxi drivers through which they could schedule appointments for installation of the taximeter.  *See* **Exhibit 7** (MOOK contract).  Like Cubeice,

MOOK is also not owned by my son. The last company mentioned, Vistra, earned administrative fees as manager of the company that is the direct owner of the real estate that I put up as collateral so that Lusad could obtain its US $18,000,000 working capital loan. I have not been compensated for taking on the significant risk associated with putting up this guaranty and Mr. León and Mr. Zayas notably have not put their own capital or property at risk.

- It is false that US $2.7 million was paid to Kichink and N9 Tecnologia de Mexico, S.A. de C.V. ("**N9**") without a contract and with no benefit provided to Lusad. As Mr. León is aware, Kichink developed the taximeter technology that was the exact object of the concession. N9 is a Kichink-affiliated company that provided services related to the same technology. It is simply untrue that there was no contract in place. *See* **Exhibit 4** (contract).

- Lusad has not paid the law firm Villasante and Freyman anywhere near the alleged US $1,000,000 for "thirteen short *amparo* actions" that Mr. León claims. Mr. León did not provide documents to support such a misstatement. Mr. León is deliberately misreading the engagement agreement with Villasante and Freyman, which provides that Villasante and Freyman could receive *up to* a total of US $1,000,000 by prevailing on *all* the *amparo*[1] actions that were ultimately filed up to the total amount listed in the engagement agreement. To date and given the number of cases it has worked on, Villasante and Freyman has been paid less than 25% of the total possible amount listed in its engagement agreement.

- It is false that Lusad "immediately" paid US $2.2 million as repayment for intercompany loans despite a 12-month "grace

---

[1] *Amparo* challenge the legality or constitutionality of a governmental act.

period."  In fact, the intercompany loans have not been paid and remain outstanding.  Mr. León's statement is simply untrue.

- Another egregious misstatement in Mr. León's declaration in this proceeding concerns US $200,000 allegedly paid toward a private aircraft.  Mr. León aspired to obtain and utilize a new aircraft once the business became operational. Mr. León asked that Lusad employ the pilot, mechanic, and other personnel that had previously operated a private aircraft that I had used so that he could fly to and from Miami and I could fly to and from Houston. The aircrew personnel were terminated by mid-2018 when it became clear that the company was nowhere near beginning operations.

- It is also false that Lusad paid an "inflated price" of US $12,058,675 for tablets purchased for US $11,832,000. Mr. León fails to mention that Inversiones Cova was forced to buy the tablets on an emergency basis because Lusad did not have sufficient capital and the tablets had to be ordered without further delay to attempt to meet the schedule that was necessary for the Mexico City concession. Inversiones Cova made a cash down payment and financed the rest of the cost through letters of credit.  The "inflated price" that Mr. León claims in reality represents a *finance charge* relating to the letters of credit.  Inversiones Cova did not make a profit on this transaction. Once again, Mr. León and Mr. Zayas did not offer to purchase the tablets themselves, did not contribute to the down payment, and did not even offer to cover the finance charge for the purchase.  All of this had to be done by the investors who were willing to put their capital at risk for this company.

- It is utterly false and completely illogical to accuse me of allegedly "siphoning" funds from Lusad's bank accounts. Given that Lusad has not made any profits or generated revenues, all of the money in

Lusad's bank accounts came from L1bero Partners or from loans that were backed by my real estate guaranty. It makes no sense to allege that I "siphoned" my own money or put my own real estate at risk to "siphon" money.  Mr. León did not provide any evidence to back up these ridiculous and false allegations.

- In relation to a supposedly abusive loan offer from Mr. Salinas, it was Messrs. León and Zayas who met with Mr. Salinas to request a loan and, when the offer was presented to me, I advised that the company should turn it down.  Lusad did not accept the offer.

- Finally, with respect to Mr. León's second-hand account of an unsubstantiated rumor from Mr. Tabuenca that Lusad was maintaining "two sets of books," this allegation is also false. Since I became involved in the company, Lusad has maintained proper accounting, which has been audited by Salles Sainz-Grant Thorton, which is an independent accounting firm in Mexico City.

18.    I have also reviewed Petitioner's allegations with regard to a purported audit by Deloitte that was never performed.  I was present during the December 14, 2018 Board of Managers Meeting in which the issue of retaining Deloitte to perform an audit of Lusad was raised. In my role as special delegate of the Board of Managers, I would be directly involved with the audit work Deloitte was supposed to be undertaking.  However, before we could reach an agreement on the process for a potential audit, two company-owned laptops containing back-up financial materials and confidential working papers were stolen from Lusad's office by a former employee named Eduardo Herrera.  Mr. Herrera and Mr. Zayas have just been indicted for this theft. I know Mr. Eduardo Herrera to have been a close business associate of Mr. Zayas.  In fact, Mr. Zayas attempted to appear before the Attorney General's office utilizing an invalid power of

attorney in order to attempt to pardon Mr. Herrera on behalf of Lusad. There is a pending criminal action against Mr. Zayas relating to his use of forged documents.

19.     In the months preceding Petitioner's "emergency" motion in this Court (i.e. from December 2018 to February 2019), Mr. León and Mr. Zayas were made the subject of a number of civil and criminal actions in Mexico due to their misconduct.  It is notable that Mr. León and Mr. Zayas filed their motion in this court as Mr. Zayas' arraignment became imminent.  In the days after they filed their motion, we were informed Mr. Zayas will now be summoned for his arraignment.  This is unfortunately not the first time that these gentlemen have been in trouble with the law and, specifically with respect to crimes involving deception.

20.     One of the actions that is relevant here concerns an injunction that Petitioners knowingly violated.  Concretely, L1bre Holding is a 99% shareholder of Lusad.  As such, L1bre Holding filed a claim before the 63rd Civil Court of Mexico City alleging that its ability to exercise its corporate rights was being violated.  Along with its underlying suit, L1bre Holding also sought and obtained an injunction preventing L1bero Partners, Espiritu Santo Holdings, Espiritu Santo Technologies and Lusad from commencing arbitration pursuant to the Partners Agreement pending adjudication of its lawsuit.  This injunction was issued on April 24, 2019 and remains in effect today.  When I learned in the afternoon of May 1, 2019 of the temporary restraining order hearing, and unable to obtain U.S. counsel in time to attend, I emailed Petitioners' counsel to inform him of the injunction and that pursuing their claims in this manner would violate a standing order from the Mexican Civil Court. Counsel ignored my email and went forward with the hearing in plain violation of the injunction.

21.     On February 21, 2019, the 30th Civil Court of Mexico City, issued an order prohibiting both Mr. Leon and Mr. Zayas from performing any action as Lusad's Board of

Managers members. *See* **Exhibit 8** (order with translated excerpts). This order was issued because Mr. León and Mr. Zayas are being held responsible by Lusad's direct shareholders, in relation to the "alteration" of the concession and of, directing and/or tacitly consenting to the theft of the company's computers. These actions not only breached the Partners Agreement and Lusad's by-laws, but also breached legal and ethical codes governing how businesses must be run in Mexico. Via a recent court filing before Mexico City's 30th Civil Court, Mr. Zayas has admitted his participation in the unauthorized "alteration" of the concession. Moreover, as mentioned above, just recently, the Attorney General's Office has found probable cause for finding Mr. Herrera liable for the theft of the computers and of Mr. Zayas being involved in this crime. I understand they will be arraigned in the coming days.

[INTENTIONALLY LEFT BLANK]

Executed on May 11, 2019

_____
Fabio Massimo Covarrubias