**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESPIRITU SANTO HOLDINGS, LP, <br><br> Petitioner, <br><br> -against- <br><br> L1BERO PARTNERS, LP, <br><br> and <br><br> ESPIRITU SANTO TECHNOLOGIES, LLC <br><br> Respondents. | Civil Action No. 19-cv-03930 |

<u>**DECLARACIÓN DE HORACIO ALAMILLA MEDINA**</u>

Yo, Horacio Alamilla Medina, declaro, bajo protesta de decir verdad, conforme a 28 U.S.C. § 1746, que lo siguiente es verdadero y correcto:

1.        Soy el Contralor de Servicios Digitales Lusad, S. de R.L. de C.V. ("**Lusad**"). Tengo conocimiento personal de los hechos y circunstancias expuestos en esta Declaración, y aquellas declaraciones de las que no tengo conocimiento personal, expongo con base en información y creencia tras una investigación de buena fe. Presento esta declaración como soporte adicional del Escrito de las Demandadas en Oposición a la Solicitud de Emergencia de ES Holdings de Medida Cautelar y Orden de Restricción Temporal en Pro de Arbitraje.

2.        Cuento con una licenciatura en Contaduría Pública de la universidad ISEC. Fui titulado en el año 1999 y tengo más de 30 años de experiencia profesional en las áreas de contraloría, tesorería, contabilidad y finanzas. Me integré al equipo de trabajo de Lusad en noviembre de 2017, y he fungido como el Contralor en la empresa desde entonces. A lo largo de mi carrera profesional

he trabajado en diversas empresas importantes en México, incluyendo IB Enterprises, S.A. de C.V., Grupo Fertinal, S.A. de C.V., Gruppo Covarra, S.A. de C.V.

3.      En mi calidad de Contralor de Lusad, soy responsable de supervisar y tengo conocimiento personal de los registros contables y financieros de Lusad. Es preciso señalar que los registros contables de Lusad son auditados por Salles Sainz - Grant Thornton S.C, una firma de auditores independientes con sede la Ciudad de México. El informe de auditoría para el año fiscal 2017 fue emitido en enero de 2018. *Véase* **Anexo 1** (copia fidedigna de informe de auditoría de Salles Sainz - Grant Thornton para el año fiscal 2017).

4.      Se me ha solicitado revisar ciertos alegatos relacionados con las transacciones financieras de Lusad mencionadas en la declaración del Sr. Santiago León Aveleyra ("**Declaración León**"). Concretamente, el Sr. León afirma que él y el Sr. Eduardo Zayas Dueñas invirtieron capital en Lusad y tiempo después "descubrieron" algunas supuestas "impropiedades." *Véase* Declaración León en el ¶ 15. He realizado una investigación sobre estas afirmaciones y puedo afirmar que las declaraciones del Sr. León resultan engañosas y/o falsas.

5.      El Sr. León dice en su declaración que "como socios, invertimos más de US $100,000,000 para desarrollar el *software*, comprar los equipos, y poner en marcha la infraestructura para instalar el sistema L1bre en más de 138,000 taxis en la Ciudad de México." *Véase* Declaración León en el ¶ 12. Los registros contables y financieros de Lusad no indican que el Sr. León o sus empresas hayan invertido capital por tales cantidades.

6.      El Sr. León afirma que "el mismo día que Lusad recibió US $10,000,000 para pagar los Prestamos Intercompañía para la operación de la concesión […] Lusad (bajo la dirección del Sr. Salinas y el Sr. Covarrubias) de manera inapropiada transfirió a Inversiones COVA (la compañía del Sr. Covarrubias) montos que sumaban casi US $8.7 millones." *Véase* Declaración

León en el ¶ 15. No hubo ninguna transferencia inapropiada como afirma el Sr. León sin fundamento. Aunque el Sr. León no aporta detalles, los US $8.7 millones a los que hace referencia corresponden a tres transferencias bancarias que Servicios Administrativos Lusad S de R.L de C.V. efectuó a Inversiones Cova el 23 de enero de 2018 como anticipo de la compra de 25,000 kits de tabletas que Inversiones Cova realizó dado que Lusad no estaba en posibilidad de llevar a cabo la compra de tabletas, puesto que no contaba con recursos financieros que se lo permitieran. Inversiones COVA llevó a cabo dicha compra inicial de 25,000 kits de tabletas mediante tres pedidos al proveedor Ingram por 10,000 kits, 7,500 kits y 7,500 kits respectivamente. Para esto tuvo que efectuar anticipos y establecer cartas de crédito que le permitieran garantizar la entrega de las tabletas necesarias para la operación de Lusad por los importes siguientes:

a. US $3,558,300 dólares corresponden al valor de la primera carta de crédito que Inversiones Cova tuvo que establecer por el pedido de 10,000 kits de tabletas y que fueron garantizadas al banco mediante un depósito en efectivo efectuado por Inversiones Cova. *Vease* **Anexo 2** (carta de crédito y estado de cuenta).

b. US $2,570,085 dólares corresponden al valor de la segunda carta de crédito que Inversiones Cova tuvo que establecer por el pedido de 7,500 kits de tabletas y que fueron garantizadas al banco mediante un depósito en efectivo efectuado por Inversiones Cova. *Vease* **Anexo 3** (carta de crédito y estado de cuenta).

c. US $2,570,850 dólares corresponden al valor de la tercera carta de crédito que Inversiones Cova tuvo que establecer por el pedido de 7,500 kits de tabletas y que fueron garantizadas al banco mediante un depósito en efectivo efectuado por Inversiones Cova. *Vease* **Anexo 4** (carta de crédito y estado de cuenta).

7.      Es importante señalar que los 25,000 kits de tabletas que inicialmente compró Inversiones Cova, le fueron vendidos en fecha posterior a Servicios Administrativos Lusad en los términos indicados en el punto 12 de esta declaración.

8.      El Sr. León indica, nuevamente sin prueba, que "el Sr. Salinas y el Sr. Covarrubias causaron la transferencia inapropiada de considerables fondos corporativos a supuestos vendedores de Lusad que en realidad pertenecían o eran controladas por el Sr. Salinas o el Sr. Covarrubias y que proporcionaron un beneficio nulo o mínimo a Lusad." *Véase* Declaración León en el ¶ 15. Según el Sr. León, "en seguimiento a las instrucciones del Sr. Covarrubias, Lusad pagó más de US $500,000 a una empresa llamada Cubeice […] la cual es de propiedad del hijo de Covarrubias a través de una serie de intermediarias. De manera similar, el Sr. Covarrubias causó que Lusad transfiriera más de US $290,000 a una empresa llamada MOOK […] la cual también es de propiedad del hijo de Covarrubias. En adición, el Sr. Covarrubias instruyó a Lusad a pagar US $34,000 a una empresa belga llamada Vistra Corporate Services, la cual luego transfirió los fondos a Fama Properties Ltd., una empresa de propiedad y controlada por Covarrubias."  Las afirmaciones del Sr. León resultan imprecisas, falsas y/o engañosas:

a. Lusad  adquirió compromisos de pago con Cubeice Consultores de Negocios, S.C. por US $802,500 más IVA de los cuales al 31 de Diciembre de 2018 se efectuaron pagos por US $564,013 por concepto de servicios de consultoría relacionados con, entre otras cosas, el desarrollo de los procesos necesarios para la instalación de aproximadamente 138,000 taxímetros en taxis en la Ciudad de México. Estos servicios se prestaron al amparo de un contrato. *Véase* **Anexo 5** (copia fidedigna del contrato entre Lusad y Cubeice Consultores de Negocios, S.C.). Acompaño a mi declaración un ejemplo del trabajo de Cubeice que demuestra que efectivamente

se prestaron los servicios objeto del contrato. *Véase* **Anexo 6** (copia fidedigna de manual de instalación desarrollado por Cubeice Consultores de Negocios, S.C.). Cabe mencionar que, a mi saber, Cubeice Consultores de Negocios, S.C. no es una empresa de propiedad del hijo del Sr. Covarrubias; es una empresa independiente conformada en su mayoría por exconsultores de McKinsey & Co.

b. Igualmente resulta imprecisa, engañosa y en parte falsa la afirmación del Sr. León en relación con la empresa MOOK, S.A.P.I. de C.V. Lusad contrajo compromisos por MXN $7,654,999 más IVA a esta empresa por concepto de servicios de, entre otras cosas, auditoría a la plataforma tecnológica y documentación de la tecnología desarrollada por Kichink Servicios, S.A. de C.V. para el taxímetro objeto de la concesión que fue otorgada a Lusad, revisión de códigos, análisis de infraestructura y análisis de riesgos operativos. Así mismo, los servicios de desarrollo de sistema de citas, página web, hailing app y el desarrollo de una plataforma redundante permitiría garantizar la viabilidad del proyecto. Estos servicios eran necesarios porque existía un precedente muy claro de tecnología que fue desarrollada por una empresa que fue seleccionada por el Sr. León y no funcionaba. Los servicios de MOOK, S.A.P.I. de C.V. fueron prestados al amparo de diversos contratos. *Véase* **Anexo 7** (copia fidedigna de contratos entre Lusad y MOOK, S.A.P.I. de C.V.). A mi saber, MOOK, S.A.P.I. de C.V. no es una empresa propiedad del hijo del Sr. Covarrubias como afirma el Sr. León sin sustento ni prueba.

c. Finalmente, Lusad pagó US $34,149 a Vistra Corporate Services por concepto de servicios administrativos necesarios para obtener un préstamo. *Véase* **Anexo 8** (copia fidedigna de comprobantes de pago de Vistra Corporate Services). Estos

servicios administrativos se relacionaban con el trámite de una garantía que Sr. Covarrubias proporcionó para que Lusad pudiera obtener el préstamo. En otras palabras, el pago que ahora pretende cuestionar el Sr. León se relaciona con un beneficio importante que fue otorgado a Lusad por el Sr. Covarrubias. El Sr. Covarrubias no ha cobrado y Lusad no ha pagado cantidad alguna como contraprestación por este beneficio aparte de los referidos costos administrativos. Cabe mencionar que sin esta garantía y el préstamo que se obtuvo a su amparo Lusad no hubiera podido seguir operando.

9.      El Sr. León declara que "el Sr. Salinas y el Sr. Covarrubias causaron que US $2.7 millones de dólares fueran pagados a dos empresas llamadas Kichink Servicios, S.A. de C.V. y N9 Tecnología México, S.A. de C.V." *Véase* Declaración León en el ¶ 15. Según el Sr. León, "Kichink y N9 aparentemente prestarían servicios a Lusad; sin embargo, no existía contrato y no se proporcionó un beneficio a cambio de estos montos." Me consta que estas afirmaciones son falsas. Sí existe el contrato con Kichink Servicios. *Véase* **Anexo 9** (copia de contrato con Kichink). N9 es una sociedad relacionada al Sr. Claudio del Conde, desarrollador del software y Drector General de Kichink. También se prestaron los servicios contratados y estos beneficiaron a Lusad. Estas empresas—que el Sr. León ahora pretende desconocer—desarrollaron precisamente la tecnología de los taxímetros digitales.

10.     El Sr. León afirma que "el Sr. Salinas y el Sr. Covarrubias causaron a Lusad a acordar pagar casi US$ 1 millón a un despacho de abogados llamado Villasante y Freyman, como contraprestación por honorarios legales incurridos para trece breves acciones de amparo que jamás costarían cerca de esto en un despacho local legítimo." *Véase* Declaración León en el ¶ 15. Esta afirmación es demostrablemente falsa. Lusad no pagó ni cerca de los US$ 1 millón que alega el

Sr. León por concepto de las referidas acciones de amparo. En realidad, Lusad pagó solamente MXN $2,964,000 que equivalen a US $156,772 dólares aproximadamente; es decir una fracción de lo que declara de manera equivocada el Sr. León. *Véase* **Anexo 10** (tabla sumaria de pagos a Villasante y Freyman según registros contables). En mi experiencia como Contralor en diversas empresas, este es un monto razonable por concepto de servicios legales, además de que dichos servicios fueron contratados por el director jurídico de Lusad, quien, en su carácter de abogado, tiene experiencia en el manejo de éstos asuntos y los costos de los mismos.

11.     El Sr. León declara que "a pesar de un 'periodo de gracia' de 12 meses [...] para el pago de préstamos intercompañía proporcionados por L1bero Partners, el Sr. Salinas y el Sr. Covarrubias causaron a Lusad a pagar de manera inmediata más de US $ 2.2 millones de dólares a las empresas del Sr. Covarrubias." *Véase* Declaración León en el ¶ 15. Esta afirmación es falsa. No se han pagado los préstamos intercompañía proporcionados por L1bero Partners ya que ésta última nunca ha efectuado préstamos a Lusad. Los únicos préstamos que se han obtenido son tres prestamos obtenidos por L1bre Holding, LLC con Security International Investments, Inc. (por US $15,000,000), Adriática Assets, LLC (por US $8,930,000) y Mediterránea Assets, LLC (por US $6,070,000), mismos que a la fecha no se han pagado. Cabe mencionar que el Sr. León era plenamente consciente de estos préstamos ya que él mismo firmo la resolución unánime en la que se reconoce la aportación de capital del monto total de los préstamos, es decir US $30,000,000. *Vease* **Anexo 11** (resolución unánime de fecha 21 de febrero 2018).

12.     El Sr. León indica que "el Sr. Salinas y el Sr. Covarrubias compraron tabletas para la concesión a través de Inversiones Cova por US $11,832,000 y luego vendieron estas tabletas a Lusad al precio inflado de US $12,058,675, lo cual causó que Lusad pagara un sobreprecio innecesario e injustificado de más de US $200,000." *Véase* Declaración León en el ¶ 15. Esta



afirmación resulta engañosa. El Sr. León no menciona que Inversiones Cova compró inicialmente las tabletas porque Lusad no contaba con recursos para la compra de kits de tabletas ni la posibilidad de establecer cartas de crédito, por lo que en fecha previa a la incorporación como accionista, a riesgo propio, y con conocimiento de los demás accionistas, llevó a cabo la compra de 25,000 kits de tabletas, mismas que posteriormente vendió a Servicios Administrativos Lusad, S. de R.L. de C.V.  Dicha operación se describe a continuación:

| Concepto | Cantidad | Pagos de Inversiones Cova a Ingram (USD) | Pagos de L1BRE a Inversiones Cova (USD) | Diferencia |
|---|---|---|---|---|
| Kits | 25000 | 10,000,000 | 10,000,000 | - |
| Mejora cámara | 10000 | 50,000 | 50,000 | - |
| Flete | 15000 | 150,000 | 150,000 | - |
| Comisión cartas crédito | | - | 35,600 | (35,600) |
| Intereses | | | 86,447 | (86,447) |
| Subtotal | | 10,200,000 | 10,322,047 | (122,047) |
| IVA | | 1,632,000 | 1,651,528 | (19,528) |
| Total | | **11,832,000** | **11,973,575** | **(141,575)** |

Como se puede apreciar, las únicas diferencias entre el costo que pagó Inversiones Cova a Ingram y lo que L1bre le pagó a ésta, son las comisiones por las cartas de crédito que se establecieron y los intereses, los cuales corresponden al costo financiero del 6.25% anual. La tasa del 6.25% utilizada para el cálculo de intereses, corresponde a la misma presupuestada para el crédito de capital de trabajo autorizada en la sesión de consejo.

13.     Finalmente, el Sr. León afirma que el Sr. Manuel Tabuenca le reportó que "había encontrado evidencia que Lusad mantenía dos juegos de registros contables, uno que incluía muchas de las transacciones inapropiadas descritas arriba y otro que no hacía referencia a estas transacciones inapropiadas." *Véase* Declaración León en el ¶ 15. El Sr. León no aporta prueba



alguna que sustente esta afirmación extraordinaria. Por los motivos que se exponen a continuación, se debe considerar que el Sr. León ha faltado a la verdad frente a este tribunal.

14.      Previo a mi gestión como Contralor, el Sr. Manuel Tabuenca fungía como Contralor y era responsable de la contabilidad de las empresas del grupo; sin embargo, al mes de noviembre de 2017 no se tenían ni registros contables ni estados financieros de ninguna de las empresas de L1bre, a pesar de que para tal fin se había contratado un despacho de contadores externo. El Sr Tabuenca no había proporcionado documentación soporte de las operaciones que permitiera el registro de las mismas, y en algunos casos, no existía documentación soporte por lo que tampoco era posible la obtención de los estados financieros, además no se había cumplido con las obligaciones fiscales de las empresas del grupo bajo su cargo.

15.      Por otro lado, se había contratado el sistema de contabilidad de Netsuite para todas las empresas del grupo. Sin embargo, el Sr. Tabuenca no había llevado a cabo la implementación del mismo. Por lo antes expuesto, a mi llegada fue necesario actualizar los registros contables, dar cumplimiento a las obligaciones fiscales y emitir estados financieros de todas las empresas del grupo que pudieran ser auditados por Salles Sainz - Grant Thornton.  Antes de mi integración como Contralor, los estados financieros no habían sido auditados.  Aunque el Sr. Tabuenca fue removido de su puesto como Contralor por su deficiente desempeño, el acceso al sistema de contabilidad Netsuite utilizado por las empresas del grupo no le fueron restringidos.

16.      En base a lo anterior, me consta que la afirmación del Sr. León en relación con la contabilidad es totalmente falsa. No existen dos juegos de registros contables; existe un solo juego de registros contables auditados por una firma internacional de contabilidad (Salles Sainz - Grant Thorton). Resulta reprochable y personalmente me es ofensivo que el Sr. León haga este tipo de

afirmación infundada frente a un tribunal de justicia, sabiendo en qué condiciones el Sr. Tabuenca mantenía los registros contables de las empresas del grupo.

Declaro bajo protesta de decir verdad bajo las leyes de los Estados Unidos de América que lo anterior es verdadero y correcto.

Suscrito el 10 de mayo 2019

_____
Horacio Alamilla Medina

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**ESPIRITU SANTO HOLDINGS, LP,**

                              **Petitioner,**

   **-against-**

**LIBERO PARTNERS, LP,**

   **and**

**ESPIRITU SANTO TECHNOLOGIES,  LLC**

                              **Respondents.**

**Civil Action No. 19-cv-03930**

<u>**DECLARATION OF HORACIO ALAMILLA MEDINA**</u>

I, Horacio Alamilla Medina, hereby declare under oath, pursuant to 28 USC § 1746, that the following is true and correct:

1.      I am the Controller at Servicios Digitales Lusad, S. de R.L. de C.V. **("Lusad").** I have personal knowledge of the facts and circumstances set forth in this Declaration and, as to those statements of which I have no personal knowledge, I make my assertions based on information and my understanding [of the facts], having investigated these in good faith. I submit this statement in further support of Respondents' opposition to ES Holdings' Emergency Motion for Preliminary Injunction and Temporary Restraining Order In Aid of Arbitration.

2.      I have a degree in Public Accounting from ISEC University. I was certified in 1999 and have over 30 years of professional experience in the controller, treasury, accounting and finance fields. I joined the Lusad staff in November 2017, and I have served as the Controller of the company since then. Throughout my professional career I have worked in several

important companies in Mexico, including IB Enterprises, S.A. de C.V., Grupo Fertinal, S.A. de C.V., Gruppo Covarra, S.A. de C.V.

3.    In my capacity as Controller of Lusad, I am responsible for supervising and I have personal knowledge of Lusad's accounting and financial records. It should be noted that the Lusad company accounting records are audited by Salles Sainz - Grant Thornton S.C., a firm of independent auditors based in Mexico City. The audit report for fiscal year 2017 was issued in January 2018. *See* **Annex 1** (true and correct copy of audit report by Salles Sainz - Grant Thornton for fiscal year 2017).

4.    I have been asked to review certain allegations related to Lusad's financial transactions mentioned in Mr. Santiago León Aveleyra's declaration **("León Declaration").** Specifically, Mr. León states that he and Mr. Eduardo Zayas Dueñas, invested capital in Lusad and later "discovered" some alleged "improprieties". *See* Leon Declaration in [chapter/item] 15. I have conducted an investigation into these claims and I can affirm that Mr. Leon's statements are misleading and/or false.

5.    Mr. Leon says in his statement that "as partners, we invested over US$ 100,000,000 developing the software, purchasing the hardware, and gearing up the instillation facilities to install the L1bre system into over 138,000 Mexico City taxis." *See* León Declaration, paragraph 12. The accounting and financial records of Lusad do not show that Mr. Leon or his companies invested capital in such amounts.

6.    Mr. León states that "the very same day that Lusad received the US$ 10,000,000 to pay the Intercompany Loans for the operation of the concession [...] Lusad (under the direction of Mr. Salinas and Mr. Covarrubias) wrongly transferred to Inversiones COVA (Mr. Covarrubias' company) amounts totaling almost US$ 8.7 million." *See* León Declaration,

[initials]

paragraph 15. There was no improper transfer, as claimed by Mr. Leon without foundation. Although Mr. León does not provide details, the US $8.7 million he refers to corresponds to three bank transfers that Servicios Administrativos Lusad S de R.L de C.V. made to Inversiones Cova on January 23, 2018, as an advance for the purchase of 25,000 kits of tablets that Inversiones Cova made given that Lusad was not in a position to carry out the purchase of [said] tablets, as it did not have the required financial resources. Inversiones COVA carried out said initial purchase of 25,000 kits of tablets through three orders to the supplier Ingram for 10,000 kits, 7,500 kits and 7,500 kits, respectively. For this, it had to provide advances and establish letters of credit that would ensure delivery of the tablets necessary for the Lusad operation, in the following amounts:

a. US$ 3,558,300 corresponding to the amount of the first letter of credit that Inversiones Cova had to establish for the purchase order of 10,000 tablet kits and that were guaranteed to the bank through a cash deposit made by Inversiones Cova. *See* **Annex 2** (letter of credit and account statement).

b. US$ 2,570,085 corresponding to the amount of the second letter of credit that Inversiones Cova had to establish for the purchase order of 7,500 tablet kits and that were guaranteed to the bank through a cash deposit made by Inversiones Cova. *See* **Annex 3** (letter of credit and account statement).

c. US$ 2,570,850 corresponding to the amount of the third letter of credit that Inversiones Cova had to establish for the purchase order of 7,500 tablet kits and that were guaranteed to the bank through a cash deposit made by Inversiones Cova. *See* **Annex 4** (letter of credit and account statement).

[initials]

7.      It is important to note that the 25,000 tablet kits purchased initially by Inversiones Cova were sold at a later date to Servicios Administrativos Lusad under the terms listed in point 12 of this declaration.

8.      Mr. Leon states, again without proof, that "Mr. Salinas and Mr. Covarrubias caused the inappropriate transfer of significant corporate funds to purported vendors of Lusad, which in reality were owned or controlled by Mr. Salinas or Mr. Covarrubias and provided no or limited benefit to Lusad". *See* Leon Declaration, paragraph 15. According to Mr. León, "pursuant to Mr. Covarrubias' instructions, Lusad paid over US$ 500,000 to a company names Cubeice Consultores de Negocios, S. C., which is owned through a series of intermediaries by Mr. Covarrubias' son. Similarly, Mr. Covarrubias caused Lusad to pay over US$ 290,000 to a company named MOOK, S.A.P.I. de CV, which is also owned by Mr. Covarrubias' son. In addition, Mr. Covarrubias instructed Lusad to pay US$ 34,000 to a Belgium company named Vistra Corporate Services, which then transferred the funds to Fama Properties Ltd., a company owned and controlled by Covarrubias." Mr. León's statements are imprecise, false and/or misleading:

a.   Lusad acquired payment commitments with Cubeice Consultores de Negocios, S.C. for US$ 802,500 plus VAT, of which, on December 31, 2018, payments were made for US$ 564,013 for consulting services related to, among other things, the development of the processes necessary for the installation of approximately 138,000 taximeters in Mexico City taxis. These services were provided under a contract. *See* **Annex 5** (true and correct copy of the contract between Lusad and Cubeice Consultores de Negocios, S.C.). I attach to this declaration, an example of the work performed by Cubeice, evidencing that the

services, object of said contract, were in fact provided. *See* **Annex 6** (true and correct copy of the installation manual developed by Cubeice Consultores de Negocios, S.C.). It should be mentioned that, to my knowledge, Cubeice Consultores de Negocios, S.C. is not owned by the son of Mr. Covarrubias; it is an independent company consisting mostly of former McKinsey & Co. consultants.

b.  Equally imprecise, misleading and partially false is Mr. León's assertion regarding the company MOOK, S.A.P.I. de C.V. Lusad contracted commitments worth MXN$ 7,654,999 plus VAT with this company for services of, among other things, auditing of the technological platform and documentation of the technology developed by Kichink Servicios, S.A. de C.V. for the taximeter, object of the concession granted to Lusad, as well as for a review of the code, infrastructure analysis and operational risk analysis. Likewise, the development services for the booking system, website, hailing app and the development of a redundant platform that would ensure the viability of the project. These services were necessary because there was a very clear precedent of technology developed by a company chosen by Mr. Leon, which did not work. The MOOK, S.A.P.I. de C.V. services were provided under various contracts. *See* **Annex 7** (true and correct copy of the contracts between Lusad and MOOK, S.A.P.I. de C.V.). To my knowledge, MOOK, S.A.P.I. de C.V. is not a company owned by Mr. Covarrubias's son as affirmed by Mr. León without support or proof.

c.  Finally, Lusad paid US$ 34,149 to Vistra Corporate Services for administrative services needed to obtain a loan. *See* **Annex 8** (true and correct copy of the Vistra Corporate Services payment vouchers). These administrative

[initials]

services were related to the processing of a guarantee that Mr. Covarrubias provided for Lusad to obtain the loan. In other words, the payment that Mr. León now intends to challenge is related to an important benefit that was granted to Lusad by Mr. Covarrubias. Mr. Covarrubias has not charged and Lusad has not paid any amount in consideration for this benefit apart from the aforementioned administrative costs. It is worth mentioning that without this guarantee and the loan that was obtained thanks to it, Lusad would not have been able to continue operating.

9.    Mr. León states that "Mr. Salinas and Mr. Covarrubias caused $2.7 million dollars to be paid to two companies named Kichink Servicios, S.A. de C.V. and N9 Tecnología México, S.A. de C.V." *See* León Declaration, paragraph 15. According to Mr. Leon, "Kichink and N9 apparently were ostensibly to provide services to Lusad; however, there was no contract and no benefit was provided in exchange for these funds". I can assure that these statements are false. A contract with Kichink Servicios does in fact exist. *See* **Annex 9** (copy of the contract with Kichink). N9 is a company related to Mr. Claudio del Conde, software developer and General Manager of Kichink. These contracted services were provided as well and these benefited Lusad. These companies -which Mr. León now claims to be unaware of- specifically developed the digital taximeter technology.

10.    Mr. León states that "Mr. Salinas and Mr. Covarrubias caused Lusad to pay almost US$ 1 million to a law firm named Villasante y Freyman, as payment for legal fees incurred for thirteen short *amparo* actions, that would never cost close to that much by any legitimate local law firm". *See* León Declaration, paragraph 15. This statement is demonstrably false. Lusad did not even come close to paying the US$ 1 million alleged by Mr. León for the aforementioned

[initials]

relief [amparo] actions. In fact, Lusad only paid MXN\$ 2,964,000 which is approximately US\$ 156,772; that is, a fraction of what Mr. León wrongly states. *See* **Annex 10** (summary table of payments to Villasante y Freyman based on accounting records). In my experience as Controller in various companies, this is a reasonable amount for legal services, in addition to the fact that these services were contracted by the legal director of Lusad, who, as a lawyer, has experience in handling these matters and of their cost.

11.      Mr. León states that "despite the 12-month "grace period" [...] for repayment of the intercompany loans provided by L1bero Partners, Mr. Salinas and Mr. Covarrubias caused Lusad to immediately pay over US\$ 2.2 million dollars back to Mr. Covarrubias' companies". See Leon Declaration, paragraph 15. This statement is false. Said inter-company loans from Libero Partners have not been paid because the latter has never made loans to Lusad. The only loans that were obtained are three loans obtained by L1bre Holding, LLC from Security International Investments, Inc. (for US\$ 15,000,000), Adriática Assets, LLC (for US\$ 8,930,000) and Mediterránea Assets, LLC (for US\$ 6,070,000), which, to date, have not been paid. It is worth mentioning that Mr. León was fully aware of these loans since he himself signed the unanimous resolution in which the capital contribution for the total loan amount is recognized, that is, US\$ 30,000,000. *See* **Annex 11** (unanimous resolution dated February 21, 2018).

12.      Mr. León states that "Mr. Salinas and Mr. Covarrubias purchased tablets for the concession through Inversiones Cova for US\$ 11,832,000 and subsequently resold the tablets to Lusad at the inflated price of US\$ 12,058,675, causing Lusad to pay an unnecessary and unjustified markup of over US\$ 200,000." *See* Leon Declaration, paragraph 15. This statement is

[initials]

misleading. Mr. León does not mention that Inversiones Cova initially bought the tablets because Lusad did not have the resources to purchase the tablet kits, nor even the possibility of establishing letters of credit, which is why, prior to entering as a shareholder, at his own risk, and with the knowledge of the other shareholders, he carried out the purchase of 25,000 tablet kits, which he subsequently sold to Servicios Administrativos Lusad, S. de RL [sic] de C.V. This operation is described below:

| Item | Quantity | Inversiones Cova payments to Ingram (USD) | Payments from L1BRE to Inversiones Cova (USD) | Difference |
|---|---|---|---|---|
| Kits | 25000 | 10,000,000 | 10,000,000 | - |
| Improved camera | 10000 | 50,000 | 50,000 | - |
| Freight | 15000 | 150,000 | 150,000 | - |
| Credit letter commission | | | 35,600 | (35,600) |
| Interest | | | 86,447 | (86,447) |
| Subtotal | | 10,200,000 | 10,322,047 | (122,047) |
| VAT | | 1,632,000 | 1,651,528 | (19,528) |
| Total | | **11,832,000** | **11,973,575** | **(141,575)** |

As can be seen, the only differences between the cost that Inversiones Cova paid to Ingram and what L1bre paid to it, are the commissions for the letters of credit that were established and the interest, which correspond to a financial cost of 6.25% annual. The 6.25% rate used to calculate interest corresponds to the rate budgeted for the working capital credit authorized in the Board session.

13.     Finally, Mr. Leon states that Mr. Manuel Tabuenca reported that "he had uncovered evidence that Lusad was maintaining two sets of books, one including many of the improper transactions described above and one making no reference to those improper transactions". *See* León Declaration, paragraph 15. Mr. Leon does not provide any evidence to

[initials]

support this extraordinary claim. For the reasons set out below, it must be considered that Mr. Leon has failed to tell the truth to this court.

14.    Prior to my tenure as Controller, Mr. Manuel Tabuenca served as Controller and was responsible for the accounting of the group's companies; however, as of November 2017, there were no accounting records or financial statements for any of L1bre's companies, despite the fact that an external accounting firm had been contracted for this purpose. Mr. Tabuenca had not provided supporting documentation for operations that would allow the accounting of the same, and in some cases, there was no supporting documentation which also made it impossible to obtain financial statements, furthermore, tax obligations of the group of companies under his charge had not been met.

15.    Additionally, the Netsuite accounting system had been purchased for all the companies in the group. However, Mr. Tabuenca had not undertaken its implementation. Due to the foregoing, upon my arrival, it was necessary to update the accounting records, comply with the tax obligations and issue financial statements for all group companies that could be audited by Salles Sainz - Grant Thornton. Prior to my coming on board as Controller, the financial statements had not been audited. Although Mr. Tabuenca was removed from his position as Controller due to his poor performance, his access to the Netsuite accounting system used by the group's companies was not restricted.

16.    Based on the foregoing, I can attest that Mr. León's statement in regard to the accounting is completely false. There are not two sets of books; there is only one set of accounting records audited by an international accounting firm (Salles Sainz - Grant Thorton). It is reprehensible and personally I find it offensive for Mr. León to make these types of unfounded

[initials]

assertions before a court of law, knowing the state in which Mr. Tabuenca kept the accounting records of the group's companies.

I declare, under oath, to tell the truth under the laws of the United States of America, that what was declared above is true and correct.

Signed on May 10, 2019

_____
Horacio Alamilla Medina

# LIONBRIDGE

STATE OF NEW YORK          )
                           )
                           )          ss
COUNTY OF NEW YORK         )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached Horacio Alamilla Declaration.

Laura Musich, Managing Editor
Lionbridge

Sworn to and subscribed before me

this 12th day of May, 20 19.

ETHAN WIN LY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LY6323702
Qualified in New York County
My Commission Expires 04-27-2023