**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/14/2019

———————————————————————x

ESPIRITU SANTO HOLDINGS, LP,

                    Petitioner,

    -against-                              No. 19 Civ. 3930 (CM)

L1BERO PARTNERS, LP; ESPIRITU SANTO
TECHNOLOGIES, LLC,

                    Respondents.

———————————————————————x

## MEMORANDUM DECISION AND ORDER
## GRANTING IN PART AND DENYING IN PART PETITIONER ESH'S
## MOTION FOR PRELIMINARY INJUNCTION IN AID OF ARBITRATION

McMahon, C.J.:

    This petition for an injunction in aid of arbitration arises out of a dispute among Mexican

citizens who formed Canadian limited liability entities, which then entered into a Partners

Agreement governed by Delaware law—all so they could own and operate, through a series of

Delaware LLCs, a taximeter and ride-hailing company operating in Mexico City.

    The Partners Agreement mandates that all disputes arising out of the agreement be

arbitrated before the International Court of Arbitration at the International Chamber of

Commerce ("ICC").

    So what are we doing in the Southern District of New York, in a state and judicial district

that has not the slightest interest in the underlying enterprise?

    The answer is that, for reasons best known to the partners themselves, the agreed site for

the ICC arbitration is New York City, and the Partners Agreement confers "exclusive

jurisdiction" on New York City courts (including specifically this Court) for the limited purpose of awarding pre-arbitral injunctive relief—including injunctions in aid of arbitration.

But while dispute resolution is supposed to take place in New York, Petitioner alleges that, through a series of unlawful corporate maneuvers and lawsuits in Mexico, Respondents[1] have wrested control of various downstream entities that the parties agreed would be controlled jointly, have misappropriated trade secrets belonging to the joint venture for their sole use, and plan to use the now solely-controlled companies to compete with the joint venture in the same line of business in different locales—and perhaps even in Mexico City itself. Petitioner has commenced an arbitration before the ICC, but Respondents appear to have obtained at least two *ex parte* orders from a Mexican court, one of which purports to bar Petitioner from commencing arbitration. This order appears to grow out of an application to declare that the arbitration clause is either void or does not apply—I do not know, as Petitioner does not have, and so cannot provide to the Court, the papers that were filed with the Mexican court. Respondents refuse to provide them.

Petitioner seeks an emergency injunction in aid of arbitration, principally to prevent Respondents from altering the status quo by bidding unilaterally on a lucrative public contract using the disputed technology or by otherwise transferring to their sole control the primary asset of the joint venture while the parties proceed to arbitration.

On May 2, 2019, Petitioner Espiritu Santo Holdings, LP ("ESH"), having given 24 hours' notice to Respondents, approached this Court seeking a temporary restraining order in their favor. Respondents did not appear. After reviewing the papers (which included Spanish

---

[1]  "Respondent" in this opinion refers to L1bero Partners, LP, which is the party adverse to Petitioner ESH. While EST is named as a Respondent in the caption, Petitioner admits that the partnership should have been named only as a nominal Respondent. Petitioner has reserved its right to challenge the representation of EST in this action by Reed Smith LLP—the same law firm that represents L1bero Partners, LP in this action. (Tr. 13:4–13.)

language copies of portions of purported orders from a Mexican court that Petitioner had no time to translate), and hearing Petitioner *ex parte*, the Court temporarily restrained Respondents L1bero Partners, LP ("L1bero") and Espiritu Santo Technologies, LLC ("EST") from:

1. Improperly competing with the joint venture in violation of that certain Espiritu Santo Technologies, LLC Partners Agreement dated December 6, 2017 (the "Partners Agreement") (Decl. of Santiago León Aveleyra ("León Decl."), Dkt. No. 21, Ex. 1);

2. Misusing any trade secret or intellectual property developed by ESH in violation of the Partners Agreement; and

3. Taking any further steps in any Mexican court or otherwise, anywhere in the world, to interfere with or divest or derogate the exclusive jurisdiction of the United States District Court for the Southern District of New York to decide the issue of pre-arbitral injunctive relief, as provided for in the Partners Agreement.

(Dkt. No. 3 at 2.)

Now before the Court is ESH's application for an order to show cause why a preliminary injunction in substantially the same form as the temporary restraining order should not issue. (*See* Dkt. No. 3.)

On May 13, 2019, the parties appeared before this Court for a hearing, at which the Court heard testimony and argument. (*See generally* Transcript of Hearing dated May 13, 2019 ("Tr.").)

For the reasons that follow, ESH's emergency motion for a preliminary injunction is granted in part and denied in part.

## I.    Findings of Fact

### A.    The Parties

Petitioner ESH is a limited partnership organized under the laws of the province of Alberta, Canada, with its principal place of business in Missouri, Texas. (Emergency Pet., Dkt. No. 1, ¶ 8.)  ESH is represented and managed by nonparties Santiago León Aveleyra ("León") and Eduardo Zayas Dueñas ("Zayas") on behalf of a close group of investors. (*Id.*)

3

Respondent L1bero is a limited partnership organized under the laws of the province of Alberta, Canada, with its principal place of business in Houston, Texas. (*Id.* ¶ 9.) L1bero is indirectly owned and controlled by two Mexican businessmen, Ricardo Salinas Pliego ("Salinas") and Fabio Covarrubias Piffer ("Covarrubias"). (*See* León Decl. Ex. 1 § 10.1(b).)

Respondent EST is a limited liability company organized under the laws of the State of Delaware with its principal office in Miami, Florida. (Emergency Pet. ¶ 10.) EST's operations is governed, in part, by the Partners Agreement entered into between the parties on or about December 6, 2017. (León Decl. Ex. 1.) Pursuant to the Partners Agreement, the CEO of EST is Covarrubias. (Emergency Pet. ¶ 10.)

## B.    Development of the New Taximeter Technology

There are approximately 138,000 registered taxis in Mexico City that, every day, account for over 2.7 million trips. (León Decl. ¶ 2.) Most of the taxi fleet is equipped with technologically obsolete equipment; the fleet cannot be hailed from smartphone applications or paid for with credit cards, and many of the taximeter systems are inaccurate and lack geolocation or safety features. (*Id.*)

Understanding these shortcomings, in 2015, León and Zayas began developing technology aimed at making taxi transport within Mexico City safer and more efficient for both taxi drivers and their customers (the "L1bre technology"). (León Decl. ¶¶ 1, 3.)

León and Zayas recruited and built a team that included senior managers formerly from companies like Uber and Apple; created and registered the "L1bre" tradename and associated trademarks for the system; and developed the first version of the overall technology and related software. (*Id.* ¶ 3.) To develop the software, León and Zayas entered into an agreement with a developer called NullData. (Tr. 49:12–19.)

4

The resulting technology was something akin to the love child of Verifone and Uber: it included physical taximeters, as well as the ability to ride hail through smartphones. In order to develop this technology, ESH spent USD $40 million of its own capital. (León Decl. ¶ 7.)

### C.     Creation and Corporate Ownership of OpCo Lusad

As part of this first phase of development, in October 2015, León and Zayas incorporated an operating company in Mexico named Servicios Digitales Lusad, S. de R.L. de C.V. ("Lusad"), as well as two other affiliated companies: Servicios Administrativos Lusad, S. de R.L. de C.V. ("Servicios Administrativos Lusad") and Lusad Servicios, S. de R.L. de C.V. ("Lusad Servicios"). (*Id.*)

Because Lusad was the operating company, Lusad registered the "L1bre trademark," (Tr. 54:1–7) and entered into the contract with NullData for the development of key software (*id.* at 58:3–7).

Lusad was the wholly-owned subsidiary of nonparties L1bre Holding and L1bre LLC, each of which, in turn, was a wholly-owned subsidiary of Respondent Espiritu Santo Technologies, LLC.[2]  (*Id.* at 58:8–11.)  EST, in turn, was the wholly-owned subsidiary of Petitioner ESH. (León Decl. ¶ 9.)

---

[2]      Paragraph 9 of the León Declaration refers to Respondent EST as "ES Technologies, LLP." (León Decl. ¶ 9.) It is clear from the rest of that declaration, however, that EST was always an LLC, rather than an LLP (*id.* ¶ 10), and that its full name is "Espiritu Santo Technologies, LLC," not "ES Technologies, LLP" (*id.*).



(*Id.* ¶ 10.)

León and Zayas appointed Manuel Tabuenca ("Tabuenca"), a former high-level employee at Uber, as Lusad's CFO.  (*Id.* ¶ 15.)

### D.   Mexico City Taximeter Concession

Through Lusad, León and Zayas approached the Mexico City Secretariat of Mobility (Secretaría de Movilidad, or "Semovi") in order to explain and promote the benefits of the system they were developing.  (*Id.* ¶ 4.)  The city's representatives explained that the technology

was appropriate and necessary, but that Semovi would have to put such a project out for public bid. (*Id.*)

As such, in or around May 2016, Semovi published in the *Mexico City Official Gazette* a declaration of need for the replacement, installation, and maintenance of the City's taxi fleet taximeters, to include a satellite geo-localization system, smart maps, centralized tracking, safety and security features, announcements and publicity capabilities, including advertising, as well as the ability for remote taxi hailing. (*Id.* ¶ 5.) The concession was to be awarded for a period of ten years. (*Id.* ¶ 12.)

Eight companies, including Lusad, submitted bid packages. (*Id.* ¶ 6.) However, Lusad was the only bidder whose bid complied with all of the bidding specifications and requirements mandated by Semovi. (*Id.*) In fact, the L1bre corporate group remains, to this day, the only company in Mexico with certified digital taximeters. (Tr. 76:23–25.) Accordingly, on June 17, 2016, Semovi's adjudication committee granted Lusad the concession for the substitution, installation, and maintenance of new taximeters and related application technology. (León Decl. ¶ 6.)

The original terms of the concession allowed Lusad to install the taximeters in the entire existing Mexico City taxi fleet and to receive trip-based compensation—up to 12 Mexican pesos per trip, as well as advertising and other revenue streams. (*Id.* ¶ 12; Tr. 99:10.)

Even at this early stage, however, the concession began to show signs of trouble on the horizon. In May of 2017, Semovi issued a mandatory notice to all taxi drivers, requiring them to switch from analog taximeters to digital ones—*i.e.*, to the Lusad technology. (Tr. 103:4–8.) This announcement was met with resistance by an organized group of about 400 taxi drivers— out of 138,000 taxis total—who sued for an injunction. (*Id.* at 103:8–12) Apparently, the

protests attracted attention both from the media and from prospective mayoral candidates, who planned to run in the summer of 2018. (*Id.* at 103:11–19.) During this time, the eventual winner of the mayoral race distinguished himself by promising taxi drivers that he would not require them to adopt the Lusad technology. (*Id.*)

### E.    The Unit Purchase Agreement and Partners Agreement

In 2017, rather than continue to fund the enterprise exclusively, and with the ten-year concession in hand, León and Zayas began to seek additional capital and financing necessary to finalize the technology, manufacture the taximeters, and further develop the L1bre project. (León Decl. ¶ 7.)

It was at this point that León and Zayas met with Salinas and Covarrubias. (*Id.*) Covarrubias is a Mexican businessman with millions of dollars of investments. (*See* Tr. 133:24–134:3.)

#### 1.    Unit Purchase Agreement

The parties agreed that Salinas and Covarrubias would together acquire 50% of the L1bre business in exchange for (*i*) USD $5 million in cash, (*ii*) a USD $20 million intercompany loan, and (*iii*) Salinas' commitment to obtain a line of credit for working capital through his bank, Banco Azteca, of USD $90 million. (León Decl. ¶ 8.)

This agreement involved restructuring the ownership of Lusad. To effectuate this, León and Zayas first entered into a Unit Purchase Agreement[3] with Salinas and Covarrubias, pursuant to which León and Zayas agreed to transfer 50% of the voting units of EST to Salinas and Covarrubias, to be held through their company, Respondent L1bero. (*Id.* ¶ 9.) As a result of the

---

[3]    The Unit Purchase Agreement is not at issue in this action.

8

Unit Purchase Agreement, the following ownership and ultimate control structure was created

for the L1bre business:



(*Id.* ¶ 10.)

### 2.  Partners Agreement

Approximately two weeks after entering into the Unit Purchase Agreement, on December

6, 2017, León, Zayas, and Covarrubias executed the Partners Agreement.  (*Id.* ¶ 11.)

The purpose of the Partners Agreement is "to govern the relation between [L1bero and

ESH] *as partners of* [EST]."  (León Decl. Ex. 1 § 1 (emphasis added).)  Note that the agreement

was to govern the relationship between ESH and L1bero both as partners of EST and otherwise.

The Partners Agreement requires EST to "take all necessary corporate actions to ensure that its

operating agreement reflects and includes the agreements contained in this PA." (*Id.*)

The Agreement gives each partner a 50% ownership interest in EST. (*Id.* § 3.1) It

further states that, "In the event of any merger, consolidation, division or other reorganizations of

the Company, each of the Partners shall have the right to maintain its percentage of Ownership

Interest in the Company *or any successor of the Company as the percentage it then holds*

*immediately before such merger, consolidation, division or other reorganizations.*" (*Id.* § 3.2.)

The Agreement also provides that, *inter alia*:

- ESH and L1bero shall be "jointly responsible for . . . [h]andling the day-to-day operations of L1bre *and Lusad*," and for "[e]xplor[ing] new business opportunities for [EST] and/or L1bre in any other countries in which services similar to those contemplated by the Lusad Concession may be performed, including the licensing of the application, software and know-how developed by L1bre for remote hiring of cab services and other related services" (*id.* § 4.2(a)– (b) (emphasis added));

- EST's Board will have four Directors, and that ESH and L1bero will each appoint two directors for indefinite terms (*id.* § 5.1(a));

- "If a Director position becomes vacant *for any reason*, the Party who appointed the Director whose position is vacant shall be entitled to appoint a successor in writing" (*id.* (emphasis added)); and

- "[T]he Board composition and structure and the appointment procedure for the Top Management shall be replicated in the other [EST] Affiliates and in any new affiliates or subsidiaries that may be incorporated as part of [EST's] expansion of its business operations" (*id.* § 5.1(b)).

This last provision applies regardless of where the subsidiary might be incorporated. There are

no restrictions whatever on its applicability. In other words, any downstream subsidiary that

might be incorporated as a part of the expansion of the partnership; and any other business

opportunities, had to have two directors appointed by ESH and two directors appointed by

L1bero.

The Agreement further provides:

- All "Major Decisions" are subject to unanimous affirmative written resolution of all Directors, including:

  o "The entry by [EST] or any of [EST]'s Affiliates into any partnership, joint venture or other profit sharing arrangement with a third party; and/or the admittance or acceptance to additional partners in [EST] or in [EST]'s Affiliates, directly or indirectly" (*id.* § 5.2(h));

  o "Engaging or changing the external auditors for the audit of [EST]'s financial statements or of any of [EST]'s Affiliates" (*id.* § 5.2(k));

  o "[T]he execution of any agreement, act or operation by [EST] or by [EST]'s Affiliates with a related party to the Parties" (*id.* § 5.2(r));

  o "[T]he incorporation by [EST] or by any of [EST]'s Affiliates of any direct or indirect affiliate or investment company or vehicle with legal personality or not" (*id.* § 5.2(t)); and

  o "The exercise of any corporate or voting rights issued by [EST]'s Affiliates and the designation of any proxy or representative authorized to vote and approve any of the acts or matters described in paragraphs (a) to (s) hereof by each of [EST]'s affiliates" (*id.* § 5.2(u));

- "The Partners shall co-operate and discuss in good faith to resolve operational disputes which might arise between them" (*id.* § 5.3(a));

- If the Directors appointed by each Party are not able to reach unanimous agreement on Major Decisions, the Parties will attempt resolution by consultation; and in the event of a failure of consultation, will engage in a procedure to valuate and sell the company (*id.*); and

- Each partner, at any time, during normal business hours, may examine the books and records of EST, L1bre LLC, and Lusad (*id.* § 8.3).

The Agreement contains a broad non-compete provision:

> The Partners agree, either directly or indirectly not to compete or to not to intervene (and to cause that none of the Principals compete or intervene directly or indirectly) in any activities similar to the ones performed by [EST] and [EST]'s Affiliates, and/or to directly or indirectly invest or participate in the capital stock and/or as creditor or lender, in or in favour of third parties that is a competitor of [EST] in such countries and jurisdictions where [EST] and [EST]'s Affiliates perform their current and/or future activities.     The provision herein will be in force during the term of this Agreement

and for a term of 24 (twenty four) months after the same is terminated for any reason.

The Partners hereby agree that they will refrain to analyse and/or to enter into any new line of businesses or economic activities or initiatives that could have a synergy with the activities or the line of business performed by [EST] or by [EST's] Affiliates, without submitting such new venture or new line of business to the prior analysis of the Board of Directors of the Company, provided that if the Board elects to reject or denies to participate in such initiative in writing, the Partners shall be free to pursue the submitted venture independently to the extent the Members of the Board of Directors appointed by the Partner not submitting the initiative rejected the proposal. The approvals of new ventures hereof shall be considered a Major Decision.

(*Id.* § 11(d)–(e).)

Crucially, the Partners Agreement contained the following language regarding dispute resolution:

### 12. APPLICABLE LAW. ARBITRATION.

This Agreement and all actions contemplated herein shall be governed by and construed in accordance with the laws of the State of Delaware. Any dispute, claim or controversy resulting from, relating to or arising out of this Agreement, including the breach, termination, enforcement, interpretation or validity thereof, shall be submitted to final and binding arbitration administered by the International Court of Arbitration of the International Chamber of Commerce ("ICC") in accordance with its Rules of Arbitration then in effect (the "Rules"), except as modified herein:

[ . . . ]

(b)     The seat of arbitration shall be New York City, New York. The language of the arbitration proceedings, and of the award, shall be the English language.

(c)     By agreeing to arbitration, the Partners do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other temporary or interim order in aid of arbitration proceedings. In any such action, each of the Partners hereto irrevocably and unconditionally (i) submit to the exclusive jurisdiction and venue of the United States District Court for the Southern

12

District of New York located in New York County, New York, or, if such court does not have jurisdiction, the Supreme Court of the State of New York or any court of competent civil jurisdiction sitting in New York County New York (the "New York Courts"); (ii) waives, and agrees not to assert, by motion or otherwise, that it is not subject to the jurisdiction and venue of such courts, that its property is exempt or immune from attachment and execution in the New York Courts, that such action is brought in an inconvenient forum, that the action should be transferred or removed to any court other than one of the New York Courts, that such action should be stayed by reason of the pendency of some other proceeding in any other court other than one of the New York Courts, or that this Agreement or the subject matter hereof may not be enforced in or by the New York Courts; and (iii) Waives any right to trial by jury. Without prejudice to such provisional remedies as may be available under the jurisdiction of a court, the arbitral tribunal[—]or the emergency arbitrator to the extent and as provided in the Rules[—]shall have full authority to grant provisional remedies and to direct the Partners to request that any court modify or vacate any temporary or preliminary relief issued by such court, and to award damages for the failure of any party to respect the arbitral tribunal's orders to that effect.

(León Decl. Ex. 1 at § 12(a)–(c).)

Covarrubias was appointed CEO of EST, L1bre Holding LLC, L1bre LLC, and Servicios Digitales Lusad, S. de R.L. de C.V., *i.e.*, Lusad. (León Decl. ¶ 11.)

Upon the appointment of Covarrubias as CEO, Tabuenca, then-general controller of Lusad, was demoted to "controller for administrative processes," where he was responsible for reviewing and supervising certain administrative procedures, including supplier relationships. (Tr. 96:6–97:2.)

### F.    Trouble Brews

From about December 2017 until mid-to-late 2018, the partnership appeared to operate smoothly. (*Id.* ¶¶ 12, 15.) León was made Chairman of EST's Board. (León Decl. Ex. 2 at 1.) Through a USD $30 million investment by L1bero—plus USD $20 million invested by

13

Covarrubias personally, and a USD $18 million bank loan from Banco Azteca secured by real estate owned by Covarrubias—Lusad finished developing the software, purchased the hardware (pursuant to the Unit Purchase Agreement) and geared up the installation facilities to install the L1bre system into over 138,000 Mexico City taxis.  (León Decl. ¶ 12; Tr. 97:17–98:3.)  In October 2018, León and Covarrubias had a series of meetings with Goldman Sachs, who valued the Mexico City concession at USD $2.4 billion.  (León Decl. ¶ 12; Tr. 51:20–52:5.)

It seems clear enough that expanding the partnership's business to other municipalities might prove advantageous, and Covarrubias, in his capacity as CEO, caused Lusad to enter into a contract with a new software developer, Kichink Servicios, S.A. de C.V. ("Kichink"), to upgrade the product to include, *inter alia*, the ability to connect with local law enforcement in real-time, and better ride-hailing technology.  (*Id.* at 91:1–11.)

Around this time, Covarrubias also started to explore the possibility of obtaining concessions in other cities.  In utter derogation of the Partners Agreement, which required that all major decisions be put to a vote of the partners—including specifically decisions to incorporate new affiliates—he secretly caused the creation of a Mexican company, L1bre Jalisco, and began engaging in talks with local governments regarding another similar, prospective entity in state of Nuevo León.  (León Decl. ¶ 15.)  It was intended that both companies would bid on concessions, in Jalisco and Monterrey (the capital city of the state of Nuevo León).  (Tr. 106:4–110:11.) Covarrubias registered L1bre Jalisco with a notary in Guadalajara, Jalisco, without notifying anyone from ESH, including León or Zayas; making anyone from ESH a shareholder; or asking ESH to appoint anyone to represent ESH on its Board.  (*Id.*; León Decl. ¶ 15.)

That same month, Tabuenca informed León and Zayas that L1bero representatives were unlawfully siphoning funds from Lusad's bank accounts to pay for non-company-related

expenses, and that they were maintaining two sets of books—based on differences he had seen

between the company's NetSuite accounting system and the figures that were being presented at

Board meetings. (León Decl. ¶ 15; Tr. 34:19–35:1.)  León and Zayas then heard from Tabuenca

that Salinas and Covarrubias were engaged in other types of misfeasance, *viz*:

- Claiming personal expenses, including for use of their own private aircraft, for reimbursement;

- Nepotistic hiring;

- Hiring employees at Lusad to work on Covarrubias' other, non-L1bre-related businesses, including one named Inversiones COVA, S.A. de C.V.;[4]

- Transferring intercompany loans to Covarrubias' other businesses;

- Transferring millions of dollars to "contractors" owned or controlled by Covarrubias, which provided limited or no benefit to Lusad, or which had no existing contracts with Lusad;

- Relatedly, transferring hundreds of thousands of dollars its preferred law firm, purportedly as compensation for simple legal work;

- Failing to negotiate favorable contract rates for Lusad when it contracted with Covarrubias' other companies; and

- Requiring the immediate repayment of USD $2.2 million in intercompany loans back to Covarrubias' companies, before the 12-month grace period had expired.

(León Decl. ¶ 15.)[5]  Tabuenca also told León that Salinas had offered Lusad a loan, the terms of

which included:  (*i*) a 67% interest rate on the principal amount and (*ii*) collateral to include:  all

of EST's, L1bre Holding LLC's, and L1bre LLC's shares; the concession rights; the IP rights;

and any other asset held by EST or its 100%-owned downstream entities.  (*Id.*)  That loan never

materialized.

---

[4]        On December 14, 2018, Inversiones COVA was given authorization by the Board of Lusad to occupy and rent 40% of the 6th floor of Lusad's offices.  (León Decl. Ex. 3 at 3.)

[5]        Whether this misfeasance actually occurred is hotly disputed by Respondent L1bero, but is ultimately immaterial for the preliminary injunction analysis, as Petitioner has shown that it is likely to prevail on several of its other breach of contract and breach of fiduciary duty claims.

Finally, León and Zayas learned from Tabuenca that Salinas and Covarrubias had taken steps to obtain for themselves sole ownership and control of the L1bre technology by incorporating or taking steps to incorporate L1bre Jalisco and L1bre Nuevo León. (*Id.*)

To make matters worse, the Mexico City mayoral election of July 1, 2018, had a profound effect on the business prospects of the partnership. During the campaign, as discussed, the forced conversion of taxis from analog to digital meters (*i.e.*, to the L1bre system) had become an issue, with the victorious candidate having promised that she would not require taxi drivers to adopt the new technology if elected. (Tr. 103:13–19.)

In November 2018, in an "unusual" move that made good on the new mayor's word, Semovi called a meeting with representatives of Lusad regarding the concession. (Tr. 100:1–4.) Both Zayas and Julio Alejandro Belmont Garibay ("Belmont"), a designee of Salinas who sat on Lusad's Board of directors, attended the meeting. (*Id.* at 100:5–13.) There, Semovi unilaterally presented Lusad with a new version of the concession—on new economic terms. (*Id.* at 98:15–100:3.) Previous versions of the concession had permitted Lusad to charge up to $12 Mexican pesos per trip. (*Id.*) In this version, however, Lusad was only entitled to collect this fee when the rider hailed a taxi through the L1bre ride-hailing app. (*Id.*) In practical terms, this represented a loss in fees for 95% of trips, and rendered the concession not economically viable. (*Id.*)

## G.    Independent Audit and Subsequent Mexican Legal Proceedings

All these matters were discussed at a Lusad Board meeting on December 14, 2018. (*See* León Decl. Ex. 3 (agenda and resolutions of December 14, 2018 meeting).) At the conclusion of that meeting, the four member Board —Covarrubias and Belmont representing L1bero, and

Zayas and León representing ESH—unanimously passed a series of resolutions that were ostensibly designed to right the ship. The resolutions included the following:

- Lusad would hire Galaz, Yamazaki y Ruiz Urquiza, S.C. (Deloitte México) to perform a formal, forensic audit of Lusad. (Tr. 37:2–10; *see also* León Decl. Ex. 3 at 2.) Tabuenca and another employee named Eduardo Herrera were eventually designated as liaisons with Deloitte. (Tr. 38:5–8.)

- Lusad would "provide for permanence on the staff of . . . Manuel Tabuenca." (León Decl. Ex. 3 at 3.)

- The partners, ESH and L1bero, would contribute equal capital for an emergency capital increase of USD $3 million to carry out Lusad's operational obligations, including paying its vendors. (*Id.* at 4.)

- The partners would take steps to "bring L1bre Jalisco and L1bre Monterrey[6] into the L1bre partnership." (León Decl. ¶ 16.) This was accomplished by a resolution of Lusad's Board, which, first, "resolve[d] to constitute a Mexican subsidiary of the affiliate L1bre Holding LLC, so that said new company can participate in the bidding process for a concession to install and operate digital taximeters in the taxis holding concessions to operate in the city of Monterrey, Nuevo León and its surrounding municipalities." (León Decl. Ex. 3 at 8.) It further provided, "Subject to authorization of this Board, L1bre Holding LLC must have a stake in this new company of not less than 51%, and a stake of up to 49% may be offered to one or several investment partners that are interested in participating in the project." (*Id.*)

- Relatedly, the board also "resolve[d] to organize a Mexican subsidiary of the affiliate L1bre Holding LLC, so that said new company can participate in the bidding process for a concession to install and operate digital taximeters in the taxis holding concessions to operate in the state of Hidalgo." (*Id.*) That entity was subject to the same shareholder structure as the Monterrey entity.

- Finally, the Board resolved that "the newly created company, called L1bre Jalisco, S.A. de C.V., [is directed] to restructure its shareholding structure to incorporate L1bre Holding[,] LLC as a controlling shareholder." (*Id.*) This was an attempt to "regularize" the structure of L1bre Jalisco, which had already been incorporated and registered outside the partnership. (Tr. 59:1–3.)

---

[6]     Having heard of this entity but never having seen any incorporation documents, León and others assumed that it would be called L1bre Monterrey, and it was so referred to in Petitioner's papers. In fact, it was L1bre Nuevo León.

There is absolutely no dispute that all of these resolutions were adopted by unanimous vote of the four directors. However, only two of the four directors—León and Belmont—signed an original written memorial of the resolutions. (Tr. 115:16–19.) Lusad's in-house counsel, Francisco José Flores Meléndez ("Flores"), had the original in his possession, but he took no steps to obtain the signatures of Zayas, who had voted in favor of the resolutions, and if he took steps to obtain the signature of Covorrubias, he did not try very hard. (*Id.* at 114:22–25.) Nonetheless, he testified, credibly, that all four directors voted to pass the resolutions and he specifically denied, in response to a direct question from the Court, that they were null and void:

> THE COURT:  Okay.  So it would be a lie to say that it wasn't passed unanimously.
>
> THE WITNESS:  Mm-hmm.
>
> THE COURT:  Okay.  Then it says, "That is why the signatures of everyone are required; otherwise, the resolutions cannot take effect and are considered null and void."  Is that your position, that these resolutions are null and void?  Yes or no?
>
> THE WITNESS:  No.

(*Id.* at 113:24–114:7.)

The resolutions should have led to a de-escalation in tensions between the partners. Instead, the evidence demonstrates that the L1bero representatives almost immediately undertook to undermine them.

*First*, Covarrubias instructed Lusad's employees not to cooperate with Deloitte for the forensic audit—even to the point of refusing to provide the auditors with the company's books or records. (León Decl. ¶ 17.)  However, Herrera complied with a request by Deloitte for two Lusad laptop computers, which contained the company's financial information. (*Id.*; Tr. 40:24–41:2.)  All parties agree that the laptops eventually ended up with Deloitte. (Tr. 117:12–16.)

On December 18, 2018, after learning that the laptops had been provided to the external auditor, Covarrubias filed a criminal complaint for robbery against Herrera in Mexico City. (León Decl. ¶¶ 18, 21.) Deloitte was forced to halt the audit. (*Id.* ¶ 19.) The criminal proceedings were eventually were expanded to include León as a defendant. (*Id.* ¶ 20.)

*Second*, Covarrubias did not bring either of the rogue L1bre entities into the corporate group. On January 31, 2019, Covarrubias used the same notary in Guadalajara to incorporate an entity called L1bre Nuevo León, S.A. de C.V. (*Id.* at 108:6–19.) In contravention of the Board resolution, L1bre Nuevo León was not incorporated as a subsidiary of the Delaware entity L1bre Holding, LLC, but was instead incorporated as a subsidiary of the Mexican entity Lusad. (*See id.* at 144:6–15.) Nor was ESH given its required two seats on the Board. (*Id.* at 86:9–87:6.) Indeed, the only thing tying ESH to L1bre Nuevo León is the fact that the new company's 99.99% shareholder, Lusad, is in turn owned 99.9% owned by L1bre Holding, LLC—which, in turn, is wholly owned by the partnership entity EST. (*Id.*) Flores informed Covarrubias that the structure of this entity did not comply with the terms of the Partners Agreement, but to no avail. (*Id.* at 109:19–110:11.)

*Third*, after the criminal complaint was filed, Zayas met with the attorney general to attempt to procure a pardon for Herrera. (*Id.* 115:6–10.) In so doing, he photocopied the relevant Board resolutions from the December 14 meeting, and signed his own (Zayas') name. (*Id.* 115:11–116:22.) While it is not clear if the pardon negotiations were ultimately successful, Covarrubias used this meeting with the AG as a pretext to cause Lusad to expand criminal proceedings to include Zayas, by arguing that Zayas had used "forged" documents (by signing his own name!). Significantly, Flores stated in these court papers that the December 14 Board resolutions were "null and void" because they did not contain all four signatures—a

representation Flores admitted, while under oath in my courtroom, was false. (*Id.* at 124:18–126:5.)

*Fourth*, Covarrubias engineered a scheme to strip León and Zayas of their right—guaranteed by Section 5.2 and other sections of the Partners Agreement—to act as directors of Lusad. The Court has not been provided with much in the way of evidence about how this occurred, but this much can be discerned:

On February 14, 2019, Lusad called a shareholder meeting,[7] in which the shareholders "unanimous[ly]" agreed to sue León and Zayas for civil damages pursuant to Section VII of Article 78 of the General Law of Commercial Corporations. (*See* León Decl. Ex. 6.) Obviously, the shareholders would not have been unanimous if directors representing 50% owner ESH had been present and voting. They were not.

Following this "shareholder" meeting, on February 20, 2019, Covarrubias and Salinas caused Lusad to file a civil action in Mexico against León and Zayas, which sought to have the court declare that they were liable for acting against the company's interests, for, among other things, (*i*) entering into a service agreement with Deloitte México, despite the fact that the resolution of Lusad's Board technically reserved this power to the General Manager of Lusad (*a.k.a.*, Covarrubias); and (*ii*) attempting to issue a pardon on Lusad's behalf in the criminal action. (León Decl. ¶ 21; *see also* León Decl. Ex. 4 at 3–5.) The complaint asked the Mexican court to bar León and Zayas from participating in the meeting of Lusad's board that was scheduled to take place the following day. (León Decl. Ex. 4 at 73.)

On February 21, 2019, the Mexican court issued an *ex parte* temporary injunction, which barred León and Zayas from making any decisions or otherwise acting on behalf of Lusad,

---

[7]    It is not clear who called this meeting.

pending the trial and final decision.  (León Decl. ¶ 22; León Decl. Ex. 5.)  However, in order not to prejudge the merits of the matter, the court also ordered Covarrubias and the other L1bero-appointed Board member, Julio Alejandro Belmont Garibay ("Belmont"), "to abstain from participating or intervening in the capacity that has been conferred upon them, in any acts where Messrs. [Zayas and León] may intervene acting as members of the Board of Directors[.]"  (León Decl. Ex. 5.)

Despite this clear court order attempting to maintain the status quo, on the morning of February 22, 2019, Covarrubias—acting in his capacity as representative of both L1bre Holding, LLC and L1bre LLC—issued a special power of attorney, which granted a certain José Guillermo García Granados Torres the authority to sign written "unanimous" resolutions of the shareholders of Lusad, on behalf of both the 99.99% owner L1bre Holding, LLC and the 0.01% owner L1bre LLC (León Decl. Ex. 6; *see also id.* Ex. 7)—this despite the fact that L1bre Holding, LLC was the direct, wholly-owned subsidiary of EST (and, therefore, the indirect, wholly-owned subsidiary of both L1bero and ESH).  (León Decl. ¶ 23.)  At noon that same day, Salinas and Covarrubias called a meeting of the shareholders of Lusad, L1bre Holding LLC, and L1bre LLC.  (León Decl. Ex. 7 at 1.)  The representatives voted to remove León and Zayas from the board of Lusad; revoke their general and special powers of attorney; and assign all powers to the L1bero-controlled Board members, Covarrubias and Belmont.  (*Id.* ¶ 24; León Decl. Exs. 6-7.)  Covarrubias also installed as alternative Board members his attorney and Lusad's in-house counsel, Flores, and Oscar Jesus Saitz Zazueta ("Saitz").  (León Decl. Ex. 7.)

Since then, ESH alleges that Salinas and Covarrubias have taken several steps in further derogation of the Partners Agreement, including:

- Lobbying Semovi to transfer Lusad's concession to another company under their sole ownership and control;

- Filing, without prior authorization, a NAFTA notice of controversy against Mexico for unilaterally amending the terms of the concession;
- Planning to have L1bre Nuevo León bid on the taximeter concession in Monterrey, which opened at 8:00 a.m. CDT on May 2, 2019 and closes at 3:00 p.m. CDT on May 15, 2019 (4:00 PM in New York City) (*see* León Decl. Ex. 8).

(*Id.* ¶ 27.) There is no evidence in the record to support the first of these allegations; the second was admitted by Flores on the witness stand; and the third is the reason for this emergency applications.

### H.    Mexican Court's Order Temporarily Enjoining Arbitration

Respondents and their principals obviously expected that their actions would cause their partners to invoke the dispute resolution mechanism in the Partners Agreement, because, on April 24, 2019—again, unbeknownst to León and Zayas—L1bero obtained a second *ex parte* temporary injunction from the same Mexican civil court, which enjoined ESH and EST from, among other things, commencing any arbitration proceeding derived from the Partners Agreement. (Dkt. No. 13-2.) It appears that the Mexican court been asked to rule on whether the arbitration clause in the parties' agreement is a valid and binding arbitration clause and should be enforced, or whether it is a "nullity." (*Id.* at 18.)

The temporary injunction also appears to have cemented in place Covarrubias' strategy to block the integration of L1bre Jalisco and L1bre Monterrey into the Lusad corporate group, since its contrived wording directs the parties and Lusad to "refrain from carrying out any acts based on said agreement among the parties that may have repercussions on the corporate sphere of [Lusad]," and requires that the "current corporate status of [Lusad] be maintained under the same terms held to date, without carrying out any shareholder meetings that could modify its current legal situation." (*Id.*)

Petitioner received notice of this order—entered without any advance notice to them or opportunity to be heard—on the evening of May 1. (Suppl. Mem. of Law in Supp. of Pet'r's Emergency Mot. for Prelim. Inj. and TRO in Aid of Arbitration, Dkt. No. 13, at 2.)

## I.    Present Proceedings

The commencement of arbitration and this request for pre-arbitral relief were occasioned by the fact that registration for bidding on the Monterey concession is open from May 2, 2019 through May 15, 2019.[8] (*See* León Decl. Ex. 8.)

On May 1, 2019, Petitioner, through its U.S. counsel, contacted officers and counsel for L1bero, including Covarrubias, to inform them that (*i*) ESH would be initiating arbitration proceedings, pursuant to the mandatory arbitration clause in Section 12 of the Partners Agreement and, (*ii*) the following day, ESH would commence a proceeding for emergency injunctive relief in aid of arbitration in the Southern District of New York, pursuant to that same provision. (Decl. of David Dunn in Supp. of Pet'r's Mot. for a TRO ("First Dunn Decl."), Dkt. No. 19, Ex. 3 (e-mail from David Dunn, counsel for ESH, to Fabio Covarrubias, of L1bero).)

In a response sent that same evening, L1bero first notified ESH that, on April 24, 2019, it had received an *ex parte* temporary restraining order from a Mexican court. (Second Decl. of David Dunn in Supp. of Pet'r's Mot. for a TRO ("Second Dunn Decl."), Dkt. No. 20, Ex. 1.) Covarrubias' e-mail also notified ESH that "commencement of the ICC Arbitration, as well as filing of the emergency proceeding in the [S.D.N.Y.] seeking emergency injunctive relief . . . may constitute an act of disobedience of the Mexican Court Order[.]" (*Id.* at 1.) The e-mail attached cell phone photos of excerpts of the Mexican court's temporary restraining order. (*Id.* at 5–12.)

---

[8]    Registration allows contractors to submit their names for an eligibility determination. Once the government determines they are eligible, they can participate in a bid, to be determined at a later date.

Undeterred, ESH proceeded to file a request for Arbitration with the International Court of Arbitration of the International Chamber of Commerce ("ICC"). (First Dunn Decl. ¶ 3; *id.* Ex. 1.) ESH seeks a declaration that L1bero's and EST's illicit seizure of the partnership's business has breached the Partners Agreement by, *inter alia*: misappropriating partnership assets, violating the Partners Agreement's non-competition provisions, prohibiting joint control in Lusad and its subsidiaries, and usurping corporate opportunities that rightly belong to the partnership. (Emergency Pet. ¶ 4.) ESH also seeks a permanent prohibition preventing Respondents from taking acts against the interest of the partnership and in contravention of the joint control established by the Partners Agreement. (*Id.*) Finally, the request seeks money damages. (*Id.*) ESH has represented that the arbitral tribunal will take at least 60 days to fully consummate. (Dkt. No. 18 at 21.)

On May 2, 2019, ESH also filed with this Court its motion for a temporary restraining order in aid of arbitration, which the Court granted after an *ex parte* hearing that same day. (Dkt. No. 3; *see also* Transcript of Hearing dated May 2, 2019, Dkt. No. 13-1.) At the hearing, the Court ordered ESH to brief the issue of the impact of the Mexican restraining order on the current proceedings.

ESH filed a supplemental brief on May 9. L1bero and EST appeared through counsel on May 10, but did not file papers until just hours before the hearing on May 13, the morning of the hearing.

At the hearing, the court took testimony from León, who affirmed his declaration as his direct testimony and was subject to cross examination. None of the five declarants for Respondent was present in court and available for cross examination, so the Court struck their declarations. Lusad's general counsel, Flores, was in court and testified of his own knowledge to

many of the matters that were otherwise covered by the declarations, particular the declaration of Covarrubias. He, too, was cross-examined.

### J.     The Proposed Preliminary Injunction

ESH sought an injunction that would do three things.

The first is to restrain Respondent from taking any steps to transfer Lusad's Mexico City concession to an entity that is solely controlled by L1bero or its representatives. As noted above, the Court has been presented with no evidence, other than León's speculation, that any such efforts are underway.

The second is to restrain Respondent from registering to bid on the Monterrey taximeter concession. On the evidence presented, the entity Respondent plans to use to bid on the Monterrey concession, L1bre Nuevo León, is part of the L1bre corporate group—albeit not in a manner that complies with the strictures of the Partners Agreement and the December 14, 2018 Board resolutions—and while ESH has no directors on its Board and has had no say in its operations, its financial interest in the Monterrey venture appears at this time to have been preserved.

The third is to Restrain Respondent from taking any steps in any Mexican court in derogation of this Court's right to determine whether pre-arbitral relief should issue—a so-called "anti-suit" injunction. ESH claims that is needs such an injunction in order to prevent its right to be heard in an arbitral forum from being nullified.

ESH claims that, if the injunction does not issue, it will suffer irreparable harm in at least two ways. (Emergency Pet. ¶ 51.)

First, they argue, Respondents have misappropriated trade secrets and intellectual property developed by ESH in violation of the Partners Agreement. (*Id.*)

Second, Respondents have engaged in competitive actions in violation of the Partners Agreement, including by creating entities like L1bre Jalisco and L1bre Monterrey that directly compete with the partnership. (*Id.*) Loss of these invaluable business opportunities constitutes irreparable injury. (*Id.*)

Respondents argue that not being able to bid on the Monterrey concession constitutes irreparable injury to L1bero and to the L1bre family of companies. *Liberty Shipping Grp. LLC v. United States*, No. 09-cv-3161, 2009 WL 2390606, at *1 (E.D.N.Y. July 31, 2009) (being "frozen out of a competitive bidding process for a government contract . . . constitute[s] irreparable harm"). They have offered evidence that the Monterrey concession will have EBITDA of $50 million after one year of depreciation, and that the inability to move forward with operations for the Mexico City concession means that the only potential source of income for the joint venture is bidding on concessions in other cities, including Monterrey. They suggest that bankruptcy looms if they lose the right to bid by failing to interpose a registration by May 15.

## II.      Threshold Conclusions of Law

"[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Before turning to the merits, the Court must satisfy itself of two things: *first*, that I have jurisdiction to hear ESH's emergency petition for pre-arbitral injunctive relief; and, *second*, that principles of comity do not require me to abstain from exercising jurisdiction in the face of the April 24, 2019 order of the Mexican court.

A.      **This Court Has Subject Matter Jurisdiction To Hear ESH's Petition**

ESH brings a claims for injunctive relief in aid of arbitration, pursuant to the Convention

on the Recognition and Enforcement of Foreign Arbitral Awards (also known as the "New York

Convention"), 9 U.S.C §§ 201–08. The statute provides, "An action or proceeding falling under

the Convention shall be deemed to arise under the laws and treaties of the United States." *Id.*

§ 203. The same section provides that district courts "shall have original jurisdiction over such

an action or proceeding, regardless of the amount in controversy." *Id.* Citizenship is relevant

insofar as the statute prohibits the exercise of jurisdiction when the agreement arises out of a

relationship "which is entirely between citizens of the United States"—which is obviously not

the case here. *Id.* § 202.

With respect to the district court's powers, the statute expressly provides that a court may

compel arbitration, appoint arbitrators, and confirm arbitral awards. *Id.* §§ 206–07. The Second

Circuit has held that "entertaining an application for a preliminary injunction in aid of arbitration

is consistent with the court's powers pursuant to § 206." *Borden, Inc. v. Meiji Milk Prods. Co.,*

919 F.2d 822, 826 (2d Cir. 1990). Moreover, district courts generally agree that the Convention

confers a standalone cause of action to issue provisional remedies in aid of arbitration, even if

the petitioner does not simultaneously seek any of the remedies expressly provided for by

sections 206 and 207. "*Borden* has been interpreted as recognizing a court's power to entertain

requests for provisional remedies in aid of arbitration *even where the request for remedies does*

*not accompany a motion to compel arbitration or to confirm an award.*" *Venconsul N.V. v. Tim*

*Int'l N.V.,* No. 03-cv-5387, 2003 WL 21804833, at \*3 (S.D.N.Y. Aug. 6, 2003) (emphasis

added). Were it otherwise, "a party could deprive federal courts of the power to entertain

requests for interim relief in aid of arbitration under the Convention, and thus insulate itself from

such relief, by simply appearing in an arbitration proceeding, thereby obviating the need to

compel arbitration." *Id.*; *see also Goel v. Ramachandran*, 823 F. Supp. 2d 206, 215–16

(S.D.N.Y. 2011) (collecting cases); *CRT Capital Grp. v. SLS Capital, S.A.*, 63 F. Supp. 3d 367,

372 (S.D.N.Y. 2014) (rejecting respondent's argument that the "New York Convention provides

only three judicial remedies:  compelling arbitration, 9 U.S.C. § 206, appointing arbitrators, *id.*,

and confirming arbitration awards, *id.* § 207").

Naturally, "in order for the Court to issue an injunction in aid of arbitration—the only

relief specifically requested by Plaintiff here—there must *be* an agreement to arbitrate between

these parties." *Solar & Envtl. Techs. Corp. v. Zelinger*, 726 F. Supp. 2d 135, 142 (D. Conn.

2009) (emphasis in original).  In other words, ESH can invoke the Convention only if it can

convince the Court, by a preponderance of the evidence, that the parties have a valid and binding

arbitration agreement. *See id.* at 148.

"There is a strong federal policy favoring arbitration as an alternative means of dispute

resolution." *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 29 (2d

Cir. 2002) (quoting *Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219,

226 (2d Cir. 2001)).  "When deciding whether the parties agreed to arbitrate a certain matter . . . ,

courts generally . . . should apply ordinary state-law principles that govern the formation of

contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Delaware's Uniform Arbitration Act tracks the language of the Federal Arbitration Act,

and provides that, "A written agreement to submit to arbitration any controversy existing at or

arising after the effective date of the agreement is valid, enforceable and irrevocable, save upon

such grounds as exist at law or in equity for the revocation of any contract[.]"  10 Del. Code

§ 5701.  In other words, Delaware courts "compel parties to submit to arbitration . . . where they

have agreed to arbitrate as a matter of contract." *Chapter 7 Tr. Constantino Flores v. Strauss*

*Water Ltd.*, No. CV 11141-VCS, 2016 WL 5243950, at *14 (Del. Ch. Sept. 22, 2016) (citing

*James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78–79 (Del. 2006)). "[T]o avoid

enforcement of the arbitration clause, [a challenger] must show either that the clear language of

section 5701 has been superceded by some other provision of law or that the clause may be

revoked under traditional principles of contract law." *Graham v. State Farm Mut. Auto. Ins. Co.*,

565 A.2d 908, 911 (Del. 1989).

That there is an agreement to arbitrate is beyond peradventure. The Partners Agreement

says, "Any dispute, claim or controversy resulting from, relating to or arising out of this

Agreement, including the breach, termination, enforcement, interpretation, or validity thereof

shall be submitted to final and binding arbitration administered by the [ICC.]" (León Decl. Ex. 1

§ 12.) This language respecting the parties' agreement to arbitrate is unambiguous—any dispute

that relates in any way to the partnership created by L1bero and ESH or its business must be

arbitrated. *See Detroit Med. Ctr. v. Provider Healthnet Servs., Inc.*, 269 F. Supp. 2d 487, 492

(D. Del. 2003) ("'arising out of or relating to this Agreement' language is indicative of a broad

arbitration provision"); *Smith v. Lindemann*, 710 F. App'x 101, 104 (3d Cir. 2017) (unpublished)

(arbitration clause providing that "[A]ny difference[ ], disagreement, or dispute between [the

parties]" shall be submitted to "binding arbitration" was "straightforward").

Respondent has introduced no evidence that any other provision of law supercedes the

clear language of section 5710—and, indeed, does not so argue. And nothing in the record

suggests that any of the traditional defenses to the validity of an arbitration agreement (duress,

fraud, *etc.*) would invalidate this crystal clear provision. Petitioner has submitted the sworn

declaration of one of the agreement's signatories, who indicates that all signatories—including

Covarrubias, who signed on behalf of Respondents—were sophisticated parties, who had, just

weeks before, executed a complicated corporate restructuring agreement, and who entered into the agreement containing the arbitration clause for the purpose of procuring additional funding to operate the Mexico City concession. (León Decl. ¶¶ 7–11.) Respondent conceded at the preliminary injunction hearing that an arbitration will have to take place (Tr. 121:16–124:3), although it is clear that there will be disputes over whether particular aspects of the overall dispute among the partners are arbitrable.

In sum, "where the terms of the arbitration clause are clear and specific and absent showing that enforcement would work a fraud upon the parties or deprive them of substantial justice, there is no sufficient reason to refuse an enforcement of their voluntary agreement." *Commercial Union Ins. Co. v. S&L Contractors*, Inc., No. CIV.A. 01-02-0083, 2002 WL 31999352, at *1 (Del. Com. Pl. Nov. 8, 2002) (internal quotation omitted). "Because [Respondent] has not challenged the enforceability of the contract under Delaware law, this Court has no basis to conclude that the contract is unenforceable." *Cf. Wood v. Palisades Collection, LLC*, No. 09-cv-4627, 2010 WL 2950323, at *7 (D.N.J. July 22, 2010).[9]

And because there is a valid and binding arbitration clause, this Court's jurisdiction to enter pre-arbitral relief—if warranted—is undoubted.

---

[9]     To the extent that the FAA, and not Delaware's Uniform Arbitration Act, might be said to govern validity of the arbitration provision, it is valid and enforceable for the same reasons. *See* 9 U.S.C. § 2. A federal district court's ability to hear challenges to the validity of the arbitration agreement is "narrowly-limited." *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 68 (2d Cir. 2005). "[A]rbitration should be ordered 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Wire Serv. Guild, Local 222, Newspaper Guild, AFL-CIO v. United Press Int'l, Inc.*, 623 F.2d 257, 260 (2d Cir. 1980) (quoting *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Gen. Elec. Co.*, 406 F.2d 1046, 1048 (2d Cir. 1969)). And, a challenger must affirmatively raise any arguments respecting traditional contract defenses. *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 61 (2d Cir. 2012).

### B.    The Court Is Not Required To Extend Comity to the Mexican Court's Injunction and I Decline to Do So

I am advised that Respondents have brought proceedings in a Mexican court to declare that the arbitration clause is a nullity—or, at least, that it is a nullity as to Lusad and EST's other downstream subsidiaries incorporated in Mexico. I am further advised that the Mexican civil court, acting *ex parte* and without affording Petitioner any advance notice or opportunity to be heard,[10] has purported to enjoin Petitioner and its principals, León and Zayas, from initiating or pursuing any arbitrating pending its determination of the validity and enforceability of the arbitration clause. Specifically, on April 24, 2019, the Mexican civil court issued an order which decreed, among other things, the following "precautionary measure": "That, during the processing of this case and until its conclusion via the issuance of a final judgment, the parties to the Partner[s] Agreement refrain from initiating the arbitration procedure agreed in clause 12, whose nullity is the subject of this lawsuit." (Dkt. No. 13-2.)

At the preliminary injunction hearing yesterday, Respondents suggested that this Court, applying the principles of comity to foreign awards, should recognize and defer to the Mexican injunction and bar Petitioner from seeking the relief it here requests. I reject any such suggestion.

Comity is discretionary, not automatic. *Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 295 (S.D.N.Y. 2013), *aff'd sub nom. Yukos Capital S.A.R.L. v. Samaraneftegaz*, 592 F. App'x 8 (2d Cir. 2014). Moreover, as a general matter, neither federal nor New York courts extend comity to non-final, non-merits orders, including specifically preliminary injunctions. The fact that such orders are entered without providing both sides a full

---

[10]    Respondent offered no evidence of notice or any opportunity to be heard.

and fair opportunity to litigate is, of course, one important reason not to pay them any mind. *See In re MF Glob. Holdings Ltd.*, 561 B.R. 608, 628–29 (Bankr. S.D.N.Y. 2016) (comity depends on the "opportunity for a full and fair trial") (quoting *Hilton v. Guyot*, 159 U.S. 113, 123 (1895)). Here, it is undisputed that Petitioner was enjoined without notice or any opportunity to be heard—unlike Respondent, who was notified in advance of Petitioner's TRO application and who was fully heard at the preliminary injunction hearing. Indeed, to this day Petitioner has not been provided with the papers that were filed against it. *Ex parte* injunctions have been identified as particularly not warranting comity. *See, e.g., Banco Nacional De México, S.A. v. Societe Generale*, 34 A.D.3d 124, 131 (1st Dep't 2006).

That the Mexican order, in addition to having been entered *ex parte*, is neither final nor on the merits could not be clearer. The order clearly states that it, "does not make any judgments as to the substance of the proceeding" (*id.*)—the substance of the Mexican proceeding being the determination of the validity of the arbitration provision in the Partners Agreement. The only order to which any comity argument might be directed is the order preventing Petitioner from coming to this Court to seek relief in accordance with the literal terms of the parties' contract. Nothing in the language of the Mexican court's order purported to divest this Court of its jurisdiction to issue an injunction in aid of arbitration.

Moreover, all parties to the Partners Agreement, including Respondents, agreed in the Partners Agreement that they would not ask this Court to abstain from exercising its undoubted jurisdiction; the Agreement provides that the parties "waive[], and agree[] not to assert, by motion or otherwise . . . that such action [for pre-arbitral relief] should be stayed by reason of the pendency of some other proceeding in any other court other than one of the New York Courts, or that this Agreement or the subject matter hereof may not be enforced in or by the New York

32

Courts[.]" (León Decl. Ex. 1 § 12(c).)  So the fact that there is pending in a Mexican court a proceeding seeking to declare the arbitration provision invalid, or invalid in some as yet unspecified circumstances, is, per the parties' contract, not a reason to stay this proceeding or refrain from ruling pending some sort of determination by the Mexican court on the issue before it.

In short, and with all respect to the Mexican court, (1) a preliminary order, (2) issued without giving ESH and its members notice or any opportunity to be heard, (3) that, by dint of prohibiting Petitioner from exercising its rights under the Partners Agreement, would effectively deprive this Court of jurisdiction to do that which the parties expressly agreed that it should do, and (4) for which absolutely no justification has been shown, since Respondents have chosen not to provide the Court with the papers that were filed in order to obtain the *ex parte* injunction, is not an order to which this Court would or should defer.  I will, therefore, proceed to exercise my undoubted jurisdiction to act.

## III.   Conclusions of Law

Federal courts treat motions for preliminary injunctions in aid of arbitration as applications under Rule 65 of the Federal Rules of Civil Procedure and, accordingly, evaluate them under the criteria for Rule 65 motions.  *See, e.g.*, *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, No. 03-cv-4148, 2003 WL 22909149, at *3 (S.D.N.Y. Dec. 10, 2003) (citing cases); *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990); *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994).

The familiar preliminary injunction standard applies.  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The party seeking

33

a preliminary injunction must show four things: (1) a likelihood of success on the merits;

(2) that the plaintiff is likely to suffer irreparable harm absent a preliminary injunction; (3) that

the balance of hardships favors the plaintiff; and (4) that a preliminary injunction is in the public

interest. *Id.* at 20.

This Court also has authority to issue the requested injunctive relief pursuant to Fed. R.

Civ. P. 64, which incorporates state-law provisional remedies, including injunctions in aid of

arbitration under C.P.L.R. § 7502(c). *See Alvenus Shipping*, 876 F. Supp. at 487; *see also*

*Bahrain Telecomms. Co. v. Discoverytel, Inc.*, 476 F. Supp. 2d 176, 183 (D. Conn. 2007).

Section 7502(c) allows a court to enter "a preliminary injunction in connection with an

arbitration that is pending or that is to be commenced . . . upon the ground that the award to

which the applicant may be entitled may be rendered ineffectual without such provisional relief."

N.Y. C.P.L.R. § 7502(c).  In deciding applications under Section 7502(c), the courts apply the

test for injunctions under Article 63 of the CPLR, which "incorporates the equitable criteria

traditionally required for the granting of preliminary injunctive relief:  likelihood of the

petitioner's success on the merits, danger of irreparable harm to the petitioner should preliminary

relief be denied, and a balancing of the equities that tips in the petitioner's favor." *SG Cowen*

*Sec. Corp. v. Messih*, 224 F.3d 79, 81 (2d Cir. 2000); *Aetna Ins. Co. v. Capasso*, 75 N.Y.2d 860,

862 (1990).

**A.      ESH Has Established a Likelihood of Success on the Merits of Its Claim that Respondents Breached the Partners Agreement in Myriad Ways**

"[B]ecause the fact of arbitration is a premise of such relief," the first element of

"likelihood of success is . . . measured in terms of the likelihood of success *in arbitration.*" *SG*

*Cowen Sec. Corp.*, 224 F.3d at 84 (emphasis in original).  That is to say, the Court must decide

whether the party seeking pre-arbitral injunctive relief is likely to win in the underlying

arbitration. This is always a difficult task, but when the parties elect to arbitrate instead of litigate, it is complicated by the fact that "arbitration is frequently marked by great flexibility in procedure, choice of law, legal and equitable analysis, evidence, and remedy. Success on the merits in arbitration therefore cannot be predicted with the confidence a court would have in predicting the merits of a dispute awaiting litigation in court, and it can be expected that when the merits are in the hands of an arbitrator, this element of the analysis will naturally have greatly reduced influence." *Id.*

Pursuant to Section 12 of the Partners Agreement, this dispute is governed by Delaware law. (León Decl. Ex. 1 § 12.) In its Request for Arbitration ("RFA"), Petitioner asserts four claims under Delaware law, all of which sound in contract or Delaware corporate law: (*i*) breach of the express provisions of the Partners Agreement; (*ii*) breach of the duties of loyalty and care, which arise under Delaware's Revised Uniform Partnership Act; (*iii*) breach of the implied covenant of good faith and fair dealing, which arises under any Delaware contract; and (*iv*) breach of the implied covenant of good faith and fair dealing under the Delaware Limited Liability Company Act. (First Dunn Decl. Ex. 1 ¶ 42.)

### 1.   Breach of the Express Terms of the Partners Agreement

Petitioner claims the following breaches of the express provisions of the Partners Agreement.

1. *First*, breach of the joint management provisions of the Partners Agreement (§ 4.2(a)–(b)), due to misappropriation of partnership assets, including cash and intellectual property.

2. *Second*, breach of the non-competition provision of the Partners Agreement (§ 11(d)–(e));

3. *Third*, breach of the joint control provisions of the Partners Agreement (§§ 3.2; 5.1(a));

4. *Fourth*, breach of the provisions providing that the joint control structures of EST be replicated throughout its subsidiaries (§ 5.1(b)).

(First Dunn Decl. Ex. 1 ¶ 43.)  Delaware courts interpret contracts to "give priority to the parties' intentions as reflected in the four corners of the agreement."  *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

ESH has easily shown a likelihood of success on the merits of its breach of contract claim.  Indeed, ESH has outlined for the Court numerous, easily proven—some freely admitted—breaches of the provisions of the Partners Agreement.

*First*, the Partners Agreement provides that "Major Decisions" on behalf of the partnership—decisions such as "the incorporation . . . by any of [EST]'s Affiliates of any direct or indirect affiliate" (León Decl. Ex. 1 § 5.2(t)), "the execution of any agreement . . . by [EST]'s Affiliates with a related party to the Parties" (*id.* § 5.2(r)), and "The Company's annual Business Plan" (*id.* § 5.2(j))—are to be subject to a vote of the partners.  The record contains evidence that Respondent breached this provision on multiple occasions, in at least the following ways:

1. incorporating new Affiliates, L1bre Jalisco and L1bre Nuevo León—each of which uses the company's valuable trademark—without obtaining the consent of the ESH representatives on the partnership's Board;

2. entering into a contract with a software developer, Kichink, and a consultant, MOOK S.A.P.I. de C.V., which were allegedly owned or controlled by a relative of Covarrubias, or which were otherwise affiliated with Covarrubias, (Tr. 43:4–46:5), and agreeing to pay compensation of $180,000 to $91,000 Mexican pesos per month and $4,175,000 Mexican pesos total, respectively;[11]

3. unilaterally determining that a bid should be made for a taxi concession in Monterrey, Nuevo León, Mexico.

---

[11]     The financial information relating to the Kichink and MOOK contracts comes from copies of the contracts that were attached to one of the stricken declarations.  I will admit the contract into evidence; the declarations were stricken because the declarants were not present in court to be cross-examined, and for no other reason.  Covarrubias' testimony that his son is not the owner of these enterprises was not cross-examined, but for record purposes I note that this is simply information that was passed on to León by Tabuenca, and it was not otherwise verified.

*Second*, the Partners Agreement provides that EST and every one of its downstream subsidiaries must have four directors—two chosen by ESH and two chosen by L1bero.  (León Decl. Ex. 1 § 5.1(b).)  It is undisputed that the two ESH directors have been ousted as directors in Lusad and replaced by nominees of L1bero, and that the two newest downstream[12] subsidiaries—L1bre Jalisco and L1bre Nuevo León—have no directors appointed by ESH.

*Third*, the Partners Agreement provides that representatives of the partners shall have unfettered access to the books and records of the partnership, L1bre, and Lusad.  It is undisputed that León and Zayas have been barred from access to the books and records of these companies, and that Covarrubias, the Chief Executive Officer of Lusad and the other operating entities, will not so much as speak with ESH representatives.

*Fourth*, there is evidence, which I find persuasive, that there has been corporate misfeasance in connection with the finances of Lusad.  I understand that the evidence provided by León about what he heard from former controller/CFO Tabuenca concerning two sets of books and the hiring of employees to work on Covarrubias' other businesses is hearsay.  However, "[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).  "The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage." *Id.*  It is this Court's experience that honest businessmen do not fear outside audits.  Here, Lusad's board, prior to the ouster of Petitioner's representatives, passed a resolution retaining an outside auditor to perform a special external audit.  Covarrubias, who voted in favor of this resolution, immediately undermined it and

---

[12]     Under the terms of the contract, L1bre Jalisco, like L1bre Nuevo León, should be part of the L1bre corporate group, because it is an entity incorporated to expand the business of the original EST Partnership per the Partners Agreement.  There is no evidence in the record that it has been brought into the corporate group.

rendered it a nullity by refusing to cooperate or to allow Lusad employees to cooperate with the Board-chosen forensic auditors; by bringing criminal charges against an employee who, faithful to his duty, tried to carry out the Board's duly authorized resolution[13] by giving financial data to the auditor; and ultimately by ousting the auditor and preventing the audit from taking place. Frankly, this evidence lends considerable weight and credence to Tabuenca's hearsay statements, and for purposes of deciding this motion I credit them.

As for the allegations of mismanagement of partnership property, including cash, vendor contracts, and intellectual property (trademarks, proprietary software, and the like): the evidence in support of these claims is deeply troubling. The facts outlined in the paragraphs above cause the Court to conclude that Covarrubias has something to hide about his management of Lusad's funds—something he does not want his partners to uncover.

Similarly, incorporating subsidiaries without the assent of the ESH partners—subsidiaries that utilize the valuable L1bre trademark—plays fast and loose with one of the corporation's most valuable assets. Both investment banks and the public have acknowledged the success of the "L1bre model." (*See* León Decl. Ex. 2; Tr. 51:20–23.) As a full and equal partner of L1bero in this venture, ESH has the contractual right to participate in decisions to use that valuable trademark—and to veto its use if circumstances appear to be inappropriate. It is being deprived of that right.

For all these reasons, I find that ESH is likely to succeed at arbitration on its breach of contract claims.

---

[13]   And make no mistake: the audit, like all the other December 14 resolutions, was duly authorized. (*See* Testimony of Flores (Tr. 113:2–6), which is discussed more fully at Findings of Fact § G, *supra*.)

### 2.   Breach of Fiduciary Duties Under Delaware's Revised Uniform Partnership Act

Delaware's Revised Uniform Partnership Act provides that all partners owe fiduciary duties to the partnership and the other partners, including the duty of loyalty and duty of care. 6 Del. C. § 15-404.  The duty of loyalty includes:  (*i*) accounting to the partnership and holding as trustee for it any property, profit, or benefit derived by the partner in the conduct of the partnership business, including the appropriation of a partnership opportunity; (*ii*) refraining from dealing with the partnership on behalf of a party having an adverse interest to the partnership; (*iii*) refraining from competing with the partnership in the conduct of the partnership's business or affairs, and (*iv*) refraining from grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.  *Id.*

Further, under Delaware law, each partner has equal rights in the management and conduct of the partnership's business and affairs.  *Id.* § 15-401(f).  Each partner and the partnership shall provide partners access to the books and records of the partnership and other information concerning the partnership's business affairs upon reasonable demand for any purpose reasonably related to the partner's interest as a partner in the partnership.  *Id.* § 15-403; *see also id.* § 18-305(a) (providing similar access to information by members of Delaware limited liability companies).  This shall include access to, among other items:

i.   Full information regarding the status of the business and the financial condition of the partnership;

ii.   Full information regarding the amount of cash and agreed value of any property or services contributed by each partner; and

iii.   Other information regarding the affairs of the partnership as just and reasonable.

*Id.* § 15-403.

For substantially the reasons discussed above, the Court finds that ESH is likely to succeed on the merits of its claim that Respondent has acted in breach of its duties under Delaware law. As discussed above, it is undisputed that Covarrubias refuses to talk to ESH representatives of the partnership and refuses to give them their right, guaranteed by statute as well as by contract, to see the books and records of the partnership, L1bre, and Lusad. L1bero-appointed Board members have arranged the ouster of Zayas and León, in utter derogation of Delaware law as well as the literal terms of the contract, from the management of the business of EST/Lusad. To the same effect is the creation of the two newest L1bre entities (L1bre Jalisco and L1bre Nuevo León), neither of which has any Board representation appointed by ESH, and neither of which identifies L1bre Holding, LLC, as a majority shareholder, as required by the unanimous Lusad Board resolutions of December 14, 2018. (León Decl. Ex. 3 at 8.)

### 3. Breach of the Implied Covenant of Good Faith and Fair Dealing Under Delaware Contract Law

Every contract in Delaware includes an implied covenant to ensure that "each party to the contract will act with good faith towards the other with respect to the subject matter of the contract." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986).

Here, the Court also finds that, based on the evidence before it, ESH has shown a likelihood of success on the merits with respect to this claim.

In addition to everything that has already been discussed, the Partners Agreement requires that, "The Partners shall co-operate and discuss in good faith to resolve operational disputes which might arise between them." (León Decl. Ex. 1 § 5.3(a).) However, the available evidence demonstrates that at no point since the fall of 2018 has Respondent or its principals engaged in any effort to comply with this provision. On the contrary: two members of the Board of Directors of Lusad, one of EST's affiliates, initiated a criminal action against the other

40

two Board members; used this as a pretext to gain shareholder consent for a civil action; and then used the civil action as a pretext to gain shareholder consent for terminating their powers. (*See* Findings of Fact § G, *supra*.) Special, *ex parte* powers of attorney were used to procure unanimous shareholder consent on at least one occasion. (*Id.*)

Moreover—and this is highly significant—the sworn testimony of Flores, Lusad's in-house counsel, given at the preliminary injunction hearing, established that both Lusad's outside counsel and Flores lied to the Mexican court in connection with the application leading to the ouster of Zayas and León as Directors, in that each swore in Mexico that the Lusad Board resolutions adopted on December 14, 2018 were null and void. As discussed above, Flores swore in my courtroom—twice, in fact—that the resolutions were not null and void. Indeed, in response to a direct question by the Court asking him which of these two blatantly contradictory statements was true, Flores replied, "The resolutions were adopted at the meeting." (Tr. 116:20–21.)

### 4. Breach of the Implied Covenant of Good Faith and Fair Dealing Under Delaware's Limited Liability Company Act

Finally, under the Delaware Limited Liability Company Act, the implied covenant of good faith and fair dealing always applies to an LLC's members and managers. 6 Del. C. § 18-1101(c). Thus, members and managers of Delaware limited liability companies shall manage or direct the business in a manner that balances the pecuniary interests of the members, the best interests of those materially affected by the corporation's conduct, and the specific public benefits set forth in its certificate of formation. 6 Del. C. § 18-1204.

For substantially the same reasons that ESH has demonstrated it is likely to succeed on its various breach of contract claims, it has demonstrated that it is likely to succeed on the merits of this claim. (*See* Conclusions of Law § A.1, *supra*.) The evidence strongly suggests that

Respondent ousted its joint venture partner on the basis of a false statement made to a Mexican court. Respondent has not complied with the December 14, 2018, Board resolutions designed to ensure that the ESH partners would share equally in the profits of any concessions that might be granted to Lusad entities in other Mexican cities, like Monterrey (the papers incorporating L1bre Nuevo León—which post-date the resolutions—list the Mexican entity Lusad rather than the Delaware entity L1bre Holding as the majority shareholder, and do not appoint any ESH representatives to the Board) and Jalisco (there is no indication that the shareholder or management structure of L1bre Jalisco has even been changed to bring it within the L1bre corporate group). While the Jalisco venture appears to be no more than an ephemeral possibility at present, Monterrey is very much alive and in the immediate future, yet no effort has been made to right the wrong of excluding the ESH representatives from the Board or making its controlling shareholder a Delaware entity. I find Respondent's explanation that ESH can expect to share in the profits from the Monterrey concession (because the incorporation papers identify Lusad as the 99.99% shareholder and Servicios Administrativos as the 0.01% shareholder) disingenuous, because (*i*) L1bre Nuevo León is currently wholly-owned by entities from which ESH representatives are excluded from Board participation; and (*ii*) Respondent appears to be trying, in Mexican courts, to argue that the fact that the partnership's downstream entities are incorporated in Mexico means that they are not subject to the terms of the Partners Agreement— a conclusion, if reached, that would cleave Petitioner from the partnership. In other words, the farther Respondent can place L1bre Nuevo León from the partnership, the more it can attempt to skirt its sworn obligations under the Partners Agreement.

**B.    ESH Has Established Irreparable Harm, Albeit Not the Irreparable Harm It Identified in Its Papers**

A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted). To make such a showing, a plaintiff must demonstrate that, "[A]bsent a preliminary injunction, they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* An injury that is compensable by monetary damages will not suffice except in extraordinary circumstances. *Id.*

ESH claims that, absent an injunction, it will suffer irreparable harm in the form of (*i*) misappropriation of trade secrets through the awarding of concessions to downstream affiliates of Lusad in which it has no interest; (*ii*) violation of an enforceable non-competition agreement between it and its partner L1bero; and (*iii*) irretrievable loss of arbitral rights. (Dkt. No. 13 at 20–21.)

With respect to the misappropriation of trade secrets, Respondent argues that any harm ESH might suffer could be recompensed through money damages, so the harm is not irreparable. In this instance, Respondent is correct.

Years ago, in *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61 (2d Cir.1984), the Second Circuit stated that "the loss of trade secrets cannot be measured in money damages," where that secret, once lost, is "lost forever." *Id.* at 63. More recently, however, the Second Circuit clarified that *FMC* should not be read to "mean that a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Rather,

> A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a

43

misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. *Where a misappropriator seeks only to use those secrets— without further dissemination or irreparable impairment of value— in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury.* Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge.

*Id.* at 118–19 (emphasis added).

I agree with Respondent that ESH's theory of misappropriation by its partner falls into the "use" rather than "dissemination" category. It argues that L1bero plans to take trade secrets belonging to the partnership—principally the software that is originally developed in order to obtain the Mexico City concession (using the paid contractor NullData)—and, most immediately, permit an entity in which it has no interest, L1bre Nuevo León, to rely on those trade secrets in order to procure the Monterrey taximeter bid, and then to use those trade secrets while cutting them out of the profits. Respondent urges that ESH is not being cut out of the profits, pointing to the fact that, in its articles of incorporation, the fact that Lusad—a downstream entity of the partnership—is the controlling shareholder guarantees ESH its share of the profits.

Shares of profits are quintessentially the sort of loss that can be measured and paid in damages. They are not irreparable. As the Second Circuit said in *Faiveley*, L1bero has the same incentive as ESH to maintain the confidentiality of the taximeter software, and it is not trying to disclose it to the world—or to a competitor. If the Monterrey concession goes to L1bre Nuevo León, and ESH does not see a penny, it has a remedy against its thieving partner L1bero—to commence an arbitration for damages.

In an effort to avoid the holding of *Faiveley,* ESH analyzes the issue of irreparable harm under Delaware trade secrets law, apparently on the theory that Delaware law governs the interpretation of the Partners Agreement. (Dkt. No. 18 at 20.) However, Delaware law does not govern the award of pre-arbitral injunctive relief—which is a procedural, not a substantive, matter. Petitioner seeks relief from this Court under Fed. R. Civ. P. 65 and, in the alternative, under N.Y. C.P.L.R. § 6301, through Fed. R. Civ. P. 64. Therefore, irreparable harm is analyzed with respect to federal procedural law or New York procedural law. *S. Wine & Spirits of Am., Inc. v. Simpkins,* No. 10-cv-21136, 2011 WL 124631, at *8 (S.D. Fla. Jan. 14, 2011). I am bound by *Faiveley* and I must apply it.

Turning to the non-compete, "Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case." *Singas Famous Pizza Brands Corp. v. New York Advert. LLC,* 468 F. App'x 43, 46 (2d Cir. 2012) (summary order) (quoting *Baker's Aid, Inc. v. Hussmann Foodservice Co.,* 830 F.2d 13, 15 (2d Cir.1987)). The Second Circuit has found irreparable harm in the analogous context of non-compete covenants in employment contracts, acknowledging the inherent difficulties of calculating damages from a client relationship that otherwise would have produced "an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 68–69 (2d Cir. 1999); *see also Marsh USA Inc. v. Schuhriemen,* 183 F. Supp. 3d 529, 536 (S.D.N.Y. 2016), *amended,* No. 16-cv-2998, 2016 WL 2731588 (S.D.N.Y. May 3, 2016) ("While defendant Schuhriemen argues that it would be possible to track how much revenue is gained from any clients solicited in breach of the non-solicitation agreements, . . . the Second Circuit has stated that 'it would be very difficult to calculate monetary damages that would

45

successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'") (quoting *Ticor Title Ins. Co.*, 173 F.3d at 69)).  But on the record before me, the evidence is to the effect that ESH—via a chain extending through EST to L1bre Holding to Lusad, which is the 99.99% owner of L1bre Nuevo León—is entitled to revenue from any taximeter concession that Nuevo León might obtain.  Therefore, it is not a "competitor."  And there is no evidence that L1bre Jalisco has as yet done anything at all, or that it is about to do so.

And yet there is irreparable harm resulting from the current situation—although it is not the harm on which Petitioner focuses.  The real irreparable harm derives from the fact that, owing to repeated breaches of contract by Respondent and its principals, Petitioner is being systematically, bit by bit by bit, cut out of the management of the Joint Venture and of its various operating corporations—depriving it of the ability to make its own business decisions about the operation of a joint venture in which it is supposed to have 50% control, while leaving it at the mercy of L1bero, and principally Covarrubias (who has demonstrated repeatedly that he has no concern whatever for Petitioner), to make business decisions about Petitioner's investment that will protect Petitioner's interests.  The right to control one's investment, to be able to manage a company in which one has a controlling interest (and a 50% co-equal interest is a controlling interest), is a valuable right, and it is one that cannot be quantified.  *Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 563 (S.D.N.Y. 2006), *aff'd*, 246 F. App'x 73 (2d Cir. 2007); *Woods v. Bos. Sci. Corp.*, No. 06-cv-5380, 2006 WL 4495530, at *22 (S.D.N.Y. Nov. 1, 2006), *report and recommendation adopted*, 2007 WL 754093 (S.D.N.Y. Feb. 9, 2007) (collecting cases); *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 115 (2d Cir. 2003); *Int'l Banknote Co. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989); *Suchodolski*

*Assocs.*, 2003 WL 22909149, at *4; *Street v. Vitti*, 685 F. Supp. 379, 385 (S.D.N.Y. 1988).

*Petitioner* founded Lusad—not Respondent, Petitioner. Yet it now no longer has any ability to

control the actions of the corporation it founded. *Cf. Davis v. Rondina*, 741 F. Supp. 1115, 1125

(S.D.N.Y. 1990) ("The shareholders agreement between Davis and Rondina guarantees Davis a

voice in the management of Connaught, a company which she has devoted almost ten years to

building and which she has shepherded from start up to success."). The laundry list of actions

that, to this Court, demonstrates a likelihood of success on the merits at arbitration—actions that

are amply supported by the evidence—are causing harm to Petitioner that cannot be remediated

in damages. Therefore, Petitioner is being irreparably harmed by the course of conduct

described in profuse detail above.

### C.   Addressing the Proposed Forms of Injunctive Relief in Light of the Finding of Irreparable Harm

The question is whether the irreparable harm Petitioner is suffering is the sort of harm

that would lead to the entry of some sort of injunction *in aid of arbitration.*

Petitioner seeks three specific forms of relief.

The aspect of the injunction sought by Petitioner that is most immediately in need of

resolution, and that has been the object of most argument—an injunction barring Respondent

from submitting a registration, on behalf of L1bre Nuevo León, for the Monterrey taxi

concession—would not address this particular irreparable harm. Nor would it be an appropriate

injunction in aid of arbitration. While Petitioner has demonstrated a likelihood of success on the

merits of its various breach of contract claims, conspicuously absent from this Court's discussion

of why it has shown likelihood of success is any mention of theft of trade secrets and non-

competition—neither of which, on the record before me, has been established. Petitioner's

counsel said yesterday, in open court, that as long as his client's financial interest in L1bre

Nuevo León exists and is protected, ESH *wants* L1bre Nuevo León to register for the Monterrey taxi concession, because that would give the partnership the opportunity to earn a lot of money. Since any harm from the failure to pay ESH its 50% of the profits of any such venture is compensable in damages, it would be cutting off its nose to spite its face for ESH to obtain such an injunction. And how an injunction that undermines the business of the partnership qualifies as one "in aid of" the pending arbitration has never been clear to the Court. I thus decline to order such an injunction.

So I turn to the two other forms of injunctive relief sought by Petitioner.

The first is an anti-suit injunction that would enjoin Respondents from litigating the issue of the validity of the arbitration agreement in Mexico. (Dkt. No. 13 at 7.) This I am not prepared to enter, either.

Petitioner argues that the express language of the Partners Agreement entitles it to an anti-suit injunction, because it prohibits Respondents from bringing the issue of the validity of the arbitration provision before any court other than this Court. That is not correct. The only thing that comes exclusively to this Court is an application for an injunction in aid of arbitration. As has already been discussed, this Court must consider whether a valid and binding arbitration agreement exists before ruling on a motion for pre-arbitral injunctive relief. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citing 9 U.S.C. § 2.) But the fact that I must decide Issue A prior to exercising my exclusive jurisdiction to decide Issue B does not mean no other adjudicative body has authority to make an independent determination as to Issue A. Section(12)(c) of the Partners Agreement does not say, "the parties confer exclusive jurisdiction to issue a pre-arbitral injunction and to make an exclusive determination of any issue of act or law that might come up in the course of such an application."

In fact, the literal language of the Partners Agreement makes it crystal clear that this Court *does not have exclusive jurisdiction to determine the validity of the arbitration agreement*. Section 12 of the Partners Agreement remits the ultimate determination of the validity of the arbitration agreement, not to any court—American or Mexican—but to the ICC: "Any dispute, claim or controversy resulting from, relating to or arising out of this Agreement, including the breach, termination, enforcement, interpretation *or validity thereof*, shall be submitted to final and binding arbitration administered by the International Court of Arbitration of the International Chamber of Commerce ('ICC') in accordance with its Rules of Arbitration then in effect[.]" (León Decl. Ex. 1 § 12 (emphasis added).)  This Court cannot possibly have exclusive jurisdiction to decide the issue of validity when the partners themselves have agreed to remit that issue to the arbitrators.

It is true that, under both US and Mexican law, courts are vested with the power to make determinations about the validity of the arbitration provision.  In the United States, courts are vested with the power to decide *threshold* questions of validity.  "[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc.*, 139 S. Ct. at 530 (citing 9 U.S.C. § 2.)  Similarly (though not identically), Mexican law recognizes that the parties may petition a court to determine whether the arbitration agreement is null and void, ineffective, or impossible to perform. *See* Manuel Vera V., et al., *Mexico* § 12.2, in Shelby R. Grubbs, ed., *International Civil Procedure* (Wolters Kluwer 2003); Claus von Wobeser, *Arbitration Guide:  Mexico*, IBA Arbitration Committee (Jan. 2018), available at

https://www.ibanet.org/Document/Default.aspx?DocumentUid=8A7876EB-EBB9-4D5F-B073-24618471E911.[14]

But, here, the partners have plainly indicated their intent that the ultimate determination of the validity of the agreement is to be made by the arbitrators, and not any court. By so agreeing, the parties limited this Court to making any preliminary (threshold) ruling about the validity of the arbitration agreement that might be necessary to ascertain whether or not to act in aid of arbitration—nothing more. And that ruling, which I have made, is ultimately without prejudice to a final determination of the validity of the agreement to arbitrate by the party chosen by the partners—the ICC.

Petitioner next argues that, even outside the context of a forum selection clause, this Court has the authority to enjoin a party from pursuing or maintaining suit in another country. (Dkt. No. 13 at 8.)

While the proposition cited is most assuredly true, "principles of comity counsel that injunctions restraining foreign litigation be 'used sparingly' and 'granted only with care and great restraint.'" *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004) (quoting *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987). "An anti-suit injunction against parallel litigation may be

---

[14] "A Mexican court may also declare a *nulidad* when the moving party shows that: (a) one of the parties to the arbitration agreement lacked capacity to contract, or the arbitration agreement is invalid under the law the parties chose as governing law or, if the agreement is silent as to choice of law, under Mexican law; (b) the moving party was not duly notified of the appointment of an arbitrator or of the arbitration proceedings, or was not able to exercise its rights for any reason; (c) the award covers a dispute or contains dispositions that are beyond the scope of the arbitration agreement, although in the latter event the court may distinguish between dispositions and declare a *nulidad* as to only those offending portions of the award; or (d) the arbitration tribunal was not formed or the arbitration proceedings were not conducted in keeping with the arbitration agreement or applicable provisions of the Commerce Code governing commercial arbitration." Manuel Vera V., et al., *Mexico* § 12.2, in Shelby R. Grubbs, ed., *International Civil Procedure* (Wolters Kluwer 2003). Here, only the first condition appears to be relevant, as ESH had not commenced arbitration at the time that Respondents received the temporary injunction.

imposed only if: (A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined. Once past this threshold, courts are directed to consider a number of additional factors, including whether the foreign action threatens the jurisdiction or the strong public policies of the enjoining forum." *Id.* at 652.

Here, while the parties to this proceeding and the Mexican injunction proceeding are sufficiently the same to overcome the identity of parties hurdle,[15] Petitioner has not clearly demonstrated that this Court's threshold determination about the validity of the arbitration agreement would be dispositive of the Mexican civil action. The Mexican action was brought by L1bre Holding, LLC, and concerns "whether certain provisions of [the Partners Agreement] violate L1bre Holding, LLC's ability to exercise its corporate rights" in its direct, 99.99%-owned subsidiary, Lusad, "under Mexican law." (Resp'ts' Mem. of Law in Opp. to Pet'r's Emergency Mot. for Prelim. Inj. And TRO in Aid of Arbitration, Dkt. No. 27, at 8.) The validity of the arbitration clause with respect to the contracting parties, ESH and L1bero, and their partnership, EST, under Delaware law will not necessarily dispose of the issues raised in the Mexican case.

Even if the threshold factors were satisfied, however, this Court would choose, as a matter of its discretion, not to enter an injunction against Mexican litigation. The business venture is located in Mexico, and the representatives of the parties are all Mexican nationals. The events leading to alleged breaches—all of them—took place in Mexico. Mexican courts are empowered by Mexican law to resolve the validity of arbitration clauses in the first instance. And although the entry of two *ex parte* orders against ESH and its Partners (one of them

---

[15] To satisfy the first prong of identity of the parties, the parties "need not be identical," and merely must be "affiliated or substantially similar, such that their interests are represented by one another." *AU New Haven, LLC v. YKK Corp.*, No. 15-cv-3411, 2018 WL 2128373, at *2 (S.D.N.Y. May 8, 2018) (internal quotations omitted); *Eastman Kodak Co. v. Asia Optical Co.*, 118 F. Supp. 3d 581, 587 (S.D.N.Y. 2015); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006), *aff'd*, 246 F. App'x 73 (2d Cir. 2007).

purporting to divest this Court of its undoubted jurisdiction) gives me pause, I ultimately conclude that there is no reason to believe that the parties will not have a full and fair opportunity to litigate the issue of validity before a Mexican court. I note that each *ex parte* order contained provisions designed to keep all parties (including Respondents) from abusing the interests of the other until the matters in suit could be finally decided; and I have no reason to believe that a Mexican court, *after hearing from both parties and being provided with the evidence that has been placed before this Court,* will refuse to read the plain language of the Partners Agreement, or will refuse to make its determination about the validity of the arbitration agreement in a contract governed by Delaware (not Mexican) law in accordance with that law. The parties are free to submit this Court's reasoning and conclusion that there exists a valid and binding arbitration clause to the Mexican court; this issue is frequently litigated in American courts, we are fully familiar with Delaware law (the governing law) on this subject, and the Mexican court, which has yet to determine the issue on the merits, may well choose to be guided by this analysis to the extent that the question is raised in that proceeding.

Finally, Petitioner seeks an order that actually touches on the irreparable harm that the Court has identified and that Petitioner has proved: an order that would prevent Respondent and any entity or individual associated with it from acting to compromise Petitioner's interest in the Mexico City concession, which was originally awarded to Petitioner. As noted above, the contention that Respondent/Covarrubias is talking to Semovi and trying to oust Petitioner from the Mexico City concession is, at this point, pure speculation on León's part. I concede that he has good reason to be fearful, but that is no substitute for proof in a court of law.

On the other hand, if indeed Covarrubias is trying to cut his partners out of the original business of the joint venture behind their backs—or is taking any other steps to disenfranchise

them from the businesses of the EST/L1bre group—then it does indeed have the potential to undermine the ability of any arbitrator to award enforceable relief that would redress the wrongs complained of. For that reason, an injunction in aid of arbitration should most certainly issue— one that bars Respondent, its principals and their privies (including their subsidiaries, agents, officers, directors, *etc.*) from taking any steps to eliminate the interest of ESH in any business ventures anywhere in the world that are affiliated with, derived from, or use the trademarks, software, and other trade secrets associated with the L1bre group.

Petitioner has not proposed the terms of such an injunction. I give it until tomorrow (May 15) at 2 PM to propose such an order; Respondent has until Thursday (May 16) at 10 AM to comment on that order.

### D.   The Balance of Hardships Favors ESH

This court cannot enter an injunction unless it first "balance the hardships between the plaintiff and defendant," and can "issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).

The balance of hardships plainly tilts in ESH's favor. The argument made by Respondent focuses on the inability to register for the bidding on the Monterrey concession, but this Court has declined to enter an injunction that would interfere with said registration. Meanwhile, Respondent's course of conduct over the last six months demonstrates a systematic effort to deprive Petitioner of its managerial and control rights, which are guaranteed by Delaware law and by the terms of the Partners Agreement. The only "harm" Respondent would suffer, if an injunction issued freezing the corporate status quo pending arbitration, is the "harm" of being held to agreements it freely made.

E.     **The Public Interest Would Be Served By Entry of a Preliminary Injunction**

Finally, a party seeking a preliminary injunction must demonstrate that the "'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger*, 607 F.3d at 80).

ESH argues that the public interest favors the enforcement of contracts, the enforcement of arbitration provisions, and the protection of trade secrets.  (Dkt. No. 18 at 22.)  The Court agrees with ESH as to the strong public interest in enforcing contracts—and most especially contracts that provide for parties to act as partners, the ultimate fiduciaries in law—and concludes that there is a strong public interest in enforcing the parties' bargained-for agreement. *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 210 (2d Cir. 2014); *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010); *In re M.B. Int'l W.W.L.*, No. 12-cv-4945, 2012 WL 3195761, at *13 (S.D.N.Y. Aug. 6, 2012); *Control Sys., Inc. v. Realized Sols., Inc.*, No. 11-cv-1423, 2011 WL 4433750, at *4 (D. Conn. Sept. 22, 2011.)

## CONCLUSION

Based on the foregoing, the application for an order to show cause for a preliminary injunction is GRANTED to the extent indicated above.

Pending the entry of a formal order of preliminary injunction (which will issue this week), Respondents, their principals and all persons acting in concert with them, including without limitation their agents, officers, directors, and subsidiaries (wherever incorporated), are temporarily restrained from taking any action anywhere in the world (including any action in a Mexican court) that would derogate the effect of the pre-arbitral relief that this court has decided to award, or to alter in any manner the corporate status, identity of directors, shareholding interest, or other ownership, managerial or control rights of any company contemplated by the

parties' Partners Agreement (including, without limitation, Lusad or L1bre Jalisco or L1bre

Nuevo León).  The TRO entered on May 2 is otherwise lifted.


Dated: May 14, 2019
        2:00 PM EST

_____
              Chief Judge


BY ECF TO ALL PARTIES