J5d1espa

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ESPIRITU SANTO HOLDINGS, L.P.,

4                    Petitioner,

5           v.                          19 Civ. 3930 (CM)

6  L1BERO PARTNERS, L.P. and
   ESPIRITU SANTO TECHNOLOGIES,
7  LLC,

8                    Respondents.         Hearing on
                                   Temporary Restraining Order
9  ------------------------------x
10                                   New York, N.Y.
                                     May 13, 2019
11                                   11:07 a.m.

12  Before:

13                   HON. COLLEEN McMAHON,

14                                        District Judge

15                        APPEARANCES

16  HOGAN LOVELLS US LLP
          Attorneys for Petitioner
17  BY:  DAVID DUNN, ESQ.
         RICHARD C. LORENZO, ESQ.
18       MARK CHESKIN, ESQ.
         ALAN MENDELSOHN, ESQ.
19
    REED SMITH LLP
20        Attorneys for Respondents
    BY:  STEVEN COOPER, ESQ.
21       JOHN B. WEBB, ESQ.
         COLIN A. UNDERWOOD, ESQ.
22       JONATHAN P. GORDON, ESQ.

23

24

25

J5d1espa

1          (Case called)

2          THE LAW CLERK:  Counsel, please state your appearances

3     for the record.

4          MR. DUNN:  Your Honor, I'm David Dunn with Hogan

5     Lovells US, LLP, and with me are my partners Richard Lorenzo

6     and Mark Cheskin.  They have been admitted in this matter *pro*

7     *hac vice*.

8          MR. COOPER:  Judge, good morning.  Steven Cooper for

9     the respondents from Reed Smith, with my colleagues from Reed

10    Smith as well as Francisco Flores, who is of counsel for Lusad,

11    one of the parties in the action.

12         THE COURT:  Don't your firms employ women lawyers?

13    I'm just curious.  It's been a very long time since I've seen

14    such a group.

15         Okay.  Long time no see, Mr. Dunn.

16         MR. DUNN:  Yes, your Honor.  It has been quite awhile.

17         THE COURT:  It's very nice to have you in my

18    courtroom.

19         MR. DUNN:  Thank you.  It's a pleasure to be here.

20         THE COURT:  Okay.  So we've been working, Ms. Brody

21    and I, very, very hard over the last few days, in the absence

22    of any submission from the respondents, which arrived at 8:00

23    this morning.  That was not helpful.  I am underwhelmed, to say

24    the least, by the fact that notice of the earlier proceeding

25    was given on May 1st.  So what?  It's more notice than your

1    people gave to them before obtaining *ex parte* orders in Mexico.

2    And we all work 24/7, 365 anyway, so break my heart.  So as far

3    as I'm concerned, it is the respondent's own fault that the

4    respondent didn't have somebody here on the 2nd.  I called, I

5    asked, I said:  Is anyone here for the respondent?  No one was

6    here.  It is arrogant, to say the least, that Reed Smith Shaw &

7    McClay, a firm with which I worked extensively in my younger

8    years -- very fine firm, finest firm in Pittsburgh -- would

9    have shown up in court under these circumstances, having had

10   the better part of two weeks' notice of an event, having filed

11   papers two hours before the hearing, at a time when they could

12   not possibly be helpful to the Court.  But times have changed.

13            So Mr. Dunn, it's your motion.

14            I understand neither party has brought the people who

15   submitted the affidavits.

16            MR. DUNN:  No, your Honor.  Our declarant -- we have

17   one declarant -- is in the courtroom and would be available if

18   necessary for cross-examination.  He is present.  It is my

19   understanding -- and Mr. Cooper will speak for himself.  I

20   understand that none of his witnesses are present, although

21   given the fact that I first saw these papers at about 20 after

22   8 this morning -- and it took me quite awhile to download them

23   because I didn't have any courtesy copies -- I have not read

24   the affidavits or all of the exhibits entirely.  I have read

25   the memorandum, but I certainly think at this point we could

1    not legitimately be expected to be prepared to cross-examine

2    those witnesses under any circumstances, but I understand

3    they're not even in the courtroom or available, if the Court

4    was willing to indulge that and we had the time and ability to

5    do it.  But our witness, our declarant, is present and is

6    available, as we understood was our obligation, your Honor --

7              THE COURT:  Indeed it is.

8              MR. DUNN:  -- on a preliminary injunction motion.

9              THE COURT:  Indeed it is, because the burden is on

10   you.

11             MR. DUNN:  Your Honor, I have one preliminary matter,

12   and I want to put this on the record.

13             As your Honor is aware, there are two respondents.

14   Lusad in fact is not a respondent, although Mr. Cooper said

15   that it was.  But two respondents are L1bero Partners, L.P.,

16   that is the other of the two disputing partners, and Espiritu

17   Santo Technologies, LLC, which is the partnership.  Mr. Cooper

18   purports to represent the partnership.  We dispute his right

19   and authority to do that, because the partnership is governed

20   by the partners agreement.  Our partners had nothing to do with

21   retaining him to represent them, and it is required, as we

22   understand it, that that happen.  In addition, we don't believe

23   that the two respondents are united in interest.

24             I don't propose to deal with this issue right now, but

25   my partner Mr. Lorenzo wrote to Mr. Cooper as soon as he

J5d1espa

 1    entered his appearance, informed him that we objected, that we

 2    believe he had a conflict, and that our position was that if

 3    he's representing the partnership --

 4              THE COURT:  Look, if you want to deal with it, deal

 5    with it now, because here's what's going to happen, Mr. Dunn.

 6              MR. DUNN:  Okay.

 7              THE COURT:  Here's what's going to happen.  We're

 8    going to have a hearing, you're going to do whatever you're

 9    going to do.  Tomorrow there will be a decision, because I'm

10    leaving the country, and guess what?  I'm then done with this

11    case.  I don't decide underlying disputes.  I have nothing to

12    do with them.  You people have signed an arbitration agreement.

13    I don't get to decide the underlying disputes.  You can't keep

14    coming to me.  I get one shot.

15              MR. DUNN:  I understand.

16              THE COURT:  One shot.  Prearbitral relief.  That's it.

17    It's all I have jurisdiction to do.  So any issue that you

18    think needs to be resolved by me will be resolved in the next

19    24 hours.

20              MR. DUNN:  I object to Reed Smith representing the

21    partnership.  It is not authorized and it is a conflict, your

22    Honor.

23              THE COURT:  Okay.  Reed Smith?

24              MR. COOPER:  Well, your Honor, I'm going to make some

25    preliminary remarks, then I'm going to have my colleague

1    address that specific issue.

2          First of all, your Honor, we do apologize for the

3    submission of the papers this morning.  However, you do need to

4    understand the circumstances here.  We were not contacted about

5    this until Tuesday, late Tuesday of last week.  We were

6    retained Wednesday morning.  As you see from the submissions,

7    we put in five affidavits, five declarations, with exhibits.

8          THE COURT:  And I only had time to read one of them.

9          MR. COOPER:  Well, what we tried to do is condense it

10   right up front in the memorandum of law.

11         THE COURT:  I read evidence.  I read evidence.

12         MR. COOPER:  Right.  It's cited there, your Honor.

13         My point is, despite the size of the papers, we think

14   that we could give you two or three reasons to immediately deny

15   the motion.

16         I just want to make one point on the diversity point.

17   Because this was such a fire drill, I went through probably 10

18   colleagues of mine, associates and partners, to get assistance,

19   many of whom are women, and they weren't available, but I do

20   want you to know that Reed Smith's commitment to that is

21   genuine, real, and you will likely not see a male bench, male

22   table in the future from Reed Smith.  I did want to just let

23   you know that, your Honor.

24         On the specific point about representing the

25   defendant, I'm going to turn it over to my colleague Colin

1    Underwood.

2            MR. UNDERWOOD:  Good morning, your Honor.

3            THE COURT:  Mr. Underwood.

4            MR. UNDERWOOD:  The entity at issue, Espiritu Santo

5    Technologies, LLC, is a Delaware entity, and of course, it's a

6    juridical entity.  It can't appear in court accept through

7    appointed counsel.

8            THE COURT:  That's true.  The question is, are you

9    conflicted, because the partnership agreement, which makes

10   everybody, front table and back table, 50/50 partners, does not

11   consent to your representation.

12           MR. UNDERWOOD:  Right.  So in a situation where you

13   have 50/50 representation of the partnership, the parties, in a

14   situation like this, where they have made the LLC an adverse

15   party by putting it on the other side of the "v," making it a

16   respondent to their petition, one can assume that the two 50/50

17   parties will not agree on counsel, and the entity cannot go

18   unrepresented.  Under Delaware law, the members of an LLC

19   generally have the right to their input into how the LLC acts.

20   The exception under Delaware law -- there are actually three

21   exceptions, two of which aren't relevant here, but where a

22   member of an LLC has demonstrated sufficient adversity to the

23   LLC itself, that partner can be excluded from decisions about

24   counsel and decisions about strategy and litigation.  And I

25   have two cases --

J5d1espa

 1          THE COURT:  Citations, please?

 2          MR. UNDERWOOD:  Yes.  And I can hand the cases up,

 3  your Honor.

 4          THE COURT:  Thank you.

 5          MR. UNDERWOOD:  *SBC Interactive v. Corporate Media*

 6  *Partners*, 1997 WL 770715; and *Kalisman v. Friedman*, 2013 WL

 7  1668205.

 8          THE COURT:  And your position is that since the

 9  petitioners have chosen to sue the LLC, with their 50 percent

10  members, that they've effectively eliminated themselves from

11  having anything to say about who will represent --

12          MR. UNDERWOOD:  They've demonstrated that they're

13  adverse, and the Delaware courts recognize the practicality

14  that when you have declared yourself adverse to the entity, you

15  have forfeited your right to have a say in how the

16  representation proceeds.

17          I also note that what we're talking about here is the

18  application, the petition this morning.  We're not addressing

19  right now what may happen in the arbitration or any other

20  disputes between the parties.  And if you review the petition

21  and the memorandum of law in support of the petition, they use

22  the unitary construct "respondents" throughout.  Even at times

23  when it doesn't make sense, they say "respondents use their

24  control of ES Technologies."  Okay?  So they have clearly, in

25  the petition, unified the two and have not distinguished that

1  L1bero did something that caused ES Technologies to do

2  something.  They have written about it as "the respondents"

3  have done this, that, and the other thing.  So we think under

4  the circumstances -- and if you'd like me to hand up the cases

5  or --

6          THE COURT:  I would.

7          MR. UNDERWOOD:  Okay.  Let me -- there are three

8  copies of each.

9          THE COURT:  One copy will be fine.

10          MR. UNDERWOOD:  Yes.  I wanted to give opposing

11  counsel a courtesy copy as well.

12          THE COURT:  Very kind of you.

13          MR. UNDERWOOD:  And your Honor, these cases deal more

14  with the question of whether there's privilege in the

15  circumstance as against a dissenting member of the LLC, but if

16  you turn to the *Kalisman* case, if you turn to page 7 of that --

17  let me see -- page 6 of that case --

18          THE COURT:  Which one is *Kalisman*?

19          MR. UNDERWOOD:  The 2013 one.

20          THE COURT:  I've got two copies of *SBC*.

21          THE LAW CLERK:  I'm sorry.  That's my fault.

22          THE COURT:  I've got three copies of *SBC*.

23          MR. UNDERWOOD:  Oh, we'll trade.

24          THE COURT:  I was happy to see that my old friend Gil

25  Sparks was on that case, but it was a 1997 case, so --

J5d1espa

1        MR. UNDERWOOD:  If you turn to page 6 of the 2013

2    case, *Kalisman* --

3        THE COURT:  Yes.

4        MR. UNDERWOOD:  -- it states there are three

5    recognized limitations, and the case in particular dealt with

6    the directors' ability to access privileged information, which

7    they've also asserted.  In saying that Reed Smith is not

8    entitled to represent the LLC, they say they're entitled to get

9    all privileged communications we have.  If you look at third:

10   "A board or committee can withhold privileged information when

11   sufficient adversity exists between the director and the

12   corporation such that the director could no longer have a

13   reasonable expectation that he was a client of the board's

14   counsel."  And again, by instituting an action and a petition

15   in this court in which they have much to say about the conduct

16   of respondents, one of whom is the LLC that they are a member

17   of, we believe they've satisfied the threshold of adversity to

18   allow us to proceed in this hearing today.

19       THE COURT:  Okay.

20       MR. DUNN:  Your Honor, the partnership is, as far as

21   we're concerned, a nominal respondent here.  I don't think the

22   petition can possibly be fairly read as creating adversity with

23   the partnership.  It is adversity with the partners and between

24   the partners, and I think the Court understands that that is

25   the issue.  They didn't try to ask us whether we could agree on

J5d1espa

1    the retention of counsel, and I think the fundamental point

2    here is that -- and I don't hear -- is it Mr. Underwood?  I

3    apologize.

4            MR. UNDERWOOD:  Yes.

5            MR. DUNN:  I don't hear Mr. Underwood addressing the

6    fundamental issue, and that is, where the partners have a

7    dispute, where the partners are 50/50 partners and have a

8    dispute about the management and operations of the partnership,

9    it cannot be said that one of them is aligned with and the

10   other one is antagonistic to the partnership.  Rather, there's

11   a dispute between partners.  The partnership is obviously a

12   necessary party.  My point is, each should be represented by

13   separate counsel.  And we would not argue, if Reed Smith were

14   representing only the adverse partner, that we're entitled to

15   their work product or that we have the right to get their

16   information, but they create all of that problem by trying to

17   represent both the partnership and the partner.  That is their

18   doing.  They didn't come to us and ask us who should be

19   representing them, they didn't select separate counsel, and our

20   point is, that's what should be done.  Hopefully by agreement,

21   but if not agreement, certainly by separate counsel, and one

22   partner cannot merely --

23           THE COURT:  Look, it might have helped if you had

24   styled your caption as L1bero Partners, L.P., Respondent, and

25   Espiritu Santo Technologies, Nominal Respondent.  It would have

J5d1espa

1    kind of helped if you had done that.  Then it would have been

2    quite clear what your position was all along.

3            MR. DUNN:  But I think if you read the petition and

4    you read our papers --

5            THE COURT:  I agree with you.  I agree with you.

6            MR. DUNN:  -- it's clear about what the position is

7    and the facts, and why the partnership is a respondent.

8            THE COURT:  And the carelessness of the word

9    "respondents," this is between you and L1bero.  I understand

10   that.

11           MR. DUNN:  Right.  That is the dispute.  And the whole

12   issue is control of and the operation of the partnership and

13   the petition and the request for arbitration.

14           THE COURT:  Right.  Which would be decided in an

15   arbitration.

16           MR. DUNN:  Right.  And the petition and the request

17   for arbitration cannot fairly be read otherwise, your Honor.

18   It cannot be the case that they thought we were making an

19   argument that we had become antagonistic to the partnership.

20           THE COURT:  Well, it occurs to me that this is just

21   all a fight for another day, because I will be listening to

22   Reed Smith knowing that you really are suing L1bero and not

23   Espiritu Santo except as a technical nominal respondent.  If

24   some day you have a dispute over whether you can get some or

25   all of Reed Smith's work product, it won't be my problem

J5d1espa

1  because you'll be long gone from me and I won't have you back.

2  So I'm not going to interrupt this hearing to demand that

3  Espiritu Santo get new counsel.

4        MR. DUNN:  I understand that, your Honor, and I merely

5  wanted -- not merely -- I wanted to make sure that issue was on

6  the record.  And we're happy to agree, and we understand your

7  directive, that that is a fight for another day.  I merely

8  wanted to make sure we were reserving our rights to have that

9  fight --

10        THE COURT:  Your rights are reserved.

11        MR. DUNN:  -- in an appropriate forum at an

12  appropriate time.

13        THE COURT:  And so are yours.

14        MR. UNDERWOOD:  I just wanted to note for the record,

15  your Honor, that the relief they seek -- there's a question

16  now -- is it meant to read on both L1bero Partners and ES

17  Technologies?

18        THE COURT:  Could we worry about that later?

19        MR. UNDERWOOD:  Okay.

20        THE COURT:  All right.  Mr. Dunn, it's your motion.

21  If you have proof to give me other than the proof that you have

22  already provided, please provide your proof.

23        MR. DUNN:  Your Honor, I have not been able to discuss

24  with my client any of the contents or virtually any of the

25  contents of the affidavits that were submitted by the

J5d1espa

respondent, so in response to that, I would fully anticipate

that we would have additional proof, but since I didn't see

them till 8:30 this morning and I didn't see my clients until

9:30 this morning, we have not had an opportunity to do that.

If your Honor is going to consider those applications, we have

nothing more affirmatively on the application, but if your

Honor is going to consider their papers --

THE COURT:  I am.

MR. DUNN:  -- then I want to cross-examine their

witnesses.  Where are they?

THE COURT:  They don't have them.

MR. DUNN:  Well, then I move to strike the

declarations.

THE COURT:  They're stricken.

MR. DUNN:  Okay.  Then I have nothing further.  But I

want to make clear that our declarant is available for

cross-examination if they wish to cross-examine him, and we'd

be happy to put him on the stand to verify his declaration, but

I'm assuming that's form over substance, and beyond that, we

have nothing more.

MR. COOPER:  Well, your Honor, there was no notice

that this was going to be a hearing with testimony.  I

understand it could be.

THE COURT:  You don't have to have notice there was

going to be a hearing.

1          MR. COOPER:  I understand, your Honor.

2          THE COURT:  They have a burden, you have a burden, to

3    raise -- if all I were confronted with were two sets of

4    affidavits, I'd throw you all out, because you tell entirely

5    different stories.  But this is a hearing, and I can hear this

6    man testify, and I can see him testify, Mr. León, and you can

7    ask him questions.  And the same thing cannot happen to your

8    person, because he's not here, because he didn't think it was

9    important enough to come, from Mexico.  If he thought it was

10   important enough to come, he would be here.

11         MR. COOPER:  Okay, your Honor.  Then I will --

12         THE COURT:  Mr. Covarrubias, or however you pronounce

13   it.

14         MR. COOPER:  Yes, your Honor.

15         Your Honor, I believe I can still oppose this motion,

16   though I would say that the declarations should be admitted

17   into evidence.  They've been presented to the Court.

18         This is, as you indicated, a narrow decision that you

19   have to make.  You're not deciding all of the underlying

20   disputes.  There are --

21         THE COURT:  No.  I know that there are underlying

22   disputes, none of which I intend to decide.

23         MR. COOPER:  Right.

24         THE COURT:  The issue is whether there are things that

25   can and should be stopped so that those underlying disputes can

J5d1espa

1    be decided by someone other than myself.  The issue is whether

2    the petitioners have demonstrated that they are likely to

3    prevail in the underlying arbitration.  That is what they must

4    demonstrate.  That's what likelihood of success means.

5              MR. COOPER:  Right.

6              THE COURT:  Not likelihood of success that they will

7    get to arbitrate as opposed to litigate in a Mexican court, but

8    likelihood of success that they will actually win at the

9    arbitration.  If you take their papers at face value, they've

10   done a very good job of that.  It's hard to take their papers

11   at face value in view of your papers, which I can't pretend I

12   haven't read Mr. Covarrubias's affidavit because I did.  It's

13   the one thing that I read, assuming that he would be here,

14   assuming that this was important enough to him that he would

15   get on a plane from Mexico City and come up here to New York

16   and deal with it.

17             MR. COOPER:  Your Honor, it is important to him.

18             THE COURT:  Really?  Not important enough.

19             MR. COOPER:  I have his federal counsel who works on

20   behalf of Mr. Covarrubias here.  I can put in evidence through

21   him.

22             THE COURT:  You can.  You certainly can.

23             MR. COOPER:  Okay.  And I will do that if need be.

24   But let me first make some legal arguments to you and some

25   factual arguments I don't think are going to be --

1    THE COURT:  I'm not there.  I don't want argument.  I

2  want evidence, now.  I want evidence from them, I want evidence

3  from you, and then we'll talk about argument.  That's how I do

4  things.

5    MR. COOPER:  Okay.  Can I point to a couple of legal

6  issues that may be --

7    THE COURT:  No, you can't point to a number of legal

8  issues.  I want evidence.  Thank you.  But not your evidence

9  yet.  Mr. Dunn's evidence.  Mr. Dunn's evidence.  If Mr. León

10  is here, put him on the stand.

11    MR. DUNN:  Mr. León.

12  SANTIAGO LEÓN,

13     called as a witness by the Petitioner,

14     having been duly sworn, testified as follows:

15  DIRECT EXAMINATION

16  BY MR. DUNN:

17  Q.  Good morning, Mr. León.

18  A.  Good morning.

19    THE COURT:  All he has to do is affirm that his

20  affidavit is what it is.

21  Q.  Mr. León --

22    MR. DUNN:  May I approach, your Honor.

23    THE COURT:  You may.

24  Q.  Mr. León, let me show you a copy of the declaration of

25  Santiago León Aveleyra.  Do you recognize that document, sir?

1   A.  I do.

2   Q.  Did you prepare that document?

3   A.  My lawyers prepared it for me and we revised it together.

4   Q.  And did you read that document carefully?

5   A.  I did.

6   Q.  And did you sign it?

7   A.  We did -- I did.

8   Q.  And did you understand it was being submitted to this Court

9   as affirmative evidence?

10  A.  Yes.

11  Q.  And did you review the attachments to that document to

12  verify that they were correct?

13  A.  Yes.

14  Q.  And is that your sworn statement?

15  A.  It is.

16  Q.  And do you have any reason, sitting here today, to change

17  anything in that statement in terms of its truthfulness?

18  A.  I do not.

19  Q.  And do you swear that it is the truth?

20  A.  I do swear.

21          MR. DUNN:  Nothing further, your Honor.

22          THE COURT:  Thank you.

23          You may cross.

24  CROSS-EXAMINATION

25  BY MR. COOPER:

1   Q.  Mr. León, you maintain in your declaration that there's a

2   company called L1bre Monterrey.  Are you familiar with that

3   company?

4   A.  I am not.

5   Q.  In your papers you indicate that L1bre Monterrey was going

6   to make a bid on a concession in Monterrey in violation of the

7   partnership agreement.  Are you aware of that?

8   A.  I am aware that there is going to be a public bidding in

9   the state of Nuevo León, where Monterrey is.  I am aware that

10  we had a board meeting where there was going to be, previously

11  to -- we were going to constitute a company for Monterrey that

12  was previously going to be approved of at another board

13  meeting, which never occurred, and I am aware that there were

14  negotiations on behalf of Mr. Covarrubias and his

15  administration with the state of Monterrey because the bidding

16  process was published and that bidding process asked for a

17  certified meter, which only we have.

18            THE COURT:  "We" being whom, please?

19            THE WITNESS:  L1bre, the company, your Honor.

20            THE COURT:  I'm sorry.  Which company?

21            THE WITNESS:  It would be the companies owned by

22  Espiritu Santo Holdings.

23  Q.  Mr. León --

24            THE WITNESS:  Technologies.  Sorry.  Espiritu Santo

25  Technologies, LLC.

J5d1espa                    León - Cross

1              THE COURT:  The LLC.

2              THE WITNESS:  Yes.

3              THE COURT:  The partnership.

4              THE WITNESS:  Yes.

5    BY MR. COOPER:

6    Q.  Sir, isn't it correct that the technology, the trademark,

7    the intellectual property is actually owned by the Lusad

8    entity, not by the partnership?

9    A.  I -- I would have to review that.  I don't recall.

10   Q.  So in asserting that somehow the partnership's rights would

11   be violated because of the use of intellectual property, you

12   don't know whether or not the partnership even has any rights

13   to intellectual property, right?

14   A.  Well, the --

15   Q.  Sir, I'm asking --

16   A.  I'm --

17             THE COURT:  You can answer the question yes or no, and

18   I assure you Mr. Dunn can follow up.  He's quite competent.

19   A.  Can you repeat the question, please.

20             THE COURT:  The question is:

21   Q.  Sir, am I correct that the partnership doesn't own the

22   intellectual property, it's owned by the Lusad entity?

23   A.  Yes.

24   Q.  And in fact, you registered the trademark for it, correct?

25   A.  Our lawyers did.

J5d1espa                    León - Cross

1   Q.  Yeah.  But you signed it, right?

2   A.  I don't recall.

3            MR. COOPER:  Your Honor, may I approach the witness.

4            THE COURT:  You may.

5   Q.  Do you recognize this document?

6            MR. DUNN:  I'm sorry, your Honor.  Could I see what it

7   is Mr. Cooper is showing to the witness.

8   A.  I recognize the name of the Mexican subsidiary, Servicios

9   Digitales Lusad, but I don't recognize this document.  I don't

10  think I've ever seen it.

11           THE COURT:  Okay.  I'm just curious.  It's a hearing,

12  so I'd like to see what you're talking about.  Was this one of

13  the exhibits to your papers?  Is this Exhibit 5?

14           MR. COOPER:  Yes, your Honor.

15           MR. DUNN:  I'm sorry.  Exhibit 5 to what?

16           MR. COOPER:  To the Covarrubias declaration.

17           THE COURT:  To the declaration of Mr. Covarrubias.

18           MR. GORDON:  It's Exhibit 5 to the Covarrubias

19  declaration.

20           THE COURT:  What did you say, you recognize the name

21  of Servicios Digitales Lusad?

22           THE WITNESS:  Yes, your Honor.

23           THE COURT:  But you've never seen this document

24  before?

25           THE WITNESS:  I don't think I have.

1    BY MR. COOPER:

2    Q.  Sir, do you recall in paragraph 3 of your declaration

3    saying that, "We created and registered the L1bre trade name

4    and associated trademarks," for the system?

5             THE COURT:  The L1bre what and associated trademarks?

6             MR. COOPER:  Trademarks.

7    A.  Yes, we created the L1bre name.

8             MR. COOPER:  Trade name and associated trademarks.

9    A.  We created the L1bre trade name and registered it, yes.

10            THE COURT:  Who is "we"?

11            THE WITNESS:  I am the chairman of the board of the

12   company, your Honor, and the founder, and we created that name.

13            THE COURT:  But who is "we"?  What is the company that

14   you're talking about?

15            THE WITNESS:  The company that we're talking about

16   is -- I believe the original company that formed the name was

17   Lusad, Servicios Digitales Lusad.

18   BY MR. COOPER:

19   Q.  And Lusad is a Mexican company that's governed by Mexican

20   law, correct?

21   A.  It's a fully-owned subsidiary of the US structure, yes.

22            THE COURT:  I'm sorry.  Wait a minute.  That wasn't

23   the question.  Is it a Mexican company?

24            THE WITNESS:  It is.

25            THE COURT:  Okay.  And you say it's owned by whom?

J5d1espa                    León - Cross

1              THE WITNESS:  By --

2              THE COURT:  Wholly owned subsidiary of whom?

3              THE WITNESS:  Of Libre's corporate structure.

4              THE COURT:  What does that mean, Libre's corporate

5     structure?

6              THE WITNESS:  It means, there is L1bre Holdings, and

7     its corporate structure in the US owns the subsidiary, the

8     Mexican subsidiary, which is Servicios Digitales Lusad.

9              THE COURT:  One of these Delaware entities owns Lusad?

10             THE WITNESS:  Yes.

11             THE COURT:  Which Delaware entity; do you know?

12             THE WITNESS:  I believe it's L1bre Holdings, LLC.

13             MR. COOPER:  Your Honor, I actually can point you to

14    the corporate chart.  I think it would be very helpful.

15             THE COURT:  Corporate charts are always helpful.

16             MR. COOPER:  It's in the Covarrubias declaration.

17             MR. DUNN:  No.  That declaration has been stricken.

18    He can't refer to that declaration, but it's in his

19    declaration.  Why don't we look at paragraph 22 of that.

20             MR. COOPER:  Well, it's inaccurate what they have, and

21    I will --

22             MR. DUNN:  There's no evidence of that, your Honor.

23             THE COURT:  Wait a minute.  We're going to put their

24    person on.  You're going to put the general counsel on and he's

25    going to testify to the inaccuracies.  Right now we have

J5d1espa                    León - Cross

1    Mr. León's chart, so you can use that.  You can cross-examine

2    with this, your other chart.

3           He can cross-examine with the telephone book, as you

4    and I were taught, as young associates, Mr. Dunn.

5           MR. DUNN:  Yes, your Honor.

6           THE COURT:  He can cross-examine with anything he

7    wants, whether it's in evidence or not.

8           MR. COOPER:  Your Honor, can I hand it up to you.

9           THE COURT:  Yes.

10   BY MR. COOPER:

11   Q.  Mr. León, have you seen the document I just showed you?

12   A.  I have.

13   Q.  Did you see it this morning?

14   A.  I saw it yesterday -- or this morning, yes.  Sorry.

15   This -- this morning.

16   Q.  Do you recognize it as a chart that was submitted in the

17   declaration of Mr. Covarrubias?

18   A.  I see some changes.

19   Q.  Well, sir, you originally put in a corporate chart,

20   correct, in your declaration?

21   A.  Correct.

22          THE COURT:  Now we can flip it around, because there's

23   a copy of it sitting right there, I believe.

24   Q.  Sir, if you see, we made a couple of changes, highlighted

25   in yellow?

J5d1espa                    León - Cross

1    A.   Yes.

2    Q.   And in the upper right-hand -- and what we did is

3    essentially use the one you submitted and we put in some

4    changes.  I want to ask you about those changes.

5            Throughout your declaration you talk about Mr. Salinas

6    being a partner.  Is Mr. Salinas a partner?

7    A.   Mr. Salinas is an ultimate beneficiary owner, yes.

8    Q.   It's your understanding that he has an ownership interest

9    in the partnership?

10   A.   Yes.

11   Q.   If I told you he didn't, would you argue with that?

12   A.   He does.  I have proof he does.

13   Q.   What proof do you have?

14   A.   I have direct communication he representing himself as

15   an -- as a shareholder.

16   Q.   Have you seen him sign on behalf of the partnership?

17   A.   I haven't seen him sign, no.

18           THE COURT:  And how is this relevant to anything I

19   have to decide?

20           MR. COOPER:  It's one of the inaccuracies on here.

21   The other one is much more important.

22           THE COURT:  And how is it relevant to anything I have

23   to decide?

24           MR. COOPER:  Because credibility and proof, your

25   Honor, throughout is going to be an issue, because there are so

J5d1espa                    León - Cross

1    many inaccuracies in the presentation, we could be here all

2    day.

3            THE COURT:  We aren't going to be here all day, and

4    I'm going to be here all night, and at 10:00 in the morning I

5    will have done with you all.

6    BY MR. COOPER:

7    Q.  I'm going to direct your attention to the yellow box on the

8    bottom, L1bre Nuevo León.  Do you see that?

9    A.  Yes.

10   Q.  Have you heard of that company?

11   A.  No.

12   Q.  Are you aware that that company was formed to make the bid

13   in Monterrey?

14   A.  I'm aware of it now that I've been made aware of it.

15   Q.  And sir, you say in your declaration that a company called

16   L1bre Monterrey was created for purposes of that.  That's not

17   correct, right?

18   A.  There was a search, there was a bidding process, and he

19   had -- Fabio Covarrubias had incorporated a company called

20   L1bre Jalisco.  L1bre Jalisco was excluded -- excluded us, the

21   partners of Espiritu Santo Holdings, L.P., in participating in

22   that, and with that company, he had asked for a concession,

23   again, excluding not only Espiritu Santo Holdings, L.P. but --

24           THE COURT:  Can I just ask a question to get to the

25   bottom of this.

J5d1espa                    León - Cross

                    THE WITNESS:  Yes.

                    THE COURT:  Is not Monterrey a city and perhaps the

largest city in Nuevo León?

                    THE WITNESS:  It is, your Honor.

                    THE COURT:  The state of Nuevo León?

                    THE WITNESS:  Correct.

Q.  And Jalisco is a whole different area, right?

A.  Jalisco is a whole different area, but it's relevant

because they tried to exclude us.  We made that point in the

14th of December board meeting, and they promised and agreed to

regularize, to incorporate L1bre Holdings, LLC to that

structure.  Now when we found out that L1bre was going to be

bidding for the concession in Nuevo León, we knew that there

was an entity.  Now we know it's called L1bre Nuevo León.  We

thought it was called L1bre Monterrey.

Q.  So in your affidavit, or your declaration, you specifically

say, using initial caps, "It was agreed that L1bre Jalisco and

L1bre Monterrey entities, secretly and wrongfully formed by

Mr. Salinas and Mr. Covarrubias to seek similar concessions in

other Mexican cities, would be formally brought into the L1bre

partnership."  I mean, you mentioned two entities.  You cannot

identify L1bre Monterrey, correct?

A.  Correct.

Q.  And L1bre Jalisco is for a different area, it's not for

Monterrey, correct?

J5d1espa                    León - Cross

 1   A.  Yes.  They're two -- they're two entities that were in --

 2   in -- in resolutions mentioned that they were going to do

 3   previous.

 4           THE COURT:  Since there are very few issues that

 5   interest me, are these resolutions that were adopted by the

 6   board at a time when your 50 percent representative was sitting

 7   on the board and voting?

 8           THE WITNESS:  They were -- they were voted --

 9           THE COURT:  Yes or no?

10           THE WITNESS:  But they were voted to have previously

11   acceptance.  They -- that's what it specifically says.  That --

12           THE COURT:  Frankly, Nuevo León is Monterrey.  I know

13   that.  I'm not an idiot.  So the fact that they ended up

14   incorporating it with the name of the state instead of the name

15   of the capital city of the state, it's not going to persuade me

16   of anything.  I want to know who voted to start it.

17           MR. COOPER:  Well, your Honor, Exhibit 3 to his

18   declaration, the board resolution, the board resolution is 7.1,

19   and --

20           THE COURT:  To the declaration of Mr. León?

21           MR. COOPER:  Mr. León.  He submitted it.  He says the

22   board resolved -- this is 7.1 -- the board resolved, and they

23   all signed off on it, to constitute a Mexican subsidiary of the

24   affiliate of L1bre Holding, LLC, so that the new company can

25   participate in the bidding process for a concession to install

1    and operate digital taxi meters in the taxis holding

2    concessions to operate in the city of Monterrey and Nuevo León

3    and throughout its municipalities.

4              THE COURT:  Perfect.  And said corporation was in fact

5    incorporated in Mexico.

6              MR. COOPER:  Correct.  And, your Honor, and Mr. León,

7    at 9.1, the same meeting --

8              THE COURT:  And it's owned 1 percent by Lusad, and

9    99.9 percent -- well, 1 percent by Servicios Administrativos

10   Lusad and 99.9 percent by Servicios Digitales Lusad.

11             MR. COOPER:  Right, right.  Now, Mr. León --

12             THE COURT:  Which is in turn owned by L1bre.

13             MR. COOPER:  Correct.

14   BY MR. COOPER:

15   Q.  Now, Mr. León, if in fact Nuevo León was owned 99 percent

16   by Lusad, you would have your appropriate partnership interest

17   in the outcome of any concession for Nuevo León, correct?

18   A.  We were, at that same agreement, in that same decision --

19   Q.  Sir, I'd like you to answer my question, what I asked you.

20             THE COURT:  You need to answer his question.  If this

21   corporation that was authorized by Exhibit 3 to your

22   declaration were to bid for the taxi concession in Monterrey

23   and to win it, you're still a 50 percent partner in that,

24   right?

25             THE WITNESS:  Yes.

J5d1espa                    León - Cross

1          THE COURT:  And you'd get 50 percent of the profits.

2          THE WITNESS:  If it's a fully-owned subsidiary, that

3     would be the case, for their --

4          THE COURT:  So my question to you is:  Aren't you

5     trying to cut off your nose to spite your face -- it's an

6     American expression, I don't know if it translates well into

7     Spanish -- by trying to stop the bidding, because if the

8     corporation in which you have a 50 percent interest doesn't

9     bid, you will make exactly nothing on the Monterrey concession,

10    whereas you have an opportunity to make 50 percent of what may

11    be a lot of money if your company wins the Monterrey

12    concession?

13         THE WITNESS:  That is correct.  It was our

14    understanding that it was the same case as L1bre Jalisco, which

15    they excluded us from that entity, but if it's a fully-owned

16    subsidiary of L1bre, that would be okay with us.

17         THE COURT:  So it's possible that your understanding

18    may have changed.

19         THE WITNESS:  Yes.  If it's -- if it's a L1bre -- if

20    L1bre Nuevo León is a fully-owned subsidiary of L1bre Holdings,

21    LLC, yes.

22         THE COURT:  If it's in the L1bre family, let's call

23    it.

24         THE WITNESS:  Yes.

25    BY MR. COOPER:

J5d1espa                    León – Cross

1   Q.  So if that was the case, there would be no misappropriation

2   of trade secrets through the use of other companies by

3   Mr. Covarrubias or anyone else, correct?

4   A.  I don't know.

5   Q.  Well, if the bid is going through Nuevo León and Nuevo León

6   is in the corporate structure, then it's totally appropriate.

7   A.  Yes, if it's a fully-owned subsidary, and that's the

8   entity bidding, then we wouldn't have any objection to that.

9           MR. COOPER:  Just a couple more questions, your Honor.

10  Q.  In your affidavit, in your declaration, sir, you go on and

11  on, with bullet points on pages 6 through 8, about all the

12  wrongdoing that Mr. Covarrubias apparently engaged in,

13  Mr. Salinas engaged in, right?

14  A.  Correct.

15  Q.  Okay.  And there you say that you were told this by Manuel

16  Tabuenca, correct?

17  A.  Correct.  He's the comptroller of the company.

18  Q.  Okay.  Now Mr. Tabuenca hasn't submitted a declaration,

19  right?

20  A.  Not to my knowledge.  To this Court?  No.

21  Q.  Is he in court today?

22  A.  No.

23  Q.  Do you have any firsthand knowledge about any of the

24  allegations that you make in paragraph 15, or is it all from

25  Mr. Tabuenca?

J5d1espa                    León - Cross

1    A.  Mr. Tabuenca is again, the comptroller of the company.  He

2    came from Uber.  He was a comptroller of Uber.  He was -- he

3    was, previously to that, the comptroller for Visa and

4    MasterCard.  He's a very reliable employer.

5    Q.  Sir, can you just answer my question.

6    A.  He's the one that --

7               THE COURT:  Anything you know, you know because the

8    comptroller told you, is that correct?

9               THE WITNESS:  That's correct.

10              THE COURT:  Okay.  Thank you.  I certainly understand

11   that.

12   Q.  And, sir, if there were to be any injury here with regard

13   to misappropriation of the intellectual property, the injury

14   would be to the owner of the intellectual property, correct?

15   A.  Correct.

16              MR. DUNN:  Objection.

17   Q.  And owner of the intellectual property, as we established a

18   few minutes ago, is the Lusad company, correct?

19   A.  Well, and to its owners.

20   Q.  Who is the owner of the intellectual property?

21   A.  The intellectual property, I would have to consult the

22   counsel.  I'm not sure who exactly is the owner, but I think

23   it's Servicios Digitales Lusad, which is the subsidiary, and

24   L1bre Technologies, perhaps.  I would have to consult.

25              THE COURT:  So this document, for example, that I've

J5d1espa                    León - Cross

1    been given that was -- it's a trademark registration.

2                THE WITNESS:  Yes.

3                THE COURT:  And the mark is registered to Servicios

4    Digitales Lusad.

5                THE WITNESS:  Yes.  That's the trademark.

6                THE COURT:  That's the trademark registration.

7                THE WITNESS:  Yes.

8                THE COURT:  And the distinctive mark is L1bre, right?

9                THE WITNESS:  Yes, with a 1.

10               THE COURT:  With a 1 instead of an i.  It just drove

11   me crazy all weekend typing that one.

12               THE WITNESS:  Yes.

13               THE COURT:  And that's the mark.  And that mark is

14   owned by Servicios Digitales, which is a 99.99 percent

15   subsidiary of L1bre Holdings, Delaware.

16               THE WITNESS:  That's correct, your Honor, and --

17               THE COURT:  Which is a hundred percent subsidiary of

18   Espiritu Santo Technologies, LLC.

19               THE WITNESS:  Yes.

20               THE COURT:  Also Delaware.  Okay.

21               THE WITNESS:  There's another entity that

22   Mr. Covarrubias and his administration formed called L1bre

23   Jalisco, which used the L-1-B-R-E and its business model and

24   technology, to ask for another concession in the state of

25   Jalisco.

1    THE COURT:  Okay.  This particular document, can we

2    agree, applies only to a trademark registration?

3    MR. COOPER:  Yes.

4    THE COURT:  The trademark is nice, but the valuable

5    intellectual property is the stuff that they use to run the

6    taxi meters, right?

7    MR. COOPER:  We have more information to establish

8    besides the ownership by Lusad, your Honor.  We can put that in

9    through our witness.

10    Your Honor, I have a lot of evidence that there is no

11    support, other than Mr. Tabuenca's hearsay conversation with

12    Mr. León, there is no factual support here.  I can debunk a lot

13    of these things, but I don't know if you want to hear it or

14    not.

15    THE COURT:  Right now I've got a witness on the stand.

16    I'd like you to finish questioning the witness.

17    MR. COOPER:  Okay.

18    BY MR. COOPER:

19    Q.  Sir, you allege in your bullet points that there are two

20    sets of books being maintained at Lusad, correct?

21    A.  Yes.

22    Q.  Have you seen that second set of books?

23    A.  I've seen the Oracle platform NetSuite, which differs from

24    what the administration reported the 14th of December of 2018,

25    which -- which makes me pretty sure that there are two sets of

1   books that they were keeping.

2   Q.  Okay.  Did you attach a screenshot of that Oracle platform

3   that you're referring to in your papers?

4   A.  I didn't -- I didn't do the -- the submissions or the

5   papers.  I didn't do it.

6   Q.  So if you think there's a second set of books, you didn't

7   think it was important to actually present that second set of

8   books to the Court?

9   A.  The thing is that that platform was taken away from us.  We

10  don't have access to it anymore.  We've asked for -- for

11  access.  They've denied access to us.  On several occasions.

12  And it is today that we don't have access to the -- to the

13  offices, to the -- to the accounting platform, to anything.

14  We've asked them, and so has Deloitte, and they have replied

15  with threats of criminal procedures.

16  Q.  So you don't even reference the Oracle platform.  I mean,

17  you say you can't get access to it, but you don't even

18  reference it.  The only substantiation you have for that

19  particular claim is that Mr. Tabuenca told you that, correct?

20  A.  And he takes it out of the platform.

21  Q.  And isn't it true that Grant Thornton, a well-regarded

22  accounting firm, audits the books?

23  A.  The audit was -- was agreed to, for Deloitte to do it, not

24  Grant Thornton.

25          THE COURT:  But who is the regular auditor for the

1   company?

2            THE WITNESS:  It was an auditor which the

3   administration has relationship with, with their prior

4   companies, which is Grant Thornton.

5            THE COURT:  Just the name of the company.

6            THE WITNESS:  Grant Thornton.

7            THE COURT:  Grant Thornton.  Thank you.

8   BY MR. COOPER:

9   Q.  Did you report to Grant Thornton that there was a second

10  set of books, that we may have a big problem here?

11  A.  I haven't reported that.

12  Q.  Did Mr. Zayas report that?

13  A.  I don't know.

14  Q.  Now you also say in your affidavit that before Deloitte

15  could take over, the laptops were taken from you, is that

16  correct?

17  A.  Sorry?

18  Q.  The laptops.  You make allegations regarding laptops being

19  stolen, correct?

20  A.  No, I don't.  That's what they allege.

21           THE COURT:  Yes, I was going to say, I think that's

22  your allegation, that company laptops, which the petitioners

23  say they had a perfect right to have and to access, were, quote

24  stolen.  How they could be stolen by the petitioners is not

25  entirely clear, but -- they were, after all, a 50 percent

1    owner.

2            THE WITNESS:  There was a board meeting, the 14th of

3    December, where an audit, a forensic audit was going to be

4    performed by Deloitte.  When they started that audit, it was

5    obstructed by the means of a criminal -- pressing charges of

6    stealing the computers that were subject to the audit, and --

7    and they also replied to the request of production of Deloitte

8    by saying it wasn't a priority for the administration and that

9    they alleged that we stole the computers that were subject to

10   the audit.

11   BY MR. COOPER:

12   Q.  Sir, did you ask for a declaration from anyone at Deloitte

13   that they had possession of the two Lusad laptop computers?

14   A.  Did I -- can you repeat the question, sir.

15   Q.  Did you ask Deloitte to put in a declaration saying that

16   they have possession of these two laptop computers?

17   A.  For this hearing?

18   Q.  Yes.

19   A.  No, I believe we didn't.

20   Q.  Okay.  Is there any --

21           THE COURT:  Please turn that off.

22   Q.  Is there any representative of Deloitte in the courtroom?

23   A.  No.

24   Q.  Are you familiar with a gentleman named Eduardo Herrera?

25   A.  I am.

1   Q.  And are you aware that he was accused of stealing these

2   laptops soon after the decision to employ Deloitte was made?

3   A.  Yes, I am, because we signed -- we signed the contract with

4   Deloitte in accordance with the agreement that we took the 14th

5   of December to conduct that forensic audit, and in that

6   contract there were two people that were going to be the

7   liaisons with the company and Deloitte.  One of them was

8   Mr. Herrera and the other one was Mr. Tabuenca.  When he gave

9   those two computers to Deloitte, that's when they pressed

10  charges of theft.

11  Q.  Are you aware that there's a security camera video of

12  Mr. Herrera walking out with a laptop after one of the

13  employees reported the laptops missing?

14  A.  Yes, he was the liaison to do just that, to -- to deliver

15  that laptop to Deloitte, so I imagine there is a security

16  camera with him carrying those laptops.  That was his job.

17          THE COURT:  You're saying it's not theft --

18          THE WITNESS:  No, it's not.

19          THE COURT:  -- he was authorized to have it, he was

20  the employee who was authorized to have it, you're a 50 percent

21  owner, there was supposed to be a forensic audit, you signed a

22  contract, it's not a theft, this is all a cooked up charge in

23  Mexico.

24          THE WITNESS:  Yes.

25          THE COURT:  That's their position.  As we know.

J5d1espa                    León - Cross

1   BY MR. COOPER:

2   Q.   Did Mr. Herrera put in a declaration saying he delivered

3   those to Deloitte?

4   A.   To this hearing?

5   Q.   Yes.

6   A.   No.

7   Q.   Is Mr. Herrera in the courtroom?

8   A.   He is not.

9   Q.   Okay.  So your basis for saying that Mr. Herrera took the

10  laptops to Deloitte is what?

11  A.   It's been established in Mexico, in the criminal

12  proceedings that the administration brought forth, in the civil

13  proceedings that they brought forth, and it is our opinion that

14  also in the --

15              THE COURT:  "It's been established."  Has there been a

16  finding that the laptops were delivered to Deloitte?

17              THE WITNESS:  Yes, there is a chain of custody.

18              THE COURT:  By whom?  Who made that finding?

19              THE WITNESS:  A finding by -- by us?  Or I don't

20  understand the --

21              THE COURT:  Well, how do you know Deloitte has the

22  laptops?

23              THE WITNESS:  Oh, because there is a chain of custody

24  that went from the company, the company -- the laptops are

25  property of the company, your Honor.

J5d1espa                    León - Cross

1          THE COURT:  I understand that.  Herrera took them out.

2          THE WITNESS:  Yes.

3          THE COURT:  You say he took them out for the purpose

4   of giving them to Deloitte.

5          THE WITNESS:  Yes.

6          THE COURT:  How am I supposed to know that Deloitte

7   has them today?  I mean, Deloitte has criminal problems in

8   Mexico, which I would be very surprised if Deloitte wanted to

9   talk to these people, but how do I know that Deloitte has the

10  laptops?

11         THE WITNESS:  Oh, I don't --

12         THE COURT:  How am I supposed to know that?

13         THE WITNESS:  I don't know if we submitted the chain

14  of custody to this hearing, your Honor.  If -- on my testimony,

15  I guess.

16  BY MR. COOPER:

17  Q.  You have no proof that the laptops were actually given to

18  Deloitte, correct?

19  A.  I do have proof.  I haven't -- if we haven't provided them

20  to this hearing, that would be another thing.

21         THE COURT:  Are you saying proof was provided to the

22  Mexican court?

23         THE WITNESS:  Yes.

24  Q.  But you would agree with me that Mr. Herrera did take the

25  laptops, correct?

J5d1espa          León - Cross

1          THE COURT:  He not only agrees, he outs it proudly.

2   A.  Yes.

3   Q.  At the December 14th meeting you had where you adopted the

4   resolution to create Nuevo León and to make a concession bid,

5   that was also the meeting where you made a decision to employ

6   Deloitte, correct?

7   A.  Yes.

8   Q.  And that was Resolution 1.1.  This is Exhibit 3 to your

9   declaration, correct?

10  A.  Correct.

11  Q.  Are you aware that Mr. Covarrubias was the one who was

12  authorized to negotiate with regard to the Deloitte engagement

13  and the Monterrey concession?

14  A.  What -- I was the one going to pay for it.  I was the one

15  petitioning for it.  And he was in a clear conflict because he

16  was the subject of the audit.

17  Q.  Okay.  Sir, 9.1, you unanimously agreed, at the

18  December 14, 2018 board meeting, that the managing director of

19  the company -- Mr. Covarrubias is the managing director of

20  Lusad, correct?

21  A.  He is the CEO.

22  Q.  "-- managing director of the company, Fabio Covarrubias

23  Piffer, is authorized to negotiate and implement the actions in

24  the terms approved in Resolutions 1-7, inclusive, adopted at

25  this meeting," and then all the partners signed, correct?

J5d1espa                    León - Cross

1   A.  No, he didn't sign it.  Fabio Covarrubias did not sign.

2   Q.  Was it authorized by the partnership?

3                THE COURT:  Did you sign?

4                THE WITNESS:  I signed it, yes.

5                THE COURT:  So you signed the thing that said,

6   notwithstanding that he's the subject of the audit, the reason

7   that we're having this forensic audit is that we think this guy

8   is stealing us blind and we're bringing Deloitte in to look at

9   that, we're going to let Mr. Covarrubias be our representative

10  to negotiate and implement this audit.

11               THE WITNESS:  If -- if that's what it says, then --

12               THE COURT:  Apparently that's what it says.

13               THE WITNESS:  Then that wasn't what was discussed and

14  voted at that -- at that meeting.

15               THE COURT:  Did you read what you signed before you

16  signed it?

17               THE WITNESS:  I usually, your Honor, have the

18  lawyers --

19               THE COURT:  It's a very fox in the henhouse -- another

20  American expression -- kind of thing, to have the subject of

21  the audit be the person who negotiates with the auditor.

22               THE WITNESS:  Yeah, that was definitely not the

23  agreement.  If Mr. Flores changed the redaction, then that's --

24  that would be another matter, but that was not the agreement.

25               MR. COOPER:  Your Honor, it's Exhibit 3 to Mr. León's

J5d1espa                    León - Cross

1   declaration.  It's not part of our evidence.  I'm just using

2   their own evidence.

3   BY MR. COOPER:

4   Q.  Now you also allege that there were improper payments made

5   to a company named Kichink, correct?  In fact, in one of the

6   bullets on page 7 of your declaration, "Mr. Salinas and

7   Mr. Covarrubias caused US $2.7 million to be paid to two

8   companies named Kichink Services, S.A. de C.V. and N9

9   Tecnología Mexico S.A. de C.V.  Kichink and N9 were ostensibly

10  to provide services to Lusad; however, there was no contract

11  and no benefit was provided in exchange for these funds."  Do

12  you recall writing that?

13  A.  There is no contract that was provided to us or any results

14  of what they paid for, not only to these but to MOOK, which is

15  related to Mr. Covarrubias's son.

16  Q.  Sir, are you aware that Kichink and N9 had a substantial

17  role in developing the technology?

18  A.  Kichink was the second provider of technology that we --

19  that we -- that we worked with, when Mr. Covarrubias insisted

20  on partnering with us, because we had other options.  He said

21  that we were going to hire top-level CTO and change Kichink,

22  which he never did, and hired MOOK, which is related with his

23  son.

24  Q.  Okay.  What basis do you have for saying Mr. Covarrubias's

25  son is associated with Kichink?

1   A.  The investigation we -- we -- we -- we found that.

2   Q.  What investigation?

3   A.  These preliminary findings that were the basis for the --

4   for the agreement of conducting a forensic audit with Deloitte.

5   Q.  Deloitte having conducted yours, correct?

6   A.  No.  It's been obstructed by your clients.

7   Q.  Sir, do you have any documentary evidence indicating that

8   Covarrubias's son is somehow associated with Kichink or N9?

9   A.  Yes, we displayed that on the 14th of December at the board

10  meeting.

11  Q.  Have you attached that evidence to your declaration?

12  A.  I'm not aware that we did, no.

13  Q.  Are there any representatives from Kichink here who can

14  testify to that, or N9?

15  A.  No.

16  Q.  Now, sir, isn't it true that there was a contract and there

17  is a contract with Kichink?

18  A.  No, not that I'm aware of.

19          MR. COOPER:  May I approach, your Honor.

20          Exhibit 5 to the Covarrubias declaration.

21          MR. GORDON:  Exhibit 4.

22          MR. COOPER:  4.  Sorry.

23  Q.  Sir, I've handed you a Spanish and English version of a

24  contract dated December 22, 2017.  Have you seen this document

25  before?

J5d1espa                    León - Cross

1    A.  This has never been in my view.  This probably was

2    produced.

3    Q.  Does that make you change your view as to whether there was

4    a contract with Kichink?

5    A.  No.

6    Q.  You don't believe that document --

7    A.  I don't believe this is a true contract.

8    Q.  What's your basis for saying that?

9    A.  Because I've never seen this before.  I've asked for it

10   several times, never produced.

11   Q.  And are you saying that Kichink provided no services at all

12   to --

13   A.  There has not been --

14   Q.  Let me finish my question, please.  -- to Lusad?

15   A.  Can you repeat it, please.

16   Q.  Are you saying that neither Kichink nor N9 provided any

17   services to Lusad?

18   A.  There have been no report to us that any work has been done

19   or provided by Kichink or any other entity that Mr. Covarrubias

20   has hired.

21   Q.  I'm not asking if it was reported.  I'm asking you, as a --

22          THE COURT:  As far as he knows, there wasn't any.

23   Q.  Is that what you're saying?

24   A.  Yes.

25   Q.  You're saying today you know of no services provided by

J5d1espa                    León – Cross

1   Kichink or N9.

2   A.  Yes, yes.

3   Q.  Do you know of any services provided by MOOK?

4   A.  No.  I know payments provided by the administration, but no

5   services rendered, no production.

6           THE COURT:  Can I ask you a question.  Could we turn

7   to Addendum A.  And truly, I don't care whether you read it in

8   Spanish if you're more comfortable.  I'm reading it in English.

9   My Spanish is not what it used to be.  But there is an Addendum

10  A which is called Descripcíon de Servicios, Description of the

11  Services, to be rendered by the consultant.

12          THE WITNESS:  Addendum A, okay.

13          THE COURT:  A.  Okay.  And as I say, feel free to read

14  it in --

15          THE WITNESS:  Oh, page 6?

16          THE COURT:  Yes.

17          THE WITNESS:  6 in English.

18          THE COURT:  It's in Spanish here, if you prefer to

19  read it in Spanish.  There is an English translation, also

20  page 6.  I'm going to be reading it in English.  Feel free to

21  read it in Spanish if you prefer.

22          Take a look at this.  This appears to me to say that

23  Kichink, the party to the contract, the contracting party, the

24  consultant, is going to develop a program and software,

25  including the digital taxi meter, the hailing app, and the back

J5d1espa                    León - Cross

1   end module and the software management model.  In other words,

2   the thing that you use to create the product.  This piece of

3   paper --

4          THE WITNESS:  This is completely wrong, your Honor.

5   This is a lie.  We -- we developed the certified platform with

6   NullData, which is --

7          THE COURT:  Whom?

8          THE WITNESS:  The company, L1bre Holdings and Lusad

9   hired NullData to certify the taxi meter before the Ministry of

10  Economy, and that's how we got --

11         THE COURT:  When did you do this?

12         THE WITNESS:  Before the --

13         THE COURT:  When did you do this?

14         THE WITNESS:  2016, your Honor.

15         THE COURT:  You say this is baloney --

16         THE WITNESS:  Baloney.

17         THE COURT:  -- because you developed this stuff a year

18  and a half or two years before this contract was ever signed.

19         THE WITNESS:  That's correct, your Honor.

20         THE COURT:  Okay.  That's your position.

21         THE WITNESS:  That is my position.

22         THE COURT:  You swear to that under oath.

23         THE WITNESS:  I swear to that under oath.

24  BY MR. COOPER:

25  Q.  Sir, did you graduate from high school?

1   A.  Yes.

2   Q.  Graduate from college?

3   A.  Yes.

4   Q.  What college?

5   A.  Universidad Anáhuac.

6   Q.  What was that?

7   A.  Universidad Anáhuac.

8   Q.  Where is that?

9   A.  In Mexico City.

10  Q.  And do you have any postgraduate degrees?

11  A.  No.

12  Q.  What was your degree in at your university, or your

13  college?

14  A.  Business administration.

15  Q.  Do you have any degrees in computer programming?

16  A.  No, I don't.

17  Q.  Do you have training in computer programming?

18  A.  No, I don't.

19  Q.  Eduardo Zayas, where did he go to college?

20  A.  I don't know.

21  Q.  Do you know what his degree is in?

22  A.  No.

23  Q.  Does he have any degrees in computer programming?

24  A.  I don't know.

25  Q.  Did you ever ask him?

J5d1espa                    León - Cross

1   A.  I don't know.  I don't remember, no.

2   Q.  Did you ever see him at work physically creating computer

3   programs for the taxi meter industry?

4   A.  I don't recall.

5   Q.  You don't recall.

6   A.  I don't recall that.

7   Q.  As you sit here today, can you think of one instance where

8   you saw Mr. Zayas doing computer programming?

9   A.  No.

10  Q.  Does he have any postcollege degrees?

11  A.  I don't know.

12          THE COURT:  And you said something about NullData.

13  What is NullData?

14          THE WITNESS:  NullData is a company in Mexico headed

15  by a person called Laszlo Palovits.  He is the one that got the

16  contract to develop the digital taxi meter that was certified

17  under the Ministry of Economy, and that's the one we bid out

18  and won the concession one year before Mr. Covarrubias and

19  Mr. Salinas entered as partners of L1bre, our company.

20          THE COURT:  You actually won the concession to do this

21  in Mexico City, you being Espiritu Santo, the Espiritu Santo

22  side of this partnership --

23          THE WITNESS:  Yes.

24          THE COURT:  -- in 2016?

25          THE WITNESS:  That's correct, your Honor.

1          THE COURT:  Which was before you entered into

2     partnership with the L1bre side.

3          THE WITNESS:  Yes, yes.

4          THE COURT:  I mean, I think of you as the Espiritu

5     Santo side and the L1bre side.

6          THE WITNESS:  Yes.  We founded both, both entities.

7          THE COURT:  What do you mean, both entities?

8          THE WITNESS:  Yes, Espiritu Santo Technologies was

9     founded by us, we incorporated it before entering into

10    partnership, as well as Lusad; we founded that company.

11         THE COURT:  So you're saying that the Espiritu Santo

12    folks founded both Espiritu Santo Tech and Lusad and that

13    Mr. Covarrubias's L1bero group bought into that, subsequently.

14         THE WITNESS:  Yes, that's correct.  Once we had the

15    concession and the ongoing business.

16         THE COURT:  Got it.

17    BY MR. COOPER:

18    Q.  That was 2017, correct?

19    A.  I would have to see the date, but yeah, it was around

20    January -- or November 2017.

21    Q.  Do you know what the cut current value of the Espiritu

22    Santo Technologies entity is today, approximately?

23    A.  Can you define "cut value."

24    Q.  Define it however you want.

25    A.  I don't understand what you mean, "cut value."

J5d1espa          León - Cross

1          THE COURT:  Do you mean book value?  Do you mean --

2          MR. COOPER:  Book.

3    Q.  If you were going to sell it, what would you put it on the

4    market for?

5    A.  Well, before your client damaged us --

6          MR. COOPER:  Your Honor, I would like him to answer

7    the question.

8    A.  Before there was a conflict of all of this --

9          THE COURT:  Well, here's the problem.  You know, he is

10   alleging that he doesn't have any access to the books, to the

11   business materials, that he's been illegally -- I mean, that's

12   why there's going to be an arbitration, right, because he's

13   saying he's being kept away from the books, he's being thrown

14   off the board, he's not getting information.

15         So at the last time you were aware of what was going

16   on, let's say December of 2018, I guess the 14th, at the

17   December 14, 2018 board meeting, because we know you were at

18   that board meeting, if somebody had said to you, what do you

19   think you could get for this company?

20         THE WITNESS:  Well, there was a valuation by Goldman

21   Sachs conducted the 4th of October of 2018, valuating the

22   Mexico City concession only, which, again, we had before we

23   entered into partnership with L1bero Partners, of $2.4 billion.

24   BY MR. COOPER:

25   Q.  And who met with Goldman Sachs?

1   A.  I did.

2   Q.  Anybody else?

3   A.  Mr. Covarrubias.

4   Q.  He was at the Goldman Sachs meeting with you?

5   A.  There were several meetings with Goldman.

6   Q.  And this Monterrey concession, isn't it true that on

7   Wednesday, May 15th, all that has to be done is a registration,

8   that the bid does not actually occur on May 15th?  Isn't that

9   correct?

10  A.  I don't know.  I haven't been a part of it.  I've been

11  excluded.

12  Q.  Would you agree with me that this could be a very valuable

13  asset for Lusad?

14  A.  It -- it may well be, yes.

15  Q.  Mr. Covarrubias estimated it to generate potentially

16  $50 million a year.  Do you have any idea whether that figure

17  is accurate, close to accurate?

18  A.  Well, yeah, Monterrey has and Nuevo León has about 50,000

19  taxicabs, which would be about 1/3 the size of Mexico City.  We

20  have 138,000 taxis in Mexico City, so it would be a substantial

21  concession.

22  Q.  And if in fact, as we discussed earlier, the Nuevo León

23  entity is the one bidding and that's within the corporate

24  structure, all the partners would potentially benefit, correct?

25  A.  Yes, if it's a fully-owned subsidiary, and not like the

1    case of L1bre Jalisco, which we were totally excluded, then

2    yes.

3    Q.  Do you have any evidence that L1bre Jalisco did any bidding

4    at all?

5    A.  We -- we were informed that management went with that L1bre

6    Jalisco to the government to ask for the concession in

7    excluding us, yes, we do.

8    Q.  Who informed you of that?

9    A.  We, Mr. Eduardo Zayas informed me of that.

10   Q.  Your partner.

11   A.  Yes.

12   Q.  Anybody else?

13   A.  He -- he got it from the people at the government of

14   Jalisco, yes.

15   Q.  And have you seen any written proof that somehow the L1bre

16   Jalisco entity is making a bid for a Jalisco concession?

17   A.  No.  We just saw the -- the entity formation, which

18   excluded us from that company.

19   Q.  So other than what Mr. Zayas told you, you have no evidence

20   that L1bre Jalisco is violating anything.

21   A.  Oh, it's certainly violating the trademark.  It's a

22   trademark infringement.  We weren't part of it.  So you -- you

23   showed me the trademark registration.  They used it without our

24   authorization.  They excluded us.  So yeah, they're in

25   violation.

1  Q.  You registered the trademark, correct?  You registered the

2  L1bre trademark?

3  A.  I believe it was a law firm that registered it, Gonzalez --

4            THE COURT:  A Mexican law firm?

5            THE WITNESS:  Yes.

6  Q.  You were involved in that?

7  A.  We instructed them to, yes.

8            MR. COOPER:  I have no further questions, your Honor.

9  Thank you.

10            MR. DUNN:  May I?

11            THE COURT:  Mr. Dunn.

12  REDIRECT EXAMINATION

13  BY MR. DUNN:

14  Q.  If we may, let's start, Mr. León, with the ownership.  I

15  just want to be clear here.

16            MR. DUNN:  Your Honor, it might help --

17            THE COURT:  You can put your chart up.

18            MR. DUNN:  Thank you.

19  Q.  So this is I believe a replication.  Would you look at

20  paragraph 22 of your declaration.

21            THE COURT:  Actually, do we have his declaration?

22  Because it will be easier for me to see from his declaration.

23  That's exactly the wrong size for me.

24            MR. DUNN:  I'm sorry.  Paragraph 10, your Honor.

25            THE COURT:  Yes, I have it.  It's on page 4.

J5d1espa                    León – Redirect

1   Q.  So looking at the chart, Mr. León, and looking at the chart

2   in your declaration here, Espiritu Santo Holdings, L.P., whose

3   entity is that?  Who owns that entity?

4   A.  That's our entity, Mr. Eduardo Zayas and myself.

5   Q.  Okay.  And L1bero Partners, L.P., who are the principals of

6   that entity?

7   A.  That would be Ricardo Salinas Pliego and Fabio Covarrubias

8   Piffer.

9   Q.  And these two entities are partners in the partnership

10  agreement, in the partners agreement, is that correct?

11  A.  Yes.

12  Q.  And the partners agreement calls for the creation of what

13  entity, looking at the chart?

14  A.  It -- it -- it integrates into Espiritu Santo Technologies.

15  Q.  That's the Delaware partnership?

16  A.  Yes.

17  Q.  And does it say anything in the partners agreement about

18  the downstream entities that were going to be owned or held by

19  Espiritu Santo Technologies, the Delaware partnership?

20  A.  Yes.  It says that it has to be replicated in each and all

21  subsidiaries and downstreaming entities.

22          THE COURT:  "It" being 50 percent ownership?  What has

23  to be replicated?

24          THE WITNESS:  All the partner agreements, the whole

25  partners agreement, in every -- in every entity.

1          THE COURT:  I don't quite understand that.

2          THE WITNESS:  The partnership --

3          THE COURT:  Mr. Dunn, why don't you point to a

4    specific provision of the partnership agreement, since that's

5    what you're talking about.

6          I think you're talking about the sentence that reads,

7    "The parties hereby agree --"

8          MR. DUNN:  Yes.

9          THE COURT:  "-- that the board composition and

10   structure and the appointment procedure for the top management

11   shall be replicated, from the preceding paragraph, in the other

12   company affiliates and any new affiliates or subsidiaries that

13   may be incorporated as part of the company's expansion of its

14   business as provided in the agreement."

15         MR. DUNN:  Yes.  Mr. León --

16         THE COURT:  So that would mean that the board of each

17   of the subsidiaries would have to have four directors, two of

18   which were appointed by Espiritu Santo, two of which were

19   appointed by L1bero, that there would be all of the officers

20   and the stuff in Section 5.1(b), every time you formed a new

21   operating subsidiary, right?

22         THE WITNESS:  Correct, yes.

23   BY MR. DUNN:

24   Q.  And that's, as the Court just read, the last paragraph of

25   Section 5.1(b) of the partners agreement.

J5d1espa                    León - Redirect

1    A.  Yes.

2    Q.  Now there's been some discussion about whether Mr. Salinas

3    was one of the direct or indirect owners.  You were questioned

4    about that by Mr. Cooper.  Would you look at paragraph 10.1(b)

5    on page 16.

6    A.  Yes.

7    Q.  And this allows the termination of the entire partnership

8    agreement if any of the underlying partners cease to have a

9    direct or indirect control of the partnership, is that right?

10   A.  That's correct.

11   Q.  And did it identify the four people whose direct or

12   indirect control loss will trigger the right to terminate?

13   A.  Correct.  It does.

14   Q.  Who are those four people?

15   A.  Mr. Fabio Covarrubias Piffer, Mr. Ricardo Benjamin Salinas

16   Pliego, Mr. Santiago León Aveleyra, and Mr. Eduardo Zayas

17   Dueñas.

18   Q.  And the intellectual property that has been discussed, the

19   trademark and the technology that Null Technologies own, or

20   Null Technologies developed, where was that?  What entity was

21   that at the level of?

22   A.  It was -- it was hired by Servicios Digitales Lusad, but

23   the L1bero Technologies I think was the entity that should have

24   held it.

25            THE COURT:  Should have held it.  Do you know who held

J5d1espa                    León - Redirect

1   it?

2           THE WITNESS:  No, your Honor, I don't at the moment

3   know, but it was -- NullData was hired by Servicios Digitales

4   Lusad.

5           THE COURT:  So Null was hired by Servicios Digitales

6   Lusad.

7           THE WITNESS:  Yes.

8           THE COURT:  Which is 99 percent owned by L1bre

9   Holding, which is a hundred percent owned by the Delaware

10  partnership.

11          THE WITNESS:  Yes, correct, your Honor.

12  BY MR. DUNN:

13  Q.  Now Mr. Cooper asked you about a company called L1bre Nuevo

14  León.

15  A.  Yes.

16  Q.  When did you first hear anything about such a company?

17  A.  Today.

18  Q.  And before this did you have any awareness of that company?

19  A.  No.

20  Q.  Do you have any awareness of what company is being used by

21  the principals to bid in Monterrey?

22  A.  I do not.

23  Q.  Did you ever ask that question?

24  A.  I did.

25  Q.  Who did you ask?

1    A.  I -- I asked at the meeting of the 14th of December to

2    regularize L1bre Jalisco and to -- if they were going to do any

3    other entities, to be a fully-owned subsidiary.  That's when I

4    asked.  But as for L1bre Nuevo León, today is the first time

5    that I've ever heard of the entity.

6    Q.  And at the time it was understood and acknowledged that

7    L1bre Jalisco had been created separately, is that right?

8    A.  Yes.  We were excluded from -- from -- from being a member

9    of those -- of that company.

10   Q.  And the board agreed that that company would come under the

11   umbrella of Lusad, right?

12   A.  It did.  It did -- it did agree, in the same agreement that

13   they're putting forth now.

14   Q.  And have you sought documentation that that happened?

15   A.  I have, but I haven't received anything.

16   Q.  Have you ever received any indication that L1bre Jalisco

17   has in fact been incorporated under Lusad, as was promised?

18   A.  No.  And it hasn't, to my knowledge.

19   Q.  And as you sit here today, do you have any knowledge

20   personally of who actually owns L1bre Nuevo León?

21   A.  I don't.

22   Q.  Now as to this resolution that you were asked about on

23   December 14th --

24            THE COURT:  Where, by the way, is the December 14th

25   resolution?

1           MR. DUNN:  It actually is Exhibit 3 to his

2     declaration, your Honor.

3           THE COURT:  Yes, Exhibit 3.  I only care about it's

4     Exhibit 3.  I've got Exhibit 4.  I've got Exhibit 5.  This is

5     Exhibit 3.  And do we have that translated?

6           MR. DUNN:  Yes, there's a copy behind -- the Spanish

7     version appears first and then the English version.

8           THE COURT:  Right.  Okay.  So while we're on this, can

9     you point out to me where L1bre Jalisco is mentioned in this

10    document.

11          MR. COOPER:  7.3, your Honor.

12          THE COURT:  7.3?

13          MR. COOPER:  Yeah.

14          THE COURT:  "The instruction is given for the newly

15    created company called L1bre Jalisco to restructure its

16    shareholding structure to incorporate L1bre Holding, LLC as a

17    controlling shareholder."  Got it.  Okay.

18          THE WITNESS:  And that was because we pointed out the

19    finding that we found this entity, your Honor, and that it

20    should be regularized, or put into the corporate structure

21    instead of being owned by third parties and the management that

22    formed it, which was the management of Mr. Fabio Covarrubias.

23    BY MR. DUNN:

24    Q.  Now all of these resolutions indicate that they bear your

25    signature, and if you look at the Spanish versions, they

J5d1espa                    León – Redirect

1    actually have your signature, is that correct?

2    A.   Yes.

3    Q.   Do they have Mr. Covarrubias's signature?

4    A.   No.

5    Q.   Did he ever sign them?

6    A.   No, he did not.

7    Q.   And who is Julio Belmont Garibay?

8    A.   He is a representative for Ricardo Salinas Pliego.  He

9    works for the Lecture Group, which is owned by him, and he was

10   assigned by Ricardo.

11            THE COURT:  I'm sorry, because you said it very fast,

12   he is the representative of?

13            THE WITNESS:  Mr. Ricardo Salinas Pliego, in the board

14   of Servicios Digitales Lusad.

15            THE COURT:  Of Salinas.

16            THE WITNESS:  Yes.

17   BY MR. DUNN:

18   Q.   Are you aware of a criminal complaint that has been

19   instigated by Lusad?

20   A.   I am.

21            THE COURT:  So just so I'm clear, it appears to me

22   that all of these resolutions are signed by one representative

23   from the Espiritu Santo side and one representative from the

24   L1bero Partners side, is that correct?

25            THE WITNESS:  The thing that happened, your Honor --

J5d1espa                    León - Redirect

1              THE COURT:  Not -- boom.  One of the two of you.

2     Zayas didn't sign, you signed.

3              THE WITNESS:  Yes.

4              THE COURT:  You're the Espiritu Santo people, right?

5              THE WITNESS:  Yes.

6              THE COURT:  Covarrubias didn't sign but the personal

7     representative of Salinas did sign.

8              THE WITNESS:  Correct, your Honor.

9              THE COURT:  Okay.  So one from each partner signed

10    these resolutions.

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.  That's all I'm trying to establish.

13    BY MR. DUNN:

14    Q.  And in the criminal complaint that has been brought, isn't

15    it true that Lusad's management now alleges that all of these

16    resolutions are invalid because they are not signed

17    unanimously?

18    A.  Yes, they allege that.

19    Q.  That is the basis for the criminal complaint, is that

20    correct?

21    A.  That is correct.

22    Q.  And on that basis they have denied that there was an

23    agreement to change the ownership of Jalisco, is that right?

24    A.  Yes.

25    Q.  They denied that Deloitte was properly hired, isn't that

J5d1espa                    León - Redirect

1    right?

2    A.  That's correct.

3    Q.  And that is the basis on which they allege that the

4    transfer of the laptops to Deloitte was stealing, isn't that

5    correct?

6    A.  That's correct, yes.

7    Q.  And are you personally a defendant in that criminal

8    proceeding?

9    A.  I am.

10   Q.  And where is that --

11              THE COURT:  Is this under Delaware law?

12              MR. DUNN:  No.

13              THE COURT:  I'm asking him.

14              And all these allegations are made under Delaware law,

15   which governs your dealings with your partners?

16              THE WITNESS:  No.  It's done under Mexican criminal

17   law, your Honor.

18              THE COURT:  I see.  Well, under Mexican law.  And

19   where, in any documents signed by the partners, does it say

20   that Mexican law governs anything at all?

21              THE WITNESS:  It doesn't.

22              THE COURT:  It doesn't.  I don't know why it doesn't.

23   Everything is happening in Mexico.  It seems to be my life to

24   deal with disputes that happen in Mexico, but there you have

25   it.

J5d1espa                    León - Redirect

1          And of course, under Delaware law, the signature of

2     any partner binds the partnership, so --

3     BY MR. DUNN:

4     Q.  You were asked some questions about a second set of books

5     and records by Mr. Cooper.  Do you remember those questions?

6     A.  Yes.

7     Q.  I want the Court to clearly understand.  How and when did

8     you learn about the existence of this second set of books and

9     records?

10    A.  When it was made -- came to my attention by Mr. Manuel

11    Tabuenca.  He was concerned that there were accounting

12    irregularities.

13         MR. COOPER:  Your Honor, I'm going to object on

14    hearsay grounds.

15         THE COURT:  Oh, this is a preliminary injunction

16    hearing.  I get to listen to hearsay.  I will give it the

17    weight that I think it deserves.  People who sign contracts

18    saying they're going to arbitration and be governed by Delaware

19    law and who go to Mexican courts and seek to enforce things

20    under Mexican law might well assume I will listen to hearsay,

21    because that smacks of bad faith to me.

22    BY MR. DUNN:

23    Q.  I'm sorry.  I think you started to explain what you were

24    told and who told you.  Could you just explain that for the

25    record, how you learned about these two sets of books and

1    records and what you were told and who told you.

2    A.   Yes.   The comptroller for our company was hired by -- by

3    us, hiring a headhunting agency.   He was the comptroller for

4    Uber Latin America.   He came to work for us.   Before working

5    for Uber, he worked at Visa MasterCard, and he had a good

6    résumé.

7    Q.   When you say "us" --

8    A.   Yes.

9    Q.   -- was he the comptroller of Lusad, or what entity was he

10   the comptroller of?

11   A.   He controlled all -- all the structure, all the account --

12   all the accounting for all -- all entities.

13   Q.   So he was an officer of each of the entities in which these

14   two entities, Espiritu Santo Holdings and L1bero Partners, were

15   50 percent partners.

16   A.   Yes, that is correct.

17   Q.   So these were conversations between you as a 50 percent

18   partner and the comptroller of the entities you had an interest

19   in.

20   A.   Yes.

21   Q.   And what did he tell you about there being -- who did he

22   tell you was creating two sets of books and records?

23   A.   There were financial records that were produced for the

24   board meetings, and they contrasted with the digital platform

25   that was based out of NetSuite, of the company Oracle, which

1   they contradicted themselves.

2   Q.  So he told you that what was presented to the board

3   meetings, such as the December 14th board meeting we've talked

4   about, was different financial figures from what were actually

5   being kept by the company.

6   A.  Yes.

7   Q.  And the financial records that vary, that were kept by the

8   company, were on this Oracle platform.

9   A.  Yes, and the audit -- the audit trail was there, so it was

10  important for us to produce it.

11  Q.  And that led to, among other things, to the retention of

12  Deloitte to conduct an internal investigation, is that correct?

13  A.  Yes.

14  Q.  Now do you have continuing access to that Oracle platform?

15  A.  No.

16  Q.  Have you asked for it?

17  A.  I have.

18  Q.  Who did you ask?

19  A.  The officers of the -- of the company and also Oracle

20  themselves.

21  Q.  You're the representative of a 50 percent holder in the

22  company, and you asked the officers to give you access to the

23  books and records of the company and they refused, is that your

24  testimony?

25  A.  Yes.

J5d1espa                    León – Redirect

 1  Q.  Now I wanted to go back to the resolution about Deloitte,

 2  because I think there was a little bit of confusion.  Do you

 3  have that Exhibit 3?  Do you have the resolution?

 4  A.  No.

 5  Q.  Let me show you this, and I'm going to call your attention

 6  specifically to Resolution No. 1, which is on page 2.

 7  A.  Thank you.

 8          MR. DUNN:  Do you have it, your Honor?

 9          THE COURT:  Yes, I do.  Yes.

10  Q.  Does that say anything about Mr. Covarrubias being charged

11  with negotiating anything with Deloitte?

12  A.  No.

13  Q.  Thank you.  Did you have an understanding that

14  Mr. Covarrubias was going to negotiate the terms of Deloitte's

15  engagement?

16  A.  No.  Because I was the one that was soliciting it, they

17  asked me that since I was the one soliciting it, then I should

18  pay for it.  I accepted that.  And I hired Deloitte as chairman

19  of the board of the company.

20  Q.  And then the Deloitte investigation was derailed by the

21  criminal complaint in Mexico that we've been talking about, is

22  that right?

23  A.  Yes.  They –– they filed the criminal charges for the

24  computers, and they also answered the production of documents

25  and relevant information from Deloitte saying it was not a

1   priority for the administration and that if they were going to

2   conduct it, they would conduct it with another firm, even

3   though the mandate of the board was to conduct it via Deloitte.

4   Q.   Under the partners agreement between these two entities,

5   your entity and the L1bero Partners entity, is there a specific

6   right to obtain access to books and records of the company and

7   to audit those books and records by the partners?

8   A.   There is.

9   Q.   Does that extend to Lusad specifically?

10  A.   Yes, it does.

11  Q.   And is Section 8.3 of the partners agreement the section

12  that contains those rights?

13  A.   It is.

14  Q.   Did you make repeated requests for access to information?

15  A.   I did.

16  Q.   Who did you make that to?

17  A.   Fabio -- Deloitte made it to -- to the CEO, Fabio, which is

18  head of the administration.  Again, we were -- we were denied

19  access, and criminal complaints came instead of that, civil

20  complaints in Mexico, even though our jurisdiction, our

21  agreed-upon jurisdiction was arbitration here in New York.

22  Q.   And when you say Fabio, the Fabio you're talking about is

23  Mr. Covarrubias, is that correct?

24  A.   Yes.

25  Q.   You made a specific request to him for access to books and

1    records of the company.  Did you make that once or more than

2    once?

3    A.  Well, I certainly did it at the -- at the board meeting.

4    We did it when I -- when I talked to him over the phone when it

5    was being obstructed.  I can remember those two specific

6    occasions.

7    Q.  And did you ever receive access or information you had

8    requested?

9    A.  No.

10   Q.  Mr. Covarrubias denied those requests.

11   A.  Yes.

12          MR. DUNN:  I have nothing further, your Honor.

13   RECROSS EXAMINATION

14   BY MR. COOPER:

15   Q.  Mr. León, let me make sure I understand this.  You're

16   saying you asked for the books and records to Mr. Covarrubias

17   at the December 14, 2018 board meeting, where these resolutions

18   were made?

19   A.  I said that those financial records and the access to

20   platforms were to be produced to Deloitte, and Deloitte made

21   those requests as well to Mr. Fabio Covarrubias directly, which

22   was answered by Mr. Francisco Flores that they were not going

23   to be produced, in a specific email.

24   Q.  The meeting authorized Deloitte to be hired.  Are you

25   saying you already working with Deloitte before the meeting?

1    A.   No.

2    Q.   So Deloitte hadn't asked for anything prior to the meeting?

3    A.   Deloitte hadn't, no.  I did.

4    Q.   You did.

5    A.   Yeah.

6    Q.   And you also I think testified that you thought there was a

7    second set of books at the time of the meeting, correct?

8    A.   Yes.

9    Q.   And that's why you brought in Deloitte, right?

10   A.   Correct.

11   Q.   And you suspected it was Mr. Covarrubias who was behind

12   that, right?

13   A.   Behind who?

14   Q.   Behind the second set of books.

15   A.   Yes.

16   Q.   Okay.  But nonetheless, you authorized him to deal with

17   Deloitte.

18            MR. DUNN:  Objection.

19   A.   Not that I recall.

20   Q.   All right.  The same meeting, where you signed Section 9.1,

21   it says, "Manager of the company, Fabio Covarrubias Piffer, is

22   authorized to negotiate and implement the action in the terms

23   approved in Resolutions 1-7, inclusive, adopted at this

24   meeting."

25   A.   If that's what --

1    Q.  Sir --

2            THE COURT:  You know, I can read this.  Don't argue

3    with him.  Yes, it says that Mr. Covarrubias is authorized to

4    negotiate Resolution No. 1 in accordance with its terms.

5    Q.  And despite the fact you were so suspicious about

6    Mr. Covarrubias at the time, you gave him the responsibility of

7    arranging for Deloitte's audit, is that correct?

8    A.  I didn't.

9    Q.  So 9.1 is incorrect?

10   A.  Mr. Flores went to redact the agreements.  Those were not

11   the ones discussed.  Obviously he was conflicted, being the one

12   subject to the audit.

13   Q.  Sir, did you show this Oracle trail to Mr. Covarrubias at

14   the meeting?

15   A.  No.  We needed access for it.

16   Q.  And you said you had no access at that time.

17   A.  At that time we did not.

18   Q.  Is there anything in the board minutes from that meeting

19   that says Mr. León, Mr. Zayas complained they don't have access

20   to the books and records of the company?

21   A.  That was the secretary of -- of the board's responsibility,

22   not ours.

23   Q.  Do you agree with me there's nothing in the record on that?

24           THE COURT:  Well, no.  Come on.  Look, I wasn't born

25   yesterday.  It says:  At the request of member Espiritu Santo

J5d1espa                    León - Recross

 1  Holdings, we're going to hire a forensic outside auditor.  I

 2  know how to read that.  I know what that means.  I credit his

 3  testimony, that he brought that up.  I would think anybody who

 4  says he didn't was a liar.

 5          MR. COOPER:  Your Honor, I refer to 9.1, where they

 6  authorize Mr. Covarrubias --

 7          THE COURT:  Sloppy drafting is not the province of

 8  just a few lawyers, as we know.

 9          I agree with you about what 9.1 says.  Sloppy drafting

10  is not the province of just a few lawyers.

11  BY MR. COOPER:

12  Q.  Her Honor was asking questions about proceedings in Mexico.

13  Lusad is a Mexican entity, correct?

14  A.  Yes.

15  Q.  It's governed by Mexican law, correct?

16  A.  Yes.

17  Q.  This is the entity we established earlier has the

18  intellectual property, correct?

19          MR. DUNN:  I can't -- I'm sorry?

20          MR. COOPER:  Has the intellectual property.

21          MR. DUNN:  He testified he didn't know who had it.

22  A.  I don't -- I can't say for sure.

23  Q.  Okay.  And Lusad Servicios Mexico, did you establish that

24  company?

25  A.  It was established for administrative purposes, I believe.

J5d1espa                    León – Recross

1  Q.  Yeah.  And how about Servicios Administrativos Lusad, what

2  was that established for?

3  A.  Those were for administrative reasons.  Holding -- I think

4  Servicios Administrativos -- Servicios -- Lusad Servicios are

5  the owners of the laptops.

6  Q.  These are Mexican entities, governed by Mexican law.

7  A.  Yes.

8  Q.  Now Lusad was established before Mr. Covarrubias was even

9  involved in the deal.

10  A.  Correct.

11  Q.  So you and Mr. Zayas established that as a Mexican company

12  under Mexican law, correct?

13  A.  Yeah, we established it, because when somebody grants your

14  concession --

15          THE COURT:  That wasn't the question.  The question

16  was --

17  A.  Yes.

18          THE COURT:  -- when you set them up, you set them up

19  under Mexican law.

20          THE WITNESS:  We did.

21          THE COURT:  Not under Delaware law.

22          THE WITNESS:  Yes.

23          THE COURT:  Or Canadian law.

24  BY MR. COOPER:

25  Q.  These two subsidiaries were also established prior to

1   Mr. Covarrubias being involved in the corporate structure?

2   A.   Yes.

3   Q.   And the allegations with regard to stealing the laptops,

4   that occurred in Mexico?

5   A.   That occurred in Mexico, yeah.

6   Q.   And are you aware of other allegations about Mr. Zayas

7   altering the concession agreement with Mexico City?

8   A.   There is an allegation that he signed a document that we

9   all were party to him -- he was -- he was told by Mr. Julio

10  Belmont to attend.  Mr. Francisco Flores said -- and

11  represented he read that document, which was a project, and

12  Mr. Salinas's representative and operatives, as well as the --

13           THE COURT:  I understand nothing of what you're

14  saying.  It's a very simple question.  Are you aware that there

15  are allegations that he altered the terms of the originally

16  negotiated -- the one you guys originally negotiated -- the

17  concession with Mexico City?

18           THE WITNESS:  No.  We didn't alter any -- any --

19  BY MR. COOPER:

20  Q.   No.  I'm asking you if you're aware that there were

21  allegations of that.

22           THE COURT:  Charges.

23  Q.   Allegations in the proceedings in Mexico.

24  A.   Yes.

25           THE COURT:  Are you aware that in Mexico they're

1   alleging --

2              THE WITNESS:  They're alleging, yes.

3              THE COURT:  That he changed the terms of the original

4   deal.  Which deal, by the way, you negotiated, right, before

5   Covarrubias?

6              THE WITNESS:  Yes.  We would be so conflicting our --

7   BY MR. COOPER:

8   Q.  And that alteration is alleged to have occurred in Mexico

9   state, correct?

10  A.  Yes.  There are allegations in two -- in a criminal

11  complaint and in a civil complaint, where there are injunctions

12  that we believe are a product of corruption in Mexican courts.

13  Q.  Now, sir, your lawyers came to court asking that

14  Mr. Covarrubias, through L1bre Monterrey, not be permitted to

15  bid on the Monterrey concession, is that correct?

16             MR. DUNN:  Objection.  That's not what the order says.

17  That's a mischaracterization.

18  Q.  You allege that --

19             THE COURT:  Who cares?

20             MR. COOPER:  Should I continue, your Honor?

21             THE COURT:  Believe me, if there's an injunction, I'll

22  craft it myself.

23  Q.  Sir, and the basis of the papers is largely your

24  declaration, right?

25  A.  Yes.

J5d1espa                    León - Recross

1   Q.  And your declaration is not from your firsthand knowledge,

2   it's from what somebody told you, correct?

3               MR. DUNN:  Objection, your Honor.

4               THE COURT:  The objection is sustained.

5   Q.  The acts of wrongdoing we pointed out earlier, the bullet

6   points, they all came from --

7               THE COURT:  Don't repeat.  I'm not a jury.  I don't

8   need it.

9               MR. COOPER:  Okay.

10              THE COURT:  Time is of the essence.

11  Q.  The issue of misappropriation is based in part on your

12  statement that you've been informed that L1bre Monterrey, an

13  entity Mr. Salinas and Mr. Covarrubias agreed to bring into the

14  L1bre family of companies, as required by the partnership

15  agreement, but failed to do so, intends to bid on a concession.

16  That's from paragraph 27 of your declaration.  Do you recall

17  that?

18  A.  Yes.

19  Q.  And I'd like to know who informed you of that.

20  A.  It was a public article that came out saying that the

21  taxicab drivers of Monterrey were protesting this, because it

22  seemed as though it was a directed public bidding because one

23  of the basis for the public bidding was a certified taxi meter,

24  which we hold exclusively in Mexico.  In the whole of Mexico,

25  we're the only ones to have it.

1  Q.  To be more precise, who told you that L1bre Monterrey, an

2  entity that Mr. Salinas and Mr. Covarrubias agreed to bring

3  into the family, was going to bid?

4  A.  I have a very dear friend that lives in Monterrey that is

5  acquainted to Mr. Longorria, I think, which is the head of the

6  transport agency.  He said that Mr. Covarrubias had visited him

7  several times and they were in negotiations, and he should have

8  informed us of those negotiations, which we weren't.

9  Q.  You were told that L1bre Monterrey, initial caps, was going

10 to be bidding?

11 A.  Yes.  I guess -- I guess that was a misunderstanding to

12 L1bre Nuevo León.

13 Q.  Mr. Covarrubias, under the resolution from December 14,

14 2018, had the ability to negotiate the Monterrey concession,

15 correct?

16 A.  Yes, but not the incorporation of the company.

17 Q.  But there is no company you could identify called L1bre

18 Monterrey, correct?

19 A.  Now there is.  According to your allegations, L1bre Nuevo

20 León does exist and they have incorporated it, which is a

21 breach of that agreement.

22 Q.  Did you go to Mr. Covarrubias and say, I hear you're

23 bidding under this company L1bre Monterrey, I'd like to know

24 what's going on?

25 A.  No.  There are so many breaches that we've decided to go to

J5d1espa

1  arbitration.

2      THE COURT:  At this point they're not talking.  They

3  filed an arbitration notice.

4      THE WITNESS:  Exactly.

5  Q.  Did you research --

6      THE COURT:  I'm unimpressed by this line of

7  questioning.  It's not going to move me.

8      MR. COOPER:  All right, your Honor.  We will rest

9  on -- I will stop my questioning and we'll put our witness on.

10      THE COURT:  Well, let's see.

11      Mr. Dunn, are you done?

12      MR. DUNN:  We have nothing further, your Honor.

13      THE COURT:  Thank you, Mr. León.  You may step down.

14      THE WITNESS:  Thank you, your Honor.

15      (Witness excused)

16      THE COURT:  Mr. Dunn, what about the rest of your

17  case?

18      MR. DUNN:  I have no further witnesses, your Honor.

19      THE COURT:  All right.  In that case, the appropriate

20  thing to do, for the poor court reporter, is to break for the

21  next 45 minutes, give her a chance to rest, give me a chance to

22  rest, but mostly her.  Okay?  So I'll see you back here around

23  1:35.

24      MR. DUNN:  I'm sorry.  Is the witness he's going to

25  call going to testify in English?

J5d1espa

1          MR. COOPER:  That's one thing we have to establish.

2    Can you give us five minutes to see whether we need an

3    interpreter?

4          THE COURT:  Well, if you need an interpreter, you'll

5    have to provide one.  This is a civil action.  We don't provide

6    interpreters for civil actions.  And he'll have to testify in

7    English because my Spanish is not good enough.

8          THE REPORTER:  And neither is mine.

9          THE COURT:  And the court reporter can't take it in

10   Spanish.

11         MR. DUNN:  Thank you, your Honor.

12         (Recess)

1                    AFTERNOON SESSION

2                        1:41 p.m.

3          (In open court)

4          THE COURT:  Okay.  Mr. Cooper.

5          MR. COOPER:  Thank you, your Honor.  We call Francisco

6   Flores, please.

7          THE COURT:  Mr. Flores.

8          MR. COOPER:  I'm going to use the podium.  Is that

9   okay?

10          THE COURT:  Please.

11          (Witness sworn)

12          THE COURT:  Good afternoon, Mr. Flores.

13          THE WITNESS:  Good afternoon, your Honor.

14   FRANCISCO FLORES,

15          called as a witness by the Respondents,

16          having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. COOPER:

19   Q.  Mr. Flores, are you presently employed?

20   A.  Yes.

21   Q.  And what is your employment?

22   A.  I am counsel for -- internal counsel for Servicios

23   Digitales Lusad and its subsidiaries, Servicios Administrativos

24   Lusad and Lusad Servicios.

25          THE COURT:  Okay.  For Servicios Digitales Lusad --

1          THE WITNESS:  Yes.

2          THE COURT:  -- and its two subsidiaries, Lusad

3    Servicios and Servicios Administrativos.

4          THE WITNESS:  Correct.

5          THE COURT:  Okay.  And its two admin subsidiaries.

6    Thank you.

7    BY MR. COOPER:

8    Q.  And are you, in that role, familiar with the business of

9    what we've referred to as Lusad today and the two subsidiaries

10   you mentioned?

11   A.  Yes, I am.

12   Q.  Okay.  How long have you been in the position as counsel?

13   A.  Since November of 2017.

14   Q.  And where do you reside?

15   A.  In Mexico city.

16   Q.  And are you a Mexican citizen?

17   A.  Yes.

18   Q.  Okay.  Now are you familiar with a bid process that's

19   upcoming in connection with the city of Monterrey?

20   A.  Yes, I am.

21   Q.  Can you tell the Court what you know about that process and

22   the deadlines.

23   A.  Yes.  Our registration process is currently under way.

24   That registration process runs from May the 2nd to May the

25   15th.  In order for all interested parties that have the

1   technology and the ability to provide the -- generally a

2   service for digital taxi meters may register in order to, in

3   the near future, participate in a bidding for the awarding of a

4   concession for -- for such service.

5           THE COURT:  Okay.  So basically this is designed to

6   see who will be in the bidding.

7           THE WITNESS:  Yeah, who would be eligible.

8           THE COURT:  Who would be eligible.  Okay.  Okay.

9   Q.  Is there any timetable presently set out for when the bids

10  would be submitted?

11  A.  Not that I know of.  I know that after the registration

12  process is completed, an evaluation of all the participants

13  that registered will be conducted, and afterwards, a call or an

14  invitation for a public bidding process will be issued by the

15  government of Nuevo León.

16  Q.  Now do all of the companies that register get to bid or is

17  that not the case?

18  A.  Yes.  Only the companies that register to bid will be

19  allowed to bid.

20          THE COURT:  But you said there's an evaluation.  So if

21  a company registered to bid but the officials in Nuevo León

22  concluded --

23          THE WITNESS:  That they are not eligible.

24          THE COURT:  -- that they are not eligible, then they

25  couldn't bid.

1          THE WITNESS:  Correct.

2          THE COURT:  But you've got to be, as we say here, in

3    it to win it.

4          THE WITNESS:  Correct.

5          THE COURT:  You have to be in the game, so you have to

6    register by the 15th.

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.

9    BY MR. COOPER:

10   Q.  And could you tell the Court a little about the city of

11   Monterrey and what the potential value of this concession would

12   be.

13   A.  Well, it is my understanding that in the city of Monterrey

14   there are around 38,000 taxis, regular taxis, and they provide

15   service to the city of Monterrey and the Nuevo León area, the

16   metropolitan area of Monterrey, which is made up of nine

17   municipalities, so these 38,000 taxis are going to be providing

18   service in this geographic area, and the bidding process

19   consists of having them substitute their current analog taxi

20   meters for digital taxi meters that feature some key safety

21   enhancements or safety features that the current digital taxi

22   meters do not possess, such as GPS location and direct link

23   with law enforcement authorities, etc.  So the aim is to

24   provide a safer taxi service to -- to its users.

25   Q.  Is it your understanding that Lusad has the software to

1    offer in connection with this bid?

2    A.  Yes, yes, it does.

3    Q.  What, just generally speaking, is the nature of the

4    software that Lusad has?

5    A.  Well, I'm not the technical expert, but from what I have

6    seen and from what I understand, the software provides all the

7    abilities to accurately measure the time and distance traveled,

8    according to the applicable fares approved by the authorities,

9    it possesses a GPS device that is live, realtime, you do not

10   need a phone service or -- you understand?

11          THE COURT:  Is it the same software that's being used

12   in the taxis in Mexico City now pursuant to the original

13   concession?

14          THE WITNESS:  My understanding is that it is basically

15   the same.  It would only be changed for the specific city of

16   Monterrey, specifically the maps and the fare.

17          THE COURT:  Yes, obviously Mexico City maps would not

18   be helpful in Monterrey.

19          THE WITNESS:  Yes.  Basically all of the remaining

20   features are the same.

21          THE COURT:  Okay.

22   BY MR. COOPER:

23   Q.  Now we looked at the corporate structure when Mr. León was

24   on the stand.  Are you familiar with which of the companies

25   owns the intellectual property, the trademarks, the patents,

J5d1espa                    Flores - Direct

1  etc.?

2  A.  Yes, it's Servicios Digitales Lusad.

3          THE COURT:  Wait a minute.  Boom.  Servicios Digitales

4  Lusad is in green on this little chart, right?

5          THE WITNESS:  That is correct.

6          THE COURT:  Okay.  All right.

7  Q.  Now were steps undertaken to create an entity to make the

8  bid for the Monterrey concession?

9  A.  Yes.  On January 31, 2018 -- no, I'm sorry, 2019, L1bre --

10  L1bre Nuevo León.

11  Q.  And that's the company we were looking at on the chart was

12  the bottom company earlier today?

13  A.  I believe in the chart that we just saw here, L1bre Nuevo

14  León was not included, but in our chart, yes, it's the one

15  highlighted in yellow.

16          THE COURT:  In yellow.  Okay.

17  Q.  Now were you involved in the incorporation of Nuevo León in

18  January of this year?

19  A.  Yes, I was asked to review the incorporation documents

20  before they were executed by Mr. Covarrubias.

21          MR. COOPER:  Okay.  Your Honor, I'm going to approach.

22          THE COURT:  Okay.

23          MR. COOPER:  This is also Mr. Covarrubias's Exhibit 3.

24  Actually, the English translation is shorter that what I'm

25  showing him.  The Spanish --

J5d1espa                    Flores - Direct

1          THE COURT:  I'm sorry.  What is it?

2          MR. COOPER:  Would you like an extra copy?

3          THE COURT:  I'd love one.  It will be much easier for

4    me that way.  Thank you.

5    BY MR. COOPER:

6    Q.  Mr. Flores, can you identify the document I just handed

7    you.

8    A.  Yes.

9    Q.  If you can tell the Court what it is, please.

10   A.  It's incorporation documents of L1bre Nuevo León.  It was

11   incorporated on January 31, 2019.

12   Q.  And is there an indication in this document as to what the

13   ownership of Nuevo León is?

14   A.  Yes.  On page 12, there is a chart that says that Servicios

15   Digitales Lusad is the owner of the 99.9 percent and Servicios

16   Administrativos Lusad is the other partner with 1 percent.

17          THE COURT:  It's very interesting.  It's very

18   interesting.  Which two directors of this company were

19   appointed by Espiritu Santo?

20          THE WITNESS:  None.

21          THE COURT:  None.  I see.

22          THE WITNESS:  None.

23          THE COURT:  And where is there any indication in this

24   document that Espiritu Santo has any ownership interest in this

25   entity?

J5d1espa                    Flores - Direct

1          THE WITNESS:  Not in this document, your Honor, but

2     Espiritu Santo Technologies, the partnership, is the sole owner

3     of L1bre Holding, LLC, which in turn is the controlling

4     shareholder of Servicios Digitales Lusad in Mexico, which in

5     turn is the controlling shareholder here in Nuevo León.  So

6     indirectly --

7          THE COURT:  Yes, I know that.  Are you familiar with

8     the Espiritu Santo Technologies, LLC partnership agreement?

9          THE WITNESS:  Not with the partnership agreement of

10    Technologies.

11         THE COURT:  It says that in any downstream company,

12    the parties agreed, Espiritu Santo Holdings and L1bero

13    Partners, that L1bero Partners would appoint two directors and

14    Espiritu Santo would appoint two directors, but that isn't what

15    happened here, is that correct?

16         THE WITNESS:  Correct.  I'm sorry.  I misunderstood

17    your -- your question.  I'm familiar with the partners

18    agreement between L1bero Partners and Espiritu Santo.

19         THE COURT:  Correct.  And it says that each of those

20    two partners gets to appoint two directors in any downstream

21    company that is formed to expand the business.  Right?

22         THE WITNESS:  Correct.  Correct.

23         THE COURT:  Bidding in Monterrey would be expanding

24    the business, would it not?

25         THE WITNESS:  Correct.

J5d1espa                    Flores - Direct

1          THE COURT:  Okay.  So where are the two board members

2     appointed by Espiritu Santo?

3          THE WITNESS:  They are not.

4          THE COURT:  They are not.  Okay.  Thank you.

5     BY MR. COOPER:

6     Q.  Do two board members from Espiritu Santo Holdings have an

7     ownership interest and would they benefit from the Monterrey

8     concession?

9     A.  Yes, they would.

10    Q.  How so?

11         MR. DUNN:  Your Honor, I know this is a preliminary

12    injunction hearing, but I think we really ought to get the

13    witness's testimony, not Mr. Cooper's.  I object to him leading

14    his own witness.

15         THE COURT:  Let him ask the next question.  I really

16    thought of that as an introductory question, Mr. Dunn.  Let him

17    ask the next question.

18         MR. DUNN:  Okay.

19    BY MR. COOPER:

20    Q.  How, if at all, would the partners from Espiritu Santo

21    Holdings benefit if the Monterrey concession is accepted and

22    generates income?

23    A.  Because they are 50 percent owners of the company sitting

24    at the top of the corporate chart.

25    Q.  As far as you know, was there ever an attempt made to

J5d1espa                    Flores - Direct

 1    create an entity to bid on the Monterrey concession that would

 2    not benefit either Mr. León or Mr. Zayas?

 3    A.  No, there was not.

 4    Q.  Was a company called L1bre Monterrey ever used or

 5    considered in connection with making a bid on the Monterrey

 6    concession?

 7    A.  No.

 8    Q.  Was a company called L1bre Jalisco ever used or considered

 9    in connection with making the bid?

10    A.  Not for Monterrey, no.

11            THE COURT:  How about for Jalisco?

12            THE WITNESS:  Well, as far as I know, there hasn't

13    been any bidding process or formal bidding process in the state

14    of Jalisco.

15            THE COURT:  That too would be an expansion of the

16    business, right, if there were to be --

17            THE WITNESS:  Yes.

18            THE COURT:  -- if one were to take the software and

19    use it in yet another part of Mexico?

20            THE WITNESS:  Yes.

21            THE COURT:  Yes.  Okay.  And does L1bre Jalisco have

22    two board members appointed by Espiritu Santo?

23            THE WITNESS:  No.

24            THE COURT:  I'm just looking for breaches.  That's all

25    I'm looking for.  I'm looking for likelihood of success on the

J5d1espa                    Flores - Direct

1    merits of the underlying arbitration.  It's the only thing that

2    interests me, so --

3         MR. COOPER:  Your Honor, if I may be so bold, the

4    likelihood of success on the merits would be with regard to

5    whether or not there's a misappropriation of the trade secret.

6         THE COURT:  No.  Likelihood of success on the merits

7    of the allegations made in the arbitration.  The notice of

8    arbitration alleges numerous breaches of the arbitration

9    agreement.  Breaches of contract.  It's a breach of contract

10   case, okay?  So I'm just looking for breaches.  Finding a lot.

11   BY MR. COOPER:

12   Q.  Mr. Flores, are you familiar with a company called Kichink

13   or N9?

14   A.  Yes.

15        THE COURT:  Is that the same company or is it a

16   different company?

17        MR. COOPER:  You can answer.

18        THE WITNESS:  I understand they are two different

19   companies, but they are associated.

20        THE COURT:  Okay.  Because I didn't understand whether

21   they were one company or two companies.  Kichink, and what was

22   the other one, N9?  Okay.  Yes.

23   BY MR. COOPER:

24   Q.  What was the -- well, what is your familiarity with Kichink

25   and N9?

A.  Well, Kichink is a software development company that was

hired to develop and build a new version of the software that

included some modifications to the original software that was

developed by a company called NullData.  My understanding --

and again, I'm not a technical guy -- is that Kichink was to

include certain additional features that were not included in

the first version of the software.  And again, my understanding

is that one of those features was the ability to connect in

realtime with the local law enforcement authorities and the

development of the hailing app, which taxi service could be

summoned by users.

          THE COURT:  So you could hail a taxi --

          THE WITNESS:  The hailing app.

          THE COURT:  -- with an app.  Okay.

Q.  Are you aware of whether Mr. Zayas or Mr. León developed

the software?

A.  I'm -- I don't know.

          THE COURT:  Developed what software?

          MR. COOPER:  The hailing app or the digital -- taxi

digital software.

          THE COURT:  We've got an old version.  He just said

Kichink was hired to build a new version of existing software.

Who built the existing software?

          THE WITNESS:  The original version was built by

NullData.

1          THE COURT:  What was it called?

2          THE WITNESS:  N-U-L-L Data.

3          THE COURT:  NullData.

4          THE WITNESS:  NullData.  NullData was hired by

5    Servicios Digitales Lusad.

6          THE COURT:  Hired by Servicios Digitales Lusad.  Okay.

7    And then Kichink you say has been hired to make a new, improved

8    version.

9          THE WITNESS:  Correct.

10          THE COURT:  To update it.

11          THE WITNESS:  Correct.

12          THE COURT:  Okay.

13   BY MR. COOPER:

14   Q.  Were you involved in the -- well, is there a contract with

15   Kichink?

16   A.  Yes, there is a services contract between Kichink Servicios

17   and Servicios Digitales Lusad, or Servicios Administrativos

18   Lusad, to be more precise, one of the subsidiaries.

19   Q.  Lusad.

20   A.  Yes.

21   Q.  Did you sign the contract?

22   A.  Yes, I did.

23          MR. COOPER:  May I approach, your Honor.

24          THE COURT:  Sure.

25          MR. COOPER:  This is also included.

1        THE COURT:  Thank you.  Is this the contract?  Because

2   I think I already have a copy of the contract.

3        MR. COOPER:  Yes.  I used it before.

4        THE COURT:  Yes.  Same contract.

5   Q.  Turning your attention to the signature page, Mr. Flores.

6   A.  Yes.

7   Q.  Is that your signature on the document?

8   A.  Yes, the one on the right is my signature.

9        THE COURT:  Wait a minute.  The one on the right?

10  Then I may have a different one.  Because Servicios

11  Administrativos Lusad signed on the left and Kichink signed on

12  the right.

13       THE WITNESS:  I'm so sorry, yes.  On left, which is

14  Servicios Administrativos Lusad signature box, the signature on

15  the right is mine, the signature on the left -- no.  That one.

16       THE COURT:  Oh, there are two signatures there.

17       THE WITNESS:  Yes, there are two signatures.

18       THE COURT:  Got it.  Now I understand.  There are two

19  signatures there.  Okay.

20       THE WITNESS:  That's -- for the powers of attorney,

21  there have to be two signatures for this kind of contract, on

22  the part of Lusad.

23  BY MR. COOPER:

24  Q.  Is this the contract that formed the relationship for

25  Kichink to provide the technical services that it did to Lusad?

1    A.  Yes, it is.

2    Q.  Was the relationship with Kichink discussed either with or

3    in front of Mr. León?

4    A.  Well, I was invited to a couple of board meetings in which

5    I know that the Kichink issue was brought up and -- and a

6    description of the services that Kichink was performing and the

7    fees that was -- were being made to Kichink was discussed.

8              THE COURT:  And who was at that board meeting?  Was

9    Mr. León at the board meeting?

10             THE WITNESS:  Yes, he was.

11             THE COURT:  Okay.

12   Q.  Before we go back, I'm not sure I got an answer.  Are you

13   aware of whether Mr. León or Mr. Zayas created the original

14   technology that Lusad has?

15   A.  No, I am not.

16   Q.  Are you aware of whether they have provided any

17   technological improvements to the software?

18   A.  No, not themselves.  It was all developed by the -- by the

19   companies that were hired by the -- by the Mexican company.

20   Q.  Kichink and N9 and --

21   A.  NullData.

22   Q.  And NullData.

23   A.  Yes.

24   Q.  There was some testimony --

25             THE COURT:  Wait.  Now I'm confused.  First you told

1    me the original software was created by NullData.

2              THE WITNESS:  Yes.

3              THE COURT:  And Mr. León testified this morning that

4    NullData was hired by him and Mr. Zayas, through Lusad --

5              THE WITNESS:  Lusad.  That is correct.

6              THE COURT:  -- long before Mr. Covarrubias was

7    involved --

8              THE WITNESS:  Yes, that's correct.

9              THE COURT:  -- to develop the first version of the

10   software.

11             THE WITNESS:  That is correct.

12             THE COURT:  That's all correct.

13             THE WITNESS:  Yes.

14             THE COURT:  So I've got that right.  Okay, good.  I

15   don't want to be confused.

16   BY MR. COOPER:

17   Q.  My question was whether Mr. León himself developed the

18   software or --

19             THE COURT:  No.  Now, come on.  He hired somebody to

20   do it.  I know that.  That's a stupid question.  Come on.

21             MR. COOPER:  It's in his declaration, your Honor, that

22   he did.

23   BY MR. COOPER:

24   Q.  There was some discussion this morning about an individual

25   named Manuel Tabuenca.  Do you know him?

1    A.  Yes.

2              THE COURT:  Manuel what?

3              MR. COOPER:  Tabuenca, if I'm pronouncing it

4    correctly, the individual who informed Mr. León in his

5    declaration.

6    Q.  Who is Mr. Tabuenca?

7    A.  Mr. Tabuenca was the comptroller for administrative

8    processes in Lusad, and he was in charge of review -- reviewing

9    and supervising certain administrative procedures in Lusad,

10   mainly relationship with key providers and key suppliers.

11   Q.  Did there come a time when his role was diminished?

12   A.  Yes.  When -- when the -- when the current administration

13   entered, my understanding is, and again, Mr. --

14             THE COURT:  The current administration being whom?

15             THE WITNESS:  Being the one appointed after the

16   partnership was executed in November of 2017, the management

17   headed by Mr. Covarrubias.

18             THE COURT:  Okay.  So when Mr. Covarrubias took over

19   as the day-to-day manager --

20             THE WITNESS:  Yes.

21             THE COURT:  -- Mr. Tabuenca was demoted, as we say?

22             THE WITNESS:  Yes.  From general comptroller to

23   comptroller of processes or administrative process.  I don't

24   know his exact title, your Honor.

25             THE COURT:  Okay.  But from general comptroller to a

1    lesser title.

2              THE WITNESS:  Yes.

3    BY MR. COOPER:

4    Q.  Did there come a time where he eventually was terminated?

5    A.  Yes.  He was terminated on the same date that the legal

6    substruction of computing equipment occurred in December of

7    2018.

8              THE COURT:  I'm sorry.  The same date as the what?

9              THE WITNESS:  Legal substruction of computing

10   equipment.

11             THE COURT:  What's substruction?  I don't understand

12   that word.

13             THE WITNESS:  The stealing of the computers.

14             THE COURT:  Oh.  Oh, that the computers were provided

15   to Deloitte.  Okay.

16   BY MR. COOPER:

17   Q.  Did Mr. Covarrubias invest money in Espiritu Santo

18   partnership?

19   A.  Yes, he did.

20   Q.  Do you know how much?

21   A.  Around $20 million himself, and through L1bero Partners,

22   around $30 million.

23   Q.  Did he --

24   A.  Plus he also secured a loan, a banking loan from Banco

25   Azteca, putting up a collateral, a real estate collateral of

1   his property.

2   Q.   How much was that loan for?

3   A.   That loan was for $18 million.

4   Q.   Are you aware of any money that was invested in the

5   partnership by Mr. León?

6   A.   Actual money?  No, I am not aware.

7   Q.   Are you aware of any money that was invested by Mr. Zayas?

8   A.   I am not aware of that.

9   Q.   There was some discussion earlier about an altered

10  concession and charges in Mexico concerning an altered

11  concession with Mexico City.

12  A.   Yes.

13  Q.   Are you familiar with that issue?

14  A.   Yes.

15  Q.   What do you know about that issue?

16  A.   I know that on November, the mobility secretary held a

17  meeting in their offices in which they presented to certain

18  representatives of the company a document.  At that point in

19  time it was not clear, from my understanding, since I was not

20  present at that meeting, what the actual document was.  We

21  found one day later, when we had the chance to review the

22  complete document, that it was in fact an amendment to the

23  concession that basically nullified all the key economic

24  aspects of the concession that made this a viable business.

25  The authorities deleted certain rights that belonged to Lusad

1    under the -- what we believe is the original concession, the

2    valid concession, and after the fact, one day after, when we

3    had a chance to review the document as I just mentioned, we --

4          THE COURT:  How did this document purport to nullify

5    the economic aspect?

6          THE WITNESS:  Because it amended the concession that

7    we had been working with in two critical aspects.  One of them,

8    in the concession that we hold to be true, it allows for every

9    taxi ride to be taken in Mexico City that -- that uses the

10   digital taxi meters to charge up to 12 pesos per trip, and that

11   right was deleted from the third version of the concession, and

12   this third version of the concession only allowed for Lusad to

13   be paid when a taxi is hailed through -- through the hailing

14   app, you know, through the phone of a user.  And these

15   represent practically only 5 percent of the possible taxi trips

16   that occurred daily in the city of Mexico, so basically what it

17   means is that there were no possibility of having the

18   sufficient income to allow for the other obligations that

19   Lusad, as titleholder of the concession, has, you know, which

20   is to pay and install for the 138,000 taxi meters.

21         THE COURT:  And you said the mobility secretary.  I

22   assume that's a government official of some sort?

23         THE WITNESS:  Yeah.  It's a -- it's a -- the

24   department of Mexico City that regulates all public

25   transportation.

J5d1espa                    Flores - Direct

1              THE COURT:  Okay.  So the mobility secretary called

2      people into the office and handed them a document and said,

3      these are the new terms of the concession.

4              THE WITNESS:  Yes.

5              THE COURT:  Okay.  And who did they call into the

6      office?  Who went to that meeting?

7              THE WITNESS:  I know for a fact that Mr. Julio

8      Belmont, who is one of the board members of Lusad, was there.

9      I know that Mr. Zayas was there.  And I don't know who else.

10             THE COURT:  Okay.  So but there was one representative

11     of each of the partners.  Mr. Belmont was a representative of

12     L1bero, and Mr. Zayas is a representative of Espiritu Santo.

13     So in they went and they were given this thing.  Okay.

14             THE WITNESS:  Correct.

15             THE COURT:  All right.

16     BY MR. COOPER:

17     Q.  Were you knowledgeable about the altered concession before

18     it happened or while it was happening?

19     A.  No, I was not.

20     Q.  Was Mr. Covarrubias knowledgeable about it before or

21     while --

22     A.  No.

23             MR. DUNN:  Objection.  He can't be a mind reader.

24             THE COURT:  The objection is sustained.

25     Q.  Did you discuss with Mr. Covarrubias whether he was aware

1    of the altered concession before it was submitted or while it

2    was being submitted?

3    A.  Everybody became aware of that the following day.  I'm

4    afraid that even the persons that were present at that meeting

5    didn't know for a fact the contents of the document that was

6    signed.  That is my understanding.

7    Q.  Do you have any knowledge as to what the value of the

8    Monterrey concession would be and how much the loss would be if

9    it was not to go through?

10             MR. DUNN:  Objection.  Foundation.

11             THE COURT:  I'll let him testify.

12   A.  I've seen the internal projections made by the company, and

13   this business could be worth as much as 50 million EBITDA after

14   one year of full operation, if assuming all 38,000 taxis are

15   equipped with -- with a digital taxi meter.

16   Q.  Okay.

17             MR. COOPER:  No further questions, your Honor.

18             THE COURT:  Okay.  Forgive me.  I'm not as familiar

19   with business practices and government customs in Mexico as I

20   should be.  Is it unusual for a business that has a contract

21   with the government to have the government call up one day and

22   say, this is what's happening to our old contract, here's your

23   new contract?

24             THE WITNESS:  It's very unusual.

25             THE COURT:  Very unusual.

J5d1espa                    Flores - Cross

1              THE WITNESS:  Very unusual, yes.

2              THE COURT:  So you were all shocked.

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.

5              MR. DUNN:  Why don't we start there, if I may, your

6     Honor.

7     CROSS-EXAMINATION

8     BY MR. DUNN:

9     Q.  Was there a catalyst to the government's change of position

10    concerning the concession?

11    A.  Was there a catalyst?

12    Q.  Yes.

13    A.  Is that -- you're asking for my personal opinion --

14    Q.  No.

15    A.  -- or --

16    Q.  Wasn't there an election and a change of administration and

17    a new administration came in?  I'm sorry.  That's three

18    questions.

19    A.  Yes.

20    Q.  Was there an election?

21    A.  Yes.

22    Q.  Was there a change of administration?

23    A.  Yes.

24    Q.  Was there a new mayor?

25    A.  Correct.  All of that is correct, yes.

1   Q.  And it was the new mayor whose administration decided they

2   didn't want to be bound by the agreement that had been made by

3   the old administration.

4   A.  Not exactly in that manner.  You see, in May of 2017, the

5   former administration issued a mandatory notice to all taxi

6   drivers for them to convert or to -- to immigrate from the

7   digital technology -- from the analog technology to the digital

8   technology.  At that point in time, a small group of taxi

9   drivers filed injunctions, around 400 of them, out of 138,000,

10  and they -- even though it was a small number comparatively,

11  they -- they were able to generate a lot of noise and they got,

12  as they say, in the agenda.

13          So in the political campaign for the mayor of Mexico

14  City, two candidates, the one that eventually won and another

15  from another party, they said that if they were to reach the

16  seat of government of Mexico City, they would not go ahead with

17  this program, basically because of an argument saying that they

18  would not be in agreement for -- that a private enterprise will

19  be profiting from the work of taxi drivers.

20  Q.  What's the current status of the concession in Mexico City?

21  A.  Well, it's -- it has not begun to operate.  Operations have

22  not begun.  Since the new administration took -- took office,

23  there has been no possibility of implementing operation, as far

24  as we know.

25  Q.  And have any companies you're associated with filed NAFTA

1    claims against the city of Mexico regarding that?

2    A.  Yes.  L1bero Partners.

3    Q.  L1bero Partners.

4    A.  L1bero Partners, the one at the very top, the one

5    controlled by --

6    Q.  No.  One of the two co-shareholders --

7    A.  Yes.

8    Q.  -- filed a NAFTA claim?

9    A.  Yes.

10   Q.  On behalf of whom?

11   A.  On behalf of itself and on behalf of Espiritu Santo

12   Technologies and L1bre Holdings.

13   Q.  Okay.  So one of the partners, the one controlled by

14   Mr. Covarrubias, filed a NAFTA claim.

15   A.  Correct.  And just to point out, it's not the NAFTA claim

16   per se.  It's just a notice of intent.

17   Q.  And who authorized that on behalf of the Espiritu Santo

18   Technologies?

19   A.  There was no board of directors resolution authorizing

20   that.  Mr. Covarrubias did it in his capacity as CEO.

21   Q.  And who authorized it on behalf of L1bre Holdings, LLC?

22   A.  Same case, would be.

23   Q.  So there was no consultation with any of the

24   representatives of Espiritu Santo Holdings, L.P., the other

25   partner, right?

J5d1espa                    Flores - Cross

 1   A.   The other partner, no.  As far as I know, Mr. Covarrubias

 2   is not -- is not -- did not discuss this with his partners.

 3             THE COURT:  There's no suggestion that -- I mean, now

 4   I understand a lot more about the background of this.  There's

 5   certainly no suggestion that Mr. León or Mr. Zayas caused this

 6   to happen.

 7             THE WITNESS:  No.

 8             THE COURT:  All right.

 9             THE WITNESS:  No, no, no.  They are not being --

10             THE COURT:  They're as disadvantaged by it as you are.

11             THE WITNESS:  Yes, they are.

12             The thing is that that claim or that notice of intent

13   could not be filed on behalf of Espiritu Santo Holdings because

14   Mr. Covarrubias does not have control or representation of

15   Espiritu Santo Holdings at the level of partner.

16   BY MR. DUNN:

17   Q.   Did he ask?

18   A.   I don't know.  As far as I know, there was no communication

19   between them.

20   Q.   Isn't it a fact that Mr. Covarrubias just stopped

21   communicating with either of them, Mr. León or Mr. Zayas,

22   concerning the management of the companies?

23   A.   It is my understanding that happened, yes.

24   Q.   Okay.  Who are the shareholders of L1bre Jalisco?

25   A.   They are two persons.  I am not familiar with them.  I

1   don't --

2   Q.  Who appointed them to be the shareholders?

3   A.  I don't know exactly who appointed them because I don't

4   know even who they are.  What I know is that L1bre Jalisco was

5   incorporated under the instructions of Mr. Covarrubias because

6   he wanted to reserve the name L1bre Jalisco for further use.

7   Q.  When was that?

8   A.  I believe it was May the -- perhaps during the first six

9   months of 2018.  I don't recall the exact date.

10  Q.  And he wanted to reserve the use in order to use it to

11  expand the taxi meter business into Jalisco, right?

12  A.  Yeah, that was the intent.

13  Q.  This would be an expansion of the existing business of the

14  company that we've been calling Lusad, right?

15  A.  Right, but my understanding --

16  Q.  Hold on.

17  A.  Right.

18  Q.  Yes.  Is Lusad a shareholder in L1bre Jalisco?

19  A.  Not at the point of incorporation of the company.  Since --

20  Q.  Today.

21  A.  Today, yes, it is.  Those individuals have -- my

22  understanding is that they have already executed a purchase

23  agreement by means of which Servicios Digitales Lusad would

24  become a 99 percent holder.  I don't have a copy of those

25  documents, but I was made aware that they were already

J5d1espa                    Flores - Cross

1   executed.

2   Q.  Have any of those documents been made available to Mr. León

3   or Mr. Zayas?

4   A.  Not yet, but they certainly can -- they can be made

5   available for their review.

6   Q.  They hadn't been told at all that that was happening?

7           THE COURT:  Because nobody's talking to them, right?

8           THE WITNESS:  Right.  The partners are not talking, so

9   it's kind of difficult.

10  Q.  The notary public who created L1bre Jalisco is located in

11  Jalisco, is that right?

12  A.  Right.

13  Q.  And I'm going to mispronounce his name.  His name is

14  Rodolfo Ramos Menchaca?

15  A.  Yes.

16  Q.  Is he the same notary public who created --

17  A.  L1bre Nuevo León.

18  Q.  Yes.

19  A.  Yes.

20  Q.  Who chose him to do that?

21  A.  Mr. Covarrubias did.

22  Q.  Okay.  So Mr. Covarrubias set up L1bre Jalisco without

23  telling Mr. Zayas or Mr. León, right?

24  A.  Yes.

25  Q.  To preserve the name to expand the business of Lusad

1    without involving them or telling them about it, right?

2    A.  I don't know without telling them, because at the point --

3    Q.  As far as you're aware, nobody ever told them about L1bre

4    Jalisco, right?

5    A.  As far as I know, that's correct.

6    Q.  Okay.  And then Mr. -- who selected the notary in Jalisco

7    to set up the Monterrey company?

8    A.  Mr. Covarrubias did.

9    Q.  So Monterrey -- my geography of Mexico is not wonderful,

10   but I think Jalisco is near Guadalajara, right?

11   A.  Correct.

12   Q.  Monterrey is nowhere near that, right?

13   A.  Correct.

14   Q.  But Mr. Covarrubias chose the same notary who had set up

15   the separate company for Jalisco to set up the Monterrey

16   company, is that right?

17   A.  Right.

18   Q.  And that was his choice --

19   A.  Yes.

20   Q.  -- is that right?  And there are no board members on any of

21   those companies representing any of the Espiritu Santo Holdings

22   interest, is that right?

23   A.  Right.

24   Q.  And the partners agreement, which you're fully familiar

25   with, requires that all of those companies have directorships

J5d1espa                    Flores - Cross

1   in which the individuals mirror the holdings of the parent

2   company, is that right?

3   A.   Right.

4   Q.   And that didn't happen.

5   A.   Right.

6   Q.   Were you aware that was not happening at the time?

7   A.   Not at the time.  Afterwards, I became aware of that.

8   Q.   When you became aware of it, did you tell Mr. Covarrubias

9   that he was violating the partners agreement?

10  A.   Not in that words.  I said this is something that --

11  Q.   In substance, did you tell him --

12          THE COURT:  Let him finish, Mr. Dunn.

13          MR. DUNN:  I apologize.  I apologize.

14          THE COURT:  Please.  The man has come all the way from

15  Mexico.  Let him finish.

16  Q.   I'm sorry.  Do you need the first part of your answer back?

17          THE COURT:  No.

18  Q.   Go ahead.

19          THE COURT:  What did you tell Mr. Covarrubias?

20          THE WITNESS:  That there is disparity between what the

21  incorporation documents of the company and what is stated in

22  the partners agreement.

23  Q.   When did you tell him that?

24  A.   I don't recall the exact date.

25  Q.   Month?

1    A.  Days, perhaps.

2    Q.  Days ago?

3    A.  Days, perhaps.  Days after.

4    Q.  Days after what?

5    A.  Days after the documents were executed.

6    Q.  So that was in January of 2018?  2019?

7    A.  2019, yes.  It was February, because they were executed on

8    January 31st.

9    Q.  And in the four months since then, nothing has been done to

10   correct that error, is that right?

11   A.  Right.

12   Q.  Did you attend the board meeting on December 14th of 2018?

13   A.  Yes, I did.

14   Q.  And were there certain resolutions passed at that board

15   meeting?

16   A.  Yes.

17   Q.  Did you act as the secretary for that purpose?

18   A.  No, I didn't, because I --

19   Q.  Who did?

20   A.  Mr. Rodrigo Nuñez.

21   Q.  Did you review those resolutions?

22   A.  Yes, I did.

23   Q.  Are those resolutions valid and binding?

24   A.  Yes, they are.

25   Q.  Have you ever asserted they were not valid and binding in

J5d1espa                    Flores - Cross

1    any written document?

2    A.   That they are not valid in any recent document?

3    Q.   Yes.

4    A.   No, I don't believe I have.

5    Q.   Okay.  Are you familiar with a criminal complaint that has

6    been filed against Mr. León and Mr. Zayas?

7    A.   Yes, I am generally aware.  Those are being handled by

8    outside counsel.

9               THE COURT:  Do you need a minute?

10              MR. DUNN:  I've got it.  I'm sorry.  I've got it.

11   Q.   Okay.  Let me show you Exhibit 3 to the stricken

12   declaration of Mr. Eduardo Amerena.

13              MR. DUNN:  May I approach.

14              Your Honor, may I approach.

15              THE COURT:  Yes.  You wouldn't mind if I saw a copy?

16              MR. DUNN:  It should be there.

17              MR. COOPER:  What exhibit number is this?

18              MR. LORENZO:  Exhibit 3 to the Amerena declaration.

19   BY MR. DUNN:

20   Q.   On the very first page of this document, does it say that

21   you swore out this statement as legal representative of Lusad?

22   A.   Yes, that is my name on the top.

23   Q.   I'm not asking -- okay.  And did you do that?

24   A.   Yes.

25   Q.   I thought you just told me this was done by outside counsel

J5d1espa                    Flores - Cross

 1   and not by you.

 2   A.   Well, the document is being handled by outside counsel.  I

 3   signed this document as legal representative of Servicios

 4   Digitales Lusad.  It was prepared by outside counsel.  That's

 5   what I meant.

 6           THE COURT:  I assume you reviewed it before you swore

 7   it out.

 8           THE WITNESS:  Yes.

 9           THE COURT:  Very serious matter, swearing out a

10   criminal complaint.

11           THE WITNESS:  Yes.

12   BY MR. DUNN:

13   Q.   And does this allege, does this criminal complaint allege

14   that the resolutions of December 14th are invalid because they

15   were not signed unanimously?

16           THE COURT:  They were not signed by all four.

17           MR. DUNN:  Correct.

18   A.   It is different --

19           THE COURT:  No, no.  Is that what it alleges?

20           THE WITNESS:  It says that the document was not signed

21   by all four members.

22           THE COURT:  Yes.  Okay.

23           THE WITNESS:  However, the resolutions were discussed

24   and approved during the meeting.  The fact that the document

25   was not signed by all of them does not make them invalid.  The

J5d1espa                    Flores - Cross

 1 | resolutions are --

 2 |          THE COURT:  It's your position they were discussed,

 3 | they were approved, they're therefore valid.  And we've already

 4 | established that they were signed by one director for each

 5 | side.

 6 |          THE WITNESS:  Correct.  Correct.

 7 |          THE COURT:  Or one member of the board of managers, I

 8 | guess is what you call the board.

 9 |          THE WITNESS:  Correct.

10 |          THE COURT:  And so what's the defect?

11 |          THE WITNESS:  That --

12 |          THE COURT:  What's the crime?  What's the crime that's

13 | been committed?

14 |          THE WITNESS:  In this document, if I recall correctly,

15 | an allegation of possible procedural fraud is being --

16 |          THE COURT:  Well, I'm looking at a page.  It's page 4.

17 | I'm looking at the English translation.  It says, "It's

18 | important to note, in order to finish the section on

19 | precedence, that the resolutions passed and adopted by the

20 | board of managers are and must be unanimous."  Now it's my

21 | understanding from your testimony that that was unanimously

22 | passed.  All four of them voted in favor of it, right?

23 |          THE WITNESS:  Yes.

24 |          THE COURT:  Okay.  So it would be a lie to say that it

25 | wasn't passed unanimously.

J5d1espa                    Flores - Cross

1          THE WITNESS:  Mm-hmm.

2          THE COURT:  Okay.  Then it says, "That is why the

3    signatures of everyone are required; otherwise, the resolutions

4    cannot take effect and are considered null and void."  Is that

5    your position, that these resolutions are null and void?  Yes

6    or no?

7          THE WITNESS:  No.

8          THE COURT:  No, it's not.

9          Okay.  Next question.

10   BY MR. DUNN:

11   Q.  Did you sign this document to swear that that was the

12   position of the company?

13   A.  No.  I signed this document saying it is my appreciation --

14   Q.  Okay.  So this document is wrong.  As you sit here today,

15   under oath, you are swearing that this document, where it says

16   those resolutions are null and void, is incorrect, is that

17   right?

18   A.  No, because -- the context of what is being described here

19   is as follows.  Can I explain?

20   Q.  Go ahead.

21         THE COURT:  Oh, go right ahead.

22   A.  Okay.  On December 14th, only two originals were executed

23   by Mr. León and Mr. Belmont.  One remained in the custody of

24   the secretary of the board, Rodrigo Nuñez, and the other

25   remains in the custody of -- of mine.

1          THE COURT:  Yes, okay.  So what?

2          THE WITNESS:  Okay.  On December 18th, when filing for

3    the criminal -- criminal complaint was filed because of the

4    stealing of the laptop computers.  That was filed on

5    December 18th.

6          On December the 28th, Mr. Zayas went to the Attorney

7    General's Office and granted a pardon to Mr. Herrera, and when

8    he granted that pardon, he -- he presented a copy of the board

9    of directors minutes signed by him as well as Mr. Belmont and

10   Mr. León.  Do you follow me, so far?

11         THE COURT:  That in addition, when he went to the

12   Attorney General's Office, he showed the Attorney General a

13   copy that was -- we all admit that everything was passed, as

14   they say, all in favor, aye, everybody said yes.

15         THE WITNESS:  Yes.

16         THE COURT:  The copies I have are signed by Mr. León

17   and Mr. Belmont, but he gave the Attorney General a copy that

18   was signed by Mr. León and Mr. Belmont and Mr. Zayas.

19         THE WITNESS:  Correct.

20         THE COURT:  Didn't purport to have signed

21   Mr. Covarrubias's name.

22         THE WITNESS:  No, he didn't.

23         THE COURT:  No.  Okay.

24         THE WITNESS:  But on December 18th, this document was

25   presented to Attorney General's Office, so a claim was made

J5d1espa                    Flores – Cross

1    that that signature, the signature of Mr. Zayas, was made on a

2    photocopy, not on the original, because there were only two

3    originals, one of them in the custody of one person, the other

4    one in my custody.  So --

5         THE COURT:  Okay.  But what you're saying is that

6    everybody agrees the board adopted the resolution, it adopted

7    the resolution unanimously, and because Mr. Zayas signed a

8    photocopy, which is the wrong copy, he committed a crime and it

9    became null and void?  Is that what you're saying?

10        THE WITNESS:  No, no, no.  What we're saying is that

11   he presented --

12        THE COURT:  But you said to me, you said to me that

13   the resolutions are not null and void.  You said those words to

14   me.  I wrote them down.  She wrote them down.  I'll bet we

15   wrote them the same way.  The resolutions are not null and

16   void.  But this says the resolutions are null and void.  Those

17   are inconsistent statements.  Which one is correct?  Just pick

18   one.  Which one is correct?  Are they null and void or aren't

19   they null and void?

20        THE WITNESS:  The resolutions were adopted at the

21   meeting.

22        THE COURT:  They were adopted.  Thank you.

23        Can I take one minute.  Excuse me.  I just -- they

24   were adopted.  Okay.

25        MR. DUNN:  Can we take five minutes, your Honor?

J5d1espa                    Flores - Cross

1          THE COURT:  Sure.  Take five.

2          (Recess)

3          (In open court)

4    BY MR. DUNN:

5    Q.  Sir, the context for this criminal declaration that you

6    swore and the allegation that was made about the board minutes

7    was with respect to a criminal complaint that an employee of

8    Lusad had committed a crime by taking laptops containing

9    financial information and giving those laptops to Deloitte, is

10   that right?

11   A.  Right.

12   Q.  And there's no dispute those laptops were given by an

13   employee of Lusad to Deloitte.  There's no dispute about that,

14   that they went to Deloitte, right?

15   A.  They -- they are with Deloitte, yes, as far as we know,

16   yes.

17   Q.  And Deloitte was the auditor that was approved unanimously

18   in the resolutions on December 14th to conduct the internal

19   investigation, right?

20   A.  Right, but --

21          THE COURT:  No, there's no "but."  There's no "but."

22   No "but."

23   Q.  Afterwards --

24          THE COURT:  Right.

25   Q.  -- Mr. Covarrubias, on his own, without the approval of the

1    directors, terminated that engagement, is that right?

2    A.   I don't know about the -- that specific action taken by

3    Mr. Covarrubias.

4    Q.   You don't know that Deloitte has been terminated?

5    A.   Not terminated.

6    Q.   Are they doing the investigation?

7    A.   No, they are not.  In fact, they didn't began to perform

8    the investigation.

9    Q.   Because of the filing of the criminal complaint, isn't that

10   right?

11   A.   Because of the filing of the criminal complaint, correct.

12   Q.   Now did you have involvement in a civil action in the state

13   court in Mexico that was filed on April 24, 2019?

14   A.   Do I have involvement?

15   Q.   Yes.  Do you have knowledge of that?

16   A.   Yes, I have general knowledge of that, yes.

17   Q.   What is your source of knowledge of that proceeding?

18   A.   Because I have been informed by the external counsel

19   handling it.

20   Q.   And is that José Garcia Granados Torres?

21   A.   He's a legal representative for one of the parties, the one

22   bringing on the lawsuit.  But that's --

23   Q.   So Mr. Cooper asked you some questions about the positions

24   you hold, and I think you said you were the internal counsel

25   for Servicios Digitales Lusad, is that right?

J5d1espa                    Flores - Cross

1    A.  Right.

2    Q.  Do you hold any position with L1bre holding LLC?

3    A.  No, I do not.

4    Q.  Do you hold any position with Espiritu Santo Technologies,

5    the Delaware partnership?

6    A.  No, I do not.

7    Q.  Okay.  Do you know Mr. Garcia Granados Torres?

8    A.  I know him, yes.

9    Q.  Who is he?

10   A.  He's an associate of Mr. Covarrubias.

11   Q.  He's an associate of Mr. Covarrubias.  Does he have any

12   position with any of the companies that are on the chart?

13   A.  I don't believe that he is a direct employee of those

14   companies.  He works for -- with Mr. Covarrubias in other

15   ventures.

16   Q.  And did somebody appoint him as the legal representative of

17   L1bre Holding, LLC?

18   A.  I believe it was Mr. Covarrubias in his capacity of CEO of

19   L1bre Holding who appointed him.

20   Q.  And was there any discussion with Mr. León or Mr. Zayas

21   about that?

22   A.  Not on my part, no, I was not involved in that.

23   Q.  Do you know of any discussion?

24   A.  No, I do not.

25   Q.  And Mr. Garcia Granados Torres was appointed by

J5d1espa                    Flores - Cross

1    Mr. Covarrubias to bring a lawsuit on behalf of L1bre Holding,

2    is that right?

3    A.   Yes.

4    Q.   The lawsuit on behalf of L1bre Holding was brought in

5    Mexico, is that right?

6    A.   Right.

7    Q.   And it was brought -- L1bre Holding is a Delaware

8    corporation.

9    A.   Right.

10   Q.   Are you familiar with the injunction that was sought in

11   that proceeding?

12   A.   Yes, generally familiar, yes.

13   Q.   Let me see if I can refresh your recollection.

14            MR. DUNN:  May I approach, your Honor.

15            THE COURT:  You may.

16   Q.   Have you seen that document before?

17   A.   Yes.

18            MR. COOPER:  I think the Spanish version is -- can I

19   get a copy of it.

20            (Counsel conferring)

21   Q.   Have you seen that document before?

22   A.   Yes, in the Spanish version.

23   Q.   Can you identify it for the record, please.

24   A.   Yeah.  It is an injunction issued by the competent court in

25   Mexico City on April 21st -- 24th, 2019.

J5d1espa                    Flores - Cross

1   Q.  This is an injunction issued in Mexico at the request of a

2   Delaware company, is that right?

3   A.  Correct.

4   Q.  By an associate acting -- by an associate of

5   Mr. Covarrubias, is that right?

6   A.  Yeah, who --

7   Q.  Who was designated by Mr. Covarrubias to do that, is that

8   right?

9   A.  Yes.

10  Q.  Okay.  And who is this injunction against?

11  A.  Against L1bre Holding or -- no, I'm sorry.  Against the

12  partners in Espiritu Santo Technologies, L1bero Partners, and

13  Espiritu Santo Holdings.

14  Q.  And against anybody else?

15  A.  I don't recall.

16  Q.  It's against Espiritu Santo Technologies, is it not, the

17  parent of L1bre Holdings?

18  A.  Mm-hmm.

19  Q.  Is that a yes?

20  A.  Perhaps, yes.

21  Q.  Well, I don't want -- I want to know whether it's

22  against -- so this is Mr. Covarrubias, on behalf of L1bre

23  Holdings, the Delaware partnership that's the parent of Lusad,

24  getting an injunction in Mexico against its parent and its

25  parent's partners, is that right?

1   A.  Well, it's -- it's the company.

2           THE COURT:  Yes, it is.  That's right.  Yes, correct.

3   Move on.

4   Q.  And what is it that's being enjoined here?

5   A.  The possibility of starting an arbitration procedure in the

6   United States by the partners in Espiritu Santo Technologies.

7   Q.  And when did you first become aware of this injunction?

8   A.  Perhaps the day after it was issued, April 25th.

9   Q.  Do you have a copy of the complaint that led to this

10  injunction?

11  A.  I don't have it with me.

12  Q.  Do you know, was it ever served on any of the defendants?

13  A.  I do not know.

14  Q.  As far as you know, it's never been served, is that right?

15  A.  I don't know if it was served.

16  Q.  And when you saw -- you testified that you're familiar with

17  the partners agreement, is that right?

18  A.  Yes.

19  Q.  And do you know that the partners agreement vests

20  jurisdiction with this court in connection with prearbitral

21  injunction matters?

22  A.  Yes.

23  Q.  You're fully aware of that, right?

24  A.  Yes.

25  Q.  And you were aware of that on April 30th of this year when

J5d1espa                    Flores - Cross

1   you first saw this injunction, were you not?

2   A.  Yes.

3           THE COURT:  I think he said he first saw it on

4   April 25th.

5   BY MR. DUNN:

6   Q.  Okay.  When you saw that and saw that L1bre Holdings, a

7   Delaware company, had gotten an injunction in Mexico to enjoin

8   arbitration in the United States, did you mention to anybody in

9   the company that this was a violation of the partners

10  agreement?

11  A.  No, because I think it is relevant to point out the nature

12  of the lawsuit in the first place, the lawsuit --

13  Q.  Do you know --

14          MR. COOPER:  Your Honor, let him finish the answer.

15          THE COURT:  The answer was no, he didn't say anything

16  to anybody.  That's the answer to the question.

17          Next question.

18  Q.  And you were aware at that time when you didn't mention

19  that subject that this was a violation of the partners

20  agreement to even bring such a lawsuit and derogate the

21  jurisdiction of this court, were you not?

22  A.  Because L1bre Holding is not a part of --

23  Q.  Yes or no, please.  Yes or no.

24  A.  No.

25  Q.  Were you aware that this court has exclusive jurisdiction

 1   over prearbitral injunctions?

 2           MR. COOPER:  Objection to form.

 3   A.  Yes, for the partners.

 4           THE COURT:  Okay.  This is what we're going to get

 5   into with this hypertechnicality and the broad arbitration

 6   clause, and I already know all that stuff, and I don't need him

 7   to testify about it.  I don't even need you guys to talk about

 8   it.  I know everything there is to know about that subject.

 9           MR. DUNN:  In that case, your Honor, I have no further

10   questions.

11           THE COURT:  Great.

12   REDIRECT EXAMINATION

13   BY MR. COOPER:

14   Q.  Mr. Flores, I just want to go back to the accusations that

15   were made in the criminal indictment regarding the board

16   minutes.

17   A.  Yes.

18   Q.  You indicated that there was a forged document that was the

19   basis of that claim.  What was the forged document?

20   A.  The December 14th minutes of the board of managers of -- of

21   Digitales Lusad.

22   Q.  And how was it forged?

23   A.  Because the day of the meeting, only two originals were

24   executed.  One was in the possession of the secretary of the

25   board, the other one was in my possession.  And on December the

J5d1espa                    Flores - Redirect

 1   28th, when Mr. Zayas attempted to grant a pardon to the person

 2   who stole the computers, he presented a copy of those same

 3   minutes with his signature on it as well as Mr. León and

 4   Mr. Belmont.  Now it has been asserted that that signature was

 5   made on a photocopy of the document; thus, meaning that those

 6   minutes were altered.  So --

 7              THE COURT:  Wait a minute.  Wait a minute.  Wait.  A

 8   photocopy doesn't alter something.

 9              THE WITNESS:  No.

10              THE COURT:  Can you point to any difference in the

11   text --

12              THE WITNESS:  No, the text --

13              THE COURT:  No, no, no, no, no, no.  Can you point to

14   any difference in the text between the minutes that were signed

15   by the two people, the one that you have the copy of, and the

16   minutes that were given to the Attorney General?  Any word?

17   Can you point to one word?

18              THE WITNESS:  No.

19              THE COURT:  Was there a single word changed?

20              THE WITNESS:  It was the exact same minutes.

21              THE COURT:  Exact same minutes.  Okay.

22   BY MR. COOPER:

23   Q.  Were the signatures exactly the same --

24              THE COURT:  Oh, I get that.  Yes, he added his name to

25   a photocopy, a precise photocopy.  Let me tell you how

J5d1espa                    Flores - Redirect

 1   unimpressed I am with this.

 2   Q.  Is that a breach of the law, to submit a forged document,

 3   under Mexican law?

 4   A.  For Mexican law purposes, it is considered a forged

 5   document, yes.

 6   Q.  Was there also an injunction against Mr. Zayas and Mr. León

 7   participating in Lusad's activities?

 8   A.  Yes.  But that was issued by a civil court in a different

 9   proceeding.

10   Q.  And when was that issued?

11           MR. DUNN:  Exceeding the scope, your Honor.

12           THE COURT:  It's beyond the scope.

13   Q.  You were asked about L1bre Jalisco.  Have they had any

14   operations or conducted any business affairs at all?

15           THE COURT:  You know what?  To hell with it.  Go ahead

16   and ask him.

17   A.  No, nothing.  L1bre Jalisco has not operated --

18           THE COURT:  If you want to ask him about the civil

19   injunction, go ahead.

20   Q.  Was there a civil injunction?

21   A.  Yes, there was.

22   Q.  And what court rendered it?

23   A.  I believe it was a civil court in Mexico City.

24   Q.  Did it concern the affairs of Jalisco -- I'm sorry -- of

25   Lusad?

1    A.   Servicios Digitales Lusad, yes.

2    Q.   Is Lusad a Mexican company under Mexican law?

3    A.   Yes, it is.

4    Q.   Would that have prevented Mr. León and Mr. Zayas from

5    participating in new bids based on Lusad technology?

6              MR. DUNN:  Your Honor, this now is substantive

7    leading.  I'm okay to have the testimony, but could we have it

8    from the witness, please.

9              THE COURT:  Correct.  You can ask him open-ended

10   questions that do not contain the answer.

11   Q.   What is the effect, if you know, of that injunction on the

12   Monterrey concession and the ability of Mr. León and Mr. Zayas

13   to participate in that?

14   A.   Well, the injunction refers to the -- basically what it is

15   saying is that they are barred from performing any -- any

16   activities as members of the board of directors of Servicios

17   Digitales Lusad.

18             THE COURT:  So what?  What's the effect on the

19   Monterrey bid?

20             THE WITNESS:  None.

21   Q.   Is this the Monterrey -- is the technology being used in

22   the Monterrey bid possessed by Lusad?

23   A.   Yes.

24   Q.   Owned by Lusad?

25   A.   It is.  It will be the technology owned by Lusad.

J5d1espa                    Flores - Redirect

 1   Q.  So they would have to license or extend the IP ownership

 2   that they have to another entity to make the bid, correct?

 3   A.  To Nuevo León, yes, to L1bre Nuevo León.

 4   Q.  Do you have an understanding of whether or not Lusad can

 5   continue as an ongoing entity and whether the parties should

 6   continue as an ongoing entity if the bid does not happen?

 7              MR. DUNN:  Objection.  Both scope and leading.

 8              THE COURT:  Overruled.

 9   A.  What I know is that in order for the company to survive,

10   income has to be generated, and right now the only possibility

11   of generating income is through obtainment of concessions.  The

12   concession in Mexico City is in trouble right now, and the

13   other real possibility in the short term is Monterrey.

14   That's -- that's why Monterrey is considered critical for the

15   survival of the business.

16              THE COURT:  And this is because the Mexico City

17   concession is in trouble because of the results of the

18   election --

19              THE WITNESS:  Correct.

20              THE COURT:  -- and change of political landscape.

21   Okay.

22   BY MR. COOPER:

23   Q.  If there is no registration done on Wednesday, what would

24   be the impact on the ability to bid?

25   A.  L1bre Nuevo León will not be able to participate in the

1    eventual bidding process, so the possibility of obtaining that

2    concession would be lost.

3    Q.   And could that possibly result in the bankruptcy of Lusad?

4    A.   Most likely, yes, because not a single dollar has been

5    earned so far because of the operation of the company.

6            MR. COOPER:  No further questions, your Honor.

7            THE COURT:  Okay.  Is there anything else?

8            MR. DUNN:  I just have two questions about this other

9    injunction.

10            THE COURT:  Okay.

11    RECROSS EXAMINATION

12    BY MR. DUNN:

13    Q.   That other injunction was an injunction sought by Lusad to

14    stop Mr. Zayas and Mr. León from acting as directors, is that

15    right?

16    A.   Yes.

17    Q.   And their right to act as directors is specifically

18    provided for and preserved in the partners agreement, is it

19    not?

20            MR. COOPER:  Objection to form.

21            THE COURT:  Overruled.

22    A.   Not in -- not in the Mexican companies, as far as I

23    understand.

24    Q.   Doesn't the partners agreement require that in the

25    downstream companies, the directorships have to mirror the

J5d1espa

1  parent company?

2  A.  Yes, but --

3         MR. DUNN:  No further questions.

4         THE COURT:  "Yes, but," and there aren't any "buts"

5  because there aren't any exceptions.  All of them, every single

6  one, regardless of where they are incorporated.

7         MR. COOPER:  I hear you, your Honor.

8         May I ask a follow-up question.

9  REDIRECT EXAMINATION

10 BY MR. COOPER:

11 Q.  Is the partnership agreement the governing document for

12 Lusad?

13 A.  No, it's not.

14 Q.  What is the governing document for Lusad?

15 A.  It's bylaws and incorporation documents.

16 Q.  And they call for what application of what law?

17 A.  Under Mexican law.

18        MR. COOPER:  Thank you.

19        THE COURT:  You may step down.

20        (Witness excused)

21        THE COURT:  Okay.  And I thank you very much, because

22 I know you didn't come here to testify today, and I really

23 appreciate it.

24        THE WITNESS:  Thank you.  Okay.

25        THE COURT:  Okay.  Mr. Cooper, anything else from you?

J5d1espa

1          MR. COOPER:  I have legal argument, your Honor, but I

2     have no further witnesses.

3          THE COURT:  All right.  So Mr. Dunn, this is your

4     motion, so you can argue first.

5          MR. DUNN:  May I stay here or do you want me to use

6     the podium?

7          THE COURT:  You can do whatever you want.

8          MR. DUNN:  Your Honor, I'm going to be very brief

9     because I think we've laid it out in our papers and I think the

10    situation is quite clear.  I think there is a fair amount of

11    confusion.  I think the injunction --

12         THE COURT:  Wait a minute.  That is the most

13    ridiculous thing.  We were young lawyers together, like 40

14    years ago, a long time ago.  Very long time ago.

15         MR. DUNN:  I was hoping you wouldn't mention how long

16    ago it was.

17         THE COURT:  It was a long time ago.  And that is the

18    dumbest thing you ever said.  I mean, you just said that "we've

19    laid it out in our papers very clearly.  There's a fair amount

20    of confusion."

21         MR. DUNN:  Being generated by the respondent here, as

22    to what is and isn't being requested and what the basis for the

23    relief is.

24         First of all, if it is the case that the Monterrey

25    entity, Nuevo León, is in fact a subsidiary of Lusad and if it

1    in fact is owned by Lusad and if its existence and operations

2    are in compliance with the partnership agreement --

3         THE COURT:  Which is to say if it has two board

4    members appointed by your people and all that jazz --

5         MR. DUNN:  Then there's no problem.

6         THE COURT:  -- no problem.  I would be really happy to

7    enter an injunction that says, as long as you've got a properly

8    constituted subsidiary called Nuevo León that complies in every

9    particular with Section 5.1(b) of the partnership agreement, go

10   ahead and bid.

11        MR. DUNN:  Absolutely, and we'd be happy to see that

12   happen, and we'd be happy to see that bid won, because we would

13   like the technology to be used on behalf of Lusad for the

14   benefit of the owners of Lusad and ultimately the owners of its

15   parent companies.  And that would not, if there was compliance,

16   be prohibited by the existing injunction and by the injunction

17   we've requested.  So I think this is very much a strawman

18   that's being generated here in terms of the threat posed by the

19   injunction.

20        THE COURT:  Right.  Okay.

21        MR. DUNN:  I think it is clear that there is a

22   likelihood of success on the merits, and I think your Honor

23   pointed out that the issue is whether we're going to have

24   success on the merits of the arbitration on the breach of

25   contract claim, because that's the underlying point that an

1    injunction is necessary in order to preserve the status quo so

2    as to allow appropriate relief in the arbitration itself on the

3    claims that have been made in the arbitration.

4           I'm not going to summarize the testimony now.  Your

5    Honor has been very patient.  We have a record.  I think you

6    understand clearly that we have alleged in our papers and we

7    have demonstrated today that there are numerous breaches of the

8    partners agreement, and even if it were true, as the witness

9    said at the very end, that Lusad is governed by the laws of

10   Mexico and its bylaws, the fact of the matter is, the partners

11   made an agreement, which is binding, subject to Delaware law,

12   between the partners that says they promise, when they set up

13   subsidiary entities, they will have the mirror image --

14           THE COURT:  They set them up under the law of Tunisia.

15           MR. DUNN:  Correct.  So it doesn't matter.  And it has

16   never been suggested, and there is no testimony whatsoever or

17   any evidence to suggest that it is illegal or improper in any

18   way for Lusad or any other subsidiary Mexican companies to have

19   the same directors structure as the other entities, as was

20   agreed to.

21           THE COURT:  Right.

22           MR. DUNN:  And if they then go and get an injunction

23   such that he --

24           THE COURT:  I think Mr. Covarrubias is a big boy.

25   He's like a big major businessman in Mexico, is that not

J5d1espa

1    correct?

2            MR. DUNN:  In making investments involving many

3    millions of dollars, and he has numerous businesses.

4            THE COURT:  Okay.  Very sophisticated businessman.

5            MR. DUNN:  Right.

6            THE COURT:  So if he didn't want to be bound by

7    Delaware law in setting up subsidiary corporations to make bids

8    on the taxi business, he didn't have to sign that agreement.

9    He didn't have to strike that deal.

10           MR. DUNN:  And he didn't invest a single nickel in the

11   business until after he did.  And by the same token, he signed

12   an agreement that disputes, with respect to that partners

13   agreement, which he executed, would be resolved in arbitration

14   and that this court exclusively would have jurisdiction over

15   preliminary injunctive relief in aid of arbitration.  And

16   then --

17           THE COURT:  Well, he would come back at you and say --

18   Mr. Covarrubias would come back at you and say, but I didn't

19   get an injunction in Mexico in aid of arbitration; I got an

20   injunction in Mexico in derogation of arbitration --

21           MR. DUNN:  Well --

22           THE COURT:  -- by arguing that this dispute involves

23   Lusad, and Lusad isn't a party to the arbitration agreement so

24   it's not bound, and there's no way to read this extraordinarily

25   broad arbitration clause as encompassing disputes between the

J5d1espa

1    partners about Lusad, which is obviously absolutely ridiculous.

2                MR. DUNN:  The plaintiff that got that injunction is

3    not Lusad.  The plaintiff that got that injunction is

4    actually --

5                THE COURT:  Is a Delaware --

6                MR. DUNN:  Is a Delaware corporation.  It is the

7    second-tier entity, not the third-tier entity.

8                THE COURT:  Right.

9                MR. DUNN:  And it got -- it sought that -- not only

10   did it derogate this court's jurisdiction by doing that --

11               THE COURT:  I'm not insulted, but --

12               MR. DUNN:  It's not a question of whether you're

13   insulted, your Honor --

14               THE COURT:  I know.

15               MR. DUNN:  -- it's a question of whether they violated

16   the agreement.

17               THE COURT:  Yes, of course they did.  Of course they

18   did.

19               MR. DUNN:  Then I have nothing further to say, because

20   they also did it without the consent of the directors of

21   L1bero, who that certainly was a major action for L1bero to

22   take to say, you can't bring an arbitration to resolve this

23   dispute between the partners, and nobody even pretends to argue

24   that there was consent sought, or even notice, and we still

25   don't even have copies of all of these documents, and these

J5d1espa

1    injunctions have never been served.

2            I think I'm going to stop there, your Honor, and just

3    point out that I think as to irreparable harm, I think the

4    potential here for --

5            THE COURT:  I think that's what the real argument is

6    here is irreparable harm.

7            MR. DUNN:  And I think, your Honor, that where there

8    is a serious threat of competition in violation of a

9    noncompetition clause and where there is a threat of use of

10   intellectual property -- and now we're being told, very hurry

11   up, oh, we didn't tell you about it, you didn't know about it,

12   but Nuevo León is actually going to be a Lusad company.  But

13   Jalisco is not a Lusad company, and L1bre Jalisco uses the

14   trademark of L1bre, which is a protected trademark and is the

15   property of Lusad, which is one of the entities of the

16   partnership, and that I think alone is sufficient basis for the

17   injunction where, as here, the contract prohibits competition

18   by any of the partners outside of the partnership structure,

19   requires a mirror image structuring that is not being followed,

20   and where there is intellectual property that obviously was

21   developed before Mr. Covarrubias or Mr. Salinas had anything to

22   do with the company by Null, and there is a serious threat that

23   absent the injunction, that that intellectual property will be

24   misused, and it would be very hard, if not impossible, to value

25   that intellectual property under the circumstances.

J5d1espa

1          And if L1bre Nuevo León is in fact a Lusad entity and

2     behaves properly and the franchise is sought or obtained on

3     behalf of the partnership entities, there won't be any

4     violation and there won't be any problem.

5          So I think there is a serious threat here that it's

6     never been explained why Jalisco was formed, it's not explained

7     why Jalisco has not been moved into the partnership structure,

8     as was supposed to have happened, and it seems to me that there

9     is a substantial showing --

10         THE COURT:  Hasn't been explained to me that Nuevo

11    León has been moved into the partnership structure.  I mean, I

12    see it on the chart, but I haven't seen any executed documents.

13    I haven't seen the board members have been appointed by ESH.  I

14    haven't seen any indication that, although Mr. Cooper protests

15    that Nuevo León is a L1bre company, that's under the

16    umbrella -- it's sitting under the umbrella on this cute little

17    chart, but I certainly haven't seen any evidence that that has

18    actually taken place, and that all of the terms and conditions

19    that are applicable under the partnership agreement have been

20    complied with.

21         MR. DUNN:  Well, and we know that the directors have

22    been frozen out of Lusad, we know they've been frozen out of

23    L1bre Holdings because their interests are being disregarded,

24    and Mr. Covarrubias has just gone on and taken over these

25    companies, and that is a breach of contract, and theoretically

J5d1espa

1    there could be damages for that, but I think these breaches are

2    so pervasive and so massive, and it is obvious that there is a

3    plan to isolate and remove our partners, the petitioners here,

4    from any operation and from having information or knowledge

5    concerning these businesses, and I would suggest under those

6    circumstances that there is a very real threat of irreparable

7    harm because we cannot know what these people are doing and we

8    cannot know how they are using information, and they have made

9    clear their ability and willingness to go repeatedly to the

10   Mexican court in violation of their obligations under the

11   partners agreement.

12             THE COURT:  And without notice.  Without notice.

13             MR. DUNN:  Without any notice and without even

14   service.

15             THE COURT:  I mean, there's clearly been a problem.

16   No notice, no opportunity to be heard.

17             MR. DUNN:  So let me stop there, your Honor.

18             THE COURT:  Okay.  Mr. Cooper, I assume that

19   irreparable harm is where you are.

20             MR. COOPER:  Yes.  Well, your Honor, it is where we

21   are, and I think it's, you know, it's the first thing that

22   courts look at, as you well know.  And I think two major points

23   have to be made here.

24             One is, where's the irreparable harm if there's a

25   breach of the agreement?  It can be remedied with damages.  The

1  irreparable harm will result if this doesn't happen.  If this

2  doesn't happen, everyone is going to lose, and you're going to

3  run the risk that this company is going to end up in

4  bankruptcy.  To me it makes no sense why my adversary would be

5  pushing to not have this bid go forward and lose this

6  opportunity and run the risk the company is going to go and

7  become insolvent.  More so, we cited --

8           THE COURT:  All they would have to do to satisfy me is

9  show me that they have actually given ESH the opportunity to

10  appoint the two directors, brought it under the corporate

11  umbrella, sign an undertaking that Mr. Covarrubias is going to

12  comply with the terms of the partnership agreement, and I'll

13  say, fine, go right ahead, bid.

14           MR. COOPER:  Okay.  Well --

15           THE COURT:  What?  What?  Why would I want to do that?

16           MR. COOPER:  No, your Honor, I'm not saying that at

17  all.  I'm not saying that at all.  And I think we showed you --

18  I don't think it's in dispute, truly, that the articles of

19  incorporation show that they have an interest in this.

20  Mr. León didn't dispute it.  I showed the articles of

21  incorporation.  I don't know why they wouldn't be acceptable.

22  We had a witness who has knowledge of them presented.  So the

23  ownership is not the issue, your Honor.

24           THE COURT:  Well, just let me make a suggestion to

25  you.  Show me documents that purport to be articles of

J5d1espa

incorporation that on their face do not comport with the terms

of the partnership agreement.  Our excellent Mexican counsel

admits very straightforwardly that there are no directors on

this board.  It has no representation whatsoever on this board

for the Espiritu Santo side of this partnership.  And that

they're relying, therefore, on the goodwill of a man who,

frankly, all the evidence shows, doesn't deal very much

goodwill toward them.  Not talking to his partners, not --

MR. COOPER:  Your Honor --

THE COURT:  That's unfortunate, says Mr. Flores.

That's correct, not talking to his partners --

MR. COOPER:  Your Honor, listen --

THE COURT:  -- trying not to resolve disputes in

accordance with the terms that the parties have agreed to.

MR. COOPER:  I respectfully disagree with your Honor.

I understand that's your position, that the partnership

agreement respects every single dispute, but the way this was

constituted, which predated Mr. Covarrubias even being involved

in this, was that disputes involving Lusad would be in Mexico

under Mexican law.  All the instances of the crimes here, of

the allegations, were in Mexico.  You can disagree, but the

Mexican courts may take a different position, and the Mexican

courts have submitted certain orders, and Mr. Dunn, all he

wants to say is --

THE COURT:  They submitted *ex parte* orders --

J5d1espa

1          MR. COOPER:  That has not been established in the

2    evidence unequivocally.

3          THE COURT:  Mr. Cooper, it's the only evidence I've

4    got.  You haven't given me a scintilla of evidence that it's

5    not true.  They have sworn, on oath, that they got no notice of

6    any of this.  And you have not given me a scintilla of evidence

7    that that's not true.  Not a scintilla.

8          MR. COOPER:  Then I would also have to give you all

9    the procedural posture of how things are done in Mexico, and I

10   wasn't prepared to do that, and I'm not an expert.  It may very

11   well be that *ex parte* orders are perfectly reasonable.  What we

12   don't have in dispute is that you do have two orders barring

13   their activities.  But, your Honor, I don't even want to go --

14         THE COURT:  I have to tell you, I'm giving zero comity

15   of any order of a Mexican court that purports to say that I

16   can't do what these people told me I can do.

17         MR. COOPER:  Your Honor, can we just bring it to

18   exactly why we're here.  We are here because the petitioners

19   want to let Wednesday come and go and no bids be made, or no --

20         THE COURT:  I actually don't think that's what they

21   want.  I think that they want to be treated like partners.

22   That's what I think they want.

23         MR. COOPER:  Okay.  Your Honor --

24         THE COURT:  I don't think they want their business to

25   be stolen out from under them by a big-time Mexican

J5d1espa

1   businessman.

2          MR. COOPER:  Your Honor --

3          THE COURT:  That's what I think they want.

4          MR. COOPER:  Okay.  But if Mr. Covarrubias wanted to

5   do that, he would not have made the ownership in the structure

6   that already exists, which gives them a 50 percent benefit.

7   That makes absolutely no sense.  If he really wanted to steal

8   it, he wouldn't have put it in the structure.  There's a case

9   we cited which I think is extremely relevant.  Was not cited by

10  the petitioners.  May I bring a copy of it up.  It's a Second

11  Circuit decision --

12         THE COURT:  I'm aware of *Faiveley*.  I've read it.

13  I've used it.  Sometimes it's appropriate; sometimes it's not.

14         MR. COOPER:  This is a bid on a concession that says

15  that's not irreparable harm, your Honor.  That's what this is.

16  That was an MTA bid and this is a bid in Mexico.

17         THE COURT:  Sorry.  I'm listening.  I wanted her to do

18  something.  She sent me a note.  I asked her to do something.

19  Now I'm entirely focused on you.

20         MR. COOPER:  Thank you, your Honor.

21         Your Honor, there's a line of cases that petitioners

22  cite about taking, misappropriating trade secrets is

23  irreparable harm.  The Second Circuit, in a subsequent case --

24  again, not cited -- addresses that line of reasoning.  It says

25  it's wrong.  I mean, I can hand you the decision.  I can read

1   this portion.  But I think it is exactly on point.  I think it

2   would be --

3           THE COURT:  And which case is this?

4           MR. COOPER:  *Faiveley*.

5           THE COURT:  Yes, *Faiveley*.  I've read *Faiveley* a

6   million times.

7           MR. COOPER:  Okay.  So if you want -- I think most of

8   the disputes that have come up today are arbitration disputes.

9   I mean, there's been a lot of back-and-forth, but that record

10  is going to be way fuller when this arbitration happens.

11  You're being asked to --

12          THE COURT:  Certainly true.  Certainly true.  I'm not

13  the person who's going to do anything except decide whether

14  there's a likelihood of success on the merits in the

15  arbitration.  I'm not going to resolve any of those disputes.

16          MR. COOPER:  And irreparable harm.

17          THE COURT:  Correct.

18          MR. COOPER:  Okay.  And --

19          THE COURT:  I will answer both questions, by the way.

20          MR. COOPER:  I understand.  You also have the

21  equities.  You have the equities of one side having put in all

22  the money and the other side having put in no money.  You also

23  have the issue of public policy of a New York court telling

24  Monterrey that they can't get this bid for, you know, digital

25  service in 38 or 28,000 taxicabs.  I mean, this is not a

144

J5d1espa

1    situation where an injunction is proper.  If they want to argue

2    not being in the governing body of Nuevo León was a breach,

3    they can get compensated, and frankly, if this goes through,

4    they're going to make more money than their claim is even going

5    to be.  But that doesn't mean we misappropriated --

6         THE COURT:  How are they supposed to think that, when

7    the board resolution specifically says that the Mexican

8    subsidiary that's going to be incorporated to bid in Monterrey,

9    Nuevo León will be a subsidiary of L1bre Holdings, LLC, not

10   Lusad, but you've incorporated something that is a subsidiary

11   of Lusad?

12        MR. COOPER:  An indirect subsidiary, your Honor.

13        THE COURT:  That's not what this is.  This is to be a

14   subsidiary of L1bre Holdings, LLC, which is a Delaware

15   corporation.

16        MR. COOPER:  I don't think that's even their argument.

17   That would be so hypertechnical, your Honor.

18        THE COURT:  Hypertechnical?  "He signed a photocopy,

19   that's a forgery"?

20        MR. COOPER:  Somebody submitted a copy to this court

21   and said three people signed it, but one of them was actually

22   just another person photocopying it on.  I don't think the

23   Court would accept a forged document.

24        But that's far afield, your Honor.  What I want to

25   talk to you about is whether there's irreparable harm here,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J5d1espa

whether it makes any sense for any party here to have this

registration -- and it's not even a bid, it's not even a bid --

have this registration not go through on Wednesday.  Everybody

loses.  The company loses.  It makes absolutely no sense.  And

at the end of the day, if it goes through and they make money,

they're a beneficiary of it.

Now for us to go appoint them to this Nuevo León,

honestly, until I can be sure that would not violate a court in

Mexico, I can't say for sure, but the bottom line is, nobody is

misappropriating.  Their order to show cause, make no mistake

about it, is based on the fact that two companies, which aren't

even correct -- one doesn't exist and one has no operations,

Monterrey and Jalisco -- are running off and doing a bid with

Monterrey, and that they have no interest in it.  That is

wholly inaccurate and wholly untrue.  The company that is

bidding on --

THE COURT:  Jalisco is irrelevant at this point.

MR. COOPER:  Correct.  And Monterrey is irrelevant.

The only one that's relevant is Nuevo León.  That's the only

one.

THE COURT:  Excuse me.  Monterrey, Nuevo León, it's

the same thing, okay?

MR. COOPER:  No, it's not the same thing, because they

went to you in a declaration, in an order to show cause --

THE COURT:  Yes, they thought the name was Monterrey.

J5d1espa

1   It turns out instead of naming it for the capital of Nuevo

2   León, they named it for the state of Nuevo León.

3           MR. COOPER:  And they named it -- and they had no

4   basis for that.

5           THE COURT:  Oh, please.  Oh, please.  Oh, please.

6           MR. COOPER:  Listen, if your Honor is inclined to --

7           THE COURT:  You know, Mr. Covarrubias, who has

8   engineered all these orders and injunctions and things like

9   that in Mexico, I have a feeling that if he wants to arrange

10  things in the next 36 to 48 hours so that it's quite clear that

11  his partners are fully functioning members of the Nuevo León

12  bidder, because it's really important to get the Nuevo León

13  bid, I bet he probably can accomplish it.  I'm just going to

14  guess that he can accomplish that.

15          MR. COOPER:  Okay.  We will go back and discuss it.  I

16  can tell you, though, your Honor, it's our view that a finding

17  of irreparable harm here would be --

18          THE COURT:  I get that.

19          MR. COOPER:  -- actually reverse of what the -- the

20  order granting it would cause the irreparable harm, not the

21  order denying it.

22          And we will go back.  I understand what you're saying.

23  I understand --

24          THE COURT:  It's not an inconsequential argument.

25  We've been going back and forth over it all weekend, she and I,

1    emails back and forth, all weekend.

2         MR. COOPER:  At the end of the day, this could all be

3    sorted out in the arbitration where we can talk about the two

4    sets of books.

5         THE COURT:  At the end of the day, this could all be

6    sorted out if four people sat around a table with goodwill.  At

7    the end of the day.

8         MR. COOPER:  I appreciate that, but the issue I take

9    is you're casting aspersions on our side, and I would tell you,

10   a close look at their papers will show you that virtually every

11   accusation they made against us was false and we provided a

12   document.  Not having contracts, making payments that were

13   illicit, all of them were untrue.  I think it's unfair to make

14   Mr. Covarrubias the bad guy here when he put in so much money

15   into this venture and what he did was integrate Nuevo León into

16   the structure.  So if you want to say yeah, they don't get

17   along, I totally concede that and agree, but I think putting

18   the black hat on him is completely, completely unfair.

19        THE COURT:  Okay.  Well, I promised you that tomorrow

20   morning you would have an opinion, and tomorrow morning you

21   will have an opinion.  And I assure you that the last words

22   will be, whatever they are, whether they be in favor of the

23   petitioner or in favor of the respondent, will be an

24   anticipatory deny of any stay, because I don't want to see you

25   tomorrow.  And you can go to the Second Circuit if you want

J5d1espa

1    emergency relief and I don't give it to you, if you want a stay

2    and I don't give it to you.  Because whatever I do, I will do

3    because I think it's the right thing to do.

4           But it's 10 after 3 and we'd better get to work.

5    Thank you, all.

6           MR. COOPER:  Thank you for hearing us.

7           MR. DUNN:  Thank you for your patience and your

8    attention, Judge.

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    SANTIAGO LEÓN

4    Direct By Mr. Dunn . . . . . . . . . . . . . .17

5    Cross By Mr. Cooper  . . . . . . . . . . . . .18

6    Redirect By Mr. Dunn . . . . . . . . . . . . .54

7    Recross By Mr. Cooper  . . . . . . . . . . . .69

8    FRANCISCO FLORES

9    Direct By Mr. Cooper . . . . . . . . . . . . .80

10   Cross By Mr. Dunn  . . . . . . . . . . . . . 102

11   Redirect By Mr. Cooper . . . . . . . . . . . 124

12   Recross By Mr. Dunn  . . . . . . . . . . . . 129

13   Redirect By Mr. Cooper . . . . . . . . . . . 130

14

15

16

17

18

19

20

21

22

23

24

25