## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**ESPIRITU SANTO HOLDINGS, LP,**

        Petitioner,

-against-

**L1BERO PARTNERS, LP,**

    and

**ESPIRITU SANTO TECHNOLOGIES, LLC**

        Respondents.

**Civil Action No. 19-cv-03930**

## MEMORANDUM OF LAW IN OPPOSITION TO ES HOLDINGS' MOTION TO HOLD RESPONDENT L1BERO PARTNERS IN CIVIL CONTEMPT OF THE COURT'S MAY 16, 2019 PRELIMINARY INJUNCTION

**REED SMITH LLP**

599 Lexington Avenue
New York, New York 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450

*Attorneys for Respondent*
*L1bero Partners, LP*

Dated: August 5, 2019

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 3

    A.    Procedural History ................................................................................. 3

    B.    Current Status of the L1bre Group Companies ....................................... 5

    C.    L1bero Provides ESH's Non-Director Designees With Access to L1bre Group Corporate, Financial, and Accounting Information .................................... 6

    D.    L1bero's Efforts to Seat ESH Nominees to the L1bre Group Boards ................... 8

    E.    ESH Delays the ICC Arbitration ........................................................... 12

    F.    ESH Files the Order to Show Cause for Contempt of Court ................................ 13

ARGUMENT ..................................................................................................... 13

I.    Applicable Legal Standards ........................................................................ 13

II.    L1bero Is Not in Contempt of the Court's Preliminary Injunction .................................. 15

    A.    L1bero's Continued Prosecution of the Mexican Legal Proceedings Does Not Violate the Preliminary Injunction ....................................... 15

    B.    L1bero's Alleged Failure to Seat ESH's Chosen Directors on Lusad's Board Does Not Violate the Preliminary Injunction .............................. 19

    C.    L1bero Has Not Denied ESH's Appointed Directors Unrestricted and Unfettered Access to L1bre Group Books and Records ...................................... 22

III.    The Court Should Not Issue Monetary Sanctions or Any Other Relief ........................... 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
  2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017).........................................................................18

*Chicago & N. W. Transp. Co. v. Ry. Labor Executives' Ass'n*,
  908 F.2d 144 (7th Cir. 1990) ......................................................................................................17

*Church & Dwight Co. SPD Swiss Precision*,
  No. 14-CV-585, 2017 WL 3605583 (S.D.N.Y. July 27, 2017)..............................................14

*City of Syracuse v. Onondaga Cty.*,
  464 F.3d 297 (2d Cir. 2006).........................................................................................................20

*DeWitt Stern Group, Inc. v. Eisenberg*,
  2013 WL 5815512 (S.D.N.Y. Oct. 29, 2013) ............................................................................17

*Dunn v. N.Y. State Dept. of Labor*,
  47 F.3d 485 (S.D.N.Y. 1995)......................................................................................................14

*Hatten-Gonzales v. Hyde*,
  579 F.3d 1159 (10th Cir. 2009) ..................................................................................................17

*Idaho Potato Comm'n v. Majestic Produce Corp.*,
  No. 97–CV–5512, 1998 WL 760333 (E.D.N.Y. Sept. 9, 1998)............................................24

*Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*,
  389 U.S. 64 (1967).........................................................................................................................17

*Joy v. North*,
  692 F.2d 880 (2d Cir. 1982).........................................................................................................18

*King v. Allied Vision, Ltd.*,
  65 F.3d 1051 (2d Cir. 1995)..........................................................................................13, 14, 24

*King v. Allied Vision, Ltd.*,
  919 F. Supp. 747 (S.D.N.Y. 1996), *aff'd*, 65 F.3d 1051 (2d Cir. 1995)................................24

*Latino Officers Ass'n City of New York, Inc. v. City of New York*,
  558 F.3d 159 (2d Cir. 2009).........................................................................................................14

*Levin v. Tiber Holding Corp.*,
  277 F.3d 243 (2d Cir. 2002).........................................................................................................14

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    454 F.3d 108 (2d Cir. 2006)...........................................................................19

*In re MarketXT Holdings Corp.*,
    336 B.R. 39 (Bankr. S.D.N.Y. 2006) ...........................................................15, 19

*N.Y. State Nat'l Org. for Women v. Terry*,
    952 F. Supp. 1033 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 86 (2d Cir. 1998) ..................24

*New York Civil Liberties Union v. New York City Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012)...........................................................................20

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) .......................................................................20

*Skarnulis v. Belmont*,
    74 F. App'x 92 (2d Cir. 2003) ........................................................................21

*Spallone v. United States*,
    493 U.S. 265 (1990)......................................................................................15

*Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*,
    154 F. Supp. 2d 586 (S.D.N.Y. 2001).........................................................21, 24

*United States v. Local
    1804-1 Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1096 (2d Cir. 1995)................14

*Yurman Studio, Inc. v. Castaneda*,
    Nos. 07 Civ. 1241(SAS), 07 Civ. 7862(SAS), 2009 WL 454275
    (S.D.N.Y. Feb. 23, 2009)...............................................................................24

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 65(d)(1)(C) ...............................................................................17

Respondent L1bero Partners, LP ("**L1bero**") respectfully submits this Memorandum of Law, together with the Declarations of John William Wood ("**Wood**") and Horacio Alamilla Medina ("**Alamilla**") in opposition to Petitioner Espiritu Santo Holdings, LP's ("**ESH**") Motion to Hold Respondent L1bero Partners in Civil Contempt (the "**Motion**").[1]

## PRELIMINARY STATEMENT

ESH's Motion is a baseless and needless attempt to overreach respecting the Court's May 16, 2019 preliminary injunction order (the "**PI Order**"). (*See* ECF No. 39.) The Motion fails to properly construe the PI Order, account for ESH's excessive demands, reflect the progress that was made, or reveal ESH's own delays. In fact, most issues have been resolved— with an agreement having been reached regarding the final major issue of the appointment of directors on July 18, 2019, which now simply awaits the signature of ESH's representative. The Motion, in its overheated form, also ignores that the affiliated companies have essentially no viable business operations because of the alteration (and, thus, diminishment) of the Mexico City Concession, and the fact that the concession bid in Monterrey did not move forward because taxis in that jurisdiction will not be required to upgrade to digital taximeters. As discussed below, this application should be denied in its entirety.

On May 14, 2019, this Court granted in part and denied in part ESH's emergency motion for a preliminary injunction in aid of arbitration (the "**PI Decision**"). (*See* ECF No. 33.) The Court held that ESH had not established the irreparable harm it had identified in its papers (*id.* at 43-46), but held that there was other irreparable harm that warranted the issuance of "an injunction in aid of arbitration … that bar[ed] [L1bero], its principals and their privies ... from taking any steps to eliminate the interest of [ESH] in any business ventures anywhere in the

---

[1] Unless otherwise indicated, capitalized terms have the same meanings as in the Court's PI Decision (ECF No. 33).

world that are affiliated with, derived from, or use the trademarks, software, and other trade secrets associated with the L1bre [G]roup" (*id.* at 53).

On May 16, 2019, this Court entered the PI Order. (*See* ECF No. 39.) The PI Order was a *prohibitory* injunction in that it prevented L1bero from taking certain actions, including, but not limited to, making any changes to the directors or the corporate structure of the L1bre Group companies or making business decisions on behalf of the L1bre Group companies relating to the commencement of litigation. (*Id.* at 3.) The PI Order did not include the anti-suit injunction language that was proposed by ESH. (*Compare* ECF No. 39 *with* ECF No. 36; *see* ECF No. 37.) The PI Order also mandated that directors appointed by ESH to the boards of the L1bre Group companies have access to corporate, financial, and accounting information, and certain other specified documents. (ECF No. 39 at 4.)

Promptly after issuance of the PI Order, L1bero undertook steps to comply with the PI Order, and otherwise satisfy ESH's demands. These included providing ESH with all of the documents specified in the PI Order; arranging for ESH's representatives to have access to the offices of the Secretary of the Board to review corporate books and records; granting ESH's representatives access to the Oracle NetSuite Platform (including L1bre Group's incoming and outgoing bank account funds and financial transactions, the information behind the transactions, and the audit trail); and refraining from making changes to the directors or the corporate structure of the L1bre Group companies without ESH's consent or making business decisions on behalf of the L1bre Group companies relating to the commencement of litigation. Among other things, L1bero has granted ESH's *non-director designees* access to corporate books and records; secured appointments for León and Zayas to the board of L1bre Nuevo León; executed documents to bring L1bre Jalisco into the L1bre Group; taken steps to secure

appointments for León and Zayas to the board of L1bre Jalisco; and finalized the documentation to secure appointments for ESH's replacement directors to the board of Lusad.

L1bero has undertaken all of these steps notwithstanding the fact that the L1bre Group companies are severely financially distressed and many of its employees have left. Further, ESH has not been cooperative and many of its demands exceeded the scope of the PI Order and were accompanied by baseless threats. Worse, ESH has also repeatedly delayed making the payments necessary to commence the arbitration (in support of which it sought and obtained the PI Order on an emergency basis) which has prevented an arbitral tribunal from hearing the disputes.

For the reasons set forth below, ESH cannot carry its heavy burden to show that (i) the PI Order clearly and unambiguously requires L1bero to do any of the things that it has not done; (ii) L1bero clearly and convincingly violated any provisions of the PI Order; and (3) L1bero has not diligently attempted to comply in a reasonable manner with the PI Order.

## FACTUAL BACKGROUND

### A. Procedural History

On May 1, 2019, ESH filed a Request for Arbitration with the International Chamber of Commerce. (ECF No. 19 at ¶ 3, Ex. 1.) Later that day, counsel for ESH informed L1bero via email that ESH intended to file an Emergency Petition for Injunctive Relief in Aid of Arbitration (the "**Petition**") in this Court the following morning. (*Id.* at ¶ 5, Ex. 3.) On May 2, 2019, ESH filed the Petition seeking a temporary restraining order and a preliminary injunction (ECF No. 1), which, given the translation dates for the documents, had been in the works for weeks (*see* ECF No. 21, Ex. 4 at 18-19, Ex. 6 at 4). Specifically, ESH sought a *prohibitory* TRO and preliminary injunction that would prevent L1bero from taking the following actions:

(1) engaging in any *competitive activities* in violation of the Partners Agreement, including, but not limited to, any efforts to obtain concessions from Monterrey and Jalisco, or taking any actions to cancel or transfer the existing MC Concession;

(2) using any *trade secrets or intellectual property* developed by ES Holdings for any purpose other than to benefit the existing MC Concession or any future concession held by an entity jointly controlled by ESH and L1bero; and

(3) taking any *further steps in any Mexican Court* or otherwise, anywhere in the world, to interfere with or divest or derogate the exclusive jurisdiction of this Court to decide the issue of pre-arbitral injunctive relief, as provided for in the Partners Agreement.

(*See, e.g.,* ECF No. 1 at 22; ECF No. *see also* ECF No. 33 at 3, 25.) That same day, this Court held a hearing, granted a TRO, and directed L1bero to show cause on May 13, 2019 why a preliminary injunction should not issue. (ECF No. 3.)

On May 13, 2019, this Court held a further hearing, and, the next day, on May 14, 2019, this Court issued a decision granting in part and denying in part the Petition. (ECF No. 33.) This Court held that ESH had *not* established the irreparable harm it identified in its papers because (a) any harm from misappropriation of trade secrets could be recompensed through money damages; and (b) the entity incorporated to bid on the Monterrey concession, L1bre Nuevo León, was not a "competitor" because it was jointly owned by ESH and L1bero. (*Id.* at 43-46.) The Court, however, held that: "an injunction in aid of arbitration should … issue—one that bars [L1bero], its principals and their privies . . . from taking any steps to eliminate the interest of [ESH] in any business ventures anywhere in the world that are affiliated with, derived from, or use the trademarks, software, and other trade secrets associated with the L1bre [G]roup." (*Id.* at 53.) This Court acknowledged that ESH had "not proposed the terms of such an injunction," but allowed it to "propose such an order" and L1bero to comment. (*Id.*)

On May 15, 2019, ESH filed a proposed order, which was styled as a *prohibitory* injunction. (ECF No. 36). On May 16, 2019, L1bero filed objections. (ECF No. 37.) Later that same day, this Court entered a *prohibitory* PI Order. (ECF No. 39.) Significantly, the Court did not include ESH's proposed anti-suit injunction language that would have prevented

L1bre Holding and Lusad from continuing to prosecute the pending Mexican legal proceedings. (*Compare* ECF No. 36 *with* ECF No. 39; *see* ECF No. 37 at 5 (citing ECF No. 33 at 48-52).)

On June 4, 2019, L1bero timely filed a notice of appeal to the Second Circuit. (ECF No. 44.) On August 1, 2019, L1bero filed its opening brief on appeal and an emergency motion to expedite the appeal. (Wood Decl. ¶ 1 n. 1, Exs. 1 & 2.)

## B. Current Status of the L1bre Group Companies

Although the L1bre Group companies were already under severe financial distress at the time that the PI Order was entered, the financial situation has deteriorated even further in the past several months. (*See generally* Wood Decl. ¶¶ 7-13.) After the alteration of the MC Concession in November 2018, the L1bre Group companies became financially distressed and directors of Lusad convened a meeting in December 2018 to discuss a contingency plan that would require a contribution of no less than US $ 3 million. (*Id.* ¶ 9, Ex. 10.) L1bero proposed that the capital contribution would be funded 50% by each of ESH and L1bero, but ESH requested an eight-day period to submit a counterproposal and never submitted any such counterproposal or plan. (*Id.*) In the interim, L1bero advanced a further US $1 million loan in order to give Lusad enough funds to operate on a scaled down basis over a six month period and obtain a potentially lucrative concession in Monterrey, Nuevo Leon. (*Id.* ¶ 10.)

After the PI Order was issued, a bid for the concession in Monterrey was made. However, this concession would not *require* taxis to upgrade on a mandatory basis to digital taximeters, which meant that the business opportunity was economically inviable. (*Id.* ¶ 11.) As a result, the L1bre Group has now run out of funds, has no income, and has no realistic prospect of obtaining additional capital at this time. (*Id.* ¶ 12.) Most of the L1bre Group's employees have left the company, payments to vendors and suppliers have been reduced or stopped entirely, and creditors and suppliers may initiate involuntary bankruptcy proceedings. (*Id.* ¶¶ 12-13.) L1bero

has also discovered that León and Zayas as well as the L1bre Group companies face lawsuits brought by third parties in federal court in Florida alleging that León and Zayas stole the trade secrets, technology, and business plan that they used to obtain the MC Concession and induce L1bero's substantial investment in the L1bre Group. (*Id.* ¶¶ 15-18, Exs. 11 & 12.)

### C. L1bero Provides ESH's Non-Director Designees With Access to L1bre Group Corporate, Financial, and Accounting Information

On May 21, 2019, a few days after the entry of the PI Order, ESH's counsel sent a letter to Francisco Flores requesting that certain non-director designees be granted access to information and documents relevant to the L1bre Group companies. (León Decl. Ex. D.) The next day, Flores replied attaching the documents that ESH requested and/or that this Court ordered L1bero to provide, including, but not limited to, documents and communications related to: (a) the NAFTA notice of intent, (b) the incorporation of L1bre Nuevo León; (c) the possible concession in Nuevo León; and (d) powers of attorney issued by L1bre Group companies. (*Id.* Ex. E.) Flores also explained that (a) ESH's non-director designees would be granted access to the Oracle NetSuite Platform upon receipt of written confirmation from ESH of the names and e-mails of the authorized designees; (b) ESH could access and review records of corporate actions through the Secretary of the Board, Mr. Rodrigo Nuñez, and he understood that its representatives had done so earlier that day; (c) Zayas was the only legal representative of the L1bre Group companies who engaged in official communications regarding the MC Concession; and (d) the L1bre Group companies had not engaged in any official communications regarding a possible concession in Jalisco. (*See id.*) Flores also stated that steps were being taken to bring L1bre Jalisco into the L1bre Group corporate structure, and that the relevant documents would be provided once they were finalized and formalized before a notary public. (*See id.*) This process was completed, and the relevant documents were provided to ESH's counsel on

July 24, 2019. (*Id.* Ex. S.) In addition, on May 23, 2019, ESH's counsel provided the written confirmation that Flores had requested (Wood Decl. ¶ 21, Ex. 13), and its non-director designees (Richard Lorenzo, Javier Mijangos, Cesar Cantoral, Javier Coello, Manuel Tabuenca, Jose Luis Valera) were granted access to the Oracle NetSuite Platform. (Alamilla Decl. ¶¶ 6-7.)

Notwithstanding L1bero's prompt efforts to comply with the PI Order and satisfy ESH's demands,[2] ESH's counsel proceeded to levy further onerous demands, unfounded accusations, and baseless threats. (*See* León Decl. Exs. F & G; *see id.* Ex. J.) For example, on May 24, 2019, the day after ESH's non-director designees were granted access to the Oracle NetSuite Platform, ESH's counsel erroneously asserted that L1bero had "restricted" ESH's access to "Accountant Reviewer Access" while L1bero enjoys "Administrator Access," which allows access to the accounting audit trail, and levied numerous other unfounded accusations regarding financial improprieties. (*Id.* Ex. G.) However, L1bero's representatives, Covarrubias and Belmont, have never had "Administrator Access" (Alamilla Decl. ¶ 11), and L1bero did not "restrict" ESH's representatives access because ESH also never had "Administrator Access" (*id.* ¶¶ 4-5). Rather, the only people who had "Administrator Access" were (i) the CFO/ Comptroller, (ii) members of staff who assist with the duties of the CFO/ Comptroller, and (iii) representatives of Multiconsulting S.A. de C.V. which is not affiliated with L1bero and serves as a supplier/consultant that facilitates the use of the Oracle NetSuite Platform. (*Id.*) On or around June 10, 2019, ESH's non-director designees were granted "Audit Trail Access." (León Decl. Ex. H; *see also* Alamilla Decl. ¶ 8.) Among other things, the information contained on the Oracle NetSuite Platform tracks the details of the L1bre Group's incoming and outgoing

---

[2] Notably, the PI Order provides only that "*the directors* appointed by ESH to the Board of any [L1bre Group] company . . . shall have unrestricted and unfettered access to any and all corporate, financial, and accounting information and documents of all such companies . . . ." (ECF No. 39 at 4 (emphasis added).)

bank account funds and financial transactions, which are uploaded onto the platform on a monthly basis. (*Id.* ¶¶ 8-9 & Ex. 2.)

Finally, ESH's allegations respecting physical access are unwarranted. (*See generally* Wood Decl. ¶¶ 25-28.) On July 8, 2019, unidentified ESH representatives arrived to the L1bre Group offices and asked building security to be admitted. (*Id.* ¶¶ 25-26.) Building security denied them entry because they refused to comply with security protocols by, among other things, providing information about the purpose of their visit. (*Id.* ¶¶ 26-27.) No one from the L1bre Group's offices was notified of the presence of any ESH representatives, L1bero did not instruct building security to deny access to ESH representatives, and neither L1bero nor any of the L1bre Group companies owns the building or employs building security. (*Id.*) Moreover, the L1bre Group offices are now empty because, given the financial situation of the L1bre Group companies described *supra* at pp. 5-6, the L1bre Group has no business and most of its former employees have left the company. (*Id.* ¶ 28.) Also, L1bero had previously arranged for ESH to have access to the offices of the Secretary of the Board who maintains the corporate books and records. (León Decl. Ex. E.)

### D.    L1bero's Efforts to Seat ESH Nominees to the L1bre Group Boards

#### 1.    L1bero's Efforts to Seat ESH's Replacement Nominees to the Lusad Board

On May 27, 2019, L1bero's counsel sent a letter to ESH's counsel explaining that L1bero "intends to comply with the PI Order" notwithstanding its disagreement with the terms and would even be open to taking steps not required by the PI Order such as discussing the possibility of ESH "designating replacement board members [for Lusad] while Mexican court orders barring Mr. Le[ó]n's and Mr. Zayas' participation remains in place." (León Dec. Ex. J.)

On May 29, 2019, ESH's counsel responded by disputing the existence of any Mexican court order that "permanently bar[s] Mr. Zayas or Mr. León f[rom] acting on the Lusad board,"[3] but nonetheless agreed to designate Mr. Francisco De Paula Leon Olea and M Jimena Rodriguez Perez-Vargas as replacement board members of Lusad." (*Id.* Ex. K at 2-3.)

On June 12, 2019, ESH's counsel requested an update on when ESH could expect its replacement directors to be confirmed to the Lusad Board. (*Id.* Ex. L.) The next day, L1bero's counsel responded that the appointment of the replacement directors would "require[] a resolution by the shareholders" and that ESH would need to contact the Secretary of the Board, Mr. Nuñez, to "request that he prepare and circulate a draft resolution providing for the appointment of [ESH's] board members." (*Id.*) Between June 15, 2019 and June 20, 2019, counsel for ESH and L1bero engaged in correspondence to coordinate a meeting in Atlanta, Georgia to discuss numerous topics related to the parties' disputes including the possibility of L1bero taking affirmative steps to appoint ESH's replacement directors (notwithstanding the fact that the PI Order is styled as a *prohibitory* injunction rather than a *mandatory* injunction). (*See* Wood Decl. ¶ 40.) On or around June 28, 2019, counsel for ESH asked counsel for L1bero to prepare a document instructing the Secretary to prepare the necessary drafts of the resolutions. (*Id.* ¶ 41.)

On July 1, 2019, ESH's counsel requested an update on the document L1bero was preparing to cause ESH's replacement directors to be confirmed to the board of Lusad. (*Id.* Ex. M.) That same day, L1bero's counsel replied that "a draft is being prepared" and then, on July 3, 2019, sent a further email attaching "a draft document for the appointment of Board

---

[3] Despite León's statement to the contrary (León Decl. ¶ 16), the Mexican court order did not merely prohibit León and Zayas from participating in the February 21, 2019 Lusad board meeting; rather, it prohibits León and Zayas from any activity inconsistent with holding. León and Zayas responsible for their actions against the company and the removal of. León and Zayas from their positions as members of the board. (Wood Decl. ¶ 37 n. 4, Ex. 17.)

Members." (*Id.*) In light of the language in the Partners Agreement that "the Board composition and structure ... shall be replicated in the other Company's Affiliates and in any new affiliates or subsidiaries ..." (Wood Decl. ¶ 8 n. 2, Ex. 9 at § 5.1(b)), the draft instruction letter to the Secretary contemplated the preparation of unanimous resolutions that would appoint Francisco De Paula Leon Olea and M. Jimena Rodriguez Perez-Vargas to the boards of all of the L1bre Group companies (*see* León Decl. Ex. M).

The next day, July 4, 2019, ESH's counsel objected to the draft letter and contended that ESH's replacement directors should be appointed only to the Lusad Board with León and Zayas remaining on the boards of the other L1bre Group companies. (*Id.* Ex. N.) On July 10, 2019, L1bero's counsel replied by explaining that "under the Partner[s] Agreement, L1bero does not have sole authority to appoint individuals to the board[s]" and that it had merely prepared and circulated a "draft joint notification to the Secretary" with the expectation that ESH would "review and revise the draft ... so that the parties can agree on final language and issue a joint instruction to the Secretary." (*Id.* Ex. O at 2.) Rather than providing the revisions, ESH's counsel baselessly accused L1bero of engaging in a "charade." (*Id.* at 1-2.) L1bero's counsel again invited ESH's counsel to "please make your redlines" so that the parties could "jointly agree on the terms, execute, and provide to the Company's Secretary." (*Id.* at 1.) Rather than cooperate by providing a revised draft, ESH's counsel again accused L1bero of "playing games." (*Id.*) L1bero's counsel explained that they were being sincere and thought they had "prepared what [ESH] wanted" but would ask Mexican counsel to "modify the document as close as they can to what they think [ESH is] asking." (*Id.* Ex. P.)

The next day, July 11, 2019, L1bero's counsel sent an email attaching a revised draft of the joint instruction letter to the Secretary. (*Id.*) Despite ESH's assertion to the contrary

(ECF No. 48 at 9), the revised draft instruction letter to the Secretary was not intended to cover appointments to L1bre Group companies other than Lusad. (Wood Decl. at ¶ 44; *see also* León Decl. Ex. P). On July 15, 2019, ESH's counsel again objected to the language in the draft instruction letter, but finally provided revisions reflecting the language that it desired. (*Id.*)

On July 18, 2019, L1bero's counsel replied that L1bero was "amenable to the changes [ESH] proposed" and that they would make a request "that the Secretary prepare the relevant resolutions." (*Id.* Ex. Q.) On July 20, 2019, Flores asked the Secretary to prepare the necessary resolutions for the appointment of ESH's replacement directors to the Lusad Board. (Wood Decl. at ¶ 45.) On July 30, 2019, before ESH filed this Motion, L1bero's counsel informed ESH's counsel that the instruction letter with their changes would be circulated for execution later that week. (Wood Decl. ¶ 46, Ex. 19.) On August 2, 2019, the Secretary sent L1bero's counsel draft resolutions for the appointment of ESH's replacement directors to the Lusad Board. (Wood Decl. ¶ 47, Ex. 20.) On August 4, 2019, L1bero executed these resolutions and its counsel sent them to ESH's counsel to be executed by ESH. (Wood Decl. ¶ 47, Ex. 21.)

### 2. L1bero's Efforts to Seat León and Zayas to the L1bre Nuevo León Board

On May 27, 2019, Flores instructed a notary public to prepare the necessary documents to appoint León and Zayas to the board of L1bre Nuevo León. (*Id.* ¶ 29.) Pursuant to Public Deed No. 15057 dated July 22, 2019, León and Zayas were appointed to the board of L1bre Nuevo León and granted the same powers of attorney as Covarrubias and Belmont with respect to L1bre Nuevo León. (*Id.,* Ex. 14.) On July 23, 2019, L1bero's counsel sent ESH's counsel an email attaching the relevant documents. (León Decl. Ex. R.) Accordingly, León and Zayas are currently members of the board of L1bre Nuevo León with the same powers of attorney as Covarrubias and Belmont, and, in any event, L1bre Nuevo León has not taken any

actions since the PI Order was entered other than registering to bid for the possible concession in Monterrey, which this Court declined to enjoin. (Wood Decl. ¶ 30; *see* ECF No. 33 at 47-48.)

### 3. L1bero's Efforts to Bring L1bre Jalisco Into the L1bre Group and Seat León and Zayas to the L1bre Jalisco Board

On May 27, 2019, Flores instructed a notary public to prepare the necessary documents to bring L1bre Jalisco into the L1bre Group and appoint León and Zayas to the board. (Wood Decl. ¶ 33.) Pursuant to Public Deed No. 15058 dated July 24, 2019, L1bre Jalisco was brought into the L1bre Group through the sale of shares by the founding shareholders to Lusad and SAL. (*Id.* ¶ 31, Ex. 16.) On July 24, 2019, L1bero's counsel sent ESH's counsel an email attaching the relevant documents pursuant to which L1bre Jalisco was brought into the L1bre Group. (León Decl. Ex. S.)

On July 24, 2019, ESH's counsel objected to the fact that, among other things, León and Zayas were not appointed to the board of L1bre Jalisco and were not granted powers of attorney. (*Id.* Ex. T.) On July 25, 2019, after this omission by the notary public was identified, Flores instructed the notary public to revise the documents to appoint León and Zayas to the board of L1bre Jalisco and grant them powers of attorney. (Wood Decl. ¶ 34.) On July 29, 2019, after realizing that the notary public had been out on vacation, Flores followed up again with the notary public to press for this change. (*Id.* ¶ 35.) The notary public confirmed that the relevant documents would be finalized by the following week. (*Id.*) On July 30, 2019, before ESH filed this Motion, L1bero's counsel emailed ESH's counsel that "the changes [ESH] ha[d] requested to the L1bre Jalisco by-laws should be in place by mid-week." (*Id.* Ex. 19.)

### E. ESH Delays the ICC Arbitration

Despite the fact that ESH sought and obtained the PI Order on the basis of an emergency motion that was purportedly in aid of arbitration, since the Court issued the PI Order,

ESH has repeatedly delayed the actual commencement of the arbitration proceedings. (*See generally* Wood Decl. ¶¶ 2-6, Ex. 3-8.)

ESH filed its Request for Arbitration on May 1, 2019, and, on July 11, 2019, L1bero and ES Technologies filed their Answer to ESH's Request for Arbitration and Counterclaims. Among other things, L1bero has asserted counterclaims related to (i) ESH's fraud with respect to inducing L1bero to purchase a 50% interest in ES Technologies; (ii) the MC Concession allegedly procured by ESH; (iii) ESH's breach of the Partners Agreement including by signing a document purporting to alter the terms of the MC Concession without obtaining written consent from L1bero; and (iv) ESH's breaches of its duties to L1bero and/or to ES Technologies with respect to transactions that it has yet to explain. (*See generally id.* ¶¶ 48-50.)

On not fewer than six separate occasions over the course of three months, the ICC requested that ESH make the payment necessary to commence the arbitration. (*Id.* ¶ 4, Exs. 3-7; *see also id.* ¶ 5, Ex. 8) ESH repeatedly missed these deadlines and/or sought extensions such that it did not actually make the payment until August 1, 2019—after it filed the instant motion for contempt. (*Id.* ¶ 6.) This has delayed bringing the disputes to the arbitral tribunal.

### F. ESH Files the Order to Show Cause for Contempt of Court

ESH filed the instant Motion on July 30, 2019 seeking an order holding L1bero in contempt for, *inter alia*, failing to (a) dismiss or withdraw the Mexican legal proceedings; (b) seat ESH's replacement directors to the Lusad board; and (c) provide ESH's representatives with Administrator Access to the Oracle NetSuite Platform. (ECF No. 48 at 5-11.)

## ARGUMENT

### I. Applicable Legal Standards

A contempt order is a "potent weapon to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *King v. Allied Vision,*

*Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (internal citations and quotation marks omitted). To ensure against the unjustified use of this potent weapon, "the district court's power to hold a party in contempt—whether civil or criminal—is significantly circumscribed." *United States v. Local 1804-1 Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1096 (2d Cir. 1995). Indeed, a "contempt order is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict." *King*, 65 F.3d at 1058. The clearly and convincing evidence standard is a "heavy burden" that the moving party "must carry … to justify deployment of the potential weapon that is a contempt order." *Church & Dwight Co. SPD Swiss Precision*, No. 14-CV-585, 2017 WL 3605583, at *5 (S.D.N.Y. July 27, 2017) (internal quotation marks and citation omitted).

"The failure to meet the strict requirements of an order does not necessarily subject a party to … contempt." *Dunn v. N.Y. State Dept. of Labor*, 47 F.3d 485, 490 (S.D.N.Y. 1995). Instead, "a movant must establish that (1) the order ... is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *King*, 65 F.3d at 1058; *see also Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009).

Importantly, as to the first prong, "[a] clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed who must be able to ascertain from the four corners of the order precisely what acts are forbidden." *King*, 65 F.3d at 1058 (internal citations and quotation marks omitted). As to the second prong, "the clear and convincing standard requires a quantum of proof to demonstrate a reasonable certainty that a violation has occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (internal citation and quotation marks omitted). Finally, as to the third prong, "the movant must prove that the alleged

contemnor has not diligently attempted to comply in a reasonable manner with the court's decree[,]" and the courts must "examine the defendant's actions and consider whether they are based on a good faith and reasonable interpretation of the court order." *In re MarketXT Holdings Corp.*, 336 B.R. 39, 52 (Bankr. S.D.N.Y. 2006) (internal quotation marks and citation omitted).

Even where the movant satisfies its heavy burden, "the use of the contempt power places an additional limitation on the district court's discretion," because "in selecting … sanctions, a court is obliged to use the least possible power adequate to the end proposed." *Spallone v. United States*, 493 U.S. 265, 275 (1990) (internal citations and quotation marks omitted).

## II.    L1bero Is Not in Contempt of the Court's Preliminary Injunction

### A.    L1bero's Continued Prosecution of the Mexican Legal Proceedings Does Not Violate the Preliminary Injunction

ESH's motion relies heavily on the assertion that L1bero's continued prosecution of the pending Mexican legal proceedings warrants a contempt finding.  (ECF No. 48 at 10-11.) The provisions of the PI Order relied on by ESH enjoin L1bero from (a) "taking any actions … that would eliminate, diminish, or compromise [ESH's] … right under the Partners Agreement … to equal participation in management and control of" the L1bre Group, and (b) "issuing directives or making business decisions on behalf of any [L1bre Group] company … in violation of the Partners Agreement or to the exclusion of [ESH] or its appointed directors…" (ECF No. 48 at 10 (citing ECF No. 39 at 2-3).)  But the PI Order as written does not provide ESH with grounds to meet its heavy burden of showing that L1bero's continued prosecution of the Mexican proceedings satisfies even one prong of the test for contempt, let alone all three. Specifically, ESH cannot show—as it must—that: (1) the PI Order is clear and unambiguous with respect to the continued prosecution of the Mexican proceedings; (2) L1bero clearly and

convincingly violated any provisions of the PI Order; and (3) L1bero has not diligently attempted to comply in a reasonable manner with the PI Order.

*First*, the PI Order does not clearly or unambiguously require L1bero to dismiss, withdraw, or even to refrain from continuing to prosecute the Mexican legal proceedings. To the contrary, in its PI Decision laying out the reasoning for the PI Order, this Court expressly declined to grant ESH's requested anti-suit injunction:

> So I turn to the two other forms of injunctive relief sought by [ESH]. The first is an anti-suit injunction that would enjoin [L1bero] from litigating the issue of the validity of the arbitration agreement in Mexico. This I am not prepared to enter…

(*Id.* at 48 (internal citation omitted).) This Court explained that it was not prepared to enter an anti-suit injunction for at least three reasons: (1) "[e]ven if the threshold factors were satisfied, ... [the Court] would choose, as a matter of its discretion, not to enter an injunction against Mexican litigation" because "[t]he business venture is located in Mexico, ... the representatives of the parties are all Mexican nationals[,] [and] [t]he events leading to alleged breaches—all of them—took place in Mexico" (*id.* at 51); (2) ESH was "not correct" in arguing that "the express language of the Partners Agreement entitles it to an anti-suit injunction" because, in fact, "[t]he literal language of the Partners Agreement makes it crystal clear that this Court *does not have exclusive jurisdiction to determine the validity of the arbitration agreement*" (*id.* at 48-49 (emphasis in original)); and (3) although this Court had the authority to enjoin L1bero from pursuing or maintaining suit in another country even without a forum selection clause, ESH failed to "clearly demonstrate that this Court's threshold determination about the validity of the arbitration agreement would be dispositive of the Mexican civil actions" (*id.* at 50-51).

Moreover, even if the provisions of the PI Order cited by ESH could be construed to constitute the anti-suit injunction that this Court rejected—and they should not—they are far from clear and unambiguous because those provisions are tied to the parties' rights and

obligations under an external document—namely, the Partners Agreement. The PI Order purports to enjoin conduct that would eliminate, diminish, or compromise rights "under the Partners Agreement" or that would otherwise be "in violation of the Partners Agreement." Such a reference to an external document inevitably leads to uncertainty, and for that reason, is expressly prohibited by Rule 65(d)(1)(C), which states that "[e]very order granting an injunction and every restraining order must ... describe in reasonable detail—*and not by referring to the complaint or other document*—the act or acts restrained or required." (emphasis added). The purpose of Rule 65(d)(1)(C) "is to provide a solid foundation for any subsequent proceeding to enforce the injunction, as by a motion to hold the defendant in contempt[,]" *Chicago & N. W. Transp. Co. v. Ry. Labor Executives' Ass'n*, 908 F.2d 144, 149 (7th Cir. 1990), and, thus, "[a]n injunction that fails to comply with Rule 65(d) may not be enforced by way of contempt sanctions." *Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1170 n.6 (10th Cir. 2009); *see also Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (reversing contempt order because it was "founded upon a decree too vague to be understood" and Rule 65 "require[es] that a federal court frame its order so that those who must obey them will know what the court intends to require and what it means to forbid"); *DeWitt Stern Group, Inc. v. Eisenberg*, 2013 WL 5815512, at *1, *4-*5 (S.D.N.Y. Oct. 29, 2013).

*Second*, ESH has not established by clear and convincing evidence that L1bero failed to comply with the PI Order, including the provision enjoining it from "issuing directives or making business decisions on behalf of any [L1bre Group] company ... relating to the *commencement* of litigation or other proceedings, and specifically to the initiation or settlement of the NAFTA Claim." (ECF No. 39 at 3 (emphasis added).) L1bero, either directly or on behalf of any L1bre Group company, has not *commenced* any litigation or any other proceedings.

(*See generally* ECF No. 48 at 10-11.)   ESH has merely alleged that L1bero "continued" to prosecute or press certain already pending Mexican legal proceedings as to which this Court expressly declined to enter an anti-suit injunction.  (*Compare* ECF No. 48 at 10 *with* ECF No. 33 at 48-52.)   The fact that this Court entered a PI Order that enjoined the *commencement* of litigation or other proceedings, but not the continued prosecution of the already pending Mexican legal proceedings, makes sense for several reasons.   As an initial matter, the purpose of a preliminary injunction, and particularly a preliminary injunction in aid of arbitration, is merely to preserve the status quo until the dispute can be heard by the arbitral tribunal.  *See Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 3727230, at *10 (S.D.N.Y. Aug. 11, 2017) ("An injunction in aid of arbitration is designed solely to preserve the status quo.")   In addition, while the Partners Agreement requires unanimous board approval for "Major Decisions," which could include the commencement of litigation (although in this case it does not expressly do so), (*see* Wood Decl. Ex. 9 at § 5.2), it expressly delegates the day-to-day management, such as the continued prosecution of litigation, to the executive officers appointed by L1bero (*see id.* at §§ 5.1(b)(i)-(ii), (iv), 6.1, 6.2).  Finally, it is far from clear that León and Zayas do or should have any right to participate in decisions about the prosecution of legal proceedings in which they are named as the defendants.  *Cf. Joy v. North*, 692 F.2d 880, 887-88 (2d Cir. 1982) (explaining that directors are impermissibly conflicted such that no demand needs be made when the directors are named as defendants).

*Third*, ESH still fails to show that L1bero did not diligently attempt to comply with PI Order in a reasonable manner.  L1bero must navigate within the bounds of the PI Order, on the one hand, while complying with its fiduciary duties and Mexican court orders, on the other hand.  If L1bero were to discontinue the Mexican legal proceedings or fail to

comply with scheduling orders in those proceedings, it would be giving up viable claims that would benefit its stakeholders, with the distinct likelihood of being unable to re-commence the proceedings (and thus losing the claims forever) should the PI Order be vacated or modified by the arbitral tribunal or by the Second Circuit. L1bero has thus attempted to comply with its fiduciary duties and Mexican court orders consistent with a "good faith and reasonable interpretation" of the PI Order. *See In re MarketXT Holdings Corp.*, 336 B.R. at 52.

### B. L1bero's Alleged Failure to Seat ESH's Chosen Directors on Lusad's Board Does Not Violate the Preliminary Injunction

ESH argues that L1bero's purported inaction regarding the seating of certain individuals to Lusad's Board violates the PI Order. (ECF No. 48 at 7-9.) ESH's argument is untethered to the text of the PI Oder and, in any event, omits L1bero's efforts to seat ESH's representatives.

*First*, the PI Order does not clearly or unambiguously require L1bero to, as ESH contends, "re-seat [ESH's] principals, Mess[]rs. Zayas and León [or even ESH's replacements directors], on Lusad's board." (*Compare* ECF No. 48 at 7-8 *with* ECF No. 39 at 2-3.) ESH does not and cannot cite any provision of the PI Order that requires L1bero to take any affirmative action to seat ESH's chosen directors on Lusad's board, or otherwise. (*See id*.) ESH cannot do so because the PI Order is styled as a *prohibitory* injunction that prevents L1bero from taking certain actions, not a *mandatory* injunction that would require L1bero to take affirmative actions "to re-establish [ESH's] equal management and control over the company." (*See id.*).

"A prohibitory injunction is one that 'forbids or restrains an act'" while "[a] mandatory injunction, in contrast, 'orders an affirmative act or mandates a specified course of conduct.'" *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) (quoting Black's Law Dictionary 788 (7th Ed. 1999)). The distinction is significant. Because a mandatory injunction requires a party to take affirmative action to alter the status quo,

there is a "more stringent standard that must be met by a plaintiff seeking a mandatory injunction, *i.e.*, a clear or substantial likelihood of success on the merits." *Cain*, 418 F. Supp. 2d at 472 (citing *Bronx Household of Faith v. Board of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003)); *see also New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (same). Here, ESH did not seek—and this Court did not issue—a mandatory injunction under this more stringent standard. Accordingly, ESH cannot now claim that L1bero should be held in contempt for failing to take affirmative action to alter the status quo when ESH never attempted to prove a case for a mandatory injunction in the first place.

*Second*, ESH has not and cannot establish by clear and convincing evidence that L1bero has failed to comply with the clear and unambiguous provision of the PI Order enjoining it from, without the consent of ESH, "making any changes in the corporate status, identity of directors, shareholder interest, or other ownership, managerial, or control rights of any company contemplated by the Partners Agreement." (ECF No. 39 at 3.) ESH cannot establish that L1bero has made any such changes without its consent. (*See* ECF No. 48 at 7-9.)[4] ESH has merely alleged that L1bero proposed to take certain steps that would have added the replacement directors designated by ESH to the boards of all of the L1bre Group companies, but refrained from taking those or other steps after ESH objected, which is exactly what was required. (*Compare* ECF No. 48 at 7-9 *with* ECF No. 39 at 3.)

---

[4] ESH's memorandum of law includes arguments in footnotes. *See, e.g.,* ESH MOL at 9-10 n.6 (arguing that L1bre Jalisco's bylaws were revised and are not compliant with the Partners Agreement). As an initial matter, "[a]rguments made only in a footnote are generally deemed to be waived." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016); *see also City of Syracuse v. Onondaga Cty.*, 464 F.3d 297, 308 (2d Cir. 2006). In any event, the by-laws of L1bre Jalisco have not been changed or amended since its incorporation, and they contain a jurisdictional clause that requires disputes to be submitted to the competent courts of Jalisco because Mexican law requires that the by-laws of companies incorporated in Mexico provide that disputes be submitted to the jurisdiction of competent courts in Mexico. (Wood Decl. ¶¶ 31-32.) Moreover, the fact that the by-laws do not appoint ESH's representatives to the board or grant them powers of attorney is not a change in the status quo and is the result of an inadvertent omission by the notary public who did not follow L1bero's instructions to appoint ESH's representatives to the board and grant them powers of attorney. (*Id.* ¶¶ 33-35.)

*Third*, L1bero has been more than reasonably diligent in complying with the PI Order to the extent it requires affirmative action to ensure that ESH has an equal ownership stake in and/or equal participation in the management and control of the L1bre Group companies. L1bero went beyond what is required by the PI Order by taking affirmative steps to secure the appointment of León and Zayas to the board of L1bre Nuevo León and to bring L1bre Jalisco into the L1bre Group. (Wood Decl. ¶¶ 29-35, Exs. 14 & 16.) L1bero has also taken affirmative steps to progress the appointment of León and Zayas to the board of L1bre Jalisco. (*See id.* ¶¶ 33-35.); *see Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 608-09 (S.D.N.Y. 2001) (denying motion for contempt where movant failed to show that the "actions were intentional" and "[u]pon learning of th[e] oversight, [the defendant] immediately corrected the problem"). Although L1bero cannot assist with the appointment of León and Zayas to the board of Lusad in light of the pending Mexican court order (Wood Decl. ¶ 37 n. 4, Ex. 17), it has taken all necessary steps to appoint ESH's chosen designees to the board of Lusad, with the executed resolution submitted to ESH's counsel on August 4, 2019 (*id.* ¶¶ 36-47, Exs. 20-21). To the extent the process moved slower than ESH desired, this is a problem of its own making because the Partners Agreement does not grant L1bero sole authority to appoint individuals to the board of Lusad, and ESH's counsel has not been fully cooperative in terms of assisting with the drafting of the necessary instruction letter to the Secretary of the Board. (*Id.* ¶¶ 39-45; *see* León Decl. Exs. M-P); *see also Skarnulis v. Belmont*, 74 F. App'x 92, 95-96 (2d Cir. 2003) (holding that the district court did not abuse its discretion in refusing to hold defendants in contempt where, as here, the movant "refused to cooperate with their efforts")

Thus, ESH cannot show that: (1) the PI Order is clear and unambiguous with respect to imposing an affirmative obligation on L1bero to seat ESH's chosen designees to the boards of

the L1bre Group companies; (2) L1bero clearly and convincingly violated any provisions of the PI Order; and (3) L1bero has not diligently attempted to comply in a reasonable manner.

### C. L1bero Has Not Denied ESH's Appointed Directors Unrestricted and Unfettered Access to L1bre Group Books and Records

ESH inaccurately asserts that L1bero denied it equal access to books and records in violation of the PI Order because, even though L1bero promptly provided documents and granted ESH's non-director designees Audit Trail Access to the Oracle NetSuite Platform, L1bero did not grant the ESH's non-director designees "Administrator Access," which would allow them to add, alter, and delete information. (*See* ECF No. 48 at 5-7.)

*First*, the PI Order does not clearly or unambiguously require L1bero to grant ESH's non-director designees Administrator Access to the Oracle NetSuite Platform. Rather, it merely requires that "*directors appointed by [ESH] to the Board of any [L1bre Group] company . . . shall have unrestricted and unfettered access to any and call corporate, financial, and accounting information and documents of all such companies*" including certain specified documents. (ECF No. 39 at 4.) It says nothing about granting any access to ESH's *non-director designees*, and it also says nothing about granting ESH's non-director designees—or even its directors— with Administrator Access that would allow them to add, alter, or delete add, alter, and delete information in the Oracle NetSuite Platform. (Alamilla Decl. ¶¶ 4, 10.) Nor can ESH rely on the provisions of the PI Order that refer to ESH's "right under the Partners Agreement" to "equal participation in the management and control of" the L1bre Group (ECF No. 39 at 2-3) because L1bero also does not have Administrator Access (Alamilla Decl. ¶ 10).[5]

---

[5] Although the CFO/ Comptroller and members of staff who assist the duties of the CFO/ Comptroller have Administrator Access to the Oracle NetSuite Platform (Alamilla Decl. ¶ 11), they are not L1bero's "representatives" and, in any event, the Partners Agreement expressly grants L1bero the *sole right* to appoint the Comptroller until the Intercompany Loans from L1bero are repaid in full (Wood Decl. Ex. 9 at § 5.1(b)(iv)).

*Second*, ESH has not and cannot establish by clear and convincing evidence that L1bero failed to comply with the provisions of the PI Order relating to access to books and records. Indeed, L1bero has (a) promptly provided ESH with all of the documents specified in the PI Order "including, but not limited to, documents relating to the NAFTA notice of intent against Mexico ..., the articles of incorporation of L1bre Nuevo Leon and L1bre Jalisco, and all documents and communications concerning the Mexico City and Nuevo León concessions and their processes" (*compare* ECF No. 39 at 4 *with* León Decl. Exs. E & S); (b) provided ESH's representatives with access to the offices of the Secretary of the Board to review corporate books and records (*see id.* Ex. E); and (c) granted ESH's non-director designees with Audit Trail Access to the Oracle NetSuite Platform, which affords them the ability to access and review the L1bre Group's incoming and outgoing bank account funds and financial transactions, the information behind those transactions, as well as the audit trail (*see* Alamilla Decl. ¶¶ 8-9).

*Third*, L1bero has been more than reasonably diligent in complying with the PI Order notwithstanding ESH's allegations about lack of Administrator Access, bank statements, and an attempt to visit the L1bre Group offices on July 8, 2019. As discussed above, via the Oracle NetSuite Platform, ESH's non-director designees have the ability to review the L1bre Group's incoming and outgoing bank account funds. (*See* Alamilla Decl. ¶ 9, Ex. 2.) Although unidentified ESH representatives were apparently denied access to the L1bre Group offices on July 8, 2019, this was done by building security after they failed to comply with security protocols. (Wood Decl. ¶¶ 25-27.) No one from the L1bre Group's offices was notified of the presence of any ESH representatives, L1bero did not instruct building security to deny access, and neither L1bero nor the L1bre Group owns the building or employs building security. (*Id.* ¶¶ 26-27.) Moreover, L1bero previously arranged for ESH to have access to the offices of

the Secretary of the Board who maintains the corporate books and records (León Decl. Ex. E), and, although the L1bre Group offices are essentially empty due to the financial situation of the L1bre Group companies (Wood Decl. ¶¶ 12 & 28), L1bero is more than willing to arrange for ESH representatives to visit the L1bre Group offices. *See Tactica*, 154 F. Supp. 2d at 608-09 (denying motion for contempt where movant failed to show that the "actions were intentional" and "[u]pon learning of th[e] oversight, [the defendant] immediately corrected the problem").

Thus, ESH cannot show that: (1) the PI Order is clear and unambiguous with respect to requiring L1bero to provide its non-director designees with "Administrator Access"; (2) L1bero clearly and convincingly violated any provision of the PI Order; and (3) L1bero has not diligently attempted to comply in a reasonable manner with the PI Order.

## III. The Court Should Not Issue Monetary Sanctions or Any Other Relief

L1bero should not be held in contempt and ESH's request for sanctions and counsel fees should be denied. The movant bears the burden of proving willfulness by clear and convincing evidence. *King v. Allied Vision, Ltd.*, 919 F. Supp. 747, 752 (S.D.N.Y. 1996), *aff'd*, 65 F.3d 1051 (2d Cir. 1995). The question of whether a contemnor violated a court order willfully requires a distinct inquiry, analytically separate from the predicate question of whether the contemnor failed to comply with the order in the first place. *See Sweater Bee*, 885 F.2d at 8; *Yurman*, 2009 WL 454275 at *5. The touchstone of an award of attorneys' fees in connection with a finding of civil contempt is the contemnor's willfulness. *King*, 65 F.3d at 1063; *Yurman Studio, Inc. v. Castaneda*, Nos. 07 Civ. 1241(SAS), 07 Civ. 7862(SAS), 2009 WL 454275, at *5 (S.D.N.Y. Feb. 23, 2009). Willfulness in the civil contempt context requires an intentional disregard of the underlying order. *See Idaho Potato Comm'n v. Majestic Produce Corp.*, No. 97–CV–5512, 1998 WL 760333, at *7 (E.D.N.Y. Sept. 9, 1998); *N.Y. State Nat'l Org. for Women v. Terry*, 952 F. Supp. 1033, 1044 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 86 (2d Cir. 1998).

ESH falls well short of its burden here: the record demonstrates that, far from deliberately ignoring the PI Order, L1bero has taken pains to comply with it. These efforts are not the "callous indifference" nor even the lack of "good faith effort to comply" that courts in this Circuit recognize as the basis for a finding of willfulness.

The record demonstrates that L1bero has worked in good faith to comply with and adhere to the terms of the PI Order, to the best of their ability and understanding. Consequently, under controlling law, ESH cannot carry its burden to demonstrate that an award of sanctions or attorneys' fees is proper.

## CONCLUSION

For all of the foregoing reasons and based on the supporting papers filed in this action, L1bero respectfully requests that the Court deny ESH's request for an order holding L1bero in civil contempt of the Court's May 16, 2019 preliminary injunction.


Dated: August 5, 2019        **REED SMITH LLP**
      New York, New York

      By:  /s/ Steven Cooper
          Louis M. Solomon
          LSolomon@reedsmith.com
          Steven Cooper
          SCooper@reedsmith.com
          Nicole Lapsatis Lech
          NLapsatis@reedsmith.com
          Jonathan P. Gordon
          Jonathan.Gordon@reedsmith.com

      599 Lexington Avenue
      New York, New York 10022
      Telephone: (212) 521-5400
      Facsimile: (212) 521-5450

      *Attorneys for Respondent L1bero Partners, LP*