# EXHIBIT 1

# 19-1665

## United States Court of Appeals
## for the Second Circuit

---

ESPÍRITU SANTO HOLDINGS, LP,

*Petitioner-Appellee,*

*v.*

L1BERO PARTNERS, LP,

*Respondent-Appellant,*

ESPÍRITU SANTO TECHNOLOGIES, LLC,

*Respondent.*

---

Appeal from the United States District Court for the Southern
District of New York, No. 19 Civ. 3930 (Hon. Colleen McMahon)

---

## BRIEF FOR APPELLANT L1BERO PARTNERS, LP

---

M. Patrick Yingling
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
Tel: (312) 207-1000

Brian A. Sutherland
Steven Cooper
Colin A. Underwood
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 521-5400
bsutherland@reedsmith.com

*Counsel for L1bero Partners, LP*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Respondent-Appellant L1bero Partners, LP, by and through undersigned counsel, states as follows:

L1bero Partners, LP is owned by Adriatica Assets LP and Mediterranea Assets LP, limited partnerships incorporated in Ontario, Canada, which are, in turn, owned by The Adriatica Trust, The Mediterranea Trust, and MA2 Holdings LP.

No publicly held corporation owns 10% or more of L1bero Partners, LP's stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................ 1

ISSUES PRESENTED .......................................................................... 8

JURISDICTION .................................................................................... 9

STATEMENT OF THE CASE ............................................................ 10

I.    Background ................................................................................ 11

    A.    The Mexico City government selects Lusad to install and maintain taximeters for the City's fleet ............................... 11

    B.    L1bero Partners and ES Holdings enter into the Partners Agreement and appoint Covarrubias to lead the L1bre Business as CEO ................................................... 12

    C.    After Covarrubias becomes CEO, he and L1bero Partners finance and operate the L1bre Business .............. 15

    D.    The Mexico City government claims that Lusad agreed to alter the terms of the Mexico City Concession ................ 16

    E.    The board authorizes Covarrubias to renegotiate the Mexico City Concession and implement an audit ............... 18

    F.    Lusad commences criminal and civil proceedings against León and Zayas in Mexico ................................................... 20

II.    Procedural history ..................................................................... 22

    A.    ES Holdings files a request for arbitration and petitions the district court for an emergency injunction in aid of arbitration ................................................................................ 22

    B.    The district court issues an opinion holding that an injunction is warranted and requesting a proposed order from ES Holdings ................................................................. 26

**TABLE OF CONTENTS (Cont.)**

Page

    C.    The district court issues an injunction in aid of
arbitration ................................................................ 27

SUMMARY OF ARGUMENT ................................................ 28

ARGUMENT ........................................................................... 30

I.    Standard of review ....................................................... 30

II.    The district court violated L1bero Partners' right to due
process because it based its order on a new theory of
irreparable harm that the court identified *sua sponte* after
the hearing ...................................................................... 32

III.    The district court abused its discretion in excluding
declarations from all five of L1bero Partners' witnesses ............. 38

IV.    The district court erred in finding that ES Holdings would
suffer irreparable harm without an injunction............................ 49

    A.    ES Holdings failed to establish any irreparable harm
alleged in its petition ............................................. 50

    B.    The district court erred in presuming irreparable harm
based on ES Holdings' alleged inability to participate in
management ........................................................ 52

V.    The district court erred in granting injunctive relief that was
not narrowly tailored to fit the purported violation and that
ES Holdings did not request in its petition.................................. 55

CONCLUSION ........................................................................ 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Express Fin. Advisors Inc. v. Thorley,*
  147 F.3d 229 (2d Cir. 1998) .................................................................. 31

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
  784 F.3d 887 (2d Cir. 2015) .......................................................... 32, 55

*Borden, Inc. v. Meiji Milk Prods. Co.,*
  919 F.2d 822 (2d Cir. 1990) .................................................................. 55

*DTC Energy Grp., Inc. v. Hirschfeld,*
  912 F.3d 1263 (10th Cir. 2018) ........................................................... 35

*Faiveley Transport Malmo AB v. Wabtec Corp.,*
  559 F.3d 110 (2d Cir. 2009) ..................................................... *passim*

*Flores v. Town of Islip,*
  No. 18-cv-3549, 2019 WL 1515291 (E.D.N.Y. Apr. 8, 2019).............. 41

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.,*
  320 F.3d 1205 (11th Cir. 2003)............................................................ 33

*FTC v. 4 Star Resolution, LLC,*
  No. 15-cv-112S, 2015 WL 7431404 (W.D.N.Y. Nov. 23,
  2015) ...................................................................................................... 41

*FTC v. Vantage Point Servs., LLC,*
  No. 15-CV-006S, 2015 WL 2354473 (W.D.N.Y. May 15,
  2015) ...................................................................................................... 41

*Garcia v. Yonkers Sch. Dist.,*
  561 F.3d 97 (2d Cir. 2009) .................................................................. 32

*Goel v. Ramachandran,*
  823 F. Supp. 2d 206 (S.D.N.Y. 2011)................................................... 55

# TABLE OF AUTHORITIES (Cont.)

**Page(s)**

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck
Drivers Local No. 70 of Alameda Cty.*,
415 U.S. 423 (1974) ..................................................................... 33, 37

*Hoxworth v. Blinder, Robinson & Co.*,
903 F.2d 186 (3d Cir. 1990) ................................................................ 57

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004) ................................................................ 41

*Lugo v. Keane*,
15 F.3d 29 (2d Cir. 1994) ..................................................................... 32

*Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*,
446 F.2d 353 (5th Cir. 1971) ............................................................... 33

*Mullins v. City of New York*,
626 F.3d 47 (2d Cir. 2010) ................................................................... 42

*Oklahoma Am. Legion Corp. v. Am. Legion*,
24 F. Supp. 3d 1082 (W.D. Okla. 2014) ............................................. 53

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
810 F.3d 631 (9th Cir. 2015) ............................................................... 57

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
317 F.3d 209 (2d Cir. 2003) ......................................................... 36, 56

*Patsy's Italian Rest., Inc. v. Banas*,
658 F.3d 254 (2d Cir. 2011) ................................................................ 32

*Rosen v. Siegel*,
106 F.3d 28 (2d Cir. 1997) ................................................................... 33

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ................................................................... 53

*Schering Corp. v. Pfizer Inc.*,
189 F.3d 218 (2d Cir. 1999) ................................................................ 31

# TABLE OF AUTHORITIES (Cont.)

**Page(s)**

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 286 (2d Cir. 1999) .......................................................... 36, 56

*Stewart v. INS*,
  762 F.2d 193 (2d Cir. 1985) ............................................................... 57

*People ex rel. Underwood v. Griepp*,
  No. 17-cv-3706, 2018 WL 3518527 (E.D.N.Y. July 20,
  2018) ..................................................................................................... 42

*United States v. El-Hage*,
  213 F.3d 74 (2d Cir. 2000) ................................................................. 31

*United States v. Reyes*,
  18 F.3d 65 (2d Cir. 1994) ................................................................... 38

*Veramark Techs., Inc. v. Bouk*,
  10 F. Supp. 3d 395 (W.D.N.Y. 2014) ................................................. 41

*Victorinox AG v. B&F Sys., Inc.*,
  709 F. App'x 44 (2d Cir. 2017) ........................................................... 56

*Waldman Publishing Corp. v. Landoll, Inc.*,
  43 F.3d 775 (2d Cir. 1994) ........................................................... 55, 56

*Weitzman v. Stein*,
  897 F.2d 653 (2d Cir. 1990) ............................................................... 32

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) ................................................................... 32, 49, 54

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
  339 F.3d 101 (2d Cir. 2003) ............................................................... 53

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2d Cir. 2012) ............................................................... 53

# TABLE OF AUTHORITIES (Cont.)

**Page(s)**

**Statutes**

9 U.S.C. §§ 201–08 .................................................................. 9

9 U.S.C. § 203 .......................................................................... 9

9 U.S.C. § 206 ........................................................................ 55

28 U.S.C. § 1291 ...................................................................... 9

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, Federal
    Practice & Procedure § 2949 (3d ed. 2019) ......................... 33

# INTRODUCTION

The purpose of an injunction in aid of arbitration is to ensure that one party does not irreparably harm the other party's interest at stake in the arbitration, before the arbitration is complete. Any injunctive relief must be narrowly tailored to fit the alleged harm and avoid burdening lawful commercial activity and encroaching on the province of the arbitrators.

In this case, appellee Espíritu Santo Holdings, LP ("ES Holdings") rushed into court because it mistakenly believed that its business partner, appellant L1bero Partners, LP, would imminently violate their partnership agreement (the "Partners Agreement") by diverting a valuable business opportunity to a competitor. If L1bero Partners caused a *competitor* to seize the opportunity in violation of the Partners Agreement, the argument went, the arbitration panel would be unable to restore the opportunity to its rightful owner.

The specific opportunity at issue was a potential contract or "concession" with the City of Monterrey in the State of Nuevo León, Mexico, to supply taximeter hardware and software for the city's taxi fleet and earn fees based on use of that hardware and software. On April 12, 2019, the City of Monterrey announced that bidding for the contract would begin on May 2, 2019, and end on May 15, 2019. ES Holdings waited until May 1, 2019—a national holiday in Mexico—and

then gave the Mexican principals of L1bero Partners less than 24 hours' notice that it would be seeking a temporary restraining order in federal court in New York to block L1bero Partners from causing a "competitor" to bid on the Monterrey taximeter contract.

ES Holdings' basis for claiming an imminent risk of harm to its arbitration interests rested on assumptions that were entirely false. As the district court later found, the entity that L1bero Partners incorporated to bid on the Monterrey taximeter contract was not a competitor at all. ES Holdings and L1bero Partners *jointly owned* the entity incorporated to bid on the Monterrey contract, through a holding company in which each held a 50% share, Espíritu Santo Technologies, LLC ("ES Technologies"). That simple fact, of which ES Holdings was apparently unaware, obliterated the only rationale for the injunction— an imminent risk of harm based on a purported unauthorized third-party competitor using ES Holdings and L1bero Partners' technology to bid on an irreplaceable opportunity. Indeed, ES Holdings' principal conceded at the preliminary injunction hearing that as long as the bidding entity was fully owned by ES Holdings and L1bero Partners, ES Holdings would have no complaints.

That should have been the end of the matter.

The district court should have denied ES Holdings' petition because its only theory of irreparable harm was factually and—under

2

*Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009)—legally baseless. Instead, the district court set out, without proper notice, to remedy a perceived "potential" harm that ES Holdings never pleaded and that bore no relation to the original rationale for the injunction. The district court sought to adjudicate whether ES Holdings might suffer irreparable harm because L1bero Partners was depriving it of its right to *manage* a company in which it held a 50% interest. In the process, the district court made numerous unnecessary findings of fact and issued sweeping conclusions of law, many of which belong before the arbitrators. The district court's *sua sponte* decision to substitute its own theory of irreparable harm, and then grant injunctive relief that ES Holdings never requested in its petition based on that unpleaded theory, was an abuse of discretion.

When ES Holdings went to court on May 2, 2019, it already held an ownership interest in a contractual right to supply taximeter hardware and software to Mexico City (the "Mexico City Concession"). Its relationship with its business partner L1bero Partners had collapsed, however, and ES Holdings apparently believed that L1bero Partners was about to misappropriate the technology that they jointly owned for use by unauthorized third-party competitors in Mexico City, Nuevo León, and Jalisco.

Specifically, ES Holdings sought to enjoin L1bero Partners from:

    (1)    engaging in any *competitive activities* in violation of the Partners Agreement, including, but not limited to, any efforts to obtain concessions from Monterrey and Jalisco, or taking any actions to cancel or transfer the existing Mexico City Concession;

    (2)    using any *trade secrets or intellectual property* developed by ES Holdings for any purpose other than to benefit the existing Mexico City Concession or any future concession held by an entity jointly controlled by ES Holdings and L1bero Partners.

(A. 30 (emphasis added))

The district court held that ES Holdings did *not* establish the irreparable harm identified in its papers. (SPA 46) But it found that "there is irreparable harm resulting from the current situation—although it is not the harm on which Petitioner focuses." (SPA 49) The court identified its own theory of harm: "The *real* irreparable harm derives from the fact that, owing to repeated breaches of contract by [L1bero Partners] and its principals, [ES Holdings] is being systematically, bit by bit by bit, cut out of the management of the Joint Venture and of its various operating corporations—depriving it of the ability to make its own business decisions about the operation of a joint venture in which it is supposed to have 50% control …." (SPA 49 (emphasis added)) On this basis, the district court ordered L1bero

4

Partners not to make *any* business decisions without express *written* consent from ES Holdings, despite the fact that the Partnership Agreement delegates day-to-day management to executives appointed by L1bero Partners and ES Holdings. These purported "breaches" are the subject of the arbitration commenced by ES Holdings, and were not sought to be remedied by the district court.

The district court deprived L1bero Partners of due process when it granted the petition on an unpleaded theory of irreparable harm that the district court announced in its decision after the hearing. L1bero Partners did not have notice of or an opportunity to respond to that theory and therefore did not receive a meaningful hearing. This was a paradigmatic deprivation of due process.

The rushed hearing process, which ES Holdings caused by waiting until May 2, 2019 to file its petition demanding relief by May 15, 2019, led the district court to commit other prejudicial errors. Over L1bero Partners' objection, the court summarily and erroneously ruled that L1bero Partners' five declarations were categorically inadmissible as hearsay because the declarants were not present in court. No notice had been given that L1bero Partners' declarations would be stricken if its witnesses, who all reside in Mexico, did not appear at the hearing. In stark contrast, when L1bero Partners objected to ES Holdings' evidence on hearsay grounds, the district court's ruling was different:

> THE COURT:  Oh, this is a preliminary injunction hearing. I get
> to listen to hearsay.

(A. 1137 [64:7-17])

As a result of this inconsistent treatment and legal error in excluding L1bero Partners' declarations, the court credited *unsworn* hearsay submitted by ES Holdings instead of *sworn* declarations based on personal knowledge submitted by L1bero Partners. The court relied on this legal error as support for granting the injunction, and therefore abused its discretion.

The district court further erred in concluding that the unpleaded harm arising from "inability to participate in management" was, standing alone, irreparable harm. The court either presumed irreparable harm or determined that participating in management has some incalculable intrinsic worth. Either way, this was error. Courts may not presume irreparable harm. And ES Holdings made no showing that any inability to participate in management impacted an imminent decision-making in any irreparable way. The only alleged irreparable harm that ES Holdings put before the district court related to unauthorized bidding on the Monterrey concession by a third-party competitor, which turned out to be unsubstantiated. Even with respect to the district court's *sua sponte* theory of irreparable harm, the court

found only a "potential" for harm, and not a likelihood of harm, which is insufficient to sustain an injunction.

Finally, the court's injunction was overbroad, even if one assumes that an injunction of any kind was warranted (and none was). The injunction granted ES Holdings far more control over management than it had previously enjoyed under the Partners Agreement, thereby violating L1bero Partners' management rights and frustrating the decision-making of the executives charged with running the company under the Partners Agreement. An injunction should be narrowly tailored to prevent irreparable harm and go no further, but the district court's order gave ES Holdings new rights and was far broader than necessary to prevent the alleged harm identified in ES Holdings' petition or the court's opinion.

In sum, the evidence and the district court's own findings here did not reveal any risk of imminent harm arising from inability to manage the partners' business interests, an issue that is being decided in arbitration. Indeed, if ES Holdings were suffering or believed that it imminently would suffer such irreparable harm, it would have pleaded *that* harm, and it would have filed its petition many months earlier than it did. ES Holdings presumably did not file its petition any earlier because it sought to enjoin the purported misappropriation of trade secrets, and the lack of control over management did not create an

imminent risk of harm. In all events, it failed to carry its burden to show that it was likely to suffer actual and imminent irreparable harm if an injunction did not issue. Accordingly, and for the reasons stated below, this Court should vacate the injunction.

## ISSUES PRESENTED

1.    Did the district court violate L1bero Partners' right to due process, given that the court based its finding of irreparable harm on a theory that the court developed *sua sponte* during and after the hearing, and not on any irreparable harm that ES Holdings noticed in its papers?

2.    Did the district court abuse its discretion in striking the declarations of all five of L1bero Partners' witnesses on the sole ground that the declarants were not present at the hearing to be cross-examined?

3.    Did the district court err in finding that ES Holdings would suffer potential irreparable harm arising from inability to participate in management, given that neither ES Holdings nor the court identified any imminent business decision or event that ES Holdings sought to influence or control in a manner different from L1bero Partners?

4.    Did the district court err in failing to tailor the order narrowly to the alleged harm by, among other things, prohibiting

8

L1bero Partners from making any business decision without ES Holdings' written consent, given that the parties' agreement delegates day-to-day management to executives appointed by L1bero Partners, and ES Holdings did not ask for that relief in its petition?

## JURISDICTION

The district court had jurisdiction under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–08. That statute provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States" and that district courts "shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." 9 U.S.C. § 203.

This Court has jurisdiction on appeal under 28 U.S.C. § 1291, which provides for appellate jurisdiction on appeal of a final decision to grant injunctive relief in aid of arbitration. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 n.3 (2d Cir. 2009). The district court entered its final order granting injunctive relief on May 16, 2019. (SPA 59–62) L1bero Partners timely filed its notice of appeal on June 4, 2019. (A. 1061)

9

## STATEMENT OF THE CASE

The underlying dispute in this matter—the one that an arbitration panel will ultimately resolve—is between two limited partnerships, ES Holdings and L1bero Partners. Each owns 50 percent of ES Technologies, a Delaware holding company whose operating subsidiaries are incorporated in Mexico. (A. 12–13 [¶¶ 8–10]) An arbitration panel will decide whether ES Holdings and L1bero Partners breached their duties and obligations to one another under a contract governing their relationship and ownership interests, the Partners Agreement.

On May 2, 2019, ES Holdings filed an emergency petition for an injunction in aid of arbitration. That same day, the United States District Court for the Southern District of New York (Hon. Colleen McMahon, C.J.) ordered L1bero Partners to show cause why an injunction should not issue and, on May 13, 2019, held a hearing on the petition. The next day, the district court issued a 55-page decision (SPA 4–58) and later an order (on May 16, 2019) granting injunctive relief (SPA 59–62). This is an appeal from the district court's final order granting the injunction.

The district court's order should be vacated for multiple reasons set out below. Among other prejudicial errors, at the hearing, the district court almost immediately granted ES Holdings' oral motion to

strike all of L1bero Partners' declarations. In the pages that follow, we explain what the full evidentiary record—the evidence presented by both ES Holdings *and* L1bero Partners—would have shown if the district court had not struck those declarations.

## I. Background

### A. The Mexico City government selects Lusad to install and maintain taximeters for the City's fleet

In 2015, Eduardo Zayas Dueñas ("Zayas") formed Servicios Digitales Lusad, S. de R.L. de C.V. ("Lusad") under Mexican law. (A. 584–757; *see also* A. 87 [¶ 3]; A. 1145–46 [72:12–73:23]) Lusad entered into a contract with a company named NullData, S.A. de C.V. to develop ride-hailing software for mobile phones and a digital taximeter for taxis. (A. 1120 [47:4–14]; A. 1122 [49:12–19]; A. 1130–31 [57:18–58:11]; A. 1164–65 [91:24–92:11]) Zayas and his business partner Santiago León Aveleyra ("León") approached Mexico City's transportation agency (Secretaría de Movilidad) to explain and promote the benefits of the technology they were developing. (A. 87 [¶ 4])

In June 2016, the Mexico City government awarded a project to install and maintain new taximeters to Lusad, *i.e.*, the "Mexico City Concession." (A. 87 [¶ 6]) The Mexico City Concession granted Lusad the right to install digital taximeters in the approximately 138,000 registered taxis in Mexico City and to receive compensation for every

trip—up to 12 Mexican pesos—as well as advertising and other revenue streams. (A. 90 [¶ 12]; A. 1172 [99:7–10])

## B. L1bero Partners and ES Holdings enter into the Partners Agreement and appoint Covarrubias to lead the L1bre Business as CEO

In May 2017, Lusad registered the "L1bre" trademark in Mexico to represent its business of making and selling ride-hailing and taximeter software and hardware (Lusad and its affiliates and parent companies are, collectively, the "L1bre Business"). (A. 427; A. 1157–58 [84:23–85:2]) Although Lusad had obtained the Mexico City Concession, it needed additional capital to finish developing the ride-hailing software and digital taximeter technology, purchase and install the hardware in the approximately 138,000 registered taxis in Mexico City, and further develop the L1bre Business. (A. 88 [¶ 7]) León and Zayas approached entrepreneurs Fabio Covarrubias and Ricardo Salinas to seek financing. (A. 88 [¶ 7]) Covarrubias agreed to invest in and assemble a team to manage the L1bre Business. (A. 88 [¶ 8]; A. 222–24 [¶¶ 5 & 7–9]) Salinas agreed to extend a line of credit from a bank that he owned, Banco Azteca. (A. 88 [¶ 8]) In return, L1bero Partners, a limited partnership controlled and indirectly owned by Covarrubias, would acquire 50% of ES Technologies, which owned the L1bre Business entities, including Lusad. (A. 106–07 [§ 4.1(a)–(vi)]; A. 88–89

[¶¶ 8–10]) In short, ES Holdings and L1bero Partners became 50-50 owners of the L1bre Business. (A. 88–89 [¶ 10])

In December 2017, L1bero Partners, ES Holdings, and ES Technologies entered into the Espíritu Santo Technologies, LLC Partners Agreement, *i.e.*, the "Partners Agreement." (A. 89–90 [¶ 11]) The stated purpose of the Partners Agreement was "to govern the relation[ship] between [L1bero Partners] and [ES Holdings] as partners of [ES Technologies]." (A. 100 [§ 1]) The Partners Agreement provided that ES Technologies would act as "a pure holding company" and the "controlling partner in L1bre Holdings, LLC" which, in turn, was "the controlling partner" in Lusad, which, in turn, was "the title holder of [the Mexico City Concession]" and owner of the relevant intellectual property. (A. 100–01 [§ 2]; A. 1105-06 [32:17-33:19]; A. 1157-58 [84:23-85:2])

The Partners Agreement provided that L1bero Partners and ES Holdings would be "jointly responsible" for handling day-to-day operations of the L1bre Business and exploring new business opportunities. (A. 107 [§ 4.2(a)–(b)]) Each side had the right to appoint two directors to the ES Technologies board and the right to appoint an equal number of directors to the boards of any new affiliates or subsidiaries that might be incorporated as part of an expansion of the L1bre Business. (A. 107–08 [§ 5.1(a)–(b)]) All "Major Decisions" required

a unanimous affirmative written resolution of all directors. "Major Decisions" included any decision to amend the Mexico City Concession or to incorporate a new affiliate or subsidiary. (A. 109–111 [§ 5.2(p), (t)])

The Partners Agreement delegated day-to-day operational authority to appointed executive officers. Notably, it provided that L1bero Partners would have the *sole right* to appoint the CEO and a majority of a three-member executive committee of the L1bre Business—including Lusad and its other operating affiliates—until ES Technologies repaid intercompany loans from L1bero Partners, which has not occurred. (A. 107–08 [§ 5.1(b)(i)–(ii), (iv)]; A. 113 [§ 6.2]) It provided that the CEO "shall be responsible for the day-to-day operations and management of [the L1bre Business]" and that the executive committee "shall make decisions to adjust the detailed operational plans to implement the Board's resolutions." (A. 113 [§§ 6.1, 6.2]) L1bero Partners appointed Covarrubias as CEO to manage the L1bre Business. (A. 89–90 [¶ 11]; A. 113 [§ 6.1]) L1bero Partners also appointed a CFO who, together with Covarrubias as CEO, comprised two of the three members of the executive committee of the L1bre Business. (A. 91 [¶ 15]; A. 113 [§ 6.2]) Thus, under the Partners Agreement, L1bero Partners was authorized to, and did in fact, appoint officers responsible for operations and management of the L1bre Business.

14

## C. After Covarrubias becomes CEO, he and L1bero Partners finance and operate the L1bre Business

After the parties executed the Partners Agreement, L1bero Partners and Covarrubias invested significant capital and assembled a team to develop the L1bre Business. (A. 223–24, A. 227–31 [¶¶ 7–9, 17]) L1bero Partners contributed $30 million; Covarrubias personally contributed $20 million and arranged a loan for an additional $18 million secured by real estate that he owned. (A. 1170–71 [97:17–98:3]) These investments enabled Lusad to pay vendors, finish developing the ride-hailing software and digital taximeter technology, purchase hardware, and prepare installation facilities to install the L1bre system in the approximately 138,000 registered taxis in Mexico City. (A. 90 [¶ 12]; A. 224, A. 225–26 [¶¶ 9, 14–15])

For example, under Covarrubias's leadership, Lusad arranged to purchase hardware from a supplier named Ingram Micro, S.A. de C.V. (A. 227–28 [¶ 17]; A. 875–77, A. 880–81 [¶¶ 6–7, 12]; A. 909–17; A. 919–29; A. 931–42) It entered into a contract with Kichink Servicios, S.A. de CV pursuant to which Kichink agreed to provide "software, computer program, application and computer system development services …." (A. 416 [§ 1.1]; A. 879 [¶ 9]; A. 1164–65 [91:1–92:20]) The L1bre Business entities also entered into various service contracts with Cubeice Consultores de Negocios, S.C. (A. 228 [¶ 17]; A. 431–54; A. 877–

78 [¶ 8(a)]; A. 443, A. 449–51 [§ 1 and Appendix A]) and MOOK, S.A.P.I. de C.V. (A. 228 [¶ 17]; A. 456–557; A. 878 [¶ 8(b)])

In May 2018, Covarrubias arranged for the incorporation of L1bre Jalisco, S.A. de C.V. to reserve the name for future use and potential expansion of the L1bre Business into the State of Jalisco. (A. 1179 [106:4–12]) L1bre Jalisco remained inactive; no evidence showed that Covarrubias or anyone else was seeking contracts or business for that entity, as the district court would later indicate in its decision. (SPA 45 ("the Jalisco venture appears to be no more than an ephemeral possibility at present …"))

In September 28, 2018, Lusad obtained approval for the digital taximeter and the related software and technology needed for the Mexico City Concession. (A. 569–79; A. 1149 [76:23–25]) Based on the approval, the Mexico City Concession, and the projection that Lusad could obtain additional concessions in Mexico, Goldman Sachs in early October 2018 valued the L1bre Business at approximately $2.4 billion. (A. 90 [¶ 12]; A. 1124–25 [51:20–52:5])

### D. The Mexico City government claims that Lusad agreed to alter the terms of the Mexico City Concession

On April 17, 2018, the Mexico City government published a notice to all taxi drivers requiring them to switch from analog taximeters to digital taximeters—*i.e.*, the L1bre system. (A. 1176 [103:4–8]) A group

of about 400 taxi drivers—out of 138,000 taxis total—objected to the requirement and sued for an injunction. (A. 1176 [103:8–12]) The lawsuit attracted attention from the Mexican media and from the prospective candidates who were running for mayor of Mexico City in the summer of 2018. (A. 1176 [103:11–19]) During this time, the candidate who was eventually elected mayor in July 2018 promised taxi drivers that she would not require them to adopt the L1bre system. (A. 1176 [103:13–19])

In November 2018, shortly before Mexico City's new administration took office, transportation officials convened a meeting with Lusad. (A. 1172–73 [99:9–18, 100:1–4]) Zayas attended the meeting on behalf of ES Holdings and Lusad board member Julio Belmont attended on behalf of L1bero Partners. (A. 1173 [100:5–14]) None of the witnesses at the hearing were present at the meeting, so virtually everything presented about what occurred was hearsay. Flores testified that in his understanding, Mexico City transportation officials presented a document to Lusad that purported to modify the terms of the Mexico City Concession. (A. 1173–74 [100:17–101:6]) As modified, the Mexico City Concession would have significantly less value to Lusad. (A. 1171–72 [98:9–99:20]; A. 1201 [128:4–15])

Flores testified that "all" were "shocked" to learn that the Mexico City government had purported to alter the concession with Lusad.

17

(A. 1174-75 [101:18-102:3]) ES Technologies and L1bre Holding LLC have commenced NAFTA arbitration against the Mexico City government, challenging the purported modifications of the Mexico City Concession. (A. 1176–77 [103:20–104:22])

### E. The board authorizes Covarrubias to renegotiate the Mexico City Concession and implement an audit

In December 2018, the Lusad board, which included León and Zayas, met to discuss a wide-ranging agenda that included a proposed audit and the purported amendment to the Mexico City Concession. (A. 138–58) This was precipitated in part because, in October 2018, according to León's testimony, Manuel Tabuenca, an employee who had served as Lusad's Chief Financial Officer, accused Covarrubias of diverting Lusad's assets for the benefit of his family and friends. (A. 91–93 [¶ 15]; A. 1104–05 [31:9–32:9]; A. 1169–70 [96:6–97:2]) Covarrubias had recently demoted Tabuenca. León's testimony, which was almost entirely hearsay, included hearing Tabuenca say that Lusad had been maintaining two sets of books and records, which were not presented at the hearing. (A. 1137–39 [64:7–66:13]) León apparently brought Tabuenca's allegations to Salinas's attention, and the latter suggested that the Lusad board convene to hire an independent auditor. León trusted Salinas at the time and agreed to the suggestion. (A. 93 [¶ 16])

The meeting resulted in a written board resolution that Lusad would hire Deloitte as a special independent auditor to perform an

audit. (A. 149) With an eye towards future deals, the board also "resolve[d] to constitute a Mexican subsidiary of L1bre Holding LLC, so that said new company can participate in the bidding process for a concession to install and operate digital taximeters … in the city of Monterrey, Nuevo León …." (A. 155 [§ 7.1]) In addition, the board resolved that a separate "newly created company, called L1bre Jalisco, S.A. de C.V., [shall] restructure its shareholding structure to incorporate L1bre Holding LLC as a controlling shareholder." (A. 155 [§ 7.3])

The board authorized Covarrubias and Belmont to "seek to engage with the Mexico City government to renegotiate the Concession granted by the Department of Transportation in 2016, in the most favorable terms for [Lusad] …." (A. 156 [§ 8.1]) The board authorized Covarrubias *alone* "to negotiate and implement the actions in the terms approved in" each of the other resolutions, including the independent Deloitte audit. (A. 157 [§ 9.1]; 1143–44 [70:20–71:4])

León submitted a declaration that attached "[a] true and accurate copy of the December 14, 2018 Unanimous Resolutions of the Board of Managers of Lusad, as well as a translation of the same … as Exhibit 3." (A. 93 [¶ 16]) The district court admitted León's declaration and relied on it as the source of most of the facts stated in its decision. (A. 1090-91 [17:17-18:20]; SPA 7-25) At the hearing, however, León

19

contradicted his declaration by speculating that Lusad's in-house counsel, Flores, had "changed" or "redacted" the board resolutions in some unspecified way. (A. 1115 [42:3–24]; A. 1144 [71:5–12]) León testified that he did not understand that the resolution he had signed authorized Covarrubias to implement the audit. (A. 1134–35 [61:21–62:5]; A. 1140 [67:1–19]) He testified that "we" signed a contract with Deloitte that designated Manuel Tabuenca and another Zayas associate, Eduardo Herrera, to serve as "liaisons" to Deloitte. (A. 1111 [38:3–7]). That contract also was not produced at the hearing.

## F.   Lusad commences criminal and civil proceedings against León and Zayas in Mexico

On December 18, 2018, just four days after the Lusad board had authorized Covarrubias (not Zayas) to lead the audit, Herrera entered the office of Lusad's controller, Horacio Alamilla Medina, and took the laptop that Alamilla had been using, along with another laptop used by an accounting manager for the L1bre Business. (A. 964–66, A. 969–71 [¶¶ 2–7 & annex 1]; A. 231–32 [¶ 18]) Lusad's personnel were unaware that anyone had directed Herrera to take the Lusad laptops, and Flores testified that L1bero Partners' representatives believed the laptops were stolen. (A. 1188) Thus, that same day, immediately after Herrera took the laptops, Flores filed a criminal complaint with Mexican prosecutors against Herrera on behalf of a Lusad affiliate, Servicios Administrativos Lusad. (A. 976–84; A. 1188 [115:2–5]) Two days later,

on December 20, 2018, Herrera delivered the laptops to Deloitte, although Flores would not learn that Herrera had done so until January 8, 2019. (A. 1011–12 [¶ 7])

Meanwhile, as Flores would later discover, Zayas sought to intervene on Herrera's behalf and improperly attempted to withdraw the Lusad affiliate's criminal complaint against Herrera. (A. 1009–10 [¶ 3]) Flores alleged that Zayas falsely represented that he was Lusad's *sole representative* and that Zayas presented a power of attorney that Lusad had revoked and was thus invalid. (A. 1009–10, A. 1011–12 [¶¶ 3–4, 7]) Flores also alleged that Zayas had improperly added his signature to a scanned copy of the December 14, 2018 Lusad board resolutions to create the appearance that Zayas had signed the resolutions on that date, when in fact he had not. (A. 1185–89 [112:13–116:4]) This resulted in the filing of another criminal complaint with Mexican prosecutors on January 29, 2019. Although Zayas misrepresented the date on which he added his signature to the resolutions, Flores agreed at the hearing that the board resolutions had been validly adopted at the board meeting on December 14, 2018, and were not "null and void" because of Zayas's misrepresentation, as he had previously believed and stated in the criminal complaint. (A. 1185–89 [112:13–116:21])

21

On February 20, 2019, Lusad commenced a civil action against
León and Zayas, alleging that they had directed Herrera to take the
laptops and misrepresented their authority to conduct the Lusad audit
to prosecutors. (*See* A. 1042 [¶¶ 4-5]) Lusad further alleged that Zayas
had violated the Partners Agreement when he signed the document
purporting to amend the Mexico City Concession. Based on the Lusad
complaint, on February 21, 2019, a Mexican court issued an injunction
prohibiting León and Zayas from participating in the management of
Lusad. (A. 563–67; A. 1042 [¶ 6]) The next day, Lusad shareholders
removed Zayas and León as directors (A. 204–215). According to León,
Covarrubias orchestrated their removal (A. 95–96 [¶¶ 23–24]). On April
24, 2019, based on a complaint filed by L1bre Holding LLC, a Mexican
court issued an injunction barring ES Holdings and L1bero Partners
from commencing arbitration under the Partners Agreement. (A. 1191–
95 [118:12–122:6]; S.D.N.Y. No. 19-cv-03930, ECF No. 13-2)

## II. Procedural history

### A. ES Holdings files a request for arbitration and petitions the district court for an emergency injunction in aid of arbitration

On May 1, 2019, ES Holdings filed a Request for Arbitration with
the International Court of Arbitration of the International Chamber of
Commerce. (A. 40–68) Later that day, counsel for ES Holdings informed
L1bero Partners via email that ES Holdings intended to commence a

proceeding for emergency injunctive relief in aid of arbitration in the Southern District of New York the following morning. (A. 69–70) That same day, May 1, 2019, L1bero Partners responded that the Request for Arbitration and Emergency Petition for Injunctive Relief may be in violation of the injunction issued by a Mexican court six days earlier, on April 24. (A. 74)

On May 2, 2019, ES Holdings filed an Emergency Petition for Injunctive Relief seeking a temporary restraining order and a preliminary injunction, which, given its size and translation dates, had been in the works for weeks. (A. 9–31) As noted, ES Holdings claimed that it needed an injunction because, without one, L1bero Partners would misappropriate its trade secrets for use by unauthorized third-party competitors. (A. 28–29 [¶ 51]) Thus, ES Holdings sought to enjoin L1bero Partners from misappropriating trade secrets or engaging in competitive activities in violation of the Partners Agreement. (A. 30)

That same day, the district court held a hearing and entered an Order to Show Cause directing L1bero Partners to show, on May 13, 2019, why a preliminary injunction should not issue. (SPA 1–3) The order prohibited L1bero Partners from engaging in competitive activities or using trade secrets. (SPA 2–3) On its own initiative, the court also barred L1bero Partners from taking any steps "to interfere with or divest or derogate" the district court's jurisdiction. (SPA 2;

23

A. 1066–67 [5:23–6:6]) Because ES Holdings chose a Mexican national holiday (Labor Day) to commence its action, and provided less than 24 hours' notice, L1bero Partners was unable to retain U.S. counsel in time to appear at the TRO hearing. (A. 224–25, A. 232 [¶¶ 11, 20]) The district court's order did not set a deadline for L1bero Partners to file papers in opposition to the requested relief. (SPA 1–3)

On May 8, 2019, L1bero Partners retained Reed Smith LLP— whose attorneys filed appearances on May 10, 2019 (ECF Nos. 22–26)— to defend it against ES Holdings' petition. (A. 1079 [6:2–7]) On May 9, ES Holdings filed a supplemental memorandum in support of its petition. (ECF No. 13) Thus, counsel had only two business days to interview witnesses, develop evidence and argument in opposition to ES Holdings' numerous allegations, obtain translations from Spanish to English, and prepare for the hearing. ES Holdings, by contrast, had been on notice of the Monterrey bidding deadline since April 12, 2019, and had known about Tabuenca's allegations since 2018. And, of course, Reed Smith focused on the actual application for relief sought respecting the misappropriation of trade secrets, in preparing L1bero Partners' defense.

On Monday morning, May 13, 2019, after working virtually continuously from the time of retention, L1bero Partners filed its papers opposing the requested injunctive relief, including a memorandum of

law and five detailed declarations with numerous exhibits factually and legally refuting ES Holdings' claims and identified irreparable harm, and appeared before the district court to show cause why a preliminary injunction should not issue. (*See* A. 1075 [2:8–11]; A. 1079 [6:2–7]; A. 220–1046 (L1bero Partners' declarations and exhibits)).

Rather than faulting ES Holdings for manufacturing an emergency by waiting until the last minute to seek relief, the district court faulted L1bero Partners for not appearing at an emergency hearing on less than 24 hours' notice delivered on a national holiday. (A. 1076 [3:2–4 ("we all work 24/7, 365 anyway, so break my heart")]) And it faulted L1bero Partners and counsel for filing an opposition brief and supporting evidence on the morning of the Monday hearing instead of the prior business day, Friday, May 10, or some other earlier time. (A. 1075–76 [2:19–3:12])

The Court stated that it had been working on the case over the weekend (*i.e.*, without the benefit of L1bero Partners' papers). (A. 1106 [33:10-11]; A. 1219-20 [146:25-147:1]) And it had to complete its decision within 24 hours because it "was leaving the country." (A. 1078 [5:7-19]) The Court stated:

> Here's what's going to happen. We're going to have a hearing, you're going to do whatever you're going to do. Tomorrow there will be a decision, because I'm leaving the

25

country, and guess what? I'm then done with this case. I
don't decide underlying disputes.

(A. 1078 [5:7-11]) As discussed below, the court in fact improperly
decided underlying disputes not before it.

The district court next summarily struck all five of L1bero
Partners' declarations and exhibits on the ground that declarants were
not in court to be cross-examined. (A. 1087 [14:9–14]; SPA 27) León
thereafter affirmed the contents of his declaration and L1bero Partners
cross-examined him. (A. 1090–1151) Francisco Flores, a Lusad
employee and in-house counsel and a resident of Mexico City testified
for L1bero Partners. (A. 1153–54 [80:5–81:17]) The court then took the
matter under submission. (A. 1220–21 [147:19–148:5]) As described
below, the court's order striking all of L1bero Partners' declarations
meant that with respect to numerous issues of disputed fact, connected
to a complex and lengthy history, the court considered only one side of
the story, and it preliminarily and prejudicially decided numerous
underlying disputes based on one side's evidence.

## B. The district court issues an opinion holding that an injunction is warranted and requesting a proposed order from ES Holdings

The next day, May 14, 2019, the district court issued its decision.
(SPA 4–58) The court held that ES Holdings had *not* established
irreparable harm based on the two grounds that it had asserted in its

motion, misappropriation of trade secrets and competitive activities in violation of the Partners Agreement. (*Compare* SPA 46–49 *with* A. 28–29 [¶ 51]) Nonetheless, the district court went on to state that, "there is irreparable harm resulting from the current situation—although it is not the harm on which Petitioner focuses." (SPA 49) The district court reasoned that "Petitioner is being systematically, bit by bit by bit, cut out of the management of the Joint Venture." (SPA 49)

The district court decided that "an injunction in aid of arbitration should most certainly issue—one that bars [L1bero Partners], its principals and their privies (including their subsidiaries, agents, officers, directors, *etc.*) from taking any steps to eliminate the interest of [ES Holdings] in any business ventures anywhere in the world that are affiliated with, derived from, or use the trademarks, software, and other trade secrets associated with the L1bre group." (SPA 56). The district court acknowledged that ES Holdings had "not proposed the terms of such an injunction," but allowed it to "propose such an order" and L1bero Partners to respond. (SPA 56)

## C. The district court issues an injunction in aid of arbitration

ES Holdings filed a proposed order for preliminary injunctive relief (A. 1047–50), after which L1bero Partners filed objections and its own proposed order based on the district court's decision. (A. 1051–60)

27

The district court thereafter entered a "preliminary injunction" that was even broader than the injunction contemplated in its opinion and even broader than the injunction that ES Holdings had proposed. (SPA 59–62) The order prohibits L1bero Partners and Covarrubias from "making business decisions" "without the express written consent" of ES Holdings, which essentially rewrote the parties' agreements and resolutions. (SPA 60–61)

L1bero Partners timely filed a notice of appeal. (A. 1061)

## SUMMARY OF ARGUMENT

This Court should vacate the district court's injunction for four independent reasons.

*First*, L1bero Partners did not have fair notice of or an opportunity to respond to the theory of irreparable harm that the district court announced in its opinion after the hearing. The court made clear that it rejected ES Holdings' only claimed irreparable harm, stating that ES Holdings had not established the harm identified in its papers. Having rejected the only grounds for injunctive relief raised in the petition, the district court should have denied the petition instead of offering new grounds for injunctive relief on ES Holdings' behalf and preliminarily deciding numerous underlying disputes that should have been left for the arbitrators to decide.

28

*Second*, the district court credited unsworn hearsay submitted by ES Holdings and excluded sworn hearsay submitted by witnesses with personal knowledge who signed declarations in support of L1bero Partners. The only reason the court gave for this decision was that L1bero Partners' declarants were not in court to be cross-examined. But many of ES Holdings' purported out-of-court witnesses were not in court to be cross-examined either. As a direct result of the district court's erroneous evidentiary ruling, it credited baseless hearsay allegations that L1bero Partners had thoroughly rebutted in its sworn papers. This unwarranted fact-finding, which should have been the province of the arbitrators, led the court to conclude that L1bero Partners and its principal had committed "corporate misfeasance," such that ES Holdings imminently needed protection it could not obtain in arbitration itself. This was incorrect and prejudicial.

*Third*, the district court erred as a matter of law in concluding that inability to manage a business, by itself, constitutes an irreparable harm. No such rule exists. To the contrary, this Court has made clear that courts should not presume irreparable harm. And neither ES Holdings nor the district court identified any pending business decisions for which ES Holdings' inability to participate in management of the L1bre Business would have amounted to actual, imminent, and irreparable harm. After all, the Partners Agreement itself granted

L1bero Partners the power to appoint Covarrubias as Lusad's CEO and manage the company's daily affairs. And the Lusad board reaffirmed these commitments when it unanimously authorized Covarrubias to carry out negotiations with the Mexico City government and to lead the independent audit. ES Holdings has not identified or shown any irreparable harm arising from its purported inability to manage.

*Finally*, even if an injunction was warranted (and it was not), the injunction at issue here is not narrowly tailored to prevent the harm that the court identified. Ironically, the injunction violates L1bero Partners' contractual rights to manage the L1bre Business because the Partners Agreement delegates operational and management authority to L1bero Partners. The district court's injunction undoes the Partners Agreement and hands control over the L1bre Business's daily affairs to an entity that, until it brought its petition, had freely delegated that control.

## ARGUMENT

### I. Standard of review

This Court reviews a district court's order granting a preliminary injunction for abuse of discretion. *Faiveley*, 559 F.3d at 116. "'A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of

permissible decisions.'" *Id.* (quoting *In re Sims,* 534 F.3d 117, 132 (2d Cir. 2008)). "Questions of law decided in connection with requests for preliminary injunctions ... receive the same *de novo* review that is appropriate for issues of law generally." *Am. Express Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998). Similarly, with respect to a claimed due process violation, this Court reviews "the district court's factual determinations for clear error," while "[t]he constitutional significance of those findings, including the ultimate determination of whether due process has been violated, is reviewed de novo." *United States v. El-Hage*, 213 F.3d 74, 79 (2d Cir. 2000).

This Court reviews a district court's evidentiary rulings for abuse of discretion. *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224 (2d Cir. 1999). "'Either an error of law or a clear error of fact may constitute an abuse of discretion.'" *Id.* (quoting *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998)). This Court vacates an order based on evidentiary error if the erroneous evidentiary ruling "affects a party's substantial rights." *Id.* (citing Fed. R. Evid. 103(a)). "This occurs when, for example, a district court excludes a party's primary evidence in support of a material fact, and failure to prove that fact defeats the party's claim." *Id.*

Federal courts treat motions for preliminary injunctions in aid of arbitration as applications under Federal Rule of Civil Procedure 65

31

and, accordingly, evaluate them under the criteria for Rule 65 motions. *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Irreparable harm is "the single most important prerequisite" that the movant must satisfy, and a preliminary injunction issued "[i]n the absence of evidentiary support of irreparable harm" is an abuse of discretion. *Faiveley*, 559 F.3d at 118, 120.

## II. The district court violated L1bero Partners' right to due process because it based its order on a new theory of irreparable harm that the court identified *sua sponte* after the hearing

"No principle is more fundamental to our system of judicial administration than that a person is entitled to notice before adverse judicial action is taken against him." *Lugo v. Keane*, 15 F.3d 29, 30 (2d Cir. 1994). Thus, this Court has made clear that a "court may not properly enter a preliminary injunction sua sponte without notice." *Weitzman v. Stein*, 897 F.2d 653, 657 (2d Cir. 1990); *see Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 105 (2d Cir. 2009). Similarly, the district court cannot grant relief that the plaintiff did not request without giving the opposing party an opportunity to be heard. *Patsy's*

32

*Italian Rest., Inc. v. Banas*, 658 F.3d 254, 274 (2d Cir. 2011) ("where neither party has requested the injunctive relief the district court intends to grant, the parties must receive an opportunity to be heard").

In short, "[t]he notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 432 n.7 (1974); *see also Rosen v. Siegel*, 106 F.3d 28, 31–32 (2d Cir. 1997). Thus, a "failure of adequate notice will be held to violate due-process standards." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2949 (3d ed. 2019); *see Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211–12 (11th Cir. 2003); *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 356–357 (5th Cir. 1971). A defendant has no fair opportunity to oppose and prepare for opposition if the theory of irreparable harm on which the district court bases its order comes to light *only during or after the hearing.*

The district court's opinion acknowledges that this is what occurred: "[ES Holdings] Has Established Irreparable Harm, Albeit Not the Irreparable Harm It Identified in Its Papers." (SPA 46) The district court rejected ES Holdings' claims of irreparable harm related to

misappropriation of trade secrets and unlawful competition, found likelihood of success on the merits based on alleged breaches of contract that ES Holdings never associated with irreparable harm, and then explained that it had identified its own theory of harm—inability to make "business decisions." (SPA 49)

The district court's order violated L1bero Partners' right to due process because it found irreparable harm based on a theory—inability to participate in management—that ES Holdings never advanced. ES Holdings filed a petition and supporting papers asserting that it would suffer irreparable harm flowing from alleged misappropriation of trade secrets and unlawful competition. (A. 9–31; A. 37–219) L1bero Partners, in its response papers and at the hearing, explained that where one seeks only to use trade secrets in pursuit of profit, without further dissemination or irreparable impairment of value, that is not irreparable harm (*Faiveley*, 559 F.3d at 119), and thus ES Holdings' irreparable harm position was meritless because there was no danger that L1bero Partners would "disseminate" rather than "use" the proprietary information through a competitor where Nuevo Leon was 50% owned by ES Holdings. The district court agreed. (SPA. 47–48)

If ES Holdings had alleged in its petition that it was suffering or imminently would suffer irreparable harm based on its ability to participate in the management of the L1bre Business, L1bero Partners

could have responded to that allegation before and at the hearing. It never had that opportunity. Nor did L1bero Partners have a fair opportunity to respond to the argument that it had unfairly deprived ES Holdings of management rights in the first place. It had no obligation to address such a claim unless ES Holdings alleged irreparable harm in connection with the claim. *See DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270, 1273 (10th Cir. 2018) (assessing likelihood of success for only one of four claims for which plaintiff showed a probability of irreparable harm). Because ES Holdings brought its petition on an emergency basis, L1bero Partners scarcely had sufficient time to address the claims for which ES Holdings identified irreparable harm. It could not reasonably have been expected to address a claim for which ES Holdings asserted no irreparable harm.

Moreover, as noted, ES Holdings delegated management rights to L1bero Partners in the Partners Agreement. (A. 107–08, A. 113 [§§ 5.1(b)(i)–(ii), (iv), 6.1, 6.2]) And the Lusad board authorized Covarrubias to negotiate with Mexico City and implement the Deloitte audit. When ES Holdings mistakenly believed that L1bero Partners unilaterally and imminently would cause a competitor to bid on the Monterrey concession, it could claim that it was excluded from a major management decision requiring unanimous board authorization. Now that the evidence has rendered this premise insubstantial because ES

35

Holdings would have made the same decision (A. 1104 [31:5–8]), it is not clear what major decision ES Holdings claims to have been excluded from making.

Similarly, if L1bero Partners had known that the district court contemplated an injunction based on impairment of management rights, it could have presented evidence and argument to explain how prohibiting L1bero Partners from making "any business decision" without ES Holdings' written consent (thereby depriving L1bero Partners of *its* management rights) would constitute a hardship to L1bero Partners that outweighed any hardship to ES Holdings under the Partners Agreement. It did not have that opportunity, either. And by the same token, L1bero Partners did not have the opportunity to argue that an injunction that deprived it of its rights under the Partners Agreement would be contrary to the public's interest in upholding contract rights, because ES Holdings never sought that relief until the district court invited it to do so.

Appellate courts vacate or modify injunctions when the injunction is not reflective of the issues raised and defended against in the case. As this Court has held, an injunction cannot extend "'beyond the scope of the issues tried in the case.'" *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir. 2003) (quoting *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 300 (2d Cir. 1999)). In *Patsy's*, this Court deemed an

36

injunction that restricted the defendants' identification of their restaurant to be improper because it "exceed[ed] the proper scope of the litigation." *Id.* at 221. The Court noted that "[w]hether or not such relief might be warranted" in a different suit with different allegations was an open question, but the injunction was not warranted based on the grounds for injunctive relief brought to the court. *Id.* Because a defendant is entitled to notice of the grounds for a sought-after injunction, it should not be forced to bear an injunction premised on grounds that were not the focus of the litigation. *See id.* at 220.

In this case, the district court issued its opinion identifying the new theory of irreparable harm on which it based its decision only *after* the hearing, when any and all meaningful opportunity to present evidence and argument had come and gone. At the earliest, L1bero Partners received notice of the district court's theory of irreparable harm at the hearing itself. But the Supreme Court has squarely held that such same-day notice is insufficient to sustain a preliminary injunction. *Granny Goose*, 415 U.S. at 433 n.7. Because L1bero Partners received nothing more with respect to the district court's theory of irreparable harm, its order violated L1bero Partners' due process rights.

## III. The district court abused its discretion in excluding declarations from all five of L1bero Partners' witnesses

The district court struck all five of L1bero Partners' declarations because the declarants did not travel from Mexico to defend against ES Holdings' claims on short notice and were "not present in court to be cross-examined, and for no other reason." (SPA 39 n.11) In other words, it rejected all of the declarations on *hearsay* grounds, given that inability to cross-examine an out-of-court statement *is* the justification for the hearsay rule. *See United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994) ("The principal vice of hearsay evidence is that it offers the opponent no opportunity to cross examine the declarant on the statement that establishes the declared fact."). At the same time, the district court expressly credited and relied on numerous hearsay statements that ES Holdings presented. (SPA 40–41) This was an error of law and an abuse of discretion.

The district court erred as a matter of law in distinguishing between ES Holdings' out-of-court statements presented by a live witness, on one hand, and L1bero Partners' out-of-court statements presented by declaration or affidavit, on the other. With respect to both sets of out-of-court statements, the witness with personal knowledge of the fact at issue was *not* in court to be cross-examined about the truth of his or her statement.

For example, L1bero Partners could not cross-examine León or Tabuenca about *any* of the allegations purportedly underlying ES Holdings' audit request respecting Deloitte because León knew *only* what Tabuenca had told him, and Tabuenca did not appear in court to testify. (A. 1104–05 [31:23–32:9]) León admitted that he based his allegation that L1bero Partners maintained two sets of books on what he had heard from Tabuenca. (A. 1107-08 [34:19–35:20]; A. 1137 [64:4–17]) León further admitted that his allegations that the L1bre Nuevo León and L1bre Jalisco entities would be bidding on taximeter projects rested on out-of-court statements as well. (A. 1126 [53:3–14]; A. 1150 [77:1–12]) L1bero Partners did not have an opportunity to cross-examine any of these declarants. Tabuenca and Herrera, ES Holdings' key witnesses with supposed personal knowledge, did *not* submit a declaration or appear at the hearing. The district court accepted their unsworn statements anyway, on the ground that León was present in court to relay their hearsay.

The district court acknowledged that "'hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction.'" (SPA 40 (citing *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010)) In fact, when L1bero Partners objected to León's hearsay testimony about "accounting irregularities," the district court replied:

THE COURT:    Oh, this is a preliminary injunction hearing. I get to listen to hearsay. I will give it the weight that I think it deserves. People who sign contracts saying they're going to arbitration and be governed by Delaware law and who go to Mexican courts and seek to enforce things under Mexican law might well assume I will listen to hearsay, because that smacks of bad faith to me.

(A. 1137 [64:7–21])

If what the district court meant was that it would consider ES Holdings' unsworn hearsay and not L1bero Partners', this was an abuse of discretion. If the ruling, as it appears, was somehow punitive, *i.e.*, because Lusad and L1bre Holding commenced civil actions in Mexico, that is a worse abuse. In addition to their being no logical connection between these conclusions, Lusad, which holds the valuable IP at issue, was incorporated in Mexico and is governed by Mexican law; this was decided upon by Leon and Zayas. Lusad properly brought an action in Mexico concerning an issue of internal corporate affairs—whether directors should be removed from its board. (A. 580 ¶ 2; A. 624; A. 636-637; A. 650–651; *see also* A. 173–175) L1bre Holding filed suit in Mexico to protect its interest in Lusad, over which the Mexican court had jurisdiction. The Mexican courts concluded that they had jurisdiction

and that Lusad and L1bre Holding, respectively, were entitled to preliminary relief. (A. 183–186; (A. 1191–95 [118:12–122:6]; S.D.N.Y. No. 19-cv-03930, ECF No. 13-2]) The district court's disagreement with the Mexican courts was not a valid basis for categorically excluding L1bero Partners' evidence.

Apart from seeking to punish L1bero Partners for going to court in Mexico, the district court did not explain why it distinguished between *unsworn* hearsay conveyed by a testifying witness and *sworn* hearsay conveyed by a signed declaration. Nor could it. Hearsay evidence that "may be considered" includes declarations and affidavits. *See Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) ("many of our sister Circuits have recognized that *affidavits* and other hearsay materials are often received in preliminary injunction proceedings" (emphasis added, alteration and quotation marks omitted)).

District courts in this circuit construe *Mullins* to provide that courts may rely on declarations in deciding motions for a preliminary injunction.[1] A court might decline to give weight to declarations where,

---

[1] *See Flores v. Town of Islip*, No. 18-cv-3549, 2019 WL 1515291, at *2 (E.D.N.Y. Apr. 8, 2019); *FTC v. 4 Star Resolution, LLC*, No. 15-cv-112S, 2015 WL 7431404, at *3 (W.D.N.Y. Nov. 23, 2015); *FTC v. Vantage Point Servs., LLC*, No. 15-CV-006S, 2015 WL 2354473, at *3 (W.D.N.Y. May 15, 2015); *Veramark Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395, 401 (W.D.N.Y. 2014).

unlike in this case, the parties had *already* had the opportunity to conduct discovery and present live testimony. *See People ex rel. Underwood v. Griepp*, No. 17-cv-3706, 2018 WL 3518527, at *5–6 (E.D.N.Y. July 20, 2018) (declining to give weight to hearsay where parties had "already conducted discovery and presented extensive live testimony from seventeen different witnesses" such that "the preliminary injunction hearing was hardly 'preliminary' …."). But where the moving party seeks injunctive relief on an emergency basis, as in this case, declarations are admissible. *See Mullins*, 626 F.3d at 52 ("At the preliminary injunction stage, a district court may rely on affidavits …." (quotation marks omitted)). Thus, the district court's conclusion that L1bero Partners' declarations were categorically inadmissible (SPA 39 n.11) was incorrect as a matter of law.

The district court's error affected L1bero Partners' substantial rights because the district court could not have concluded that ES Holdings carried its burden without the error. Before any witness testified, the district court stated that it would *not* make findings in favor of ES Holdings, which had the burden of proof, based on conflicting affidavits. (A. 1088 [15:3–4 ("if all I were confronted with were two sets of affidavits, I'd throw you all out")]) It emphasized at the hearing that it wanted to hear live testimony *because* the declarations were in conflict. (A. 1088 [15:3–10 ("you tell entirely different stories")])

But the live testimony thereafter revealed that the *only* ES Holdings witness had no personal knowledge whatsoever of the key allegations of corporate misfeasance that triggered the collapse of the parties' relationship. (A. 1104–05 [31:23–32:9])

At the hearing, León admitted that he had no personal knowledge of Covarrubias's or Salinas's alleged corporate wrongdoing, as follows:

Q.  In your affidavit, in your declaration, sir, you go on and on, with bullet points on pages 6 through 8, about all the wrongdoing that Mr. Covarrubias apparently engaged in, Mr. Salinas engaged in, right?

A.  Correct.

Q.  Okay. And there you say that you were told this by Manuel Tabuenca, correct?

A.  Correct. He's the comptroller of the company.

Q.  Okay. Now Mr. Tabuenca hasn't submitted a declaration, right?

A.  Not to my knowledge. To this Court? No.

Q.  Is he in court today?

A.  No.

43

Q.    Do you have any firsthand knowledge about any of the allegations that you make in paragraph 15, or is it all from Mr. Tabuenca?

A.    Mr. Tabuenca is again, the comptroller of the company. He came from Uber. He was a comptroller of Uber. He was – he was, previously to that, the comptroller for Visa and MasterCard. He's a very reliable employer.

Q.    Sir, can you just answer my question.

A.    He's the one that --

THE COURT:    Anything you know, you know because the comptroller told you, is that correct?

THE WITNESS: That's correct.

THE COURT: Okay. Thank you. I certainly understand that.

(A. 1104–05 [31:23–32:11]) The district court understood that *everything* in León's declaration was based on information he had heard from others and not personal knowledge, because it would not even permit L1bero Partners to cross-examine him about the hearsay basis for the statements in his declaration. (A. 1148-49 [75:23-76:10 ("Sir, and the basis of the papers is largely your declaration, right? A. Yes. Q. And your declaration is not from your firsthand knowledge, it's from what

somebody told you, correct? MR. DUNN: Objection, your Honor. THE COURT: The objection is sustained.")])

Although the district court understood that all the evidence of "corporate misfeasance in connection with the finances of Lusad" consisted of unsworn hearsay, it credited and relied heavily on the hearsay. (SPA 40-41) As support for its decision to credit unsworn hearsay, the district court relied on still more hearsay and speculation that Covarrubias undermined the resolution to retain an auditor by "refusing to allow Lusad employees to cooperate with the Board-chosen forensic auditors" and "bringing criminal charges against an employee who, faithful to his duty, tried to carry out the Board's duly authorized resolution" and "ousting the auditor and preventing the audit from taking place." (SPA 40-41) But no hearing testimony showed that Covarrubias "ousted" Deloitte; León testified vaguely that "they" said to Deloitte that the audit "wasn't a priority" and that "they" alleged that "we stole the computers"—purportedly to sabotage the audit. (A. 1110 [37:2-10])

What the contemporaneous written record and live testimony from a witness with personal knowledge showed, however, was that Flores went to prosecutors *immediately* after discovering that Herrera had taken the laptops. (A. 980–84; A. 1188 [115:2–5]) His immediate reaction is inconsistent with an elaborate, premeditated plan to oust the

auditor by cooking up false charges against Herrera. The simpler and correct explanation is that Flores believed that Herrera had absconded with confidential data and acted accordingly to protect the L1bre Business that ES Holdings and L1bero Partners jointly owned. (A. 980–84; A. 1188 [115:2–5]) The criminal complaint prevented Deloitte from conducting the audit (A. 1191 [118:4-11]), but no evidence shows that Flores brought criminal charges to block the audit, and speculation to that effect adds no weight to the unsworn hearsay on which the district court relied.

The extensive list of hearsay allegations that León conveyed in his declaration raises numerous disputed factual issues for the ultimate trier of fact—here the arbitration panel. The district court observed that L1bero Partners disputed Tabuenca's hearsay allegations and stated that the "misfeasance" that León heard from Tabuenca was "immaterial." (SPA 18 n.5) Despite this disclaimer, the court relied heavily on the Tabuenca allegations, which it found "deeply troubling." (SPA 41) Based on hearsay from Tabuenca and Herrera, the district court concluded that Covarrubias "has something to hide." (SPA 41) The court also found that L1bero Partners had engaged in a "laundry list of actions" and that León had "good reason to be fearful." (SPA 50, SPA 55) If the district court had not credited Tabuenca's laundry list of false allegations—based entirely on Tabuenca's hearsay (SPA 18)—its

46

assessment of the equities necessarily would have been different. As the district court put it, Tabuenca had alleged that Covarrubias was "stealing us blind" (A. 1115 [42:8]) through various acts of alleged nepotism and self-dealing (SPA 18). Crediting false allegations of theft was plainly prejudicial.

If the district court also had not struck L1bero Partners' declarations, it could have considered Covarrubias' sworn declaration testimony—based on his personal knowledge—which rebutted Tabuenca's allegations point by point. (A. 227–31 [¶ 17]) L1bero Partners' declarant Horacio Alamilla Medina, Lusad's Controller, also gave sworn testimony to rebut Tabuenca's allegations based on his personal knowledge of Lusad's accounting and financial records. (A. 874–83)

For example, León submitted a sworn declaration stating that Tabuenca told him that Covarrubias "caused US $2.7 million dollars to be paid to two companies named Kichink Servicios, S.A. de C.V. and N9 Tecnologia Mexico, S.A. de C.V." which "were ostensibly to provide services to Lusad." (A. 92) León alleged, based on Tabuenca's statements, that in fact "there was no contract and no benefit was provided in exchange for these funds." (A. 92) This allegation was patently false. Covarrubias and Alamilla submitted sworn declarations in which they explained that Kichink developed the taximeter

technology and N9 was a Kichink-affiliated company that provided services related to the same technology. (A. 226; A. 229; A. 879) They also *attached a true and correct copy of the contract* between Lusad and Kichink setting out the services that were to be provided by and the amounts that were to be paid to Kichink. (A. 416-424)

León also stated that Tabuenca told him that Covarrubias caused Lusad to wrongfully transfer $8.7 million to Inversiones Cova and "purchased tablets for the concession through Inversiones Cova for US $11,832,000 and subsequently resold the tablets to Lusad at the inflated price of US $12,058,675, causing Lusad to pay an unnecessary and unjustified markup of over US $200,000." (A. 91; A. 93) But Covarrubias and Alamilla submitted sworn declarations in which they explained that Inversiones Cova was forced to buy the tablets on an emergency basis because Lusad did not have sufficient capital, it did so through a cash down payment and letters of credit, and the difference in the price it paid and the amount it was reimbursed represented a finance charge relating to the letters of credit. (A. 227–228; A. 230; A. 875–877; A. 880–881) Alamilla also *submitted true and correct copies of the letters of credit and account statements relating to the purchases of the tablets.* (A. 909–916; A. 919–928; A. 931–940)

As these examples and others in the record demonstrate, the district court should not have credited Tabuenca's unsworn hearsay

allegations. Even after crediting the Tabuenca hearsay, however, the district court found only a conditional and legally insufficient *potential* for harm. *See Winter*, 555 U.S. at 22. The district court stated that "*if* indeed Covarrubias is trying to cut his partners out of the original business of the joint venture behind their backs—or is taking any other steps to disenfranchise them from the business of the EST/L1bre group—*then* it does indeed have the *potential* to undermine [the arbitration]." (SPA 55–56 (emphasis added)) This if-then-potential hypothetical was the sole reason the court gave for its conclusion that an injunction "should most certainly issue." (SPA 56) This was an improper basis in any event, and had the court admitted L1bero Partners' declarations, it could not have made even this tentative assertion of potential harm. Striking L1bero Partners' declarations affected L1bero Partners' substantial rights.

## IV. The district court erred in finding that ES Holdings would suffer irreparable harm without an injunction

"To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley*, 559 F.3d at 118 (citation and quotation marks omitted). Moreover, "[w]here there is an adequate remedy at law,

such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id.* (citation omitted).

As explained below, ES Holdings failed to establish irreparable harm and the district court erred as a matter of law in concluding that ES Holdings would suffer irreparable harm because of alleged inability to participate in the management of certain L1bre entities.

### A. ES Holdings failed to establish any irreparable harm alleged in its petition

As the district court held, ES Holdings failed to show that it would suffer the irreparable harm alleged in its petition. (SPA 46–49) In its petition, ES Holdings asserted that it would suffer irreparable harm in the absence of an injunction because: (1) L1bero Partners misappropriated trade secrets; and (2) L1bero Partners engaged in competitive actions in violation of the Partners Agreement. (A. 28–29 [¶ 51]) ES Holdings failed to substantiate these claims.

In *Faiveley*, this Court explained that a finding of irreparable harm based on alleged misappropriation of trade secrets is not warranted "[w]here a misappropriator seeks only to use those secrets— without further dissemination or irreparable impairment of value—in pursuit of profit … because an award of damages will often provide a complete remedy for such an injury." 559 F.3d at 118–19. Here, as in *Faiveley*, the parties' jointly owned enterprise had developed its

technology in order to gain a competitive advantage in bidding for concessions like the Monterrey taxi concession and disclosure of trade secrets would only undermine the competitive advantage they confer. *See id.* at 119. The district court agreed and correctly held that ES Holdings had not shown irreparable harm based on its "misappropriation" theory. (SPA 47)

ES Holdings also failed to show a likelihood of irreparable harm based on competition in violation of the Partners Agreement. It had based its theory on the mistaken premise that L1bero Partners had incorporated new entities—L1bre Nuevo León and L1bre Jalisco—to *compete* with the L1bre Business. The evidence at the hearing established, however, that these entities are not competitors. Rather, they are *part* of the L1bre Business. (A. 1102–03 [29:20–31:8]; A. 1158–59 [85:7–86:16]; A. 1179–80 [106:18–107:1]) Accordingly, the district court found that ES Technologies would be entitled, via a chain of ownership, to any revenue that L1bre Nuevo León obtains. (SPA 49) The district court also found that "there is no evidence that L1bre Jalisco has as yet done anything at all, or that it is about to do so." (SPA 49) Thus, ES Holdings failed to show that it would suffer irreparable harm because the Nuevo León and Jalisco entities were competing with it or using its trade secrets.

**B.  The district court erred in presuming irreparable harm based on ES Holdings' alleged inability to participate in management**

The district court's opinion does not identify any management decision that ES Holdings would have made differently if had appointed two directors to the boards of L1bre Jalisco and L1bre Nuevo León. Just the opposite. As the district court found, ES Holdings wanted L1bre Nuevo León to register for the Monterrey taxi concession, which was also what L1bero Partners wanted. (SPA 50–51; A. 1104 [31:5–8]) And the district court found that "the Jalisco venture appears to be no more than an ephemeral possibility at present ...." (SPA 45) Accordingly, the district court's specific findings refute any conclusion that ES Holdings' inability to manage these two entities would create a risk of imminent harm.

Similarly, the district court's specific findings show that ES Holdings did not show its inability to manage *Lusad* portended any imminent risk of harm. The district court found that any assertion that L1bero Partners or Covarrubias were acting to injure Lusad's interest in the Mexico City concession was, "at this point, pure speculation on León's part." (SPA 55)

Instead of identifying any *imminent* harm that was likely to occur, the district court effectively presumed *potential* irreparable harm arising from inability to participate in management based on its finding

52

that ES Holdings was likely to succeed on its claims that L1bero Partners had improperly deprived ES Holdings of that right. (SPA 46–50) But this Court has held that courts "must not simply presume irreparable harm" based on a finding of likelihood of success on an underlying claims. *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010); *see WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (same). Accordingly, ES Holdings had the burden to show that inability to participate in management would harm it in some actual, imminent, and concrete way relating to an upcoming "business decision or critical event." *Oklahoma Am. Legion Corp. v. Am. Legion*, 24 F. Supp. 3d 1082, 1091 (W.D. Okla. 2014). For example, if L1bre Nuevo León had *refused* to register for the Monterrey concession over ES Holdings' objections, that management decision might have constituted an imminent irreparable harm. No such evidence exists in this case.

Alternatively, if the district court meant to hold that a Canadian entity's abstract right to participate in management of various Mexican and Delaware entities has *intrinsic* worth, such that *any* deprivation of that right constitutes an irreparable injury, that holding would be erroneous as a matter of law. This Court has stated that the "denial of a controlling ownership interest in a corporation *may* constitute irreparable harm." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003) (emphasis added). Especially after

*Salinger*, the proposition that loss of management rights *always* constitutes irreparable harm is untenable.[2] If that were the case, then the judiciary could intervene in and direct the management of even the most "ephemeral" ventures or when the possibility of mismanagement was nothing more than "pure speculation." (SPA 45, SPA 55) This Court's precedents provide otherwise. So do the Partners Agreement and the December 14, 2018 Board resolutions, which delegated management authority to Covarrubias and L1bero Partners. *See supra*, at 14, 19.

In sum, nothing in the record or the district court's own findings showed that L1bero Partners would imminently make a business decision that would irreparably harm ES Holdings absent an injunction. And the mere possibility or "potential" (SPA 56) that it would do so is insufficient, as a matter of law, to justify an injunction. *See Winter*, 555 U.S. at 22 ("'possibility' standard is too lenient") The "joint control" issue is before the arbitrators (A. 41 [c.]), and in the absence of irreparable harm to an arbitration interest, the district court had no reason to decide it. Because the record does not support the district

---

[2] Whether a limited partnership organized under Canadian law such as ES Holdings could ever have a legal interest in "management" that has intrinsic value apart from the Partners Agreement raises questions of foreign law that neither ES Holdings nor the district court addressed. Because ES Holdings did not petition for injunctive relief based on irreparable harm arising from loss of management rights, much less brief this issue, it failed to carry its burden in the district court.

court's *sua sponte* theory of irreparable harm, the court abused its discretion in issuing the injunction here.

## V.  The district court erred in granting injunctive relief that was not narrowly tailored to fit the purported violation and that ES Holdings did not request in its petition

"Where the parties have agreed to arbitrate a dispute, a district court has jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration." *Benihana*, 784 F.3d at 894–95; *see also Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 826 (2d Cir. 1990). ES Holdings sought relief pursuant to 9 U.S.C. § 206, which states that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." An injunction under § 206 should issue *only* where it is necessary to ensure "speedy arbitral decisions" and "preserve the possibility of recoveries upon awards." *Goel v. Ramachandran*, 823 F. Supp. 2d 206, 216 (S.D.N.Y. 2011) (quotation marks omitted).

In all cases, injunctive relief "should be 'narrowly tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley*, 559 F.3d at 119 (quoting *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)). "Accordingly, '[a]n injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal

conduct that was not fairly the subject of litigation.'" *Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44, 51 (2d Cir. 2017) (quoting *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011)). Thus, this Court requires "further tailoring of injunctions issued by district courts" where the injunctions go "'beyond the scope of the issues tried in the case.'" *Patsy's Brand*, 317 F.3d at 220–21 (quoting *Starter*, 170 F.3d at 300).

Based on the district court's *sua sponte* finding of irreparable harm, the court prohibited L1bero Partners and Covarrubias from "making business decisions" "without the express written consent" of ES Holdings. (A. 60–61). This order amounts to a significant interference in the company's operations and is far broader than necessary to remedy the irreparable harm identified by the district court. Accordingly, if this Court does not vacate the district court's order based on the errors identified above, it should vacate and remand for further tailoring. *See Faiveley*, 559 F.3d at 119; *Patsy's Brand*, 317 F.3d at 221; *Starter*, 170 F.3d at 300; *Waldman*, 43 F.3d at 785.

The district court's order does not merely return the parties to the status quo that existed prior to the dispute—instead, it gives ES Holdings powers that it never possessed. The Partners Agreement granted L1bero Partners the power to appoint the CEO and two-thirds of the executive committee responsible for Lusad's day-to-day business.

56

(A. 107–08, A. 113 [§§ 5.1(b)(i)–(ii), (iv), 6.1, 6.2]) And the Lusad board authorized Covarrubias, not Zayas, to carry out negotiations with the Mexico City government and to implement the independent Deloitte audit. (A. 138–583) In addition, the court's order leaves the parties in an operational stalemate, with the business unable to advance its interests through the decision-making of the executives charged with running the company under the Partners Agreement.

ES Holdings did not petition the district court to grant it veto power over all "business decisions" pending arbitration, and the district court lacked authority to grant relief that ES Holdings did not request in its petition. *See Stewart v. INS*, 762 F.2d 193, 199 (2d Cir. 1985) (district court lacked jurisdiction to enter preliminary injunction based on claims not pleaded in complaint); *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) (same); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 198 (3d Cir. 1990) (vacating injunction where district court did not "tailor its scope appropriately"). For all these reasons, even if this Court lets the district court's irreparable harm finding stand (and it should not), it should still vacate the injunction and remand to the district court with instructions to tailor the injunction to fit the alleged violation of the Partners Agreement and ES Holdings' petition.

57

# CONCLUSION

This Court should vacate the district court's order.

Dated: August 1, 2019

Respectfully submitted,

/s/ Brian A. Sutherland

Brian A. Sutherland
Steven Cooper
Colin A. Underwood
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 521-5400
bsutherland@reedsmith.com

M. Patrick Yingling
REED SMITH LLP
10 South Wacker Dr., 40th Floor
Chicago, IL 60606

*Counsel for L1bero Partners, LP*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Federal Rules of Appellate Procedure 28(a)(10) and 32(g)(1), along with Local Appellate Rule 32.1(a)(4)(A), because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,829 words as counted by the word-processing software used to create the brief.

I further certify that this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Century Schoolbook 14-point font.

/s/ Brian A. Sutherland
Brian A. Sutherland

*Counsel for L1bero Partners, LP*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed using the Court's CM/ECF system. I certify that all participants are CM/ECF users and that service will be accomplished via CM/ECF system.

/s/ Brian A. Sutherland

Brian A. Sutherland

*Counsel for L1bero Partners, LP*